IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GINA TORRES, ET AL., | ) |
| Plaintiffs, | ) |
| vs. | ) Case No. 4:19-CV-1525 |
| CITY OF ST. LOUIS, ET AL., | ) |
| Defendants. | ) |

**STATEMENT OF FACTS IN SUPPORT
OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Lance Coats, Glennon P. Frigerio, Joshua D. Becherer, Nicholas J. Manasco, Ronald Allen Jr., John C. Jones, Mark S. Seper, Jon B. Long, Tim Boyce and Benjamin Lacy (collectively "Defendant Officers") and the City of St. Louis ("City"), by and through counsel, and for their Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment, state as follows:

*The following material facts are set forth for the purpose of this Motion for Summary Judgment only:*

1. Prior to and on June 7, 2017, Hammett possessed an INTER ORDNANCE Sporter rifle with a serial number of S029900, which is an AK-47-type weapon that Hammett had purchased at Triple Threat Armory, LLC, on May 16, 2017. Ex. A, Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center Firearms Trace Summary; Ex. R, Dennis Torres Deposition, p. 123, ln. 2-8.

2. On May 31, 2017, the honorable Judge Timothy Boyer signed a search warrant for 5414 Kingshighway seeking narcotics and firearms. Ex. B.

1

3. Isaiah Hammett was the target of the search warrant. Ex. P, Benjamin Lacy Affidavit, ¶ 5.

4. Detective Benjamin Lacy was the search warrant affiant and attested to his belief that marijuana, heroin, and firearms were being held and kept in 5414 South Kingshighway Blvd. by Hammett. Ex. B-1, Search Warrant Affidavit, Ex. P, Lacy Affidavit, ¶¶ 3-6.

5. The front door of the residence at 5414 Kingshighway opens into a living room. Ex. I, Coats, p. 19, ln. 3-24, p. 32, ln. 5-24 (Ex. I-1, Diagram); Ex. F, Manasco, p. 13, ln. 16- p. 15, ln. 18 (Ex. F-1, Diagram); Ex. H, Seper, p. 31, ln. 4-p. 32, ln. 3 (Ex. H-1, Diagram); Ex. G, Becherer, p. 19, ln. 8-p. 20, ln. 23 (Ex. G-1, Diagram); Ex. J, Frigerio, p. 36, ln. 22 - p. 37, ln. 7; p. 42, ln. 25 – p. 43, ln. 7 (Ex. J-1, Diagram); Ex. K, Allen, p. 23, ln. 1-25 (Ex. K-1, Diagram).

6. A door to a front bedroom is located directly across from the front door of the residence. Ex. I, Coats, p. 19, ln. 3-24, p. 32, ln. 5-24 (Ex. I-1, Diagram); Ex. F, Manasco, p. 13, ln. 16- p. 15, ln. 18 (Ex. F-1, Diagram); Ex. H, Seper, p. 31, ln. 4-p. 32, ln. 3 (Ex. H-1, Diagram); Ex. G, Becherer, p. 19, ln. 8-p. 20, ln. 23 (Ex. G-1, Diagram); Ex. J, Frigerio, p. 36, ln. 22 - p. 37, ln. 7; p. 42, ln. 25 – p. 43, ln. 7 (Ex. J-1, Diagram); Ex. K, Allen, p. 23, ln. 1-25 (Ex. K-1, Diagram); Ex. D, Long Affidavit, ¶ 2.

7. On June 7, 2017 Lance Coats, Glennon P. Frigerio, Joshua D. Becherer, Nicholas J. Manasco, Ronald Allen Jr., John C. Jones, Mark S. Seper, Jon B. Long, and Tim Boyce were City of St. Louis employees and members of a Police Department SWAT team, who while acting in the course and scope of their employment, participated in the execution of a search warrant at 5414 Kingshighway. See generally Ex. I, Coats; Ex. F, Manasco; Ex. H, Seper; Ex. G, Becherer; Ex. J, Frigerio; Ex. K, Allen; Ex. L, Declaration of Jones, ¶ 3; Ex. D, Long Affidavit, ¶¶ 6, 19, 27.

8.     After arriving at 5414 Kingshighway, the SWAT team formed a "stack" (a single file line) and approached the front porch.  Ex. J, Frigerio, p. 24, ln. 17-23; Ex. G, Becherer, p. 21, ln. 9-13.

