**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GINA TORRES, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-CV-1525-DDN |
| | ) | |
| CITY OF ST. LOUIS, ET AL. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO
DEFENDANTS' STATEMENT OF MATERIAL FACTS**

COME NOW Plaintiffs, by and through their counsel, and for Plaintiffs' Statement of

Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment and

Response to Defendants' Statement of Material Facts, state as follows:

**STATEMENT OF ADDITIONAL FACTS**

1. On June 7, 2017, Dennis Torres was asleep in his room when he was woken up by

loud noises. Defendants' Ex. R, Dennis Torres Depo., p. 50.[1] The first thing Dennis Torres heard

was a lot of shots fired. Id., p. 114. Dennis did not hear any yelling until after the shooting. Id.,

pp. 50-51.

2. The next thing that happened was that Isaiah Hammett came out of his room to

Dennis, picked him up and put him on the floor. Defs Ex. R, Dennis Torres Depo., p. 114.

---

[1] For the Court's convenience and to avoid the unnecessary and repetitive filing of the same
documents, Plaintiffs have cited to Defendants' previously filed Exhibits wherever possible.
Defendants' exhibits are indicated by letters whereas Plaintiffs' Exhibits are indicated by
numbers.

3.    Dennis asked him, "Who's shooting?" Isaiah stated "I don't know, Grandpa. Stay down. I love you." Then his grandson went to the dining room. Defs Ex. R, Dennis Torres Depo., p. 115.

4.    When Isaiah Hammett went into the dining room, he did not have anything in his hands. Defs Ex. R, Dennis Torres Depo. p. 116.

5.    Dennis Torres passed the vision test for his driver's license. If Isaiah Hammett had something in his hands the size of an AK-47, he would have been able to see it. Defs Ex. R, Dennis Torres Depo., p. 116.

6.    Isaiah got about twelve feet into the dining room. At this point Dennis could see just his left side. Exhibit R, Dennis Torres Depo., p. 118

7.    Isaiah said "Please don't shoot" and then Dennis heard more shots.  Ex. R, Dennis Torres Depo. p. 119.

8.    Dennis was trying to get up into his wheelchair and he yelled "Isaiah." Two more shots went off right by his head. If he would have gotten up any sooner, he would have gotten hit in the head. Defs Ex. R, Dennis Torres Depo., p. 119. Those two bullets ended up in the wall. The holes are still there. Dennis Torres Depo., p. 120.

9.    Dennis then heard more shots. He thought they were shooting at him but there weren't any more bullets coming into his room. He thought they were meant for him because Isaiah was already down on the floor. Defs Ex. R, Dennis Torres Depo., p. 120. He stayed down until he heard nothing. Defs Ex. R, Dennis Torres Depo., p. 121.

10.    Dennis called 911 and informed them that someone was shooting up his house. They asked if he knew who, and he said he did not know who it was. Defs Ex. R,   Dennis Torres

Depo., p. 121. Dennis does not know exactly when he called 911. Ex. R, Dennis Torres Depo., p. 147.

11.    Dennis' 911 call was recorded by the Police and is also referenced in an "Event Information" document produced by Defendants, which indicates that the officers did not properly announce their presence, as Dennis was not aware that the shooters were police officers: "CALLER SAYS HIS HOME IS GETTING SHOT UP. CALLER DIDN'T SEE ANYONE." Plaintiffs' Exhibit 2, Event Information.

12.    Everything stopped. Dennis crawled up into the wheelchair. He went to the dining room and Isaiah's head was laying with his mouth kind of open and blood was behind his head. He appeared to be deceased. Defs Ex. R, Dennis Torres Depo., p. 121. There was no gun next to Isaiah. Dennis Torres Depo., pp. 121-122.

13.    The officers yelled "come out with your hands up" and he did. Ex. R, Dennis Torres Depo., p. 51. That was the only yelling he heard. Id.

14.    Dennis Torres is a decorated combat veteran who served his country in Vietnam for three years and estimates that in that time he was in approximately 20 firefights. Defs Ex. R, Dennis Torres Depo., p. 97.

15.    Dennis received a total of 15 medals and citations for his service, including unit citations, three Purple Hearts, the Bronze Star with a Cloverleaf, Vietnam medals, good conduct medals and the infantry badge. Defs Ex. R, Dennis Torres Depo., p. 106.

16.    After the shooting and Dennis was told to wheel out of the house the police were inside the home and Dennis was not allowed inside for six hours. Defs Ex. R, Dennis Torres Depo., p. 110.

17.     After the shooting, Dennis' medals were taken off the wall and thrown in a dumpster with all of his Vietnam stuff. Defs Ex. R, Dennis Torres Depo., p. 107.

18.     Dennis heard an AK-47 being fired thousands of times in Vietnam. Dennis testified that "If you were in combat in Vietnam, it's a sound you will hear until the day you die. … You will never forget that sound." Defs Ex. R, Dennis Torres Depo., p. 99.

19.     If Dennis had heard an AK-47 he would have been able to identify it on June 7, 2017 he did not at any time hear an AK-47 being fired. Defs Ex. R, Dennis Torres Depo., p. 100.

20.     The Defendant Officers agree that the sound of shots being fired from a 9mm handgun, a .223 caliber rifle and an AK-47 are all distinctive sounds that can be differentiated. See Defs Ex. E, Timothy Boyce Depo. p. 30, 39; Defs Ex. I, Lance Coats Depo. p. 64; Defs Ex. J, Glennon Frigerio Depo. p. 26, 28; Defs Ex. G, Joshua Becherer Depo. p. 66; Defs Ex. K, Ronald Allen Depo. p. 32-33; and Defs Ex. H, Mark Seper Depo. pp. 51-52.

21.     Dennis was wounded five times in Vietnam. He lost many friends. Defs Ex. R, Dennis Torres Depo., p. 99. When Dennis returned from Vietnam he was in the hospital for awhile because he had been shot in the back and it damaged the nerves in his back. Id., p. 101. He still has pain from that. Id., p. 102. Dennis was diagnosed with PTSD as a result of his service in Vietnam. Id., p. 74.

22.     When Dennis woke up, to the flashbang and shooting he thought he was back in Vietnam. It brought the fighting in Vietnam back to him as he was there in his house on June 7, 2017. Defs Ex. R, Dennis Torres Depo., p. 74.

23.     In his dreams Dennis use to see men from his battalion who had died who were under him because he was the platoon leader. That finally went away, but now he sees Isaiah in his room standing over him with tears in his eyes. He saw Isaiah at his door when he was in ICU

intensive care at Barnes. Sometimes Dennis thinks that Isaiah tells him it's time to join him and Dennis' wife, who is also deceased. Defs Ex. R, Dennis Torres Depo., p. 75.

24.     After 1980, Dennis did not have nightmares and stuff like that. He thought he was doing good until this happened. Defs Ex. R, Dennis Torres Depo., p. 79. In the five years prior to June 7, 2017, Dennis had not sought any treatment for any mental health condition. Defs Ex. R, Dennis Torres Depo., p. 77.

25.     Before the shooting Dennis was just in groups with other veterans where they talked. Now he is seeing a psychiatrist. Dennis started seeing the psychiatrist a week after his grandson was killed. Defs Ex. R, Dennis Torres Depo., pp. 76-77. Dennis is still in treatement at the VA. Defs Ex. R, Dennis Torres Depo., p. 76.

26.     Dennis had no knowledge of Isaiah having any drugs in his room. Dennis would not have allowed it. Defs Ex. R, Dennis Torres Depo., pp. 70-71.

27.     There was no blood on the "AK-47" model gun recovered from the scene. Plaintiffs' Ex. 1, Photographs of AK-47. Ms. Sommer, the evidence technician, testified that she documented in her reports that there were "areas of apparent blood on the floor inside the dining room directly west of the victim. A larger area of apparent blood was located on the floor inside the dining room following investigation completed by the medical examiner. I observed an area of apparent blood on the south door frame of the east doorway of the dining room." Defs Ex. M, Sommer Depo., p. 33. Despite the copious amount of blood documented as a result of Isaiah being shot at least 24 times, Sommer did not document any blood on the "AK-47" model gun, and there is no blood on the weapon in the photographs taken by the police. Defs Ex. M, Sommer Depo., pp. 33-37. Photographs of Isaiah taken by the police also shows blood splattered on his stomach. The gun was turned over to Officer Skaggs for conveyance back to police

headquarters. Officer Skaggs similarly testified that, based on the photographs taken, he did not see any blood on either side of the weapon. Defs Ex. N, Officer Skaggs Depo., pp. 24-25. Dr. Ely also did not see any blood on the gun as depicted in Defendants' photographs of the AK-47. Plaintiffs' Exhibit 3, Dr. Ely Depo. pp. 49-50.

28.     Plaintiffs' deceased hands were bagged at the scene for the purpose of preserving "trace evidence" including any evidence of gunshot residue. See Defs Ex. M, Sommer Depo., pp. 52, 65-66.  It was up to the police department to elect to perform a gunshot residue test, yet evidently no gunshot residue test was performed on Isaiah's hands. See Defs Ex. M, Sommer Depo., p. 52; Ex. 3, Ely Depo., p. 62.