9.     As the SWAT team approached the porch, a member of the team observed a surveillance camera mounted on the side of the house, and Sergeant Jones announced a "compromise." Ex. J, Frigerio, p. 31, ln. 22 – p. 32, ln. 4; Ex. K, Allen, p. 16, ln. 2-6; Ex. G, Becherer, p. 25, ln. 16-p. 26, ln. 3; Ex. E, Boyce, p. 18, ln. 18- p. 20, ln. 1; Ex. F, Manasco, p.19, ln. 9-13; Ex. H, Seper, p. 24, ln. 24- p.25, ln. 2; Ex. I, Coats, p. 23, ln. 23-24; Ex. L, Declaration of Jones, ¶¶ 6-7;

10.    Prior to pre-warrant briefing for the execution of this warrant, Frigerio had never heard of Hammett and was unaware of any of his activities. Ex. J, Frigerio, p. 20, ln. 1-7.

11.    Prior to pre-warrant briefing for the execution of this warrant, Allen did not know Hammett and knew nothing about his background. Ex. K, Allen, p. 45, ln. 2-4.

12.    Prior to pre-warrant briefing for the execution of this warrant, Becherer had never heard of Hammett and did not know anything about the occupants of 5414 Kingshighway. Ex. G, Becherer, p. 18, ln. 17-19; p. 62, ln. 19-25.

13.    Prior to pre-warrant briefing for the execution of this warrant, Boyce did not know anything about Hammett. Ex. E, Boyce, p. 24, ln. 2-4.

14.    Prior to pre-warrant briefing for the execution of this warrant, Seper had never heard of Hammett and did not know the people who lived at 5414 Kingshighway. Ex. H, Seper, p. 8, ln. 12-14; p. 59, ln. 1-3.

15.    Prior to pre-warrant briefing for the execution of this warrant, Coats knew nothing about Hammett or the people who lived at 5414 Kingshighway. Ex. I, Coats, p. 67, ln. 12-24.

16. Prior to pre-warrant briefing for the execution of this warrant, Sergeant Jones did not know Hammett and did not know his name. Ex L, Declaration of Jones, ¶ 19.

17. Prior to his involvement with the execution of the search warrant, Manasco had never heard of Hammett or been to his residence. Ex. F, Manasco, p. 8, 7-13.

18. All members of the SWAT team, except Long and Boyce, were armed with .223 caliber AR-15s that use .223 ammunition. Ex. J, Frigerio, p. 25, ln. 9-15; Ex. I, Coats, p. 72, ln. 7-13; Ex. K, Allen, p. 14, ln. 4-14; Ex. D, Long Affidavit, ¶ 22; Ex. E, Boyce, p. 28, ln. 21-25.

19. The type of .223 ammunition used by the SWAT team is designed to not penetrate walls. Ex. I, Coats, p. 72, ln. 7-25.

20. Boyce, because he was the "breacher" carrying a department-issued ram, was armed only with his service pistol. Ex. E, Boyce, p. 28, ln. 21-25.

21. Long, who was carrying the ballistics shield when the warrant was executed, was armed with only a 9 mm Beretta handgun. Ex. E, Boyce, p. 28, ln. 3-11; Ex. D, Long Affidavit, ¶ 22.

22. When the team arrived at the front door, several officers began loudly screaming "Police! Search warrant!" Ex. C-1 (Cell phone video recording); Ex. C, Frigerio Affidavit, ¶¶ 5-11; Ex. P, Lacy Affidavit, ¶¶ 8-10, 21-22; Ex. J, Frigerio, p. 33, ln. 14-21; Ex. K, Allen, p. 17, ln. 24 – p. 18, ln. 2; Ex. G, Becherer, p. 26, ln. 8- p. 17; p. 65, ln. 15-23; Ex. F, Manasco, p. 26, ln. 17-p. 27, ln. 5; p. 48, ln. 3-10; Ex. H, Seper, p. 29, ln. 6-11; Ex. I, Coats, p. 30, ln. 14- 24; p. 71, ln. 21 – p. 72, ln. 1; Ex. L, Sgt. Jones Affidavit, ¶ 9; Ex. D, Long Affidavit, ¶ 14.

23. As the team continued to announce "Police! Search Warrant!" Boyce, "the breacher," swung a department-issued ram toward the front door. Ex. E, Boyce, p. 23, ln. 10-12; Ex. L, Declaration of Sgt. Jones, ¶ 9.