29.     On the morning of June 8, 2017, Dr. Erin Ely, assistant medical examiner, performed a post-mortem examination on Isaiah Hammett. Plaintiffs' Ex. 4, Medical Examiner's Report, p. 1. Dr. Ely determined the cause of death was gunshot wounds to the neck and chest. Plaintiffs' Ex. 3, Dr. Ely Depo. p. 53.

30.     Dr. Ely has a lot of experience examining gunshot wounds. Ex.3, Dr. Ely Depo. p. 8. In four years as an assistant medical examiner she has performed autopsies in over 400 homicide cases, almost all of which were caused by gunshot wounds. Ex. 3, Dr. Ely Depo. p. 8.

31.     Dr. Ely can determine the track or trajectory of a bullet by examining external wounds together with the internal injuries caused by a bullet and with the use of x-rays. Ex. 3, Dr. Ely Depo. p. 10. The description of a bullet's track or trajectory is always given from the decedent's anatomic position. Id., p. 15. Anatomic position means the body is positioned as if standing with hands at the side and palms facing up. Id., p. 15.

32.     Dr. Ely analyzed thirty-one gunshot wounds during her examination of Isaiah. Plaintiffs' Ex. 4, Medical Examiner's Report. pp. 2-8.

33.     The gunshot wound to the left side of his neck was lethal. Ex. 3, Dr. Ely Depo. p. 12. The lethal wound to the neck tracked upward, backward, and rightward. Ex. 3, Dr. Ely Depo. p. 13.  The gun had to be positioned below the wound. Ex. 3, Dr. Ely Depo. p. 18. The bullet passed through Isaiah's larynx, fractured his C2 vertebrae, and transected the spinal cord, fracturing the mandible and maxilla. Ex. 4, Medical Examiner's Report, p. 3.

34.     Dr. Ely determined that the second gunshot wound described in her report to the left side of the chest was also lethal. Ex. 3, Dr. Ely Depo. p. 21. The lethal chest wound had the same trajectory as the neck wound: upward, backward and rightward. Dr. Ely Depo. p. 24. The barrel of the gun had to be positioned lower than, or below, the wound at the time Isaiah was shot. Ex. 3, Dr. Ely Depo. pp. 24-25. That bullet fractured Isaiah's left fourth rib, disrupted the lower lobe of the left lung, obliterated the pericardial sac, damaged all four chambers of the heart and the aorta, fractured his sternum, disrupted the middle lobe of the right lung and fractured the fourth and sixth right ribs. Ex. 4, Medical Examiner's Report, p. 3.

35.     Dr. Ely determined a wound to the left pelvis and lower abdomen also could have been lethal. Plaintiffs' Ex. 3, Dr. Ely Depo. p. 37. The pelvis wound also tracked upward, backward, and rightward, like the other lethal wounds. Ex. 3, Dr. Ely Depo. p. 37. The bullet transected the pancreas, disrupted the inferior vena cava and disrupted the liver. Ex. 4, Medical Examiner's Report, pp. 5-6.

36.     Most of the wounds tracked upward, backward, and rightward. Ex. 3, Dr. Ely Depo. p. 46. There were no gunshot wounds that tracked straight into Isaiah's body. All of the wounds, except a graze wound to the back, tracked upward or downward into his body. Ex. 3, Dr. Ely Depo. pp. 46-47.

37.     Dr. Ely testified that there is no question that Isaiah's body was oriented to the trajectory of the bullets that she described in her deposition. The muzzle of the gun had to be at an angle such that the bullets could travel through the body at the paths she described. Ex. 3, Dr. Ely Depo. p. 63.

38.     Plaintiffs have also attached the Affidavit of their weapons and ballistics expert Samuel Andrews. Mr. Andrews is highly qualified to opine in this matter, including because he has previously trained the SLMPD SWAT Team. See Plaintiffs' Exhibit 7, Andrews Affidavit, paras. 1-5, setting forth qualifications and experience.

39.     Mr. Andrews was contacted on the day of the shooting of Plaintiffs' decedent, and asked to conduct a ballistics analysis of the shooting. The next morning he travelled from his home in Lebanon, Missouri to 5414 S. Kingshighway and did an extensive inspection of the ballistics evidence left behind after the police turned control of the premises back over to the home owner. Mr. Andrews states that the photographs provided by the St. Louis Police Department accurately depict what he saw at the time of his ballistics analysis.  See Ex. 7, Andrews Affidavit, para. 6.

40.     In addition to the personal inspection the day following the shooting, Mr. Andrews viewed and reviewed the Kevin Broccard video/audio of the shooting.  From that video/audio he concluded that the initial  shots have a .13 "split", or seconds between shots which is impossible with an AK-47 model rifle because of the length of the trigger pull, the length of the recoil recovery time and the length of the "trigger  reset". In addition, he opines that the timing and "signature" or sounds of the shooting are as follows, based on the Broccard recording:

| Time of Event: | Event: |
| --- | --- |
| :08  seconds | Flash Bang; |
| :12 – :14 secs. | 4 shots from a 9 mm cal hand gun from inside the house; |

| | |
|---|---|
| :14 – :19 | Barrage of over 25 shots from .223 caliber assault rifles; |
| :19 – 20 | Frantic 3 syllable scream possibly ending with the " f " word; |
| :21 – :22 | 4 shots from .223 caliber assault rifles; |
| :26 – :28 | 6 shots from .223 caliber assault rifles; |
| :32 – :35 | 2 bursts of 6 and 7 shots from .223 caliber assault rifles; |
| :37 – :39 | 2 bursts of 3 shots each from .223 caliber assault rifles; |
| :43 – :44 | Someone yelling "back up" twice; |
| 1:13 –1:19 | 2 shots followed by approximately 23 shots from multiple .223 caliber assault rifles; |
| 1:30 – 1:35 | 12 to 16 shots fired from .223 caliber assault rifles; |
| 3:50 – 3:58 | "Police we have a search warrant" yelled outside the house; |
| 4:06 – 4:13 | Yelling at house next door; |
| 4:24 – 4:26 | "Come to me, come out of the house". |

See Ex. 7, Andrews Affidavit, para. 7.

41.     Based upon the fact that you can hear the Police announce "Police we have a search warrant" at the 3:50 mark of the recording but at no other time during the video it is clear there was no announcement by the police before the breach, flash bang and shots being fired as claimed by the police in their post shooting interviews and depositions.  See Ex. 7, Andrews Affidavit, para. 8.

42.     Mr. Andrews opines that, if the officers were planning on a knock and announce search as they claim there would be no reason or any concern about being "compromised" by the camera on the front of the house because they intended to identify themselves from the beginning. The Officers then claim to have called a "compromise" which is a no knock battering ram breach with a flash bang and approximately 93 shots fired.  However, the Officers thereafter

claim that they knocked and announced which is directly conflicting evidence. This demonstrates that the Officers were using an alleged "compromise" to turn the knock and announce into a battering ram breach flash bang assault. This has been a known approach since the Supreme Court of Missouri required officers to knock and announce. A no knock raid is much higher risk that shots will be fired because of the surprise element heightening everyone's fear and adrenaline levels. See Ex. 7, Andrews Affidavit, para. 9.

43. Mr. Andrews states that he has heard AK-47 model rifles fired tens of thousands of times under many different circumstances and as a result is very familiar with that sound signature because the diameter of the AK-47 bullet is .311 inches (7.62 mm). He has heard .223 inches (5.56 mm) assault rifles fired tens of thousands of times. He has heard 9mm handguns fired tens of thousands of times. The diameter of the cartridge which holds the gun powder causes that gun to make a distinctive sound to him and the officers from the SWAT team who have testified in this case that they can tell the difference. In addition, Dennis Torres, testified that based on his extensive service in the Vietnam War he can tell that difference. They have repeatedly listened to the Broccard video/audio and at no time do they hear an AK-47 fired. Based upon his comparisons of firearm "signatures" of the 5414 Kingshighway shooting recorded in the Broccard video there can be no doubt or dispute that there was never an AK-47 fired at the time of this raid. The first shots fired are 4 rounds of a 9mm handgun followed by approximately 90 .223 assault rifle shots being fired. See Ex. 7, Andrews Affidavit, para. 10.

44. Mr. Andrews' affidavit notes that the officers in their reports contradict who purportedly announced "police search warrant." When an officer "yells police search warrant" it is established that they are five times normal volume. In listening to the Broccard video you would clearly hear that if they announced it while they were outside the house as they claim because you

can clearly hear it at 3:50-3:58 time frame of the video after all of the shooting has stopped. In his opinion the police did this so the neighborhood witnesses would be able to say they heard "police search warrant" when interviewed after the officer involved shooting as required by standard operating procedure after Officer involved shootings. See Ex. 7, Andrews Affidavit, para. 11.