4

24. After the door was breached and swung open, Becherer threw a flash bang noise diversion device into the house, and it went off. Ex. G, Becherer, p. 31, ln. 5-17; Ex. J, Frigerio, p. 35, ln. 21- p. 36, ln. 6; Ex. K, Allen, p. 22, ln. 6; Ex. E, Boyce, p. 26, ln. 16-25; Ex. I, Coats, p. 30, ln. 10-13.

25. After the door opened and the flash bang deployed, the team began entering the home. Ex. E, Boyce, p. 26, ln. 4-9; Ex. L, Sgt. Jones Affidavit, ¶ 11.

26. As the team made entry, Becherer and other officers continued to yell "Police Search Warrant" as the officers entered. Ex. G, Becherer, p. 66, ln. 4-9; Ex. F, Manasco, p. 26, ln. 17-p. 27, ln. 5; Ex. I, Coats, p. 31, ln. 3-5; Ex. D, Long Affidavit, ¶ 17.

27. Long, who was holding the ballistic shield, entered first. Ex. E, Boyce, p. 27, ln. 21-23; Ex. F, Manasco, p. 17, ln. 23 – p. 18, ln. 2; Ex. D, Long Affidavit ¶ 8, 17.

28. Manasco entered the home behind Long, who was holding the ballistic shield. Ex. F, Manasco, p. 28, ln. 3-22; p. 34, ln. 5-7; p. 52, ln. 18-22; Ex. D, Long Affidavit ¶ 8, 17.

29. Coats entered behind Long and Manasco, and together they approached the door to the front bedroom, which was Hammett's room. Ex. I, Coats, p. 31, ln. 6 – p. 33, ln. 21; p. 19, ln. 3-24, p. 32, ln. 5-24 (Ex. I-1, Diagram); Ex. F, Manasco, p. 28, ln. 3-22; Ex. D, Long Affidavit, ¶¶ 17-18.

30. At that point gunfire started coming through the bedroom door toward the officers. Ex. F, Manasco, p. 13, ln. 16- p. 15, ln. 18 (Ex. F-1, Diagram), p. 28, ln. 3-22; p. 52, ln. 18-22; Ex. I, Coats, p. 33, ln. 22- p. 43, ln. 11; Ex. D, Long Affidavit, ¶¶ 18-20.

31. As shots were fired from the bedroom and through the wooden door, Manasco could feel fragments from the wood door hitting him in the legs. Ex. F, Manasco, p. 52, ln. 7-12.

5

32. After Seper entered the home, Seper observed gunfire coming towards the officers from the bedroom door and wall, and he began moving left into the living room. Ex. H, Seper, p. 30, ln. 10-18; p. 47, ln. 2 – p. 48, ln. 4; p. 61, ln. 5-16, p. 31, ln. 4-11 (Ex. H-1, Diagram),

33. Manasco returned fire through the bedroom door and began moving to his left as he continued firing through the bedroom door. Ex. F, Manasco, p. 28, ln. 23 – p. 30, ln. 23; p. 53, ln. 2-9.

34. Long returned fire with his 9 mm handgun while he and Manasco moved left. Ex. D, Long Affidavit, ¶¶ 21-22.

35. Coats held in place as Manasco and Long moved left, and Coats returned fire. Ex. I, Coats, p. 35, ln. 1 – p. 36, ln. 22.

36. Long fell to the ground and his helmet flew off. Ex. D, Long Affidavit, ¶ 23; Ex. I, Coats, p. 35, ln. 25 - p.36 ln. 6.

37. When Long fell to the ground and his helmet flew off, Coats thought Long had been shot. Ex. I, Coats, p. 35, ln. 25- p. 36, ln. 9.

38. Long had not been shot after he got back up, Coats positioned himself behind Long and the ballistics shield, and as more gunfire came from the bedroom wall, Coats fired back. Ex. D, Long Affidavit, ¶ 23; Ex. I, Coats, p. 35, ln. 25 – p. 37, ln. 17-21.

39. Boyce did not enter the house, and as soon as he heard gunfire, he jumped off the porch into the alleyway. Ex. E, Boyce, p. 28, ln. 15- p. 28, ln. 15.