45. Based on Mr. Andrews' review of the scene, there are no bullet hole entries in the home that match a 7.62 caliber gun. There are many bullet hole entries that match the diameter of a .223. He searched extensively for a 7.62 entry hole as he expected to find, because it would have justified the officers "returning" fire and exonerated them of wrong doing. Having measured the entry of all bullet holes throughout the home with a caliper Mr. Andrews can testify beyond any question that the damage done to the walls of the Torres home shown in the Department's photographs were not done with an AK-47 caliber gun. The width of the entry holes made are either much too small or much to large to have come from and AK-47 model rifle. They are the width of a .223 bullet or a 9 mm handgun bullet. It is also his understanding that Dennis Torres served in the military in Vietnam, used a .223 caliber assault rifle and heard AK-47s being shot hundreds if not thousands of times and has testified that at no time did he hear and AK-47 fired on June 7, 2017. See Ex. 7, Andrews Affidavit, para. 12.

46. In addition, the photographs provided by the department of the alleged AK-47 shell casings taken immediately after the shooting do not show signs of having been recently fired because they do not have any of the normal markings of a recently fired shell. There is in fact demonstrable evidence that the shell's had not come from a cartridge that was recently fired. This is consistent with the Police Department's information that Isaiah Hammett had an AK-47 model rifle that they intended to allege he fired at them. Of importance, if Isaiah Hammett fired as many

rounds as the police claim there would have been many more than 10 shell casings. See Ex. 7, Andrews Affidavit, para. 13.

47. In addition, the Department's photographs of the alleged AK-47 shell casings do not match up with the ballistics evidence of the scene . When the round of an AK-47 is ejected to allow the next round to enter the chamber it causes scratches on the casings as it is ejected causing "extraction marks". The pictures of the casings lying on the floor of the Torres home do not have these shiny markings because the casings in the photographs show oxidation. Therefore, the AK-47 casings had not been fired on June 7, 2017. Therefore the evidence of the scene does not match up with the claims of the SWAT Officers in their post shooting interviews or deposition testimony. See Ex. 7, Andrews Affidavit, para. 14.

48. During his ballistics investigation Mr. Andrews did not find any evidence of damage to the front living room wall which would have been there if the AK-47 rounds were fired through the bedroom wall and door as claimed by the Officers in their post-shooting interviews and depositions. See Ex. 7, Andrews Affidavit, para. 15.

49. In the ten years between 2006 and 2016, Internal Affairs Statistics maintained by the St. Louis Police Department record a total of 318 complaints against officers relating to the following categories: Physical Abuse/Use of Force, Violation of Use of Force Policy, and Physical Abuse. The statistics reflect that those charges were sustained only 16 times, or approximately 5% of the time. See Plaintiffs' Exhibit 8, Group Exhibit of SLMPD IAD Statistics.

50. In a letter dated January 31, 2018, City Counselor, the Honorable Julian Bush provided an explanation to Alderwoman Green of "the City's self insurance fund, 'something called a PFPC,' the funds used for paying settlements, and the liability of the City for paying

settlements, particularly those involving police misconduct." Plaintiffs' Exhibit 9, Judge Bush Letter.

51.    The Public Facilities Protection Corporation of the City of St. Louis is a not for profit corporation incorporated on November 20, 1986. Its articles of incorporation state that the purpose of the corporation is "to implement a program which will assure the continuing provision of municipal and governmental services by various public facilities and functions in the St. Louis metropolitan area which facilities are placed in jeopardy by escalating costs and exposures to exceed fiscal abilities." Ex. 9, Judge Bush Letter.

52.    On September 16, 1987, the City's Board of Estimate and Apportionment adopted a resolution approving the "City of St. Louis Risk Management Program." Among many other things, the program imposed a duty on the City to annually appropriate funds into a "Risk Trust Fund" to be administered by PFPC, which was made responsible for administering that fund and payment of all claims, given its purpose to "insure the City against all claims." Ex. 9, Judge Bush Letter.

53.    Judge Bush further states that "It is my understanding that over the years PFPC has, just as the September 16, 1987 plan approved by the Board of Estimate and Apportionment provided, paid claims against the City for damages. In addition to paying claims against the City, it has paid claims against City employees, other public employees, and also claims against other public corporations and not for profit corporations." Ex. 9, Judge Bush Letter.

54.    The City transfers amounts to the PFPC which "uses the sums so transferred to pay judgments against the City and its employees generally, including those arising from the operations of the Division of Police and from the operations of the old Saint Louis Metropolitan Police Department, to the extent that the latter are not paid out of the State Legal Expense Fund."

Ex. 9, Judge Bush Letter. In addressing the Alderwoman's question "is the City self-insured", Judge Bush concludes that "Self-insurance is "[t]he practice of setting aside a fund to meet losses instead of insuring against such through insurance." Black's Law Dictionary, 6th ed. In 1979 … the appropriations made each year in the law department and other budgets directed at PFPC and workers compensation can be properly thought to be self – insurance." Exhibit 9, Judge Bush Letter.

55.     Documents obtained in discovery from the City verify the description of the PFPC as the City's insurer as given by Judge Bush in his letter. On September 16, 1987, the Board of Estimate and Approval adopted Resolution No. 88.093 to approve the City of St. Louis Risk Management Approval. See Plaintiffs' Exhibit 9, Judge Bush Letter; Plaintiffs' Exhibit 10, Board Minutes/Risk Management Program.

56.     The Risk Management Program provides that it is "designed to protect the City and its related agencies against accidental loss or losses in the most cost effective manner available by applying to risks of accidental loss a risk management process" which includes "financing of risk consistent with the City's financial resources." Exhibit 10. The Risk Management Program further provides that the PFPC shall "be responsible for all risk management decisions and administer the Risk Trust Fund. The PFPC shall be responsible for the payment of all claims[.]" Exhibit 10. The Program explicitly states that "it is the intent to insure the City against all claims for damages[,]" other than for certain claims relating to damage to City property. See Exhibit 10.

57.     Agreements entered into between the PFPC and other public entities further demonstrate the intent of the entity to serve as an insurer of the City or a form of self-insurance. For example, a Cooperation Agreement entered with the Public Library of the City of St. Louis on May 1, 2014 (after the City's takeover of the Police Department) provides that "the City has established PFPC as an independent corporation formed for the purpose of establishing a

common fund to provide general liability … protection to the City, its agencies and other public entities operating within the City." Exhibit 11.

### PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT
### OF MATERIAL FACTS

1.      Prior to and on June 7, 2017, Hammett possessed an INTER ORDNANCE Sporter rifle with a serial number of S029900, which is an AK-47-type weapon that Hammett had purchased at Triple Threat Armory, LLC, on May 16, 2017. Ex. A, Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center Firearms Trace Summary; Ex. R, Dennis Torres Deposition, p. 123, ln. 2-8.

**RESPONSE: Admitted in part. The exhibits cited by Defendants demonstrate that Plaintiffs' Decedent legally owned and did not merely "possess" the Model AK-47 rifle.**

2.      On May 31, 2017, the honorable Judge Timothy Boyer signed a search warrant for 5414 Kingshighway seeking narcotics and firearms. Ex. B.

**RESPONSE: Admitted that a search warrant was signed. The Defendants characterization of the search warrant is denied. The search warrant signed by Judge Boyer was for marijuana, heroin, and illegal possession of firearms. (See Defendants' Ex. B) No heroin or illegally possessed firearms were found on the premises.  Only 3 ½ ounces of marijuana was allegedly found in the house. The Police Department was in control of the home for 6 hours after the shooting.  See Defs Ex. R, Plaintiff Dennis Torres deposition, p. 117.**

3.      Isaiah Hammett was the target of the search warrant. Ex. P, Benjamin Lacy Affidavit, ¶ 5.

**RESPONSE: If Defendants are alleging Isaiah Hammett was "targeted" at the time of the execution of the search warrant, that is admitted as he was shot by the SWAT team at least 24 times while unarmed. Otherwise denied. The warrant was not an arrest warrant but a search warrant for  marijuana, heroin, and illegal possession of firearms. See response to**

**para. 2. The affidavit of Officer Benjamin Lacy to obtain the search warrant does not identify any of the people or vehicles alleged to be involved in the alleged drug deals, either by name, physical description or vehicles by physical description or license plate numbers and therefor constitutes rank hearsay and therefore cannot be the basis for summary judgement nor can it excuse excessive force employed in the execution of that search warrant. See Defs Ex. B-1, Search Warrant Affidavit.**

4.      Detective Benjamin Lacy was the search warrant affiant and attested to his belief that marijuana, heroin, and firearms were being held and kept in 5414 South Kingshighway Blvd. by Hammett. Ex. B-1, Search Warrant Affidavit, Ex. P, Lacy Affidavit, ¶¶ 3-6.