40. Becherer entered the home and was standing to the left of the couch against the bedroom wall when he observed gunfire from inside bedroom through the bedroom wall into the living room toward the officers Ex. G, Becherer, p. 31, ln. 14 - p. 33, ln. 14; p. 67, ln. 3-9, p. 19, ln. 8-p. 20, ln. 23 (Ex. G-1, Diagram)

6

41. Becherer heard the gunfire and observed the wall to his right "coming apart" from the gunfire. Ex. G, Becherer, p. 33, ln. 15- p. 35, ln. 16; p. 36, ln. 2-5.

42. After Frigerio stepped through the threshold of the front door, he heard gunfire erupt, felt bullets flying past him, and realized he was being shot at. Ex. J, Frigerio, p. 36, ln. 8- p. 39, ln. 4; p. 36, ln. 14 – p. 37, ln. 7; p. 42, ln. 25 – p. 43, ln. 7 (Ex. J-1, Diagram); Ex. I, Coats, p. 38, ln. 1-13.

43. Frigerio observed plaster exploding from the bedroom wall in his direction. Ex. J, Frigerio, p. 39, ln. 9-10.

44. Frigerio returned fire through the bedroom wall and bedroom door. Ex. J, Frigerio, p. 41, ln. 5-7.

45. Allen was located outside the front door when he first heard shots fired. Ex. K, Allen, p. 26, ln. 20-21; p. 26, ln. 25 – p. 27, ln. 10.

46. After additional volleys of shots were fired, Allen entered the home through the front door. Ex. K, Allen, p. 27, ln. 17-21; p. 23, ln. 1-25 (Ex. K-1, Diagram).

47. After hearing gunfire, Sergeant Jones entered the home and observed gunfire coming through the front wall of the bedroom wall. Ex. L, Declaration of Sergeant Jones, ¶ 11-12.

48. Sergeant Jones returned fire through the bedroom wall. Ex. L, Declaration of Sergeant Jones, ¶ 12.

49. After he entered the house and was standing to the left of the front door, Allen observed gunfire coming through the bedroom door toward the front of the house. Ex. K, Allen, p. 28, ln. 13-22 (Ex. K-1, Diagram); p. 31, ln. 5-10.

50. In response, Allen fired several shots toward the bedroom door. Ex. K, Allen, p. 30, ln. 10-21.

51. Becherer also observed gunfire come through the northern wall of the bedroom, and he then moved closer to the fireplace located on the northern wall of the living room. Ex. G, Becherer, p. 39, ln. 6- p. 40, ln. 4.

52. After he moved left away from the bedroom door, Manasco observed shots coming through the bedroom wall, and Manasco returned fire through the bedroom wall. Ex. F, Manasco, p. 31, ln. 6- p. 32, ln. 9.

53. Long continued to return fire at the wall in an attempt to stop the gunfire directed at him and the other officers. Ex. D, Long Affidavit, ¶¶ 24-35.

54. Manasco also observed gunfire from within the bedroom travel through the dining room wall in a northernly direction. Ex. F, Manasco, p. 33, ln. 18-p.34, ln. 2.

55. After Seper moved to his left and towards the fireplace, he observed Hammett in the foyer looking around the doorjamb with a rifle shouldered and pointed in his direction. Ex. H, Seper, p. 31, ln. 12 – p. 32, ln. 6 (Ex. H-1, Diagram); p. 33, ln. 4-10; p. 34, ln. 3- 18; p. 62, ln. 1- p. 63, ln. 22.

56. When Hammet first looked through the doorjamb with a rifle shouldered and pointed in the direction of Seper, Hammet had a clear line of sight to Seper who was wearing a full tactical uniform marked "police." Ex. H, Seper, p. 62, ln. 5 – 16.

57. The entire SWAT team was in full tactical uniform marked "police." Ex. H, Seper, p. 62, ln. 17-19.

58. Manasco slid behind Seper so that Seper could provide cover while Manasco changed magazines, and at that point, Seper began firing shots toward the back of the house. Ex. F, Manasco, p. 34, ln. 10-23.

59.     Seper felt threatened by Hammett's rifle pointed in his direction so he fired, hitting the door frame. Ex. H, Seper, p. 34, ln. 19-23.

60.     After Seper shot, Hammett recessed back from the doorway for a couple seconds and then entered the dining room with the rifle shouldered. Ex. H, Seper, p. 35, ln. 5- p. 36, ln. 3 (Ex. H-1, Diagram); p. 64, ln. 22- p. 65, ln. 25.