   **RESPONSE: Denied in part. Admitted that Detective Benjamin Lacy was the search warrant affiant. See response to para. 2.**

5.      The front door of the residence at 5414 Kingshighway opens into a living room. Ex. I, Coats, p. 19, ln. 3-24, p. 32, ln. 5-24 (Ex. I-1, Diagram); Ex. F, Manasco, p. 13, ln. 16- p. 15, ln. 18 (Ex. F-1, Diagram); Ex. H, Seper, p. 31, ln. 4-p. 32, ln. 3 (Ex. H-1, Diagram); Ex. G, Becherer, p. 19, ln. 8-p. 20, ln. 23 (Ex. G-1, Diagram); Ex. J, Frigerio, p. 36, ln. 22 - p. 37, ln. 7; p. 42, ln. 25 – p. 43, ln. 7 (Ex. J-1, Diagram); Ex. K, Allen, p. 23, ln. 1-25 (Ex. K-1, Diagram).

   **RESPONSE: Admit.**

6.      A door to a front bedroom is located directly across from the front door of the residence. Ex. I, Coats, p. 19, ln. 3-24, p. 32, ln. 5-24 (Ex. I-1, Diagram); Ex. F, Manasco, p. 13, ln. 16- p. 15, ln. 18 (Ex. F-1, Diagram); Ex. H, Seper, p. 31, ln. 4-p. 32, ln. 3 (Ex. H-1, Diagram); Ex. G, Becherer, p. 19, ln. 8-p. 20, ln. 23 (Ex. G-1, Diagram); Ex. J, Frigerio, p. 36, ln. 22 - p. 37, ln. 7; p. 42, ln. 25 – p. 43, ln. 7 (Ex. J-1, Diagram); Ex. K, Allen, p. 23, ln. 1-25 (Ex. K-1, Diagram); Ex. D, Long Affidavit, ¶ 2.

**RESPONSE: Admit.**

7.     On June 7, 2017 Lance Coats, Glennon P. Frigerio, Joshua D. Becherer, Nicholas J. Manasco, Ronald Allen Jr., John C. Jones, Mark S. Seper, Jon B. Long, and Tim Boyce were City of St. Louis employees and members of a Police Department SWAT team, who while acting in the course and scope of their employment, participated in the execution of a search warrant at 5414 Kingshighway. See generally Ex. I, Coats; Ex. F, Manasco; Ex. H, Seper; Ex. G, Becherer; Ex. J, Frigerio; Ex. K, Allen; Ex. L, Declaration of Jones, ¶ 3; Ex. D, Long Affidavit, ¶¶ 6, 19, 27.

**RESPONSE: Admit.**

8.     After arriving at 5414 Kingshighway, the SWAT team formed a "stack" (a single file line) and approached the front porch.  Ex. J, Frigerio, p. 24, ln. 17-23; Ex. G, Becherer, p. 21, ln. 9-13.

**RESPONSE: Admit.**

9.     As the SWAT team approached the porch, a member of the team observed a surveillance camera mounted on the side of the house, and Sergeant Jones announced a "compromise." Ex. J, Frigerio, p. 31, ln. 22 – p. 32, ln. 4; Ex. K, Allen, p. 16, ln. 2-6; Ex. G, Becherer, p. 25, ln. 16-p. 26, ln. 3; Ex. E, Boyce, p. 18, ln. 18- p. 20, ln. 1; Ex. F, Manasco, p.19, ln. 9-13; Ex. H, Seper, p. 24, ln. 24- p.25, ln. 2; Ex. I, Coats, p. 23, ln. 23-24; Ex. L, Declaration of Jones, ¶¶ 6-7;

**RESPONSE: Denied that Defendant Officers first became aware of the surveillance camera during the execution of the search warrant. According to the Officers a "compromise" was announced because they allegedly did not know there was a surveillance camera. However these is a large camera readily visible from the street on the very front of the home. See Plaintiffs' Exhibit 12, a photograph of the camera produced by Defendants**

to Plaintiffs. Officers agreed that the camera is readily visible from the street. See Defs Ex. E, Boyce Depo. at 52, Ex. G, Becherer Depo., at 25; Defs Ex. F, Manasco Depo., pp. 19-20. Furthermore, according to the Affidavit of Officer Lacy and the Affidavit in Support of Search Warrant he was at the residence on numerous occasions. Officer Lacy allegedly did extensive surveillance of the home and area and therefore would have been well aware of the camera in advance of June 7, 2017. See Defs' Ex. P and Defs Ex. B-1. SWAT team members testified that the presence of cameras is something that should be looked for and if present that information should be conveyed to the SWAT team in the pre-execution briefings. See Defs Ex. E, Boyce Depo., pp. 19, 50; Defs Ex. I, Coats Depo., p. 13; Defs Ex, G, Becherer Depo., p. 25; Defs Ex. J, Frigerio Depo., pp. 12-14, 58; Defs Ex. K, Allen Depo., pp. 16, 19, 21; and Defs Ex. H, Seper Depo., p. 24. In addition, calling a "compromise" to justify elevating a knock and announce search to a no knock, "breach" of the front door with a battering ram and flash bang entry and assault on the home heightens the risk and danger to everyone. It is a known tactic of the police to announce compromise so that they don't have to knock and allow the resident a chance to cooperate and open the door in a non-violent manner. See Plaintiffs' Exhibit 7, Andrews Affidavit.

10.     Prior to pre-warrant briefing for the execution of this warrant, Frigerio had never heard of Hammett and was unaware of any of his activities. Ex. J, Frigerio, p. 20, ln. 1-7.

**RESPONSE: Denied in part. It is immaterial what the officer knew "prior to pre-warrant briefing." Before the execution of the warrant at both of the pre-execution briefings, Officer Lacy gave false information that Isaiah Hammett was allegedly involved in a murder, was a member of the Morgan Street Gangsters, and was a heroin dealer all for the purpose of generating fear in the minds of the SWAT team. See Defs Ex. I, Coats Depo., pp.**

**16-17 and 62; Defs Ex, G, Becherer Depo., pp. 15-17; Defs Ex. J, Frigerio Depo., p. 14; Defs Ex. F, Manasco Depo., pp. 11-12. They were told this so officers would believe that Isaiah would be "on edge." Defs Ex. G, Becherer Depo., p. 17. The officer's danger alerts were heightened by putting all of the officers on edge and making the situation appear far more dangerous than it actually was.**

11.     Prior to pre-warrant briefing for the execution of this warrant, Frigerio had never heard of Hammett and was unaware of any of his activities. Ex. J, Frigerio, p. 20, ln. 1-7.

 **RESPONSE: Denied in part. See response to Paragraph 10.**

12.     Prior to pre-warrant briefing for the execution of this warrant, Becherer had never heard of Hammett and did not know anything about the occupants of 5414 Kingshighway. Ex. G, Becherer, p. 18, ln. 17-19; p. 62, ln. 19-25.

**RESPONSE: Denied in part. See response to Paragraph 10.**

13.     Prior to pre-warrant briefing for the execution of this warrant, Boyce did not know anything about Hammett. Ex. E, Boyce, p. 24, ln. 2-4.

 **RESPONSE: Denied in part. See response to Paragraph 10.**

14.     Prior to pre-warrant briefing for the execution of this warrant, Seper had never heard of Hammett and did not know the people who lived at 5414 Kingshighway. Ex. H, Seper, p. 8, ln. 12-14; p. 59, ln. 1-3.

 **RESPONSE: Denied in part. See response to Paragraph 10.**

15.     Prior to pre-warrant briefing for the execution of this warrant, Coats knew nothing about Hammett or the people who lived at 5414 Kingshighway. Ex. I, Coats, p. 67, ln. 12-24.

 **RESPONSE: Denied in part. See response to Paragraph 10.**

16.     Prior to pre-warrant briefing for the execution of this warrant, Sergeant Jones did not

know Hammett and did not know his name. Ex L, Declaration of Jones, ¶ 19.

**RESPONSE: Denied in part. See response to Paragraph 10.**

17.     Prior to his involvement with the execution of the search warrant, Manasco had never

heard of Hammett or been to his residence. Ex. F, Manasco, p. 8, 7-13.

**RESPONSE: Denied in part. See response to Paragraph 10.**

18.     All members of the SWAT team, except Long and Boyce, were armed with .223 caliber

AR-15s that use .223 ammunition. Ex. J, Frigerio, p. 25, ln. 9-15; Ex. I, Coats, p. 72, ln. 7-13;

Ex. K, Allen, p. 14, ln. 4-14; Ex. D, Long Affidavit, ¶ 22; Ex. E, Boyce, p. 28, ln. 21-25.

**RESPONSE: Admit.**

19.     The type of .223 ammunition used by the SWAT team is designed to not penetrate walls.

Ex. I, Coats, p. 72, ln. 7-25.

**RESPONSE: Admit.**

20.     Boyce, because he was the "breacher" carrying a department-issued ram, was armed only

with his service pistol. Ex. E, Boyce, p. 28, ln. 21-25.

**RESPONSE: Admit.**

21.     Long, who was carrying the ballistics shield when the warrant was executed, was armed

with only a 9 mm Beretta handgun. Ex. E, Boyce, p. 28, ln. 3-11; Ex. D, Long Affidavit, ¶ 22.

**RESPONSE: Admit.**

22.     When the team arrived at the front door, several officers began loudly screaming "Police!

Search warrant!" Ex. C-1 (Cell phone video recording); Ex. C, Frigerio Affidavit, ¶¶ 5-11; Ex. P,

Lacy Affidavit, ¶¶ 8-10, 21-22; Ex. J, Frigerio, p. 33, ln. 14-21; Ex. K, Allen, p. 17, ln. 24 – p.