61.     Coats also saw Hammett walk into the dining room in the officers' direction with a rifle at a "low ready," or shouldered just below his line of sight, and believing Hammett was going to try to kill him or the other officers located to his left, Coats fired at Hammett. Ex. I, Coats, p. 43, ln. 18 - p. 47, ln. 14; p. 48, ln. 22- p. 50, ln. 14; p. 74, ln. 8-13.

62.     Shortly after Manasco completed his magazine change, he also observed Hammett emerge through the foyer doorway with an assault rifle shouldered and pointed at him, and fearing for his life, he fired at Hammett. Ex. F, Manasco, p. 35, ln. 6- p. 36, ln. 6; p. 38, ln. 2-6.

63.     When Hammett entered through the doorway into the dining room with the AK-47 shouldered, Seper again felt threatened and fired rounds at him. Ex. H, Seper, p. 36, ln. 4-8; p. 37, ln. 12-22.

64.     Becherer also observed Hammett walk into the dining room holding an AK-47 rifle at his right shoulder pointing at him. Ex. G, Becherer, p. 42, ln. 12- p 45, ln. 1. (exhibit

65.     Becherer fired at Hammett in response to seeing him approach with an AK-47 pointed in his direction. Ex. G, Becherer, p. 42, ln. 12-19.

66.     Long also observed a gun barrel appear through the entry way to the living room and saw the suspect enter the with an AK-47-style assault rifle shouldered just below sights and pointed in the officers' direction. Ex. D, Long Affidavit, ¶¶ 29.

67. Long observed gunfire coming from his left, and fearing for his life, he fired one round in the suspect's direction. Ex. D, Long Affidavit, ¶¶ 30-32.

68. Hammett was struck by gunshots and fell to the ground. Ex. F, Manasco, p. 38, 12-14; Seper, p. 38, ln. 16-25; Ex. I, Coats, p. 49, ln. 24- p.50, ln.3.

69. No more shots were fired after Hammett fell to the ground. Ex. R, Torres, p. 126, ln. 9-20.

70. After Hammett no longer posed a threat, and without having entered Hammet's bedroom, the team backed out of the house through the front door. Ex. F, Manasco, p. 40, ln. 15-19; Ex. H, Seper, p. 43, ln. 2-11; Ex. I, Coats, p. 52, ln. 5-16; Ex. D, Long Affidavit, ¶¶ 33-34.

71. After gunfire ceased, Frigerio reentered the house and observed shell casings on the floor of the bedroom. Ex. J, Frigerio, p. 49, ln. 22 – p. 50, ln. 4.

72. After reentering the house, Manasco observed shell casings on Hammett's bedroom floor. Ex. F, Manasco, p. 44, ln. 11-23.

73. After reentering the house, Coats observed casings he believed to be from an AK-47 on the floor of Hammett's bedroom. Ex. I, Coats, p. 76, ln. 1-4.

74. Boyce never entered the house until the shooting had stopped, and the scene was secure. Ex. E, Boyce, p. 32, ln. 4- p. 33, ln. 4.

75. Frigerio never saw or observed Hammett at any point. Ex. J, Frigerio, p. 52, ln. 21-23.

76. Becherer never entered Hammett's bedroom. Ex. G, Becherer, p. 59, ln. 16-17.

77. Seper never entered Hammett's bedroom. Ex. H, Seper, p. 67, ln. 3-5.

78. After Hammett was shot and collapsed to the ground, the AK-47 rifle he had been carrying was located on the floor next to the right side of his body. Ex. K, Allen, p. 45, ln. 23- p. 46, ln. 2; Ex. I, Coats, p. 47, ln. 15 – p. 48, ln. 1; Ex. G, Becherer, p. 43, ln. 24- p. 44, ln. 4; p. 46,

ln. 6-12; Ex. G-2 (Photograph of Hammett and AK-47); Ex. G-3 (Photograph of AK-47); Ex. N, Skaggs, p. 20, ln. 14-16; Ex. R, Torres, p. 41, ln. 8-18; Ex. R-1 (Photograph of Hammett).

79.     Dennis Torres was located in a back bedroom throughout the duration of the shooting. Ex. Q, Torres, p. 24, ln. 17 - p. 121, ln. 15; Ex. G, Becherer, p. 37, ln. 14-19.

80.     Exhibit S depicts the exterior west wall and door of Hammett's bedroom as it appeared on June 7, 2017 after the shooting.