18, ln. 2; Ex. G, Becherer, p. 26, ln. 8- p. 17; p. 65, ln. 15-23; Ex. F, Manasco, p. 26, ln. 17-p. 27,

ln. 5; p. 48, ln. 3-10; Ex. H, Seper, p. 29, ln. 6-11; Ex. I, Coats, p. 30, ln. 14- 24; p. 71, ln. 21 – p. 72, ln. 1; Ex. L, Sgt. Jones Affidavit, ¶ 9; Ex. D, Long Affidavit, ¶ 14.

**RESPONSE: Denied. Homeowner Dennis Torres called 911 and on that recording clearly states "somebody is shooting up my house." The 911 call taker asked who is shooting up your house to which he responds "I do not know." Dennis' 911 call is referenced in an "Event Information" document produced by Defendants, which indicates that the officers did not properly announce their presence, as Dennis was not aware that the shooters were police officers: "CALLER SAYS HIS HOME IS GETTING SHOT UP. CALLER DIDN'T SEE ANYONE." See Plaintiffs' Exhibit 2, Event Information.**

**The only recording of the execution is by Mr. Kevin Broccard and as the Court can hear for itself on Defendants' Ex. C-1 there is in fact no "loudly screaming" of police at the beginning of that recording. The only evidence of the claimed announcement of "Police" is the Officers' claims that they did so. However, that testimony is contradicted by Officer Boyce, who testified that he had the responsibility to knock and announce as the breacher. He testified that he did not do that because of the purported "compromise." Ex. E, Boyce Depo., p. 19. Nowhere in his deposition or description of the events does he say that any other officer announced, "police, search warrant" at that time.). Plaintiffs' Expert Mr. Andrews' affidavit notes that the officers in their reports contradict who purportedly announced "police search warrant." When an officer "yells police search warrant" it is established that they are five times normal volume. In listening to the Broccard video you clearly hear that if they announced it while they were outside the house as they claim because you can clearly hear it at 3:50-3:58 time frame of the video after all of the shooting has stopped. In Mr. Andrews opinion the police did this so the neighborhood witnesses would be**

**able to say they heard "police search warrant" when interviewed after the officer involved shooting as required by standard operating procedure after Officer involved shootings. See Ex. 7, Andrews Affidavit, para. 11.**

23.     As the team continued to announce "Police! Search Warrant!" Boyce, "the breacher," swung a department-issued ram toward the front door. Ex. E, Boyce, p. 23, ln. 10-12; Ex. L, Declaration of Sgt. Jones, ¶ 9.

**RESPONSE: Denied in part as to the alleged announcement of "Police". See response to Para. 22. Admitted as to Officer Boyce swinging the department issued battering ram and breaking open the front door.**

24.     After the door was breached and swung open, Becherer threw a flash bang noise diversion device into the house, and it went off. Ex. G, Becherer, p. 31, ln. 5-17; Ex. J, Frigerio, p. 35, ln. 21- p. 36, ln. 6; Ex. K, Allen, p. 22, ln. 6; Ex. E, Boyce, p. 26, ln. 16-25; Ex. I, Coats, p. 30, ln. 10-13.

**RESPONSE: Admit.**

25.     After the door opened and the flash bang deployed, the team began entering the home. Ex. E, Boyce, p. 26, ln. 4-9; Ex. L, Sgt. Jones Affidavit, ¶ 11.

**RESPONSE: Admit.**

26.     As the team made entry, Becherer and other officers continued to yell "Police Search Warrant" as the officers entered. Ex. G, Becherer, p. 66, ln. 4-9; Ex. F, Manasco, p. 26, ln. 17-p. 27, ln. 5; Ex. I, Coats, p. 31, ln. 3-5; Ex. D, Long Affidavit, ¶ 17.

**RESPONSE: Denied. See response to Paragraph 22.**

27.     Long, who was holding the ballistic shield, entered first. Ex. E, Boyce, p. 27, ln. 21-23; Ex. F, Manasco, p. 17, ln. 23 – p. 18, ln. 2; Ex. D, Long Affidavit ¶ 8, 17.

**RESPONSE: Admitted.**

28.     Manasco entered the home behind Long, who was holding the ballistic shield.  Ex. F,
Manasco, p. 28, ln. 3-22; p. 34, ln. 5-7; p. 52, ln. 18-22; Ex. D, Long Affidavit ¶ 8, 17.

**RESPONSE: Admitted.**

29.     Coats entered behind Long and Manasco, and together they approached the door to the
front bedroom, which was Hammett's room. Ex. I, Coats, p. 31, ln. 6 – p. 33, ln. 21; p. 19, ln. 3-
24, p. 32, ln. 5-24 (Ex. I-1, Diagram); Ex. F, Manasco, p. 28, ln. 3-22; Ex. D, Long Affidavit, ¶¶
17-18.

**RESPONSE: Admitted.**

30.     At that point gunfire started coming through the bedroom door toward the officers. Ex. F,
Manasco, p. 13, ln. 16- p. 15, ln. 18 (Ex. F-1, Diagram), p. 28, ln. 3-22; p. 52, ln. 18-22; Ex. I,
Coats, p. 33, ln. 22- p. 43, ln. 11; Ex. D, Long Affidavit, ¶¶ 18-20.

**RESPONSE: Denied. The allegations by the Officers that numerous rounds of AK-47
rounds were fired from the bedroom is directly contradicted by the evidence. No gun shots
shots were directed at the officers. The damage done to the bedroom walls was in fact done
by the 100 plus rounds fired by the Police with their 9mm handguns and .223 caliber
assault rifles. Officers testified that no officers were shot during execution of the warrant.
See Defs Ex. E, Boyce Depo., p. 48; Defs Ex. H, Seper Depo., p. 44. During his ballistics
investigation Mr. Andrews did not find any evidence of damage to the front living room
wall which would have been there if the AK-47 rounds were fired through the bedroom
wall and door as claimed by the Officers in their post-shooting interviews and depositions.
See Plaintiffs' Ex. 7, Andrews Affidavit, para. 15.**

**In addition, Isaiah Hammett's hands were bagged for the purpose of preserving any**

gunshot residue on his hands in accordance with the Police Department procedure, but his hands were never tested for gunshot residue. See Ex. M, Sommer Depo., pp. 52, 65-66; Ex. 3, Ely Depo., p. 62.

The AK-47 prototype legally owned by Isaiah Hammett that was allegedly fired through the walls was apparently never tested to determine if it had been recently fired, as Defendants have presented no such evidence and Defendants' Evidence Technician testified that she was unaware of any such testing. See Defs Ex. M, Sommer Depo., p. 62.

Officer Sommer only documented ten (10) 7.62 cartridge casings at the scene. However, the photographs provided by the department of the alleged AK-47 shell casings taken immediately after the shooting do not show signs of having been recently fired because they do not have any of the normal markings of a recently fired shell. There is in fact demonstrable evidence that the shell's had not come from a cartridge that was recently fired. This is consistent with the Police Department's information that Isaiah Hammett had an AK-47 model rifle that they intended to allege he fired at them. Of importance, if Isaiah Hammett fired as many rounds as the police claim there would have been many more than 10 shell casings. See Plaintiffs' Ex. 7, Andrews Affidavit, para. 13.

In addition, the Department's photographs of the alleged AK-47 shell casings do not match up with the ballistics evidence of the scene. When the round of an AK-47 is ejected to allow the next round to enter the chamber it causes scratches on the casings as it is ejected causing "extraction marks". The pictures of the casings lying on the floor of the Torres home do not have these shiny markings because the casings in the photographs show oxidation. Therefore, the AK-47 casings had not been fired on June 7, 2017. Therefore the evidence of

the scene does not match up with the claims of the SWAT Officers in their post shooting interviews or deposition testimony. See Plaintiffs' Ex. 7, Andrews Affidavit, para. 14.

During his ballistics investigation Mr. Andrews did not find any evidence of damage to the front living room wall which would have been there if the AK-47 rounds were fired through the bedroom wall and door as claimed by the Officers in their post-shooting interviews and depositions. See Plaintiffs' Ex. 7, Andrews Affidavit, para. 15.

31.     As shots were fired from the bedroom and through the wooden door, Manasco could feel fragments from the wood door hitting him in the legs. Ex. F, Manasco, p. 52, ln. 7-12.

**RESPONSE: Denied. See response to Para. 30.**

32.     After Seper entered the home, Seper observed gunfire coming towards the officers from the bedroom door and wall, and he began moving left into the living room. Ex. H, Seper, p. 30, ln. 10-18; p. 47, ln. 2 – p. 48, ln. 4; p. 61, ln. 5-16, p. 31, ln. 4-11 (Ex. H-1, Diagram),

**RESPONSE: Denied. See response to Paragraph 30.**

33.     Manasco returned fire through the bedroom door and began moving to his left as he continued firing through the bedroom door. Ex. F, Manasco, p. 28, ln. 23 – p. 30, ln. 23; p. 53, ln. 2-9.