81.     Exhibit T depicts the interior south wall next to Hammett's bedroom door as it appeared on June 7, 2017 after the shooting.

82.     Benjamin Lacy is not a member of SWAT, did not enter the residence on June 7, 2017 prior to Hammett's death, and did not fire any shots during the execution of the search warrant at 5414 Kingshighway on June 7, 2017. Ex. P, Lacy Affidavit, ¶ 19.

83.     Subsequent to the death of Hammett and the execution of the search warrant, City of St. Louis Evidence Technician Jennifer Sommer arrived at the scene, located and documented ballistics evidence, and subsequently authored a report describing the ballistics evidence she seized and its location within the house.  Ex. M, Sommer, p. 18, ln. 23- p. 19, ln. 4, p. 49, ln. 21 – p. 50, ln. 8; Ex. M-1 (ETU Notes).

84.     Among a variety of ballistics evidence, Sommer seized 10 cartridge cases, head stamped "7.62X39," from the floor of the front bedroom and conveyed this evidence to the Police Department laboratory. M-1 (ETU Notes), pp. 18-20; Ex. M, Sommer, p. 51, ln. 7-20.

85.     Subsequent to the execution of the search warrant, City of St. Louis Police Detective Robert Skaggs located an AK-47 type semi-automatic rifle on the floor to the right of Hammett's body and seized it as evidence. Ex. N, Deposition of Skaggs, p.14, ln.12-18, p. 15, ln. 24-p.16, ln. 1; p. 20, ln. 14-24.

86. Julie Davis performed testing comparing the 10 Barnaul stamped, 7.62x39 mm caliber cartridge cases collected by Sommer to the Inter Ordnance, Inc. make Sporter model, 7.62x39 mm caliber semi-automatic rifle with serial #S029900 also recovered from the scene of the incident. Ex. O, Julie Davis Affidavit, ¶¶ 4-9.

87. Through testing, Julie Davis concluded, to a reasonable degree of scientific certainty, that 9 of the Barnaul stamped 7.62x39mm caliber cartridge cases recovered from the scene of the incident by Sommers were fired in the Inter Ordnance Inc. make, Sporter model, 7.62x 39mm caliber semi-automatic rifle Detective Skaggs seized from the scene. Ex. O, Julie Davis Affidavit, ¶¶10-11.

88. Coats later discovered that a bullet fragment lodged in his elbow as a result of this shooting. Ex. I, Coats, p. 55, ln. 21-p. 56, ln. 13.

89. Exhibit Q is a true and accurate recording of the statement made by Dennis Torres on June 7, 2017 to the City of St. Louis Police Department following this incident. Ex. R, Torres, p. 23, ln. 15 - p. 24, ln. 9.

90. As he exited the house, Dennis Torres saw Hammett on the living room floor after he had been shot. Ex. R, Torres, p. 41, ln. 9-12.

91. No officers used force against Dennis Hammett during or after the execution of the search warrant. See generally, Ex. R, Torres, pp. 22-72.

92. Exhibit R-1 fairly and accurately depicts the scene where Hammett was lying on the living room floor as Torres saw it that day. Ex. R, Torres, p. 41, ln. 13 – 18.

93. Exhibit R-1 shows a rifle next to Hammett. Ex. R-1.

94. City has not purchased any liability insurance policy to cover torts, personal injuries, or any other claims that do not arise from dangerous property conditions or the operation of motor vehicles. Ex. U, Kistler Dec. ¶ 3.

95. City has no ordinance that purports to adopt a plan of self-insurance providing liability coverage for City for tort claims other than those arising from motor vehicle accidents with vehicles operated by City employees and claims arising from dangerous conditions of public property. Ex. V, Flowers Aff. ¶ 6.

96. City has no ordinance that purports to purchase or obtain insurance from the entity known as the Public Facilities Protection Corporation. Ex. V, Flowers Aff. ¶ 7.

Respectfully submitted,

**JULIAN BUSH**
**CITY COUNSELOR**

By: /s/ Erin K. McGowan
Erin K. McGowan #64020MO
Andrew Wheaton #65269 MO
1200 Market Street, Room 314
City Hall
St. Louis, Mo 63103
(314) 622-3361
(314) 622-4956 fax
McGowanE@stlouis-mo.gov
WheatonA@stlouis-mo.gov
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify this **Statement of Facts** was filed electronically on this **13th day of March 2020** with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all attorneys of record.

/s/ Erin K. McGowan

13