**RESPONSE: Denied that Manasco "returned fire." See response to Paragraph 30.**

34.     Long returned fire with his 9 mm handgun while he and Manasco moved left. Ex. D, Long Affidavit, ¶¶ 21-22.

**RESPONSE: Denied that Long "returned fire." See Response to para. 30.**

35.     Coats held in place as Manasco and Long moved left, and Coats returned fire. Ex. I, Coats, p. 35, ln. 1 – p. 36, ln. 22.

**RESPONSE: Denied that Coats "returned fire." Admit the Officers continued to fire their**

**weapons in excess of 90 times, however they were not returning fire. See Response to Paragraph 30.**

36.     Long fell to the ground and his helmet flew off. Ex. D, Long Affidavit, ¶ 23; Ex. I, Coats, p. 35, ln. 25 - p.36 ln. 6.

**RESPONSE: Denied. Officers Long and Coats testified that this took place however there is no corroborating evidence. Officer Seper testified that no officers were hit, including on their uniforms. Defs Ex. H, Seper Depo. p. 44.**

37.     When Long fell to the ground and his helmet flew off, Coats thought Long had been shot. Ex. I, Coats, p. 35, ln. 25- p. 36, ln. 9.

 **RESPONSE: Denied. See response to Para. 36.**

38.     Long had not been shot after he got back up, Coats positioned himself behind Long and the ballistics shield, and as more gunfire came from the bedroom wall, Coats fired back. Ex. D, Long Affidavit, ¶ 23; Ex. I, Coats, p. 35, ln. 25 – p. 37, ln. 17-21.

**RESPONSE: Denied in part. Admitted that neither Long nor any other officer was ever shot. Denied that gunfire came from the bedroom wall and that Coats fired "back." See Response to paragraph 30.**

39.     Boyce did not enter the house, and as soon as he heard gunfire, he jumped off the porch into the alleyway. Ex. E, Boyce, p. 28, ln. 15- p. 28, ln. 15.

**RESPONSE: Admit. Officer Boyce testified to jumping off the porch.**

40.     Becherer entered the home and was standing to the left of the couch against the bedroom wall when he observed gunfire from inside bedroom through the bedroom wall into the living room toward the officers Ex. G, Becherer, p. 31, ln. 14 - p. 33, ln. 14; p. 67, ln. 3-9, p. 19, ln. 8- p. 20, ln. 23 (Ex. G-1, Diagram)

**RESPONSE: Denied. See response to paragraph 30.**

41.     Becherer heard the gunfire and observed the wall to his right "coming apart" from the gunfire. Ex. G, Becherer, p. 33, ln. 15- p. 35, ln. 16; p. 36, ln. 2-5.

**RESPONSE: Denied. See response to paragraph 30.**

42.     After Frigerio stepped through the threshold of the front door, he heard gunfire erupt, felt bullets flying past him, and realized he was being shot at. Ex. J, Frigerio, p. 36, ln. 8- p. 39, ln. 4; p. 36, ln. 14 – p. 37, ln. 7; p. 42, ln. 25 – p. 43, ln. 7 (Ex. J-1, Diagram); Ex. I, Coats, p. 38, ln. 1-13.

**RESPONSE: Denied. See response to Paragraph 30.**

43.     Frigerio observed plaster exploding from the bedroom wall in his direction. Ex. J, Frigerio, p. 39, ln. 9-10.

**RESPONSE: Denied. See response to Paragraph 30.**

44.     Frigerio returned fire through the bedroom wall and bedroom door. Ex. J, Frigerio, p. 41, ln. 5-7.

**RESPONSE: Denied that Frigerio "returned" fire. See response to paragraph 30.**

45.     Allen was located outside the front door when he first heard shots fired. Ex. K, Allen, p. 26, ln. 20-21; p. 26, ln. 25 – p.  27, ln. 10.

**RESPONSE: Admit.**

46.     After additional volleys of shots were fired, Allen entered the home through the front door. Ex. K, Allen, p. 27, ln. 17-21; p. 23, ln. 1-25 (Ex. K-1, Diagram).

**RESPONSE: Admit.**

47.     After hearing gunfire, Sergeant Jones entered the home and observed gunfire coming through the front wall of the bedroom wall. Ex. L, Declaration of Sergeant Jones, ¶ 11-12.

**RESPONSE: Denied. See Response to Paragraph 30.**

48.     Sergeant Jones returned fire through the bedroom wall. Ex. L, Declaration of Sergeant Jones, ¶ 12.

**RESPONSE: Admit that Sergeant Jones fired through the bedroom wall. Deny that he "returned" fire. See response to paragraph 30.**

49.     After he entered the house and was standing to the left of the front door, Allen observed gunfire coming through the bedroom door toward the front of the house. Ex. K, Allen, p. 28, ln. 13-22 (Ex. K-1, Diagram); p. 31, ln. 5-10.

**RESPONSE: Denied. See Response to Paragraph 30.**

50.     In response, Allen fired several shots toward the bedroom door. Ex. K, Allen, p. 30, ln. 10-21.

**RESPONSE: Denied that it was "in response." See Response to Paragraph 30.**

51.     Becherer also observed gunfire come through the northern wall of the bedroom, and he then moved closer to the fireplace located on the northern wall of the living room.  Ex. G, Becherer, p. 39, ln. 6- p. 40, ln. 4.

**RESPONSE: Denied. See response to Paragraph 30.**

52.     After he moved left away from the bedroom door, Manasco observed shots coming through the bedroom wall, and Manasco returned fire through the bedroom wall. Ex. F, Manasco, p. 31, ln. 6- p. 32, ln. 9.

**RESPONSE: Denied. See Response to Paragraph 30.**

53.     Long continued to return fire at the wall in an attempt to stop the gunfire directed at him and the other officers. Ex. D, Long Affidavit, ¶¶ 24-35.

**RESPONSE: Denied. See Response to Paragraph 30.**

54.     Manasco also observed gunfire from within the bedroom travel through the dining room wall in a northernly direction. Ex. F, Manasco, p. 33, ln. 18-p.34, ln. 2.

**RESPONSE: Denied. See response to Paragraph 30.**

55.     After Seper moved to his left and towards the fireplace, he observed Hammett in the foyer looking around the doorjamb with a rifle shouldered and pointed in his direction. Ex. H, Seper, p. 31, ln. 12 – p. 32, ln. 6 (Ex. H-1, Diagram); p. 33, ln. 4-10; p. 34, ln. 3- 18; p. 62, ln. 1- p. 63, ln. 22.

**RESPONSE: Denied. The allegation that Plaintiffs' deceased, Isaiah Hammett, was carrying the AK-47 at this point in time is directly contradicted by the fact that all witnesses who handled the AK-47, photographed the AK-47, or viewed photographs of the AK-47 have denied that there was any blood on the AK-47 after it was allegedly being held by Isaiah Hammett when he was shot at least 23 times.  See Plaintiffs' Ex. 1, Photographs of AK-47. Officer Sommer, the evidence technician, testified that she documented in her reports that there were "areas of apparent blood on the floor inside the dining room directly west of the victim. A larger area of apparent blood was located on the floor inside the dining room following investigation completed by the medical examiner. I observed an area of apparent blood on the south door frame of the east doorway of the dining room." Defs Ex. M, Sommer Depo., p. 33. Despite the copious amount of blood documented as a result of Isaiah being shot dozens of times, she did not document any blood  on the "AK-47" model gun, and there is no blood on the weapon in the photographs taken by the police. Defs Ex. M, Sommer Depo., pp. 33-37. The gun was turned over to Officer Skaggs for conveyance back to police headquarters. Officer Skaggs similarly testified that, based on the photographs taken, he did not see any blood on either**

side of the weapon. **Plaintiffs' Ex. 2, Officer Skaggs Depo., pp. 24-25. Dr. Ely also did not see any blood on the gun as depicted in photographs of the AK-47. Plaintiffs' Exhibit 3, Dr. Ely Depo. pp. 49-50.**

56.     When Hammet first looked through the doorjamb with a rifle shouldered and pointed in the direction of Seper, Hammet had a clear line of sight to Seper who was wearing a full tactical uniform marked "police." Ex. H, Seper, p. 62, ln. 5 – 16.

**RESPONSE: Denied that Isaiah had a rifle shouldered or pointed in the direction of Seper. See response to Paragraph 55.**

57.     The entire SWAT team was in full tactical uniform marked "police." Ex. H, Seper, p. 62, ln. 17-19.

**RESPONSE: Admit.**

58.     Manasco slid behind Seper so that Seper could provide cover while Manasco changed magazines, and at that point, Seper began firing shots toward the back of the house. Ex. F, Manasco, p. 34, ln. 10-23.

**RESPONSE: Admit.**

59.     Seper felt threatened by Hammett's rifle pointed in his direction so he fired, hitting the door frame. Ex. H, Seper, p. 34, ln. 19-23.

**RESPONSE: Denied. See response to Paragraph 55.**

60.     After Seper shot, Hammett recessed back from the doorway for a couple seconds and then entered the dining room with the rifle shouldered. Ex. H, Seper, p. 35, ln. 5- p. 36, ln. 3 (Ex. H-1, Diagram); p. 64, ln. 22- p. 65, ln. 25.

**RESPONSE: Denied. See response to Paragraph 55.**

61.     Coats also saw Hammett walk into the dining room in the officers' direction with a rifle

at a "low ready," or shouldered just below his line of sight, and believing Hammett was going to try to kill him or the other officers located to his left, Coats fired at Hammett. Ex. I, Coats, p. 43, ln. 18 - p. 47, ln. 14; p. 48, ln. 22- p. 50, ln. 14; p. 74, ln. 8-13.

**RESPONSE: Denied. See response to Paragraph 55.**

62.     Shortly after Manasco completed his magazine change, he also observed Hammett emerge through the foyer doorway with an assault rifle shouldered and pointed at him, and fearing for his life, he fired at Hammett. Ex. F, Manasco, p. 35, ln. 6- p. 36, ln. 6; p. 38, ln. 2-6.

**RESPONSE: Denied. See response to Paragraph 55.**

63.     When Hammett entered through the doorway into the dining room with the AK-47 shouldered, Seper again felt threatened and fired rounds at him. Ex. H, Seper, p. 36, ln. 4-8; p. 37, ln. 12-22.

**RESPONSE: Denied. See response to Paragraph 55.**

64.     Becherer also observed Hammett walk into the dining room holding an AK-47 rifle at his right shoulder pointing at him. Ex. G, Becherer, p. 42, ln. 12- p 45, ln. 1. (exhibit

**RESPONSE: Denied. See response to Paragraph 55.**

65.     Becherer fired at Hammett in response to seeing him approach with an AK-47 pointed in his direction. Ex. G, Becherer, p. 42, ln. 12-19.

**RESPONSE: Denied. See response to Paragraph 55.**

66.     Long also observed a gun barrel appear through the entry way to the living room and saw the suspect enter the with an AK-47-style assault rifle shouldered just below sights and pointed in the officers' direction. Ex. D, Long Affidavit, ¶¶ 29.

**RESPONSE: Denied. See response to Paragraph 55.**

67.     Long observed gunfire coming from his left, and fearing for his life, he fired one round in

the suspect's direction. Ex. D, Long Affidavit, ¶¶ 30-32.

**RESPONSE: Denied. See response to Paragraph 55.**

68.    Hammett was struck by gunshots and fell to the ground. Ex. F, Manasco, p. 38, 12-14; Seper, p. 38, ln. 16-25; Ex. I, Coats, p. 49, ln. 24- p.50, ln.3.

**RESPONSE: Admitted that Hammett was struck by gunshots. Denied that he was struck while standing and only then fell to the ground. As set forth in Plaintiffs' Statement of Additional Facts, para. 29-37, Dr. Erin Ely, Assistant Medical Examiner, testified that most bullets striking Isaiah Hammett, including the three lethal wounds to the neck, chest and pelvis, "tracked upward, backward, and rightward." See Ex. 4, Medical Examiner's Report.  In her video deposition, Dr. Ely marked the approximate locations of the gunshot wounds to Isaiah's body on an illustration of an anatomical figure. She then demonstrated the trajectories of the bullets on that ilustration with a dowel rod. See Plaintiff's Exhibit 5, Still Frames of Ely Video Depo. As is clear from her demonstrations, Dr. Ely concluded that the barrel of the guns had to be positioned lower than, or below, the wounds at the time Isaiah was shot in order to create the upward trajectory. See Plaintiffs' Statement of Additional Facts, see also Ex. 3, Dr. Ely Depo. pp. 24-25. Plaintiff's Exhibit 6 is the anatomical illustration together with the trajectories of the bullets based on and as demonstrated by Dr. Ely in Exhibit 5. See Demonstrative Exhibit 6. There is no testimony from the Officers that they were firing from below Isaiah Hammett. As set forth in Defendants' Statement of Uncontroverted Material Facts, Officers Becherer, Manasco, Seper and Coats all fired at Plaintiffs' decedent Isaiah Hammett from an upright position from the living room into the dining room. The officers testified to their approximate locations in the living room at the time they shot and killed Isaiah Hammett. See Defs Ex.**

**G, Joshua Becherer Depo. pp. 40-41, Defs Ex. F, Nicholas Manasco Depo. Pp. 33-35, Defs Ex. H, Mark Seper Depo. Pp. 31-33, Defs Ex. I, Lance Coats Depo. P. 42. ETU Officer Sommers created a diagram of the house with the approximate location of Isaiah's body in the dining room. Plaintiff's Demonstrative Exhibit 13 demonstrates the locations of the Officers when they shot Isaiah on Sommer's diagram based on their testimony. The location the officers testified to are consistent with the trajectories provided by Dr. Ely, showing that the lethal bullets entered Isaiah on the left side of his neck, chest and pelvis, and moved rightward and backward through his body. However, the upward trajectory the bullets took through his body wholly contradicts the officers' statements that he was standing at the time he was shot. Because the officers were not lying on the floor shooting up at Isaiah, the only reasonable inference is that their positions were reversed: Isaiah was lying on the floor while the officers shot down into his body.**

69.     No more shots were fired after Hammett fell to the ground. Ex. R, Torres, p. 126, ln. 9-20.

**RESPONSE: Denied. See response to paragraph 68.**

70.     After Hammett no longer posed a threat, and without having entered Hammet's bedroom, the team backed out of the house through the front door. Ex. F, Manasco, p. 40, ln. 15-19; Ex. H, Seper, p. 43, ln. 2-11; Ex. I, Coats, p. 52, ln. 5-16; Ex. D, Long Affidavit, ¶¶ 33-34.

**RESPONSE: Denied that Isaiah Hammett ever "posed a threat" because he never held or fired the AK-47. See responses to paragraphs 30 and 55.**

71.     After gunfire ceased, Frigerio reentered the house and observed shell casings on the floor of the bedroom. Ex. J, Frigerio, p. 49, ln. 22 – p. 50, ln. 4.

RESPONSE: Denied that the officers saw or recovered shell casings or any implication that they were from a recently fired weapon.  Officer Sommer only documented ten (10) 7.62 cartridge casings at the scene. However, the photographs provided by the department of the alleged AK-47  shell casings taken immediately after the shooting do not show signs of having been recently fired because they do not have any of the normal markings of a recently fired shell. There is in fact demonstrable evidence that the shell's had not come from a cartridge that was recently fired.  This is consistent with the Police Department's information that Isaiah Hammett had an AK-47 model rifle that they intended to allege he fired at them.  Of importance, if Isaiah Hammett fired as many rounds as the police claim there would have been many more than 10 shell casings. See Ex. 7, Andrews Affidavit, para. 13.

In addition, the Department's photographs of the alleged AK-47 shell casings do not match up with the ballistics evidence of the scene. When the round of an AK-47 is ejected to allow the next round to enter the chamber it causes scratches on the casings as it is ejected causing "extraction marks".  The pictures of the casings lying on the floor of the Torres home do not have these shiny markings because the casings in the photographs show oxidation. Therefore, the AK-47 casings had not been fired on June 7, 2017.  Therefore the evidence of the scene does not match up with the claims of the SWAT Officers in their post shooting interviews or deposition testimony. See Ex. 7, Andrews Affidavit, para. 14.

72.     After reentering the house, Manasco observed shell casings on Hammett's bedroom floor. Ex. F, Manasco, p. 44, ln. 11-23.

 RESPONSE: Denied.  See response to paragraph 71.

73.     After reentering the house, Coats observed casings he believed to be from an AK-47 on the floor of Hammett's bedroom. Ex. I, Coats, p. 76, ln. 1-4.

**RESPONSE: Denied. See response to paragraph 71.**

74.    Boyce never entered the house until the shooting had stopped, and the scene was secure. Ex. E, Boyce, p. 32, ln. 4- p. 33, ln. 4.

**RESPONSE: Admit.**

75.    Frigerio never saw or observed Hammett at any point. Ex. J, Frigerio, p. 52, ln. 21-23.

**RESPONSE: Admit.**

76.    Becherer never entered Hammett's bedroom. Ex. G, Becherer, p. 59, ln. 16-17.

**RESPONSE: Admit.**

77.    Seper never entered Hammett's bedroom. Ex. H, Seper, p. 67, ln. 3-5.

**RESPONSE: Admit.**

78.    After Hammett was shot and collapsed to the ground, the AK-47 rifle he had been carrying was located on the floor next to the right side of his body. Ex. K, Allen, p. 45, ln. 23- p. 46, ln. 2; Ex. I, Coats, p. 47, ln. 15 – p. 48, ln. 1; Ex. G, Becherer, p. 43, ln. 24- 44, ln. 4; p. 46, ln. 6-12; Ex. G-2 (Photograph of Hammett and AK-47); Ex. G-3 (Photograph of AK-47); Ex. N, Skaggs, p. 20, ln. 14-16; Ex. R, Torres, p. 41, ln. 8-18; Ex. R-1 (Photograph of Hammett).

**RESPONSE: Denied that Isaiah had been carrying the AK-47 or that it was located on the floor next to his body after he was shot, as there was blood everywhere except on the weapon and there is no evidence that the weapon was ever fired. The reasonable inference is that the weapon was placed next to Isaiah after he was killed and prior to the photograph cited by Defendants being taken. See response to paragraph 55.**

79.    Dennis Torres was located in a back bedroom throughout the duration of the shooting. Ex. Q, Torres, p. 24, ln. 17 - p. 121, ln. 15; Ex. G, Becherer, p. 37, ln. 14-19.

**RESPONSE: Admit.**

80.    Exhibit S depicts the exterior west wall and door of Hammett's bedroom as it appeared on June 7, 2017 after the shooting.

**RESPONSE: Admit.**

81.    Exhibit T depicts the interior south wall next to Hammett's bedroom door as it appeared on June 7, 2017 after the shooting.

**RESPONSE: Admit.**

82.    Benjamin Lacy is not a member of SWAT, did not enter the residence on June 7, 2017 prior to Hammett's death, and did not fire any shots during the execution of the search warrant at 5414 Kingshighway on June 7, 2017. Ex. P, Lacy Affidavit, ¶ 19.

**RESPONSE: Admit.**

83.    Subsequent to the death of Hammett and the execution of the search warrant, City of St. Louis Evidence Technician Jennifer Sommer arrived at the scene, located and documented ballistics evidence, and subsequently authored a report describing the ballistics evidence she seized and its location within the house.  Ex. M, Sommer, p. 18, ln. 23- p. 19, ln. 4, p. 49, ln. 21 – p. 50, ln. 8; Ex. M-1 (ETU Notes).

**RESPONSE: Admit.**

84.    Among a variety of ballistics evidence, Sommer seized 10 cartridge cases, head stamped "7.62X39," from the floor of the front bedroom and conveyed this evidence to the Police Department laboratory. M-1 (ETU Notes), pp. 18-20; Ex. M, Sommer, p. 51, ln. 7-20.

**RESPONSE: Denied. The casings which police claimed to have recovered from the scene were old cartridges which had not been recently fired. There is no evidence that gunshot residue was recovered from Isaiah, despite his hands being bagged, or evidence that**

**Defendants tested the gun to determine if it had recently been fired. Plaintiff's expert testifies that his inspection of the premises revealed no bullet holes from such a weapon at the scene or where they would have hit if fired as the Officers claim. See response to paragraphs 30, 55 and 71; see also Exhibit 7, Andrews Affidavit.**

85.     Subsequent to the execution of the search warrant, City of St. Louis Police Detective Robert Skaggs located an AK-47 type semi-automatic rifle on the floor to the right of Hammett's body and seized it as evidence. Ex. N, Deposition of Skaggs, p.14, ln.12-18, p. 15, ln. 24-p.16, ln. 1; p. 20, ln. 14-24.

**RESPONSE: Denied. See response to paragraphs 30, 55, 71 and 78.**

86.     Julie Davis performed testing comparing the 10 Barnaul stamped, 7.62x39 mm caliber cartridge cases collected by Sommer to the Inter Ordnance, Inc. make Sporter model, 7.62x39 mm caliber semi-automatic rifle with serial #S029900 also recovered from the scene of the incident. Ex. O, Julie Davis Affidavit, ¶¶ 4-9.

**RESPONSE: Denied that accurate testing of the cartridge cases was performed or that they had been fired on the day in question. See response to paragraphs 30, 55 and 71.**

87.     Through testing, Julie Davis concluded, to a reasonable degree of scientific certainty, that 9 of the Barnaul stamped 7.62x39mm caliber cartridge cases recovered from the scene of the incident by Sommers were fired in the Inter Ordnance Inc. make, Sporter model, 7.62x 39mm caliber semi-automatic rifle Detective Skaggs seized from the scene. Ex. O, Julie Davis Affidavit, ¶¶10-11.

**RESPONSE: Denied that accurate testing of the cartridge cases was performed or that they had been fired on the day in question. See response to paragraphs 30, 55 and 71.**

88.     Coats later discovered that a bullet fragment lodged in his elbow as a result of this

shooting. Ex. I, Coats, p. 55, ln. 21-p. 56, ln. 13.

**RESPONSE: Denied. Officer Seper testified that no officers were hit, including on their uniforms. Ex. H, Seper Depo. p. 44. See response to paragraphs 30, 55 and 71.**

89.     Exhibit Q is a true and accurate recording of the statement made by Dennis Torres on June 7, 2017 to the City of St. Louis Police Department following this incident. Ex. R, Torres, p. 23, ln. 15 - p. 24, ln. 9.

**RESPONSE: Admit.**

90.     As he exited the house, Dennis Torres saw Hammett on the living room floor after he had been shot. Ex. R, Torres, p. 41, ln. 9-12.

**RESPONSE: Admit.**

91.     No officers used force against Dennis Hammett during or after the execution of the search warrant. See generally, Ex. R, Torres, pp. 22-72.

**RESPONSE: Denied. As set forth in Plaintiffs' Statement of Additional Facts, Defendant Officers repeatedly fired their weapons in Plaintiff Dennis Torres' direction and into his bedroom where he was located at the time of the shooting. Among other things, after Dennis yelled "Isaiah" two more shots went off right by his head. If he would have gotten up any sooner, he would have gotten hit in the head. Defs Ex. R, Dennis Torres Depo., p. 119. Those two bullets ended up in the wall. The holes are still there. Dennis Torres Depo., p. 120.**

92.     Exhibit R-1 fairly and accurately depicts the scene where Hammett was lying on the living room floor as Torres saw it that day. Ex. R, Torres, p. 41, ln. 13 – 18.

**RESPONSE: Denied. As set forth above, given the evidence, including the ballistics evidence of Plaintiff's expert and the fact that the AK-47 had no blood on it after the**

shooting, the only conclusion can be that an Officer placed the gun under Isaiah Hammett's body after the shooting.

93.     Exhibit R-1 shows a rifle next to Hammett. Ex. R-1.

**RESPONSE: Admit that the exhibit shows a rifle. Denied that the photo accurately reflects the scene at the time of Isaiah Hammett's death. See responses to paragraphs 91 and 92.**

94.     City has not purchased any liability insurance policy to cover torts, personal injuries, or any other claims that do not arise from dangerous property conditions or the operation of motor vehicles. Ex. U, Kistler Dec. ¶ 3.

**RESPONSE: Denied that the City has not obtained liabiltiy insurance applicable to this claim and/or does not have a duly enacted self-insurance plan. See Plaintiffs' Statement of Additional Facts, paras. 50 to 57.**

95.     City has no ordinance that purports to adopt a plan of self-insurance providing liability coverage for City for tort claims other than those arising from motor vehicle accidents with vehicles operated by City employees and claims arising from dangerous conditions of public property. Ex. V, Flowers Aff. ¶ 6.

**RESPONSE: Plaintiffs deny any inference that the City has not obtained liabiltiy insurance applicable to this claim and/or does not have a duly enacted self-insurance plan, as the City has repeatedly admitted this and City documents reflect this, including referring to the PFPC and Risk Management Program as "a form of general liability protection" that provides coverage for "all claims" and "self-insurance." See Plaintiffs' Statement of Additional Facts, paras. 50 to 57. Further answering, the declarant Mrs. Flowers testified to a complete lack of knowledge regarding the Public Facilities Protection Corporation, including the resolution of the Board of Estimate and Approval which authorized the**

City's Risk Management Fund, the fact that the Risk Management Fund is funded by the City and from other public sources and the fact that it is independently administered by the PFPC.

96.     City has no ordinance that purports to purchase or obtain insurance from the entity known as the Public Facilities Protection Corporation. Ex. V, Flowers Aff. ¶ 7.

**RESPONSE: Plaintiffs deny any inference that the City has not obtained liabiltiy insurance applicable to this claim and/or does not have a duly enacted self-insurance plan, as the City has repeatedly admitted this and City documents reflect this, including referring to the PFPC and Risk Management Program as "a form of general liability protection" that provides coverage for "all claims" and "self-insurance." See Plaintiffs' Statement of Additional Facts, paras. 50 to 57. Further answering, the declarant Mrs. Flowers testified to a complete lack of knowledge regarding the Public Facilities Protection Corporation, including the resolution of the Board of Estimate and Approval which authorized the City's Risk Management Fund, the fact that the Risk Management Fund is funded by the City and from other public sources and the fact that it is independently administered by the PFPC.**

DOWD & DOWD, P.C.

By:     /s/ Richard K. Dowd
        Richard K. Dowd (33383)
        Alex R. Lumaghi (56569)
        211 N. Broadway, Suite 4050
        St. Louis, MO 63102
        (314) 621-2500
        (314) 621-2503 Facsimile
        rdowd@dowdlaw.net
        alex@dowdlaw.net

        *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above motion was electronically filed on June 2, 2020 and a copy was served by the Court's electronic delivery system on all attorneys of record.

/s/ Richard K. Dowd