**Deposition of:**

Erin E. Ely, M.D.

**Case:**

Gina Torres, et al.
v.
City of St. Louis, et al.

**Date:**

02/05/2020



360 Litigation Services
10097 Manchester Rd, Ste 102
St. Louis, Missouri  63122
360LitigationServices.com
314-394-2206

**Exhibit 3**

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF MISSOURI

3                    EASTERN DIVISION

4

5    GINA TORRES and DENNIS L. TORRES,

6

7    Plaintiffs,

8

9     vs.                      Case No. 4:19-cv-01525-DDN

10

11   CITY OF ST. LOUIS, ET AL.,

12

13   Defendants.

14

15

16

17          VIDEOTAPED DEPOSITION OF ERIN E. ELY, M.D.,

18   taken on behalf of the plaintiff, at the Office of the

19   Medical Examiner, 1300 Clark Avenue, in the city of

20   St. Louis, state of Missouri, on Wednesday, the

21   5th day of February, 2020, before Heather L. Shallow,

22   Certified Court Reporter, Registered Professional

23   Reporter, Registered Merit Reporter.

24

25

1    APPEARANCES OF COUNSEL:

2

3       FOR THE PLAINTIFFS:

4            Richard K. Dowd, Esq.

5            Dowd & Dowd, P.C.

6            211 North Broadway - Suite 4050

7            St. Louis, Missouri  63102

8            (314) 621-2500

9            rdowd@dowdlaw.net

10

11      FOR THE DEFENDANTS:

12           Erin K. McGowan, Esq.

13           City Counselor's Office

14           1200 Market Street

15           Room 314, City Hall

16           St. Louis, Missouri  63103

17           (314) 622-4618

18           McGowanE@stlouis-mo.gov

19

20      ALSO PRESENT:

21           Steve Johnston, Legal Video Specialist

22           360 Litigation Services

23           10097 Manchester Road - Suite 102

24           St. Louis, Missouri  63122

25           (314) 394-2206

```
 1                INDEX                          PAGE

 2   Examination by Mr. Dowd                    4, 62

 3   Examination by Ms. McGowan                   60

 4

 5              PLAINTIFF'S EXHIBITS             PAGE

 6   1 – Post-Mortem Examination report           8

 7   2 – 8x10 photograph                         12

 8   3 – 8x10 photograph                         49

 9   4 – 8x10 photograph                         50

10   5 – 8x10 photograph                         51

11   6 – 8x10 photograph                         54

12   7 – Floor plan diagram                      56

13   8 – Anatomic diagram (front)                15

14   9 – Anatomic diagram (back)                 31

15              DEFENDANT'S EXHIBITS

16   A – Post-Mortem Examination report          62

17

18   (Original exhibits retained by Mr. Dowd.)

19

20

21

22

23

24

25
```

1          ERIN E. ELY, M.D.,

2   of lawful age, having been first duly sworn to testify

3   the truth, the whole truth, and nothing but the truth

4   in the case aforesaid, deposes and says in reply to

5   oral interrogatories propounded as follows, to wit:

6          THE VIDEOGRAPHER:  We are on the record at

7   10:13.  Today's date is February 5th, 2020, and we are

8   at the Office of the Medical Examiner of St. Louis.

9   The address is 1300 Clark Avenue, St. Louis, Missouri.

10         We are here today for the deposition of

11  Dr. Erin Ely to be taken in the case of Gina Torres

12  versus the City of St. Louis.

13         At this time would counsel identify

14  themselves for the record, please.

15         MR. DOWD:  Richard Dowd for the plaintiffs.

16         MS. MCGOWAN:  Erin McGowan for the

17  defendants.

18         THE VIDEOGRAPHER:  Thank you.  Would the

19  court reporter please swear in the witness.

20         (Oath was administered.)

21                    EXAMINATION

22  QUESTIONS BY MR. DOWD:

23     Q.  Doctor, could you state your name for the

24  record, please?

25     A.  Erin Ely.

1    Q.  Doctor, my name is Richard Dowd, as you

2    know, and I'm going to be asking you some questions

3    this morning.  If I at any time ask you a question you

4    don't both fully hear and understand, would you make

5    me repeat it until you do?

6    A.  Yes.

7    Q.  Can you give the jury a little background in

8    terms of where you were born and raised?

9    A.  Sure.  I was born and raised in Cincinnati,

10   Ohio.

11   Q.  Okay.  And can you tell them about your

12   educational background, please?  Where you went to

13   high school, college, medical school?

14   A.  Sure.  I grew up in -- as I said, in

15   Cincinnati, Ohio.  I went to the same school

16   kindergarten through twelfth grade called Indian Hill

17   schools.  So it had an elementary -- a primary,

18   elementary, middle school, and high school.  I

19   received my BA from the University of Virginia.  I

20   then attended medical school at Wright State

21   University Boonshoft School of Medicine.  It's located

22   in Dayton, Ohio.

23        I did a -- following my medical degree, I

24   did a anatomic and clinical pathology residency at

25   Saint Louis University.  Pathology is the study of the

1    diagnosis of disease.  So it's both anatomic and

2    clinical.  Anatomic is the body aspect of it, more of

3    the, quote/unquote, solid organs.  So if you think

4    about diagnosis of disease and, for example, your

5    heart, your kidneys, your liver, whereas clinical is

6    the diagnosis of disease within the blood.  So, for

7    example, the leukemias and lymphomas that are

8    diagnosed in the blood.

9            Following that, I did a one-year fellowship

10   in forensic pathology located here at the St. Louis

11   City Medical Examiner's Office.  Excuse me.  And at

12   the completion of that, I was hired on as an assistant

13   medical examiner here at the City of St. Louis.  I am

14   also -- I'm actually employed by Saint Louis

15   University as an assistant medical examiner here in

16   the city of St. Louis, so I am an assistant professor

17   in the department of pathology.  I am the co-director

18   of autopsy services at Saint Louis University

19   Hospital, so I oversee all of the hospital autopsies

20   that occur.

21           As -- in addition, I do some part-time work

22   for St. Louis County where I'm an assistant medical

23   examiner for St. Louis County, Franklin, Jefferson,

24   and St. Charles Counties.

25           Q.  Thank you, Doctor.  In -- in your profession

1   here at the medical examiner's office, what are your

2   duties?

3       A.  So my duties as a medical examiner primarily

4   are determining cause and manner of death and how

5   individuals die.  Forensic pathologists, if you will,

6   are what are considered the gatekeepers of death

7   certificates.  Where we get vital statistics or the

8   data that tells us what people die from in the nation

9   comes from the Center for Disease Controls looking at

10  all the death certificates in the nation.  So anyone

11  who dies suddenly, unexpectedly, violently,

12  accidentally, they will come to our office for

13  potentially an exam in helping to determine the cause

14  and the manner of death.

15      Q.  All right.  So you have specialized training

16  as a medical examiner in determining the cause of

17  death, as you explained, with regard to gunshot

18  deaths.  Do you have a lot of experience and training

19  with regard to determining the cause of death when

20  it's related to gunshots?

21      A.  Yes.  Gunshot wounds -- excuse me -- are

22  included in something that a medical examiner would be

23  expertly trained on.  Part of my education as the

24  fellow is determining -- is evaluating gunshot wounds

25  to determining cause and manner of death.

 1   Additionally, I don't know if you know this, but

 2   St. Louis is, per capita, the highest gunshot -- the

 3   highest homicide rate in the country, so in the four

 4   years that I've been here, I have had an extremely

 5   large experience with homicides, and in St. Louis,

 6   it's primarily by gunfire.  So I have had probably at

 7   least over 400 homicides in just four years.

 8        Q.  All right.  Now, you performed the autopsy

 9   -- do you call it the autopsy?

10        A.  Yes.

11        Q.  Okay.  You performed the autopsy on Isaiah

12   Hammett; correct?

13        A.  Correct.

14        Q.  And as a result of that, you generated a

15   report; is that correct?

16        A.  Correct.

17        Q.  I'm going to hand you what's been marked

18   Plaintiff's Exhibit No. 1 and ask you to identify that

19   for the jury, please.

20        A.  This is my autopsy report, but I think there

21   might be a page missing.

22        Q.  I have 15 pages.

23        A.  Let me see.  One, two, three -- yes, I have

24   15 here, but I don't think this one has all 15.  One,

25   two --

1      Q.  Okay.  Well, let's just use -- if you would,

2    just refer to your copy.

3      A.  Okay.

4      Q.  But other than the missing page, that --

5    that is a copy of your report?

6      A.  Yes.

7      Q.  All right.  And I'd just like to -- thank

8    you -- go through that with the jury very briefly.

9    With regard to the postmortem examination, what -- can

10   you tell the jury what that is?

11     A.  The postmortem examination is another term

12   for autopsy.  It is what we do to determine the cause

13   and manner of death.  It starts with what we call --

14   well, let me back up.  An example -- for example, on a

15   homicide, we will get full-body x-rays prior to

16   beginning the examination to determine if there is any

17   ballistic evidence that I need to recover.  So first,

18   full body x-rays would be done.

19     Q.  Did you do that with Mr. Hammett?

20     A.  Yes, full body x-rays were performed.

21     Q.  All right.

22     A.  And then following that, we will start with

23   what's called the external examination where

24   everything is documented on the outside of the body.

25   So we document clothing, height, weight, any

1   distinguishing factors on the individual such as scars

2   or tattoos, and then also any injuries.

3       Q.  All right.  And that is the first two pages

4   of your report; correct?

5       A.  Correct.

6       Q.  And then there are numbered paragraphs and

7   it's entitled Detailed Description of Specified

8   Injuries.  Is that a fair statement?

9       A.  Yes.  So after the external examination, we

10  do the internal examination which involves opening the

11  body and looking at all of the organs, and I will look

12  for any natural disease pathology as well as look at

13  the injuries to the organs within the body.  And it's

14  only once you completely open the body you can fully

15  determine with gunshot wounds exactly the trajectory,

16  the path of bullets.

17      Q.  Okay.  Did you find any natural disease

18  pathology in Mr. Hammett?

19      A.  No, there was no natural disease pathology.

20      Q.  Okay.  And you describe in the next 31

21  paragraphs each of the injuries you found?

22      A.  Correct.

23      Q.  And correct me if I am wrong.  If you go

24  back to page 11 of your report, Pathologic Findings --

25      A.  Mm-hmm.

1    Q.  -- is that a description of each of the

2  wounds and injuries that you found?

3    A.  Yes.  The pathologic findings describes all

4  of the injuries that were listed initially and then --

5  so all of the injuries are listed initially.  Gunshot

6  wounds, abrasions -- abrasions would be like a scrape

7  or a rub in the skin -- and then only the gunshot

8  wounds are then further described.  But the abrasions

9  and all of that was listed initially.  And then the

10  findings is putting it altogether in an outline form

11  to make it easier and more readable.  A little bit

12  less information is included.  For example, when I

13  describe everything initially, I'm going to give sizes

14  of injuries, whereas in this final pathologic

15  description I'm not going to include sizes of injuries

16  to make it easier to read --

17    Q.  Okay.

18    A.  -- and understand.

19    Q.  All right.  If you would, turn to page 11,

20  Pathologic Findings, and if you would, tell the jury

21  what -- what the first wound that you described is.

22    A.  The first wound is a gunshot entrance wound

23  of the left neck.

24    Q.  All right.  And is there any reason you put

25  that wound first?

 1          A.  So typically for me when I do my reports, I

 2     like to start with wounds that are more lethal than

 3     others and then I will go from head to toe.  So in

 4     this case, ultimately this wound is a lethal wound.

 5     There are other wounds that are lethal as well.

 6     However, this would also be a lethal wound so it was

 7     labeled as No. 1.  I elected to go directly from head

 8     to toe on this because I just started with wounds that

 9     were -- that could be lethal and I started with the

10     highest lethal wound.

11          Q.  With regard to the wound that you started

12     with being the most lethal --

13          A.  Not necessarily the most lethal.  He had a

14     very devastating injury also in his chest --

15          Q.  Okay.

16          A.  -- but I can't say for certain which wound

17     was first.

18          Q.  Gotcha.

19          A.  So I just tend to start with, A, lethality,

20     and B, go from head to toe.

21          Q.  Okay.  I am going to hand you what I am

22     marking as Exhibit 2 and ask you to identify that for

23     the jury, please.

24          A.  This is a photograph of the decedent located

25     at the -- at the scene where he died.

 1        Q.  Have you seen that photograph before?

 2        A.  I am not sure if this is the crime scene

 3   photos or our investigator's photos, but we have a

 4   similar photo to this, yes.

 5        Q.  Okay.  And could you hold that up and point

 6   out that wound to the jury, please?

 7        A.  So this is the photograph.  The wound is on

 8   the left side of the neck.  It's located right there.

 9        Q.  All right.

10             THE VIDEOGRAPHER:  Can you point to it

11   again, please?

12        A.  Sure.  This might be easier.  Right there.

13   Left side of the neck.

14        Q.  (By Mr. Dowd)  And can you tell the jury how

15   you determined the trajectory of that bullet that

16   caused that wound?

17        A.  So, again, it's -- you can't definitively

18   determine everything until you open the body.  So once

19   the body is open, you look at the wounds and where

20   that projectile ended up.  So this gunshot wound ended

21   up going upward, backward, and rightward.

22        Q.  Okay.  Would you, for the jury, mark on that

23   diagram where -- just -- just do a circle with an X in

24   it where that wound happened?

25        A.  I'm actually going to do an E for entrance.

1          Q.   Okay.

2          A.   X could be for exit.  So this is about.

3          Q.   And pursuant to your subsequent examination

4    as you described with regard to opening up, you

5    determined the trajectory of that -- that gunshot

6    wound?

7          A.   Yes.

8          Q.   And would you, for the jury -- it's my

9    understanding it fractured his C2 vertebrae, severed

10   his spinal cord?

11         A.   (Nods head.)

12         Q.   Is that true?

13         A.   Yes.

14         Q.   Okay.

15         A.   There were more injuries than that.  It

16   actually went through his C2 -- so it went through his

17   larynx, which is part of your breathing apparatus in

18   the neck.  Some of you may think of it more as the

19   trachea, but the medical term best of the region of

20   the neck that it injured was the larynx.  Then it

21   injured the second cervical vertebrae in the neck.  So

22   if you think about your neck, it's called the cervical

23   vertebrae.  There are seven vertebrae.  Starting

24   closest to the skull is 1.  2 would be the second one.

25   It went through that vertebrae.  It severed the spinal

1   cord.  It fractured both his mandible and maxilla.  So

2   if you think about where your teeth are located, your

3   bottom teeth are with the mandible.  Your upper teeth

4   are with the maxilla.  So it fractured both of those

5   bones.  And the fragments kind of -- this was

6   high-velocity gunfire, so with high velocity you tend

7   to get ballistics that tend to fragment in multiple

8   pieces so fragments were recovered throughout the neck

9   and in the -- the soft tissue of the face.

10          He also incurred some basilar skull

11  fractures from this.  So if you think about the brain,

12  your brain sits about at your eye level in your skull.

13  So if we take off -- off the top of the head, take out

14  the brain, that's the base of your skull.  You would

15  be looking down on the base of the skull.  He had

16  three bones that were fractured due to the blast

17  nature of this gunshot wound.

18          Q.  All right.  Could you, for the jury, use --

19  use this to point out the trajectory of that bullet

20  when it struck him?

21          A.  So this photo -- this depiction is good.  We

22  do everything in what's called anatomic position,

23  which is a little foreign to a lot of people.  It's

24  with an individual standing with your hands at your

25  side, palms up.  And we give all directions based on

 1  this stance.  I cannot say how he was standing at the

 2  time he was injured.  However, we give everything from

 3  standing in anatomic position.  So anything going

 4  backwards will be from this position, upwards,

 5  downwards, right, and left.  So this bullet went

 6  upwards --

 7          Q.  When you use the term "right," are you

 8  talking about the individual's right?

 9          A.  Correct.

10          Q.  All right.

11          A.  His right, his left.

12          Q.  All right.

13          A.  So this bullet tracked upwards, backwards,

14  and rightward.  So it went up this way.  It's hard to

15  definitively show you backwards.

16          Q.  But if you start where the wound happened --

17          A.  Uh-huh.  Yep.

18          Q.  -- can you --

19          A.  So it goes -- it goes upwards, backwards,

20  and rightward.  And then again, as I said, it was very

21  fragmentary nature of this, so fragments of

22  projectiles were recovered that were large enough to

23  be recovered.

24          Q.  All right.  So it appeared that the bullet

25  came -- if I may -- correct me if I'm wrong, but if it

 1   went up to his C in the base of his skull, it would be

 2   something like that?

 3        A.  No projectiles were actually recovered in

 4   the base of the skull.  I think it was more of the

 5   blast nature of it.  So I think it was more like this.

 6        Q.  Okay.  All right.

 7        A.  Because no projectiles actually entered into

 8   the cranial cavity.  He just had fractures in the base

 9   of the skull.  So it wouldn't have gone as severe an

10   angle.  It would have been more like this.

11        Q.  Okay.  Now, with regard to that angle, can

12   you tell the jury what the angle would have been in

13   this plane?  Would it have been like this or would it

14   have been like this?

15        A.  It would have been backwards.  So it would

16   have been like this.  It's -- it's hard on a

17   two-dimensional.

18        Q.  I understand.

19        A.  So it would have been backwards.  So from

20   front to back.  So it would have had to go through the

21   neck and injure the second cervical vertebrae and then

22   also sever the spinal cord.

23        Q.  So from -- from this angle, if you take this

24   as being the flat surface of the body, how many

25   degrees would you say?  It didn't come in straight

Deposition of Erin E. Ely, M.D.                    Gina Torres, et al. v. City of St. Louis, et al.

1    from the side, did it?

2        A.  It could have come in straight from the

3    side.  I can't say for certain.

4        Q.  Well, if it came in straight from the side,

5    wouldn't it have gone --

6        A.  Oh, I -- I'm sorry.  I understand what

7    you're saying.  Yes.  It came at an angled nature from

8    the side.

9        Q.  Okay.  And what would your best estimate be

10    as to that angle if this is a flat plane?

11        A.  Oh, I can't make a -- I'm not that much of a

12    ballistics expert.

13        Q.  I see.

14        A.  However, all I can say is that the gun has

15    to be positioned in an -- in a way such that it could

16    be -- the gun -- the -- the bullet could go through

17    the body, upwards, backwards, and rightward.

18        Q.  Okay.

19        A.  So it had to be below.

20        Q.  Like you described before, like --

21        A.  Correct.

22        Q.  -- like that?

23        A.  Correct.

24        Q.  Okay.  But -- and as far as whether it was

25    this -- at this angle or this angle, you can't say?

1     A.   True.   It's also more challenging with high

2   velocity because high velocity rounds are made to

3   fragment and cause destruction within the body.   So

4   just because you have injury at a higher level doesn't

5   mean that it was that steep of an -- of an angulation.

6     Q.   Okay.

7     A.   So definitively determining that, you would

8   probably need more of a ballistics expert.

9     Q.   Okay.   But in terms of the -- the trajectory

10  on this plane, you -- you've testified it was

11  something like that?

12          MS. MCGOWAN:   Objection.   Foundation.

13     Q.   (By Mr. Dowd)   Am I right or not?

14     A.   That's more steep than what I've said, yep.

15     Q.   I'm sorry.   Okay.

16     A.   More like that.   Yep.

17     Q.   But you said -- oh, I see.   And -- and the

18  fact that it got to the base of his skull indicate --

19  could be from fragmentation?

20     A.   I think the base of the skull fractures are

21  more a blast effect.   So if you think about a gunshot

22  wound, it's going to create a cavity.

23     Q.   Vibration?

24     A.   Yeah.   And so there's going to be expansion

25  and I think that is more -- he did have fractures of

 1   his mandible and maxilla and there were fragments

 2   recovered within the soft tissue of the lower face, so

 3   I do think it was at an angle where it could hit the

 4   lower face.  However, I don't think it was as steep as

 5   that, but again, I feel like that's the best I can

 6   say.

 7           Q.  Okay.  But that's your best statement?

 8           A.  Mm-hmm.

 9           Q.  Okay.  With regard to wound number two --

10           A.  Okay.

11           Q.  -- could you describe that for the jury as

12   well?

13           A.  Sure.  Wound number two is a gunshot

14   entrance wound to the left chest.

15           Q.  And with regard to Exhibit No. 2, could you

16   point that out to the jury with your pen, if you

17   would?

18           A.  Gunshot wound number two is located on the

19   left side of the chest.

20               THE VIDEOGRAPHER:  The light is kind of

21   reflecting.  Maybe angle it down just a little.

22               THE DEPONENT:  (Complies.)

23               THE VIDEOGRAPHER:  Other way.  Sorry.  There

24   you go.  Thank you.

25           Q.  (By Mr. Dowd)  All right.  And can you tell

 1 | -- tell the jury what you found with regard to that
 2 | wound?
 3 |       A.   This was also another wound that would be
 4 | considered lethal.  It had a very devastating injury
 5 | within the chest or the thoracic cavity.  It
 6 | injured --
 7 |            THE VIDEOGRAPHER:  I'm sorry.  Her papers
 8 | were -- could you repeat that?
 9 |            THE DEPONENT:  Sure.  Is it easier if I sit
10 | down too?
11 |            THE VIDEOGRAPHER:  Yes.
12 |       A.   So this was also another injury that had a
13 | very devastating effect in the chest cavity.  This
14 | injured -- refer -- the left fourth rib, the lower
15 | lobe of the left lung.  So if you think about the left
16 | lung, it has two lobes, so the lower lobe of the left
17 | lung.  It obliterated the sac that holds the heart
18 | which is called the pericardial sac, and then it had a
19 | devastating injury to the heart, including all four
20 | chambers of the heart.  If you think about your heart,
21 | it's a pump.  It has four different chambers.  It had
22 | a very large injury to the heart, injured all four
23 | chambers.  It also injured the aorta.  The aorta is
24 | the largest blood vessel -- largest artery in your
25 | body that carries blood from the heart to other

 1 | aspects of the body.  It tracks through both your
 2 | chest and your abdomen.  It was injured kind of by the
 3 | -- the area right by the heart.
 4 | The sternum, or if you think about your
 5 | chest plate, the midline chest plate that your ribs
 6 | attach to was fractured, and then multiple other ribs.
 7 | I'm sorry.  The middle lobe of the right lung.  The
 8 | right lung has three lobes, so the middle lobe of the
 9 | right lung, and then the right fourth and sixth ribs
10 | were fractured, and this projectile exited the body in
11 | multiple components.
12 | Q.  (By Mr. Dowd)  Would you, again for the
13 | jury, mark the -- with red where that wound appeared
14 | to you on
15 | Mr. Hammett?  If you need the photograph --
16 | A.  (Complies.)
17 | Q.  Was there -- was there an exit to the neck
18 | wound?
19 | A.  No.
20 | Q.  Okay.  And what about to this chest wound
21 | that you've just demonstrated?
22 | A.  Yes, there are multiple components related
23 | to this exit -- this entrance wound.  They were
24 | located here, here, and here.
25 | Q.  And what do you -- what are those

1   components, please?

2       A.  Those are all exit wounds related to this

3   gunshot entrance wound.

4       Q.  I see.  Can you describe -- tell the jury

5   why that was?

6       A.  After examining the body, to the best of my

7   ability -- obviously this is a challenging case

8   because of the fragmentary nature of the ballistics --

9   those are exit wounds associated with this entrance

10  wound.

11      Q.  All right.  Because of the bullet striking

12  bone?

13      A.  It's more -- not just that.  Again, as I

14  have previously said, it's high velocity.  The nature

15  of these projectiles are that when they enter whatever

16  tissue they enter, they are made to cause destruction

17  and to fragment so sometimes you get multiple

18  component exit wounds.

19      Q.  Are you familiar with a .223 caliber that

20  the St. Louis Police Department uses?

21      A.  I don't know exactly what they use, but it's

22  possible that that's what they used.

23      Q.  The officers have testified that that's --

24  that's what they shot him with.  Is that consistent

25  with your findings?

1      A.   That is consistent with a high velocity

2   gunshot wound, yes.

3      Q.   Okay.  Would you, for the jury -- again, you

4   use the same description as the neck wound, tracked

5   upward, backward, and rightward; is that correct?

6      A.   Correct.

7      Q.   And can you show the jury that trajectile?

8      A.   Again, it's going upward, backwards, and

9   rightward.

10      Q.   Okay.  And with -- with regard to the plane

11   of this drawing, you can't say with -- how specific

12   can you be with regard to where it entered and the

13   direction it was going when it entered?

14      A.   Again, what I -- what I can say is that the

15   barrel of the gun had to be positioned at a level

16   lower -- lower than this wound because it's going

17   upward.  So the barrel of the gun had to be positioned

18   such that this bullet could go into the body upward,

19   backward, and rightward.

20      Q.   Would that be -- when you say the position

21   of the body, could that be caused by the body being on

22   the -- on the floor?

23          MS. MCGOWAN:  Objection.  Foundation.

24      Q.   (By Mr. Dowd)  Your best estimate.

25      A.   I cannot say anything about the position of

```
 1   the body.  Potentially he could have been on the

 2   floor, he could have been standing, he could have been

 3   kneeling.  All I can say is that the barrel of the gun

 4   had to be positioned such that --

 5        Q.  Okay.  So if based on -- and -- and that

 6   angle was -- was like this, roughly?  You --

 7        A.  I mean, it goes backwards.  So it's kind of

 8   like this, kind of into the -- into the paper.

 9        Q.  Okay.

10        A.  And upward and rightward.

11        Q.  Okay.  So the gun had to be down in this

12   position?

13             MS. MCGOWAN:  Objection.  Foundation.

14        Q.  (By Mr. Dowd)  Is that what you're saying?

15        A.  It has to be below where he was.  I don't

16   know how he was when this was fired, so potentially if

17   he is standing --

18        Q.  What I'm saying is the gun had to be below

19   -- as you -- as you put it, below where it's -- the

20   bullet struck him?

21             MS. MCGOWAN:  Objection.  Foundation.

22        Q.  (By Mr. Dowd)  You can answer.

23        A.  The gun has to be positioned such that it

24   can go upward, backward, and rightward.

25        Q.  Which means --
```

1      A.   How the victim was at the time, I cannot say

2   for certain.  Again, technically you would think

3   below, but I guess potentially if he were on the

4   ground, you would be above, so I can't say for

5   certain.

6      Q.   Okay.  But --

7      A.   It just has to be positioned such that the

8   bullet can go through the body at that angle.

9      Q.   So --

10      A.   At that direction.

11      Q.   So to use those same words, the -- the gun

12   would have to be downward from the wound; correct?

13      A.   Yes.

14      Q.   All right.  And -- and leftward?  Because

15   you used the word -- the term rightward.

16      A.   Yes.  The gun --

17      Q.   Right.

18      A.   -- would have to be on the left side of the

19   body so that it could go rightward.

20      Q.   Okay.  Thank you.  With regard to the third

21   wound, could you -- could you point that out for the

22   jury, please?

23      A.   I don't think there is a very good -- I

24   don't think it's really --

25      Q.   Okay.

1        A.  -- located well on this.  It's kind of

2   covered up underneath his arm.

3        Q.  Okay.  If you would --

4        A.  It would be on the left lateral aspect or

5   the side of his chest.  So the left side of his chest.

6        Q.  Okay.  Would you go ahead and mark on the

7   diagram that, please?

8        A.  Mm-hmm.

9        Q.  And, if you would, the trajectory of that,

10  please?

11       A.  Again, this one goes upward, backward, and

12  rightward.  So, again, it's going this way kind of

13  into the -- into the body.

14       Q.  And -- and what parts of his body were

15  damaged by that?

16       A.  This one was -- I'm sorry.  I did that

17  incorrectly.

18       Q.  Okay.

19       A.  This one actually went upward, backward, and

20  it did go rightward.  So it was kind of like this.

21  And it exited the anterior aspect of his -- of his

22  shoulder.

23       Q.  Okay.  I'm sorry.  Could you show that to me

24  one more time?

25       A.  (Complies.)

1          Q.  It was at that angle?

2          A.  Yes.

3          Q.  So it went in basically under his left arm

4     and -- and went up through the --

5          A.  It's the side of his chest and went upwards.

6          Q.  To his clavicle, to his collarbone?

7          A.  To his kind of shoulder region, yes.

8          Q.  Okay.  And is there an exit wound?

9          A.  There is.  (Demonstrates.)

10          Q.  Okay.  With regard to the next wound,

11     please?

12          A.  He has another wound on the lateral aspect

13     or the side of his chest.

14          Q.  If you'd mark that, please.

15          A.  (Complies.)  And this wound -- I apologize.

16     I looked at the wrong one.  This one goes upward,

17     backward, and rightward, similar to this wound, into

18     the chest back like this, and it fragmented within the

19     chest.

20          Q.  All right.  And the next one, please?

21          A.  Okay.  He had another wound of his left

22     lateral chest.  Again, similar -- like possibly and a

23     little bit below here.  It still is his chest, not his

24     abdomen.  But again, also similar, went upward,

25     backward, and rightward, and fragmented within the

1    chest cavity.

2        Q.  All right.  Can -- because these bullets

3    were all hitting in his chest, can -- can you

4    determine which one was doing the damage?

5        A.  Not probably definitively.  I believe it was

6    probably this one that injured the heart just based on

7    the trajectory and using the internal examination, but

8    it's possible that one of the other ones actually made

9    that injury, but I did the best I could and based on

10   the evidence that I had, also reviewed with some of

11   the other doctors in the office for their opinion too

12   and it was felt that this one is probably the one that

13   injured the heart.  However, it's possible that one of

14   these, based on the fragmentary nature of these

15   bullets, actually caused the heart injury.

16       Q.  All right.  Would you describe the next

17   wound for the jury, please?

18       A.  Yes.  Give me just a second.  There is

19   another entrance wound to the left chest.  I believe

20   it is there.  This one also had a similar trajectory.

21   Went upward, backward, and rightward, and fragmented

22   again within the chest.  As we said previously, again,

23   potentially this could have been the lethal wound.

24   However, based on the trajectory, the location of this

25   one with where the injuries to the heart was, it was

1    felt that this was actually the one that caused the

2    lethal heart injury.

3           Q.  Okay.  The next wound, please?

4           A.  The next wound is in the right central

5    chest.  And it also went upward, backward, and

6    rightward again, kind of into the body diagram, to the

7    right and fragmented within the chest.  Obviously this

8    one is more to the right so your likelihood of injury

9    to the heart with this would not be highly likely.

10   So, again, this one kind of went this way and

11   fragmented within the chest cavity.

12          Q.  Based upon your examination, could you tell

13   the position of Isaiah's arms at the times -- at the

14   times he was shot?

15          A.  I cannot testify to that.

16          Q.  Okay.

17          A.  Again, we give everything in anatomic

18   position.

19          Q.  Okay.

20          A.  So I can't say how his hands were.

21          Q.  All right.

22          A.  Or arms.

23          Q.  Are you done with that wound?

24          A.  I'm done with that wound.

25          Q.  Would you move to the next, please?

1      A.   Sure.   The next is the right lower chest.

2  It's located approximately right there.   This one also

3  tracked upward and rightward, but this one, I don't

4  believe, actually entered into the body cavity.   It

5  just injured soft tissue, and this one exited on the

6  right lateral chest.   So this one doesn't go backward

7  per se.   Just goes upward and rightward to exit there.

8      Q.   Okay.   And the next, please?

9      A.   The next is the left lateral back.

10      Q.   Okay.

11           MR. DOWD:   Can we take a two-minute break,

12  please?

13           THE VIDEOGRAPHER:   Sure.   Off the record at

14  10:48.

15           (A brief recess was had.)

16           THE VIDEOGRAPHER:   Back on the record at

17  10:50.

18      A.   Okay.   The next wound is the left lateral

19  back.   It's still in the chest region, but it's on the

20  back.   So now we have the body diagram, again, in

21  anatomic position but from the back or the posterior

22  aspect of the body.   So this is over here.   And this

23  wound went upward, forward, and leftward.   It exited

24  the armpit region on the front surface of the body.

25  So we'll actually have to change the diagram to show,

 1    but it goes upward, forward, and leftward.

 2         Q.  (By Mr. Dowd)  And -- and that's an

 3    approximation that you did with the -- the dowel

 4    there?

 5         A.  Yes.

 6         Q.  Okay.  Could you -- could you do that again

 7    as far as the -- the trajectory?

 8         A.  (Complies.)

 9         Q.  Okay.  Next wound -- is that pretty much --

10         A.  It -- yeah.  So that's it for the back.

11         Q.  Okay.

12         A.  Actually, I take that back.  There is --

13    there are some abrasions on the back and there is a

14    graze gunshot wound.

15         Q.  Could you mark those --

16         A.  Sure.

17         Q.  -- for the jury, please?

18         A.  We have some abrasions here and also located

19    here, and then he has a graze gunshot wound of the

20    right lower back, meaning that it just goes through

21    the outer surface of the skin and the subcuticular

22    tissue but doesn't actually enter into the body

23    cavities.  So it's considered just a graze gunshot

24    wound.

25         Q.  Could you tell the jury, please, your

1    opinion as to the trajectory of that bullet?

2         A.   I was not definitively able to determine

3    which direction it was going.  So it's either going

4    right or left and didn't enter the body so it would

5    just be going like this across his body.  I can't say

6    which way it was going --

7         Q.   All right.

8         A.   -- with certainty.

9         Q.   Okay.  And with the abrasions, were you able

10   to determine the cause of those?

11        A.   So most of them I refer to them as what is

12   called pseudostippling.  I believe they were created

13   from the projectiles breaking up and hitting the skin.

14   It didn't look like any of it was actually true

15   stippling.  Stippling is what's caused on -- what's

16   created when unburned gunpowder hits the skin and

17   creates little abrasions like we previously talked

18   about, little breaks in your skin, from the unburned

19   gunpowder hitting the skin.  None of it looked like

20   actual stippling.  It looked more like pseudostippling

21   meaning pseudo, fake.  So basically because the

22   projectiles were breaking up, they were creating

23   breaks in the skin by portions of bullets hitting the

24   skin.  So, again, I don't think it can tell us

25   anything about range of fire.  The best I can say is

1    that it was greater than 3 feet.

2           Q.  I see.  Okay.  And strickling (phonetic) is

3    -- is where there are just little cuts perhaps?

4           A.  Stippling is usually very small little cuts.

5    Most of these are larger abrasions, but also regions

6    with -- for example, this region had abrasions ranging

7    in size from 0.2 to 0.7 centimeters.  So if you think

8    about a centimeter, it's about the size of the tip of

9    your finger.  So it was, you know, two tenths of that

10   to seven tenths of that abrasions in this location

11   probably from fragments of projectiles hitting the

12   skin and causing a scrape.

13          Q.  If -- if that's -- if that bullet didn't

14   enter his body, it was just hitting skin, would that

15   cause it to fragment?  Just -- just curious.

16          A.  That one not necessarily.  I believe it was

17   created from other projectiles that had fragmented.

18          Q.  I see.

19          A.  Potentially going through -- going through

20   something before hitting him.

21          Q.  Okay.  All right.  Any more that would be --

22   you would be able to demonstrate on that figure?

23          A.  There is nothing more on the back.

24          Q.  All right.

25               MR. DOWD:  If we could take a brief break.

```
 1            THE VIDEOGRAPHER:  Off the record at 10:54.
 2            (A brief recess was had.)
 3            THE VIDEOGRAPHER:  Back on the record at
 4    10:55.
 5        Q.  (By Mr. Dowd)  Doctor, have you completed
 6    your testimony with regard to the wounds and injuries
 7    in his back?
 8        A.  No.  The -- the left lateral back wound
 9    exited his left armpit.  It's a little challenging to
10    make a good drawing because it's two -- you know, it's
11    one-dimensional, but it basically exited his left
12    armpit located there.  So it would have been going,
13    again, from the back to the front and exiting the
14    armpit region.
15        Q.  So it would have been going upward like you
16    just --
17        A.  Upward --
18        Q.  -- just directed?
19        A.  -- and then forward because we went from the
20    back to the front.
21        Q.  Okay.
22        A.  And then left -- slightly leftward because
23    it exited -- you know, it went from the back and then
24    exited out his armpit region.
25        Q.  All right.  Okay.  The next wound, please?
```

1      A.   The next wound is in the left abdomen.

2      Q.   Can you describe that for the jury, please?

3      A.   It's located about right here.  And this

4  wound -- this bullet went upward, backward, and

5  rightward, and it fragmented within the abdominal

6  cavity.  So it went this way.

7      Q.   All right.

8      A.   But backward so into the -- into the board.

9      Q.   But it was in a trajectory from -- from down

10 low and --

11     A.   It went upward, yes.

12     Q.   -- and going upward to the right side?

13     A.   Correct.  Correct.

14     Q.   Okay.  The next wound, please?

15     A.   I'm sorry.  And the -- that first one

16 injured the stomach.  I believe --

17     Q.   The one you just described?

18     A.   Yes.

19     Q.   Okay.

20     A.   And I believe fragments were recovered from

21 the abdominal cavity, including one in the stomach.

22     Q.   Okay.

23     A.   The next one is a little bit lower in his

24 left side of his abdomen located approximately there.

25 This one also went upward, backward, and rightward.

1    So, again, into the -- into the board.  This one

2    injured his left kidney and again also fragmented

3    within the abdominal cavity.

4         Q.  All right.

5         A.  And I believe a -- fragments were recovered.

6         Q.  All right.

7         A.  The next -- the next wound is also in the

8    left abdomen.  I technically called it in the pelvis.

9    Some people are lumpers versus splitters.  So your

10   pelvic region think more about closer toward your

11   groin region.  It was located down here.  This one

12   also went upward, backward, and rightward.  This one

13   injured the pancreas.  It injured a major vessel.

14   There was a small injury to the inferior vena cava.

15   The vena cava, if you think about it, courses through

16   the lower portion pelvic region of your abdomen and

17   goes up to the liver, and that was injured as well as

18   it went through the vasculature in the middle part of

19   the liver and then made a large injury to the liver.

20   Some fragments were also recovered.

21        Q.  All right.

22        A.  Potentially that could be a lethal injury.

23   However, the injury to the heart would definitely have

24   been lethal as well as the one to the -- to the neck

25   with injury to the head.

1    Q.  All right.  Can -- can you tell us about the

2  next wound, please?

3    A.  Sure.  So the next wound that's listed is

4  the right -- the graze wound of the right back which

5  we already talked about.

6    Q.  Mm-hmm.

7    A.  Then we have -- so I prefer to use the terms

8  ventral and dorsal for the arm.  So if you think about

9  a fish, the dorsal fin is on the back part of the

10  fish.  So the back part of your arm is the dorsal and

11  the front part of it is ventral.  It's just a medical

12  term that I prefer.  So the entrance is the right

13  ventral arm.

14    Q.  The entrance was in the front of the arm?

15    A.  Yes, the front of the arm.

16    Q.  Can you --

17    A.  Let me just see -- there are several wounds

18  so I just want to make sure I list the right one based

19  on measurements.  Okay.  So this one is located

20  approximately here.  So, again, it's the front part of

21  the arm.  Also remember we phrase the arm as from the

22  shoulder to the elbow.  The forearm is from the elbow

23  to the wrist.  The thigh is from the hip to the knee,

24  and the leg is from the knee to the ankle.  So the

25  arm, again, from the shoulder to the elbow, and the

1   ventral or the anterior surface of the arm.  So the

2   location is here.

3           Q.  And could you tell us what the trajectory

4   was of that bullet?

5           A.  Yes.  It was downward, backward, and

6   rightward.  So this wound was going this way.

7           Q.  All right.

8           A.  Backwards.  And some fragments were

9   recovered in the soft tissue of the right arm.

10          Q.  Could you tell the position of his arm when

11   that bullet --

12          A.  I could not tell the position of the arm.

13          Q.  Okay.  Next, please?

14          A.  The next is the ventrolateral, so the

15   anterior but side portion of the right arm.  So it was

16   located about right here.

17          Q.  And -- I'm sorry.  Go ahead.

18          A.  And this also tracked downward, backward,

19   and this one went leftward, so it was going this way

20   but backwards.  The fragments in this one were deemed

21   too small to be recovered.

22          Q.  All right.  Next wound, please?

23          A.  There is another wound to the right ventral

24   arm.  It's located about here.  And this one exits the

25   right dorsal arm so you will probably have to flip the

1   paper again.  So, again, this is -- actually, I'm

2   sorry.  I'm sorry.  It's the forearm.  I'm sorry.

3   Let's see.  Right -- no.  I'm sorry.  I'm right.

4   Okay.  Sorry.  Right ventral arm and it exits the

5   right dorsal arm.  So, again, it exits the back

6   portion of the arm, so this one goes upward, backward,

7   and leftward.  It goes like this and then it's going

8   to exit out the back part of the arm.

9        Q.  And that's where -- that's the entrance that

10   you've --

11        A.  Correct.

12        Q.  -- marked there?

13        A.  That's the entrance.

14        Q.  Okay.

15        A.  So if you want to flip the -- so we can see

16   the back part, I can show the exit wound.

17        Q.  Was there anything significant about that?

18        A.  There is nothing significant.  It's just,

19   you know, it would be -- think of the back part of the

20   arm and it would be on -- located on this aspect.  It

21   would be located roughly here but on the back part of

22   the arm.

23        Q.  Gotcha.

24        A.  So the dorsal aspect of the arm.

25        Q.  All right.  And it did go through and --

1      A.   Soft tissue and exited.

2      Q.   All right.

3      A.   The next wound is actually on, again, the

4   dorsal surface of the forearm, so it would be on the

5   back portion of the right forearm.  So it's on the

6   lateral aspect.  So, again, think -- if I say medial,

7   it means closer to the body whereas lateral means

8   farther away.  So it would have been -- I mean it

9   would be on the right forearm on the back surface of

10   the arm.  So it would be on the other surface, roughly

11   about there.  Again, because we are looking at the

12   back surface of the forearm, this one goes upward,

13   forward, and rightward.  I'm sorry.  It's actually --

14   it would be a little bit more like that.  And then the

15   exit wound was here.  So, again, remember this is

16   supposed to be on the back surface of the forearm, so

17   it would go upward, forward, and rightward.

18      Q.   The way you've demonstrated with the -- with

19   that dowel?

20      A.   Yes.

21      Q.   Okay.

22      A.   However, you know, remember, this would be

23   the back surface of the arm.

24      Q.   Okay.

25      A.   Forearm.   Excuse me.

1    Q.  Were any of the arm wounds, were they

2  lethal?

3    A.  No.

4    Q.  All right.

5    A.  The next wound is an entrance wound of the

6  left anterior shoulder.  So, again, if you think about

7  the shoulder, this one would be roughly about right

8  here.  And it went downward, backward, and rightward.

9  So it went downward, backward, and rightward, and

10  fragmented within the chest.

11    Q.  So if it started that high in his shoulder

12  and it fragmented down in his chest, that would mean

13  that the -- the gun that it was fired from was --

14    A.  The barrel of the gun had to be at a

15  position such that it could go downward, yes.

16    Q.  And the fact that the trajectory is down

17  into his chest would indicate that it was being shot

18  from the side more than from the front?

19      MS. MCGOWAN:  Objection.  Foundation.

20    Q.  (By Mr. Dowd)  Do you see what I -- do you

21  understand my question?

22    A.  The trajectory goes to the right so the

23  position of the barrel of the gun has to be at a

24  position such that the bullet can go rightward,

25  downward, and backward.

1  Q.  Okay.  And would you point that out with the

2  dowel again one more time?  I'm --

3  A.  (Complies.)  But backwards.  So --

4  Q.  Okay.  Okay.  Next wound, please?

5  A.  The next wound is also the left anterior

6  shoulder.  This one's actually more kind of on the arm

7  and also goes downward, backward, and rightward, and

8  fragments within the chest cavity.  So similar thing.

9  Downward, backward, but backward so into the -- into

10  the drawing, and rightward.  Similar instance, the

11  barrel of the gun has to be positioned such that the

12  bullet can go downward, backward, and rightward.

13  Q.  Thank you.  And the next?

14  A.  So the next is the left dorsolateral

15  forearm.  So, again, we're on the -- the back surface

16  of the arm.  And again, it's -- it's roughly -- it's

17  roughly here, but again, on the back surface of the

18  arm, and then it exits the front surface, so the --

19  the ventral surface, in two components.  You have two

20  components here.  So remember, this is on the back

21  surface so it is going -- well, I guess I drew that

22  incorrectly because it's actually going downward.

23  Yeah.  Downward, forward, and rightward.  So I

24  apologize.

25  Q.  That's quite all right.

1          A.  Exits are below.  So you're going from the

2     back surface to the front surface.  And actually I

3     drew that wrong.  It's going rightward.  So, again,

4     remember we do everything in anatomic position.  It's

5     going to his right.  So it's going downward, forward,

6     and rightward.  So it went from the back surface of

7     his forearm, out the front surface, and broke both his

8     bones of his forearm, the radius and the ulna, in the

9     process.

10          Q.  All right.

11          A.  And then he also has a graze gunshot wound

12     of the left dorsomedial hand.  So it would be roughly

13     -- remember dorsal, so on the outer -- it would be on

14     the posterior surface.  There was a graze wound here.

15     Again, I can't reliably say which way that bullet was

16     going nor how his hand was positioned when that

17     occurred.  There was also a graze wound on his left

18     lateral fifth finger.  So there was a graze wound

19     located there as well.  Again, I wouldn't reliably say

20     which way that bullet was going nor how his hand was

21     positioned during that injury.

22          Q.  All right.  Is that all of the bullet

23     wounds?

24          A.  No.  There is one more, in the left anterior

25     knee.  So this one would be located about here.  And

 1    this was more likely a handgun.  However, ballistics

 2    would have to confirm with what was recovered.

 3    However, the wound characteristics and the injury lead

 4    me to believe that this -- this is the one wound that

 5    was not high velocity and likely created more from

 6    just like a handgun or -- I think most of the

 7    St. Louis police carry Berettas.  Likely from

 8    something like that.  However, the -- the ballistics

 9    recovered would have to be confirmed.

10         Q.  Okay.

11         A.  So this wound goes upward, backward, and

12    rightward.  So it goes up this way, and there were

13    some fragments recovered within the soft tissue of the

14    thigh.  I'm sorry.  Of the knee, left knee.

15         Q.  All right.  Is that -- I had counted 24

16    wounds, bullet wounds to him.  Does that -- is that

17    all of them?

18         A.  That is all of them.  I labeled up to 31

19    injuries.  That is including entrance, exits, and

20    graze wounds.

21         Q.  Yes -- yes, Doctor.  So -- but that would

22    consist of all the bullets that went into his body?

23         A.  Those are all of the gunshot wounds.  There

24    were also some other abrasions located on the anterior

25    or front chest also created probably from projectiles

1   breaking up.  He was shirtless when this occurred so

2   it was easy for his skin to have injury to it created

3   by fragments of projectiles.

4        Q.  Okay.  Now, with regard to your description

5   of all these wounds, they are all at an angle.  Most

6   of them are at this upward, backward, and rightward;

7   correct?

8        A.  Yes, most of them are going upward,

9   backward, and rightward.

10       Q.  Did you find any wounds that were directly

11  into his -- his body as if someone was positioned like

12  you and I are and he was shot standing up?

13            MS. MCGOWAN:  Objection.  Form.

14       Q.  (By Mr. Dowd)  Do you know what I'm saying?

15  Could I borrow that, that dowel?

16       A.  (Complies.)

17       Q.  What I'm saying is, with the dowel you've --

18  you've always pointed at an angle such as this or

19  this.  Were there any like this?

20       A.  The graze wound of the right back is going

21  either right to left or left to right.  So yes.

22       Q.  That -- just that one?

23       A.  Correct.

24       Q.  Okay.  But none -- none other that where he

25  was shot in the chest and it was directed directly at

1    him?

2         A.   Correct.

3         Q.   With regard to Exhibit 2, it -- does the

4    body bleed when it gets shot?

5         A.   Yes.

6         Q.   Does that -- does that photograph depict the

7    amount of blood you would see from those 24 shots?

8              MS. MCGOWAN:   Objection.   Form.   Foundation.

9         A.   I mean, this would not be uncommon.   There

10   was a large amount of blood that was located within

11   the body cavities that did not actually exit the body

12   so it depends on position because he's on his back and

13   a lot of the projectiles didn't actually exit the

14   body.   A lot of the blood is maintained within the

15   body cavity.

16        Q.   (By Mr. Dowd)   Okay.

17        A.   I know when he was rolled at the scene,

18   there was a large amount of blood that was expelled

19   from the body.

20        Q.   You say he was rolled?

21        A.   So our investigators always also view the

22   back.   It's also a safety measure to make sure there's

23   not something underneath the body before he is removed

24   from the scene.

25        Q.   So the medical examiner's office sends an

1   investigator that is to examine the body before it's

2   moved?

3       A.   Correct.  We have an investigator, a

4   medicolegal death investigator who is on 24 hours a

5   day, 7 days a week, 365 days a year.  Just like any

6   other medical profession, a history is very important

7   to us.  Autopsy alone cannot determine cause and

8   manner of death so we have somebody -- anybody who

9   dies not at the hospital, who dies at what we call a

10  scene, we send our investigator to investigate.  They

11  take their own photographs, they talk to witnesses,

12  they talk to law enforcement, and basically give us a

13  scenario that's provided to us before we do the case.

14      Q.   And who was the investigator on this -- this

15  shooting?

16      A.   The investigator was Tara Rick.  She has

17  since been promoted to the office administrator.

18  However, at the time, she was still an investigator in

19  our office.

20      Q.   Okay.  And would she have taken photographs?

21      A.   Yes, she did take photographs at the scene.

22      Q.   Okay.  And you've had an opportunity to

23  review those photographs?

24      A.   Yes.

25      Q.   Did you look -- we received small copies.

 1    Were you able to review them on the computer?

 2           A.  Yes.

 3           Q.  Okay.  And they were color pictures on the

 4    computer?

 5           A.  Yes, on the computer they are color.

 6           Q.  Okay.  I'm going to hand you what is being

 7    marked Plaintiff's Exhibit 3 and ask you if you've had

 8    an opportunity to view that.

 9           A.  I don't believe this was in our photographs.

10    I believe the -- this was removed prior to the medical

11    examiner being called to the scene.  So I had not seen

12    this previously, I believe.

13           Q.  Okay.

14           A.  It's -- I -- I'm not 100 percent certain it

15    was in our photos or not.

16           Q.  Okay.

17           A.  Typically any guns are removed prior to the

18    medical examiner being called to the scene.

19           Q.  I see.  Okay.  With regard to that

20    photograph -- you're -- you're familiar with police

21    investigative procedures, that they photograph

22    everything before it's been handled or touched?

23           A.  Yes.

24           Q.  Okay.

25           A.  They have to ensure the scene is secure.

```
 1   They need to do their evidence collection before the
 2   medical examiner is called.  We only have jurisdiction
 3   of the body.  Nothing else at the scene.
 4        Q.  Can you tell me, based upon your review --
 5   if you would show that picture to the jury and tell me
 6   and point out anywhere you see on that -- that gun any
 7   -- any blood of any kind.
 8            MS. MCGOWAN:  Objection.  Form.
 9        A.  Grossly I don't see any, but that doesn't
10   mean there is not any blood on it.  But I don't --
11        Q.  (By Mr. Dowd)  There's none --
12        A.  I mean, I don't see any on the surface
13   that's up towards us, but I can't be certain.
14        Q.  There's none on that picture, is there?
15        A.  Not that I can see with the naked eye.
16        Q.  Okay.  I'm going to hand you what's been
17   marked Plaintiff's Exhibit 4, that being the other
18   side of the gun, if -- correct me if I'm wrong about
19   that, but it appears to be the opposite side of the
20   gun?
21        A.  I can't say for certain.
22        Q.  Okay.  We'll -- but --
23        A.  On -- I don't see any blood on this either.
24   I can't say for certain if it's the opposite side or
25   not.
```

1      Q.  Okay.

2      A.  Again, but that's with the -- with the --

3  with the naked eye I cannot see it.

4      Q.  Okay.  Do you recall seeing blood on the

5  floor in -- in the photographs that you reviewed?

6      A.  Yes.

7      Q.  Okay.  And they were the same kind of

8  photographs?

9      A.  Yes.

10     Q.  I'm going to hand you what's been marked

11 Exhibit 5 and ask you if that's one of the photographs

12 you saw in your -- in your review.

13     A.  I don't recall this photograph.  Potentially

14 Tara did take a photograph of it, but unlikely she

15 would be concerned.  This is a photograph of the floor

16 with blood spatter, but typically our investigators

17 are not concerned with blood spatter.  That's for a

18 blood spatter expert.

19     Q.  I see.  Okay.  Thank you.  With regard to

20 the gunshot wounds in the back on Isaiah, can -- it

21 sounds like they were all from -- from above and going

22 downward?

23         MS. MCGOWAN:  Objection.  Foundation.

24     A.  That's incorrect.

25     Q.  (By Mr. Dowd)  Okay.

1      A.   The left lateral back went upwards.   So it

2   was kind of more like the lateral back aspect of the

3   chest.   So similar to where the ones on the left

4   lateral chest was, but it was going upwards like the

5   other ones.   Some in the arm were going downwards.

6   However, the majority of wounds were going upwards.

7      Q.   Okay.   And again, the wounds in the back

8   were not straight into his back?   They were -- they

9   were at a pretty dramatic angle?

10      MS. MCGOWAN:   Objection.   Vague.

11      A.   I can't say dramatic.   They were going --

12   the wound in the back was going upward.

13      Q.   (By Mr. Dowd)   And I think you described it

14   as something like this?

15      MS. MCGOWAN:   Objection.   Foundation.

16      Q.   (By Mr. Dowd)   If you would.   I don't -- I

17   don't want to put words in your mouth if --

18      A.   It went upward --

19      Q.   Okay.

20      A.   -- and exited the armpit.

21      Q.   So that's -- by "dramatic" I mean as opposed

22   to this, it was -- I'm sorry -- it was more like this?

23      A.   I mean, it was upward.

24      Q.   Bad word.   Bad word.   All right.

25      A.   It was upward.

1    Q.  Okay.  Are -- were you able to determine --

2    well, you've testified as to what were the lethal or

3    the killing shots.  Can you tell us which those were

4    specifically?

5    A.  So the -- the -- the most lethal injuries

6    were the injury to the neck with also the basilar

7    skull fractures.  So the gunshot wound of the neck --

8    I'm sorry -- gunshot wounds of the neck and chest.

9    Also the chest wound that injured such a large portion

10   of the heart.  Again, I do believe it's probably that

11   first chest wound we -- I described.  However,

12   potentially it could have been from one of the other

13   ones due to the fragmentary nature of the ballistics.

14   So it was -- the cause of death is gunshot wounds of

15   the neck and chest.

16   Q.  And you cannot tell which -- which of the

17   shots hit him first or in what order?

18   A.  I cannot tell order of shots.

19   Q.  Okay.  Because of the angle of the shots,

20   because they were either -- they were coming from

21   below him, the gun would -- the gun firing the shots

22   would either have to be below his waist?  Is that a

23   fair statement?

24   MS. MCGOWAN:  Objection.  Foundation.

25   A.  Not necessarily.  I mean, you could probably

1  have a gun at your waist and still angle it upward.  I

2  mean, I'm --

3       Q.  (By Mr. Dowd)  Do you see what I'm saying?

4  I'm trying to get --

5       A.  Again, the barrel of the gun has to be

6  positioned such that it can go in the direction that

7  these went.  The majority of them went upward,

8  backward, and leftward.  So the guns had to have been

9  positioned such that they could -- the bullets could

10 enter the body in that way.

11      Q.  Do you mean upward, backward, and rightward?

12      A.  I'm sorry if I said leftward.  Yes.

13      Q.  Okay.

14      A.  Upward, backward, and rightward, yes.

15      Q.  Okay.  So if he was on the floor and his

16 feet were closer to the officers that were shooting

17 than his head, he was at an angle as he is in this

18 picture -- you see the angle he's at in this picture.

19 I'll hand you what been marked Plaintiff's Exhibit 6.

20 That would be consistent with the bullets being fired

21 from the -- are you familiar with the floor plan of

22 the home?

23      A.  Not exactly, no.

24      Q.  Okay.

25      A.  The problem with this photo is that his left

1    arm covers a majority of the left chest wounds.

2         Q.  Okay.

3         A.  So it's unlikely that they were created in

4    this position without more injury to his left arm

5    located right there.

6         Q.  That's the position he ended up in; correct?

7         A.  Correct.

8         Q.  We don't know what position he was in when

9    he first hit the floor, do we?

10        A.  No.

11        Q.  The police department created a diagram of

12   the floor plan.  Was that ever a part of your

13   examination or evaluation of it?

14        A.  It was not.  That does not affect cause and

15   manner of death, and I am charged with determining

16   cause and manner of death.

17        Q.  Okay.  Well, there's no -- no question that

18   the cause of death was the bullet holes that -- that

19   you found.  Is that a fair statement?

20        A.  Yes.  The cause of death was gunshot wounds

21   of the neck and chest.

22        Q.  Okay.

23             MR. DOWD:  Can we take a quick break?

24             THE VIDEOGRAPHER:  Off the record at 11:25.

25             (A brief recess was had.)

1              THE VIDEOGRAPHER:  Back on the record at

2      11:26.

3          Q.  (By Mr. Dowd)  Doctor, I'm going to hand you

4      what's been marked Plaintiff's Exhibit 7, and I will

5      hand it to you in a second, but it shows the dining

6      room where his body was located and there is a stick

7      figure from the investigator, Detective Sommers,

8      setting forth where his body was, and the dining -- in

9      the living room you see the fireplace on the left end.

10     The officers have testified they were there in the

11     living room on that end firing into the dining room

12     and that that's where he -- he ended up in that.

13     Could you take a look at that, please?

14             Based upon the angle of his body in that

15     diagram from the detective and the location of the

16     officers in the dining room there and the upward,

17     backward, and rightward trajectile of most of these

18     bullets, would it be -- and the officers have

19     testified they fired from those locations -- would it

20     have been possible for him to be standing and receive

21     those wounds that you've described here today?

22             MS. MCGOWAN:  Objection.  Foundation.  Form.

23     Vague.

24         Q.  (By Mr. Dowd)  Do you understand the

25     question?

1          MS. MCGOWAN:  Compound.

2      A.  If they were firing from the fireplace, it

3  is unlikely that they could hit the left side based on

4  this diagram if this is indeed how he was found.  So

5  it was unlikely that he was lying on ground when he

6  received these and it is most likely that he was in a

7  standing position.  However, again, that assumes that

8  this is indeed correct and that that's exactly how it

9  occurred.

10      Q.  (By Mr. Dowd)  Explain to the jury, Doctor,

11  how -- you've pointed this direction on all of these.

12  And they -- they came in here and went here.  All of

13  these.

14          MS. MCGOWAN:  Objection.  Foundation.

15      Q.  (By Mr. Dowd)  How -- how could those -- how

16  could he have been standing?

17          MS. MCGOWAN:  Objection.  Form.

18      A.  Again, this has him located here, and you

19  said the --

20      Q.  (By Mr. Dowd)  No, he's not -- that's where

21  he was lying when they came.

22      A.  Right.

23      Q.  Okay.

24      A.  That's where he was lying, and you're saying

25  that they fired from the fireplace.

1     Q.  Well, that --

2     A.  So how can they go this way from his left

3  side to his right -- he was lying on his back.  So if

4  he is indeed lying here and they are shooting from the

5  fireplace --

6     Q.  They're not shooting from the fireplace.

7     A.  -- they could not --

8     Q.  I didn't mean to misrepresent that to you.

9  They said they were here in the -- in the living room.

10  Right here.

11     A.  Again, in the living --

12          MS. MCGOWAN:  Objection.  Foundation.

13  Vague.

14     Q.  (By Mr. Dowd)  You can answer.

15     A.  Again, shooting from this location with the

16  body if it is indeed this way, you cannot get to the

17  left side and go upwards and backwards shooting from

18  here so that implies that he was not in this position

19  when he was injured.

20     Q.  This is his left side; correct?

21     A.  Correct.  And his left side is located here

22  which is not a possible trajectory that would be able

23  to be shot from here to hit going this way.

24     Q.  This is his left side which -- and the

25  bullets went -- that bullet went this way; correct?

```
 1        A.   Correct.   And his left side is over here
 2   furthest away which suggests if this is indeed how it
 3   took place, that he would have had to have been in a
 4   standing position.   It does not suggest --
 5        Q.   If he is in --
 6        A.   If they indeed fired from this location, you
 7   can't possibly go this way if that's indeed how he was
 8   found on the ground without be -- being over here.
 9        Q.   If he was standing, the bullets would have
10   gone in like this; correct?
11        MS. MCGOWAN:   Objection.   Foundation.
12        Q.   (By Mr. Dowd)   They would have gone straight
13   into him --
14        A.   No, not necessarily --
15        Q.   -- at whatever angle?
16        A.   -- if the gun is angled upwards.   Perhaps
17   the police were kneeling.   Perhaps -- I can't say.
18        Q.   So they would have to be a lot closer than
19   here if they were going to shoot upwards and -- and
20   have bullets go into him like that; correct?
21        A.   Not necessarily.   All I can say is that the
22   range of fire is greater than 3 feet.   I can't say
23   other than that that they were further than 3 feet
24   away.   They could have been as close as 3 feet.
25        Q.   So --
```

 1          A.  But --

 2          Q.  You testified earlier you're not a

 3   ballistics expert?

 4          A.  Correct.

 5          Q.  Okay.  That's all I have.  Oh, Doctor, have

 6   all of your opinions you've expressed here today been

 7   within a reasonable degree of medical and scientific

 8   certainty?

 9          A.  Yes.

10          Q.  Thank you.

11                      EXAMINATION

12   QUESTIONS BY MS. MCGOWAN:

13          Q.  Good morning, Doctor.  My name is Erin

14   McGowan.  I introduced myself before.  I'm

15   representing the defendants.  It's true that how the

16   muzzle of a gun is oriented to the body dictates the

17   angle the projectile enters the body?

18          A.  Correct.

19          Q.  So bullet wound trajectory is the

20   three-dimensional description of a path of the bullet

21   into the body; is that correct?

22          A.  Yes.

23          Q.  Okay.  So it simply reflects the orientation

24   of the firearm relative to the body?

25          A.  Correct.

1    Q.  So long as the relationship between the

2    firearm and the body is maintained, that scenario can

3    be rotated in almost a 3-D access -- axis?

4    A.  Correct.

5    Q.  So given that there's a three-dimensional

6    relationship between the firearm and the body, as long

7    as that relationship is kept and it can be rotated on

8    the access -- axis, there could be several possible

9    circumstances or scenarios that cause these wounds

10   that we've talked about today; is that true?

11   A.  Yes.  For example, most people don't stand

12   with their palms up in anatomic position.  So, again,

13   like we said with the -- the arm and forearm wounds,

14   we can't reliably say how his arms were, but again,

15   it's a three-dimensional rotating potentially

16   scenario.

17   Q.  So it's true that any number of body

18   positions or circumstances can be consistent with

19   these wounds?

20   A.  Correct.

21   Q.  And you cannot tell from examining these

22   wounds whether or not he was in any particular

23   position?

24   A.  Correct.

25   MS. MCGOWAN:  Could you please mark this

 1    Defendant's Exhibit A.
 2    (Defendant's Exhibit A marked for identification.)
 3         Q.  (By Ms. McGowan)  And, Doctor, I'm handing
 4    you what's been marked Defendant's Exhibit A.  I want
 5    to direct you to the last page of that exhibit which
 6    I'll represent to you is the postmortem examination.
 7         A.  The cause of death sheet?
 8         Q.  That's correct, yes.
 9         A.  Okay.
10         Q.  And is it true that Isaiah Hammett tested
11    positive for cannabinoids?
12         A.  Yes, he did.
13         Q.  Okay.  And did you perform any tests for
14    gunshot residue on Mr. Hammett?
15         A.  No.
16         Q.  Doctor, I think those are all the questions
17    I have for you today.  Thank you very much.
18         A.  You're welcome.
19                        EXAMINATION
20    QUESTIONS BY MR. DOWD:
21         Q.  Doctor, I'm not sure I followed what you
22    were saying about -- and what the city counselor was
23    saying as far as it's a three-dimensional rotating.
24    So you would have to move the position of everybody
25    for -- for these wounds to have come from the -- from

1  a position where Isaiah was standing?

2       A.  No.  I guess the -- people don't stand

3  typically with their hands at their sides like this so

4  there is going to be some movement of hand and body.

5       Q.  Right.  So that's why you testified you

6  couldn't tell why -- or where his arms were when he

7  was being shot?

8       A.  Correct.

9       Q.  But there is no question that his body was

10 in that relationship to the trajectory of the bullets

11 that you described throughout your deposition;

12 correct?

13      A.  Yes.  The muzzle of the gun had to be at an

14 angle such that the bullets could travel through the

15 body at the described path.

16      Q.  Okay.  With regard to the question about

17 cannabinoids, that's marijuana?

18      A.  Correct.

19      Q.  And he didn't have any opioids or any meth

20 -- any -- anything else in him?

21      A.  No.  It was a metabolite of marijuana.

22      Q.  All right.  What does that mean?

23      A.  It's a breakdown product.  Again, looking at

24 one value is very hard to say how somebody would have

25 been affected by it.  I can't say for certain without

1   knowing frequency of use including how much and how

2   often used.

3        Q.  So -- so you're saying it was a very minimal

4   amount?

5        A.  Not necessarily.

6        Q.  What -- what is --

7        A.  Again, you cannot make a statement looking

8   at one level in an individual.  You would have to have

9   serial values, you would have to know how much he used

10  how frequently to know the effect of it on him.

11       Q.  Okay.  Again, all of your opinions you've

12  expressed here today have been within a reasonable

13  degree of medical and scientific certainty?

14       A.  Yes.

15           MR. DOWD:  That's all I have.

16           MS. MCGOWAN:  Nothing further.  Thank you,

17  Doctor.

18           THE DEPONENT:  Thank you.

19           MR. DOWD:  Doctor, you have the right to

20  read your deposition to ensure that it was taken down

21  as spoken here today and as demonstrated, or you can

22  waive signature, whichever you would like to do.

23           THE DEPONENT:  I would prefer to read it and

24  sign.

25           MR. DOWD:  Okay.  Very good.

 1              THE VIDEOGRAPHER:  This concludes --

 2              MR. DOWD:  That's all I have.  Thanks,

 3    Doctor.

 4              THE VIDEOGRAPHER:  -- the deposition of

 5    Dr. Erin Ely.  We are off the record at 11:37.

 6              (Video off.)

 7              MR. DOWD:  The diagrams I'm going to mark 9

 8    and 10.

 9

10              (Deposition was concluded and will be signed

11               by the witness.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

 

    I, Heather L. Shallow, Certified Court Reporter

within and for the State of Missouri, duly

commissioned, qualified and authorized to administer

oaths and to certify to depositions, do hereby certify

that pursuant to notice/agreement in the cause now

pending and undetermined in the United States District

Court for the Eastern District of Missouri, Eastern

Division, to be used in the trial of said cause in

said court, I was attended at the Office of the

Medical Examiner, 1300 Clark Avenue, in the city of

St. Louis, State of Missouri, by the aforesaid

witness, and by the aforesaid attorneys, on the

5th day of February, 2020.

      That the said witness, being of sound mind and

being by me first carefully examined and duly

cautioned and sworn to testify the truth, the whole

truth, and nothing but the truth in the case

aforesaid, thereupon testified as is shown in the

foregoing transcript, said testimony being by me

reported in shorthand and caused to be transcribed

into typewriting, and that the foregoing pages

correctly set forth the testimony of the

aforementioned witness, together with the questions

1   propounded by counsel and remarks and objections of

2   counsel thereto, and is in all respects a full, true,

3   correct and complete transcript of the questions

4   propounded to and the answers given by said witness,

5   that signature of the deponent was not waived by

6   agreement of counsel and of witness.

7        I further certify that I am not of counsel or

8   attorney for either of the parties to said suit, not

9   related to nor interested in any of the parties or

10  their attorneys.

11       Witness my hand at St. Louis, Missouri, this 12th

12  day of February, 2020.

13

14

15  _____

16  Heather L. Shallow, CCR, RPR, RMR

17  CCR No. 0442

18

19

20

21

22

23

24

25

1    February 12, 2020

2

3    Erin E. Ely, MD
     Office of the Medical Examiner
4    1300 Clark Avenue
     St. Louis, Missouri  63103
5    erin.ely@health.slu.edu

6

     Re:  Deposition of Erin E. Ely, MD
7    Date:  February 5, 2020
     Case:  Gina Torres and Dennis L. Torres vs. City of
8    st. Louis, et al.

9

     Dr. Ely,
10

     You did not waive the right to read and sign your
11   deposition in the above referenced matter.  Attached
     is the copy of the deposition, together with errata
12   sheets and additional signature page.  Please read the
     transcript, list any corrections (including page and
     line number) on the errata sheets, and sign and date
13   the signature page in front of a notary.
14

     Within 30 days, please return the errata sheets and
15   signature page to our office via e-mail or regular
     mail for further processing.  Your prompt cooperation
16   will be appreciated.

17   Sincerely,

18

     Heather L. Shallow, CCR, RPR, RMR
19

20

21

     360 Litigation Services
22   Production Department
     10097 Manchester Road, Suite 102
23   St. Louis, MO  63122
     (314) 394-2206(main)
24   (314) 394-2207(fax)
     Office@360litigationservices.com

25

Deposition of Erin E. Ely, M.D.                                    Gina Torres, et al. v. City of St. Louis, et al.

1                              — — — — — — —
                                    ERRATA
2                              — — — — — — —

3            PAGE     LINE    CHANGE

4            _____    _____   _____

5            _____    _____   _____

6            _____    _____   _____

7            _____    _____   _____

8            _____    _____   _____

9            _____    _____   _____

10           _____    _____   _____

11           _____    _____   _____

12           _____    _____   _____

13           _____    _____   _____

14           _____    _____   _____

15           _____    _____   _____

16           _____    _____   _____

17           _____    _____   _____

18           _____    _____   _____

19           _____    _____   _____

20           _____    _____   _____

21           _____    _____   _____

22           _____    _____   _____

23           _____    _____   _____

24           _____    _____   _____

25           _____    _____   _____

```
 1                          _ _ _ _ _ _ _
                                ERRATA
 2                          _ _ _ _ _ _ _

 3             PAGE    LINE   CHANGE

 4             ____    ____   _____

 5             ____    ____   _____

 6             ____    ____   _____

 7             ____    ____   _____

 8             ____    ____   _____

 9             ____    ____   _____

10             ____    ____   _____

11             ____    ____   _____

12             ____    ____   _____

13             ____    ____   _____

14             ____    ____   _____

15             ____    ____   _____

16             ____    ____   _____

17             ____    ____   _____

18             ____    ____   _____

19             ____    ____   _____

20             ____    ____   _____

21             ____    ____   _____

22             ____    ____   _____

23             ____    ____   _____

24             ____    ____   _____

25             ____    ____   _____
```

1            Comes now the witness, ERIN E. ELY, M.D.,

2    after having read the foregoing transcript of the

3    deposition taken on the 5th day of February, 2020,

4    hereby acknowledges by signature hereto that it is a

5    true and accurate transcript of the testimony given on

6    the date hereinabove mentioned.

7

8

9

10

11   _____

12   ERIN E. ELY, M.D.

13

14

15

16   Subscribed and sworn to me before this _____ day of

17   _____, 2020.

18

19   My Commission expires:

20

21

22   _____

23   Notary Public

24

25

Deposition of Erin E. Ely, M.D.

Gina Torres, et al. v. City of St. Louis, et al.

**WORD INDEX**

**< - >**
**-** 69:1, 1, 1, 1, 1, 1, 1, 2, 2, 2, 2, 2, 2, 2 70:1, 1, 1, 1, 1, 1, 1, 2, 2, 2, 2, 2, 2, 2

**< 0 >**
**0.2** 34:7
**0.7** 34:7
**0442** 67:17

**< 1 >**
**10:13** 4:7
**10:48** 31:14
**10:50** 31:17
**10:54** 35:1
**10:55** 35:4
**100** 49:14
**10097** 2:23 68:22
**102** 2:23 68:22
**11:25** 55:24
**11:26** 56:2
**11:37** 65:5
**1200** 2:14
**12th** 67:11
**1300** 1:19 4:9 66:12 68:4

**< 2 >**
**2020** 1:21 4:7 66:15 67:12 68:1, 7 71:3, 17
**211** 2:6
**223** 23:19

**< 3 >**
**30** 68:13
**31** 3:14 10:20 45:18
**314** 2:8, 15, 17, 25 68:23, 24
**360** 2:22 68:17
**365** 48:5
**394-2206** 2:25 68:23

**394-2207** 68:24
**3-D** 61:3

**< 4 >**
**4:19-cv-01525-DDN** 1:9
**400** 8:7
**4050** 2:6
**49** 3:8

**< 5 >**
**50** 3:9
**51** 3:10
**54** 3:11
**56** 3:12
**5th** 1:21 4:7 66:15 71:3

**< 6 >**
**60** 3:3
**62** 3:2, 16
**621-2500** 2:8
**622-4618** 2:17
**63102** 2:7
**63103** 2:16 68:4
**63122** 2:24 68:23

**< 8 >**
**8x10** 3:7, 8, 9, 10, 11

**< A >**
**abdomen** 22:2 28:24 36:1, 24 37:8, 16
**abdominal** 36:5, 21 37:3
**ability** 23:7
**able** 33:2, 9 34:22 49:1 53:1 58:22
**abrasions** 11:6, 6, 8 32:13, 18 33:9, 17 34:5, 6, 10 45:24
**access** 61:3, 8
**accidentally** 7:12
**accurate** 71:5

**acknowledges** 71:4
**actual** 33:20
**addition** 6:21
**additional** 68:12
**Additionally** 8:1
**address** 4:9
**administer** 66:5
**administered** 4:20
**administrator** 48:17
**affect** 55:14
**aforementioned** 66:25
**aforesaid** 4:4 66:13, 14, 20
**age** 4:2
**agreement** 66:7 67:6
**ahead** 27:6 39:17
**AL** 1:11 68:8
**altogether** 11:10
**amount** 47:7, 10, 18 64:4
**Anatomic** 3:13, 14 5:24 6:1, 2 15:22 16:3 30:17 31:21 44:4 61:12
**angle** 17:10, 11, 12, 23 18:10, 25, 25 20:3, 21 25:6 26:8 28:1 46:5, 18 52:9 53:19 54:1, 17, 18 56:14 59:15 60:17 63:14
**angled** 18:7 59:16
**angulation** 19:5
**ankle** 38:24
**answer** 25:22 58:14
**answers** 67:4
**anterior** 27:21 39:1, 15 42:6 43:5 44:24

**45:24**
**anybody** 48:8
**aorta** 21:23, 23
**apologize** 28:15 43:24
**apparatus** 14:17
**appeared** 16:24 22:13
**appears** 50:19
**appreciated** 68:16
**approximately** 31:2 36:24 38:20
**approximation** 32:3
**area** 22:3
**arm** 27:2 28:3 38:8, 10, 13, 14, 15, 21, 21, 25 39:1, 9, 10, 12, 15, 24, 25 40:4, 5, 6, 8, 20, 22, 24 41:10, 23 42:1 43:6, 16, 18 52:5 55:1, 4 61:13
**armpit** 31:24 35:9, 12, 14, 24 52:20
**arms** 30:13, 22 61:14 63:6
**artery** 21:24
**asking** 5:2
**aspect** 6:2 27:4, 21 28:12 31:22 40:20, 24 41:6 52:2
**aspects** 22:1
**assistant** 6:12, 15, 16, 22
**associated** 23:9
**assumes** 57:7
**attach** 22:6
**Attached** 68:11
**attended** 5:20 66:11
**attorney** 67:8
**attorneys** 66:14 67:10

**authorized** 66:5
**autopsies** 6:19
**autopsy** 6:18 8:8, 9, 11, 20 9:12 48:7
**Avenue** 1:19 4:9 66:12 68:4
**axis** 61:3, 8

**< B >**
**BA** 5:19
**back** 3:14 9:14 10:24 17:20 28:18 31:9, 16, 19, 20, 21 32:10, 12, 13, 20 34:23 35:3, 7, 8, 13, 20, 23 38:4, 9, 10 40:5, 8, 16, 19, 21 41:5, 9, 12, 16, 23 43:15, 17, 20 44:2, 6 46:20 47:12, 22 51:20 52:1, 2, 7, 8, 12 56:1 58:3
**background** 5:7, 12
**backward** 13:21 24:5, 19 25:24 27:11, 19 28:17, 25 29:21 30:5 31:6 36:4, 8, 25 37:12 39:5, 18 40:6 42:8, 9, 25 43:7, 9, 9, 12 45:11 46:6, 9 54:8, 11, 14 56:17
**backwards** 16:4, 13, 15, 19 17:15, 19 18:17 24:8 25:7 39:8, 20 43:3 58:17
**Bad** 52:24, 24
**ballistic** 9:17
**ballistics** 15:7 18:12 19:8 23:8 45:1, 8 53:13 60:3

Deposition of Erin E. Ely, M.D.                                      Gina Torres, et al. v. City of St. Louis, et al.

**barrel** 24:*15*, *17*
25:*3* 42:*14*, *23*
43:*11* 54:*5*
**base** 15:*14*, *15*
17:*1*, *4*, *8* 19:*18*,
*20*
**based** 15:*25*
25:*5* 29:*6*, *9*, *14*,
*24* 30:*12* 38:*18*
50:*4* 56:*14* 57:*3*
**basilar** 15:*10*
53:*6*
**beginning** 9:*16*
**behalf** 1:*18*
**believe** 29:*5*, *19*
31:*4* 33:*12*
34:*16* 36:*16*, *20*
37:*5* 45:*4* 49:*9*,
*10*, *12* 53:*10*
**Berettas** 45:*7*
**best** 14:*19* 18:*9*
20:*5*, *7* 23:*6*
24:*24* 29:*9*
33:*25*
**bit** 11:*11* 28:*23*
36:*23* 41:*14*
**blast** 15:*16*
17:*5* 19:*21*
**bleed** 47:*4*
**blood** 6:*6*, *8*
21:*24*, *25* 47:*7*,
*10*, *14*, *18* 50:*7*,
*10*, *23* 51:*4*, *16*,
*17*, *18*
**board** 36:*8* 37:*1*
**body** 6:*2* 9:*18*,
*20*, *24* 10:*11*, *13*,
*14* 13:*18*, *19*
17:*24* 18:*17*
19:*3* 21:*25*
22:*1*, *10* 23:*6*
24:*18*, *21*, *21*
25:*1* 26:*8*, *19*
27:*13*, *14* 30:*6*
31:*4*, *20*, *22*, *24*
32:*22* 33:*4*, *5*
34:*14* 41:*7*
45:*22* 46:*11*
47:*4*, *11*, *11*, *14*,
*15*, *19*, *23* 48:*1*

50:*3* 54:*10*
56:*6*, *8*, *14* 58:*16*
60:*16*, *17*, *21*, *24*
61:*2*, *6*, *17* 63:*4*,
*9*, *15*
**bone** 23:*12*
**bones** 15:*5*, *16*
44:*8*
**Boonshoft** 5:*21*
**born** 5:*8*, *9*
**borrow** 46:*15*
**bottom** 15:*3*
**brain** 15:*11*, *12*,
*14*
**break** 31:*11*
34:*25* 55:*23*
**breakdown**
63:*23*
**breaking** 33:*13*,
*22* 46:*1*
**breaks** 33:*18*, *23*
**breathing** 14:*17*
**brief** 31:*15*
34:*25* 35:*2*
55:*25*
**briefly** 9:*8*
**Broadway** 2:*6*
**broke** 44:*7*
**bullet** 13:*15*
15:*19* 16:*5*, *13*,
*24* 18:*16* 23:*11*
24:*18* 25:*20*
26:*8* 33:*1*
34:*13* 36:*4*
39:*4*, *11* 42:*24*
43:*12* 44:*15*, *20*,
*22* 45:*16* 55:*18*
58:*25* 60:*19*, *20*
**bullets** 10:*16*
29:*2*, *15* 33:*23*
45:*22* 54:*9*, *20*
56:*18* 58:*25*
59:*9*, *20* 63:*10*,
*14*

**< C >**
**C2** 14:*9*, *16*
**caliber** 23:*19*
**call** 8:*9* 9:*13*
48:*9*

**called** 5:*16* 9:*23*
14:*22* 15:*22*
21:*18* 33:*12*
37:*8* 49:*11*, *18*
50:*2*
**cannabinoids**
62:*11* 63:*17*
**capita** 8:*2*
**carefully** 66:*17*
**carries** 21:*25*
**carry** 45:*7*
**Case** 1:*9* 4:*4*,
*11* 12:*4* 23:*7*
48:*13* 66:*19*
68:*7*
**cause** 7:*4*, *13*, *16*,
*19*, *25* 9:*12* 19:*3*
23:*16* 33:*10*
34:*15* 48:*7*
53:*14* 55:*14*, *16*,
*18*, *20* 61:*9* 62:*7*
66:*7*, *10*
**caused** 13:*16*
24:*21* 29:*15*
30:*1* 33:*15*
66:*22*
**causing** 34:*12*
**cautioned** 66:*18*
**cava** 37:*14*, *15*
**cavities** 32:*23*
47:*11*
**cavity** 17:*8*
19:*22* 21:*5*, *13*
29:*1* 30:*11*
31:*4* 36:*6*, *21*
37:*3* 43:*8* 47:*15*
**CCR** 67:*16*, *17*
68:*17*
**Center** 7:*9*
**centimeter** 34:*8*
**centimeters** 34:*7*
**central** 30:*4*
**certain** 12:*16*
18:*3* 26:*2*, *5*
49:*14* 50:*13*, *21*,
*24* 63:*25*
**certainty** 33:*8*
60:*8* 64:*13*
**certificates** 7:*7*,
*10*

**Certified** 1:*22*
66:*3*
**certify** 66:*6*, *6*
67:*7*
**cervical** 14:*21*,
*22* 17:*21*
**challenging** 19:*1*
23:*7* 35:*9*
**chambers** 21:*20*,
*21*, *23*
**change** 31:*25*
69:*3* 70:*3*
**characteristics**
45:*3*
**charged** 55:*15*
**Charles** 6:*24*
**chest** 12:*14*
20:*14*, *19* 21:*5*,
*13* 22:*2*, *5*, *5*, *20*
27:*5*, *5* 28:*5*, *13*,
*18*, *19*, *22*, *23*
29:*1*, *3*, *19*, *22*
30:*5*, *7*, *11* 31:*1*,
*6*, *19* 42:*10*, *12*,
*17* 43:*8* 45:*25*
46:*25* 52:*3*, *4*
53:*8*, *9*, *11*, *15*
55:*1*, *21*
**Cincinnati** 5:*9*,
*15*
**circle** 13:*23*
**circumstances**
61:*9*, *18*
**CITY** 1:*11*, *19*
2:*13*, *15* 4:*12*
6:*11*, *13*, *16*
62:*22* 66:*12*
68:*7*
**Clark** 1:*19* 4:*9*
66:*12* 68:*4*
**clavicle** 28:*6*
**clinical** 5:*24*
6:*2*, *5*
**close** 59:*24*
**closer** 37:*10*
41:*7* 54:*16*
59:*18*
**closest** 14:*24*
**clothing** 9:*25*

**co-director** 6:*17*
**collarbone** 28:*6*
**collection** 50:*1*
**college** 5:*13*
**color** 49:*3*, *5*
**come** 7:*12*
17:*25* 18:*2*
62:*25*
**comes** 7:*9* 71:*1*
**coming** 53:*20*
**Commission**
71:*19*
**commissioned**
66:*5*
**complete** 67:*3*
**completed** 35:*5*
**completely** 10:*14*
**completion** 6:*12*
**Complies** 20:*22*
22:*16* 27:*25*
28:*15* 32:*8*
43:*3* 46:*16*
**component** 23:*18*
**components**
22:*11*, *22* 23:*1*
43:*19*, *20*
**Compound** 57:*1*
**computer** 49:*1*,
*4*, *5*
**concerned** 51:*15*,
*17*
**concluded** 65:*10*
**concludes** 65:*1*
**confirm** 45:*2*
**confirmed** 45:*9*
**considered** 7:*6*
21:*4* 32:*23*
**consist** 45:*22*
**consistent** 23:*24*
24:*1* 54:*20*
61:*18*
**Controls** 7:*9*
**cooperation**
68:*15*
**copies** 48:*25*
**copy** 9:*2*, *5*
68:*11*
**cord** 14:*10* 15:*1*
17:*22*

Deposition of Erin E. Ely, M.D.                    Gina Torres, et al. v. City of St. Louis, et al.

corrections 68:12
correctly 66:24
COUNSEL 2:1
  4:13 67:1, 2, 6, 7
counselor 62:22
Counselor's 2:13
counted 45:15
Counties 6:24
country 8:3
County 6:22, 23
courses 37:15
COURT 1:1, 22
  4:19 66:3, 9, 11
covered 27:2
covers 55:1
cranial 17:8
create 19:22
created 33:12,
  16 34:17 45:5,
  25 46:2 55:3, 11
creates 33:17
creating 33:22
crime 13:2
curious 34:15
cuts 34:3, 4

< D >

damage 29:4
damaged 27:15
data 7:8
date 4:7 68:7,
  13 71:6
day 1:21 48:5
  66:15 67:12
  71:3, 16
days 48:5, 5
  68:13
Dayton 5:22
death 7:4, 6, 10,
  14, 17, 19, 25
  9:13 48:4, 8
  53:14 55:15, 16,
  18, 20 62:7
deaths 7:18
decedent 12:24
deemed 39:20
Defendants 1:13
  2:11 4:17 60:15
DEFENDANT'S

3:15 62:1, 2, 4
definitely 37:23
definitively
  13:17 16:15
  19:7 29:5 33:2
degree 5:23
  60:7 64:13
degrees 17:25
demonstrate
  34:22
demonstrated
  22:21 41:18
  64:21
Demonstrates
  28:9
DENNIS 1:5
  68:7
department 6:17
  23:20 55:11
  68:22
depends 47:12
depict 47:6
depiction 15:21
DEPONENT
  20:22 21:9
  64:18, 23 67:5
deposes 4:4
DEPOSITION
  1:17 4:10
  63:11 64:20
  65:4, 10 68:5, 11,
  11 71:3
depositions 66:6
describe 10:20
  11:13 20:11
  23:4 29:16 36:2
described 11:8,
  21 14:4 18:20
  36:17 52:13
  53:11 56:21
  63:11, 15
describes 11:3
Description 10:7
  11:1, 15 24:4
  46:4 60:20
destruction 19:3
  23:16
Detailed 10:7
Detective 56:7,
  15

determine 7:13
  9:12, 16 10:15
  13:18 29:4
  33:2, 10 48:7
  53:1
determined
  13:15 14:5
determining 7:4,
  16, 19, 24, 25
  19:7 55:15
devastating
  12:14 21:4, 13,
  19
diagnosed 6:8
diagnosis 6:1, 4,
  6
diagram 3:12,
  13, 14 13:23
  27:7 30:6
  31:20, 25 55:11
  56:15 57:4
diagrams 65:7
dictates 60:16
die 7:5, 8
died 12:25
dies 7:11 48:9, 9
different 21:21
dining 56:5, 8,
  11, 16
direct 62:5
directed 35:18
  46:25
direction 24:13
  26:10 33:3
  54:6 57:11
directions 15:25
directly 12:7
  46:10, 25
disease 6:1, 4, 6
  7:9 10:12, 17, 19
distinguishing
  10:1
DISTRICT 1:1,
  2 66:8, 9
DIVISION 1:3
  66:10
Doctor 4:23 5:1
  6:25 35:5
  45:21 56:3
  57:10 60:5, 13

62:3, 16, 21
  64:17, 19 65:3
doctors 29:11
document 9:25
documented 9:24
doing 29:4
dorsal 38:8, 9,
  10 39:25 40:5,
  24 41:4 44:13
dorsolateral
  43:14
dorsomedial
  44:12
Dowd 2:4, 5, 5
  3:2, 18 4:15, 15,
  22 5:1 13:14
  19:13 20:25
  22:12 24:24
  25:14, 22 31:11
  32:2 34:25
  35:5 42:20
  46:14 47:16
  50:11 51:25
  52:13, 16 54:3
  55:23 56:3, 24
  57:10, 15, 20
  58:14 59:12
  62:20 64:15, 19,
  25 65:2, 7
dowel 32:3
  41:19 43:2
  46:15, 17
downward
  26:12 39:5, 18
  42:8, 9, 15, 25
  43:7, 9, 12, 22, 23
  44:5 51:22
downwards 16:5
  52:5
Dr 4:11 65:5
  68:8
dramatic 52:9,
  11, 21
drawing 24:11
  35:10 43:10
drew 43:21 44:3
due 15:16 53:13
duly 4:2 66:4,
  17

duties 7:2, 3

< E >

earlier 60:2
easier 11:11, 16
  13:12 21:9
EASTERN 1:2,
  3 66:9, 9
easy 46:2
education 7:23
educational 5:12
effect 19:21
  21:13 64:10
either 33:3
  46:21 50:23
  53:20, 22 67:8
elbow 38:22, 22,
  25
elected 12:7
elementary 5:17,
  18
ELY 1:17 4:1,
  11, 25 65:5 68:3,
  5, 8 71:1, 12
e-mail 68:15
employed 6:14
ended 13:20, 20
  55:6 56:12
enforcement
  48:12
ensure 49:25
  64:20
enter 23:15, 16
  32:22 33:4
  34:14 54:10
entered 17:7
  24:12, 13 31:4
enters 60:17
entitled 10:7
entrance 11:22
  13:25 20:14
  22:23 23:3, 9
  29:19 38:12, 14
  40:9, 13 42:5
  45:19
ERIN 1:17 2:12
  4:1, 11, 16, 25
  60:13 65:5
  68:3, 5 71:1, 12

Deposition of Erin E. Ely, M.D.                                    Gina Torres, et al. v. City of St. Louis, et al.

erin.ely@health.slu.edu 68:5
errata 68:11, 13, 13 69:1 70:1
Esq 2:4, 12
estimate 18:9 24:24
ET 1:11 68:8
evaluating 7:24
evaluation 55:13
everybody 62:24
evidence 9:17 29:10 50:1
exactly 10:15 23:21 54:23 57:8
exam 7:13
Examination 3:2, 3, 6, 16 4:21 9:9, 11, 16, 23 10:9, 10 14:3 29:7 30:12 55:13 60:11 62:6, 19
examine 48:1
examined 66:17
Examiner 1:19 4:8 6:13, 15, 23 7:3, 16, 22 49:11, 18 50:2 66:12 68:3
Examiner's 6:11 7:1 47:25
examining 23:6 61:21
example 6:4, 7 9:14, 14 11:12 34:6 61:11
Excuse 6:11 7:21 41:25
Exhibit 8:18 12:22 20:15 47:3 49:7 50:17 51:11 54:19 56:4 62:1, 2, 4, 5
EXHIBITS 3:5, 15, 18
exit 14:2 22:17, 23 23:2, 9, 18 28:8 31:7 40:8,

16 41:15 47:11, 13
exited 22:10 27:21 31:5, 23 35:9, 11, 23, 24 41:1 52:20
exiting 35:13
exits 39:24 40:4, 5 43:18 44:1 45:19
expansion 19:24
expelled 47:18
experience 7:18 8:5
expert 18:12 19:8 51:18 60:3
expertly 7:23
expires 71:19
Explain 57:10
explained 7:17
expressed 60:6 64:12
external 9:23 10:9
extremely 8:4
eye 15:12 50:15 51:3

< F >
face 15:9 20:2, 4
fact 19:18 42:16
factors 10:1
fair 10:8 53:23 55:19
fake 33:21
familiar 23:19 49:20 54:21
far 18:24 32:7 62:23
farther 41:8
fax 68:24
February 1:21 4:7 66:15 67:12 68:1, 7 71:3
feel 20:5
feet 34:1 54:16 59:22, 23, 24
fellow 7:24

fellowship 6:9
felt 29:12 30:1
fifth 44:18
figure 34:22 56:7
fin 38:9
final 11:14
find 10:17 46:10
Findings 10:24 11:3, 10, 20 23:25
finger 34:9 44:18
fire 33:25 59:22
firearm 60:24 61:2, 6
fired 25:16 42:13 54:20 56:19 57:25 59:6
fireplace 56:9 57:2, 25 58:5, 6
firing 53:21 56:11 57:2
first 4:2 9:17 10:3 11:21, 22, 25 12:17 36:15 53:11, 17 55:9 66:17
fish 38:9, 10
flat 17:24 18:10
flip 39:25 40:15
Floor 3:12 24:22 25:2 51:5, 15 54:15, 21 55:9, 12
followed 62:21
following 5:23 6:9 9:22
follows 4:5
forearm 38:22 40:2 41:4, 5, 9, 12, 16, 25 43:15 44:7, 8 61:13
foreign 15:23
forensic 6:10 7:5
form 11:10 46:13 47:8

50:8 56:22 57:17
forth 56:8 66:24
forward 31:23 32:1 35:19 41:13, 17 43:23 44:5
found 10:21 11:2 21:1 55:19 57:4 59:8
Foundation 19:12 24:23 25:13, 21 42:19 47:8 51:23 52:15 53:24 56:22 57:14 58:12 59:11
four 8:3, 7 21:19, 21, 22
fourth 21:14 22:9
fractured 14:9 15:1, 4, 16 22:6, 10
fractures 15:11 17:8 19:20, 25 53:7
fragment 15:7 19:3 23:17 34:15
fragmentary 16:21 23:8 29:14 53:13
fragmentation 19:19
fragmented 28:18, 25 29:21 30:7, 11 34:17 36:5 37:2 42:10, 12
fragments 15:5, 8 16:21 20:1 34:11 36:20 37:5, 20 39:8, 20 43:8 45:13 46:3
Franklin 6:23
frequency 64:1
frequently 64:10
front 3:13 17:20 31:24

35:13, 20 38:11, 14, 15, 20 42:18 43:18 44:2, 7 45:25 68:13
full 9:18, 20 67:2
full-body 9:15
fully 5:4 10:14
furthest 59:2

< G >
gatekeepers 7:6
generated 8:14
GINA 1:5 4:11 68:7
give 5:7 11:13 15:25 16:2 29:18 30:17 48:12
given 61:5 67:4 71:5
goes 16:19, 19 25:7 27:11 28:16 31:7 32:1, 20 37:17 40:6, 7 41:12 42:22 43:7 45:11, 12
going 5:2 8:17 11:13, 15 12:21 13:21, 25 16:3 19:22, 24 24:8, 13, 16 27:12 33:3, 3, 5, 6 34:19, 19 35:12, 15 36:12 39:6, 19 40:7 43:21, 22 44:1, 3, 5, 5, 16, 20 46:8, 20 49:6 50:16 51:10, 21 52:4, 5, 6, 11, 12 56:3 58:23 59:19 63:4 65:7
good 15:21 26:23 35:10 60:13 64:25
Gotcha 12:18 40:23
grade 5:16

Deposition of Erin E. Ely, M.D.                    Gina Torres, et al. v. City of St. Louis, et al.

**graze** 32:*14, 19, 23* 38:*4* 44:*11, 14, 17, 18* 45:*20* 46:*20*
**greater** 34:*1* 59:*22*
**grew** 5:*14*
**groin** 37:*11*
**Grossly** 50:*9*
**ground** 26:*4* 57:*5* 59:*8*
**guess** 26:*3* 43:*21* 63:*2*
**gun** 18:*14, 16* 24:*15, 17* 25:*3, 11, 18, 23* 26:*11, 16* 42:*13, 14, 23* 43:*11* 50:*6, 18, 20* 53:*21, 21* 54:*1, 5* 59:*16* 60:*16* 63:*13*
**gunfire** 8:*6* 15:*6*
**gunpowder** 33:*16, 19*
**guns** 49:*17* 54:*8*
**gunshot** 7:*17, 21, 24* 8:*2* 10:*15* 11:*5, 7, 22* 13:*20* 14:*5* 15:*17* 19:*21* 20:*13, 18* 23:*3* 24:*2* 32:*14, 19, 23* 44:*11* 45:*23* 51:*20* 53:*7, 8, 14* 55:*20* 62:*14*
**gunshots** 7:*20*

**< H >**
**Hall** 2:*15*
**Hammett** 8:*12* 9:*19* 10:*18* 22:*15* 62:*10, 14*
**hand** 8:*17* 12:*21* 44:*12, 16, 20* 49:*6* 50:*16* 51:*10* 54:*19* 56:*3, 5* 63:*4* 67:*11*
**handgun** 45:*1, 6*

**handing** 62:*3*
**handled** 49:*22*
**hands** 15:*24* 30:*20* 63:*3*
**happened** 13:*24* 16:*16*
**hard** 16:*14* 17:*16* 63:*24*
**head** 12:*3, 7, 20* 14:*11* 15:*13* 37:*25* 54:*17*
**hear** 5:*4*
**heart** 6:*5* 21:*17, 19, 20, 20, 22, 25* 22:*3* 29:*6, 13, 15, 25* 30:*2, 9* 37:*23* 53:*10*
**Heather** 1:*21* 66:*3* 67:*16* 68:*17*
**height** 9:*25*
**helping** 7:*13*
**hereinabove** 71:*6*
**hereto** 71:*4*
**high** 5:*13, 18* 15:*6* 19:*1, 2* 23:*14* 24:*1* 42:*11* 45:*5*
**higher** 19:*4*
**highest** 8:*2, 3* 12:*10*
**highly** 30:*9*
**high-velocity** 15:*6*
**Hill** 5:*16*
**hip** 38:*23*
**hired** 6:*12*
**history** 48:*6*
**hit** 20:*3* 53:*17* 55:*9* 57:*3* 58:*23*
**hits** 33:*16*
**hitting** 29:*3* 33:*13, 19, 23* 34:*11, 14, 20*
**hold** 13:*5*
**holds** 21:*17*
**holes** 55:*18*
**home** 54:*22*
**homicide** 8:*3*

9:*15*
**homicides** 8:*5, 7*
**hospital** 6:*19, 19* 48:*9*
**hours** 48:*4*

**< I >**
**identification** 62:*2*
**identify** 4:*13* 8:*18* 12:*22*
**implies** 58:*18*
**important** 48:*6*
**include** 11:*15*
**included** 7:*22* 11:*12*
**including** 21:*19* 36:*21* 45:*19* 64:*1* 68:*12*
**incorrect** 51:*24*
**incorrectly** 27:*17* 43:*22*
**incurred** 15:*10*
**INDEX** 3:*1*
**Indian** 5:*16*
**indicate** 19:*18* 42:*17*
**individual** 10:*1* 15:*24* 64:*8*
**individuals** 7:*5*
**individual's** 16:*8*
**inferior** 37:*14*
**information** 11:*12*
**initially** 11:*4, 5, 9, 13*
**injure** 17:*21*
**injured** 14:*20, 21* 16:*2* 21:*6, 14, 22, 23* 22:*2* 29:*6, 13* 31:*5* 36:*16* 37:*2, 13, 13, 17* 53:*9* 58:*19*
**injuries** 10:*2, 8, 13, 21* 11:*2, 4, 5, 14, 15* 14:*15* 29:*25* 35:*6* 45:*19* 53:*5*
**injury** 12:*14* 19:*4* 21:*4, 12, 19,*

22 29:*9, 15* 30:*2, 8* 37:*14, 19, 22, 23, 25* 44:*21* 45:*3* 46:*2* 53:*6* 55:*4*
**instance** 43:*10*
**interested** 67:*9*
**internal** 10:*10* 29:*7*
**interrogatories** 4:*5*
**introduced** 60:*14*
**investigate** 48:*10*
**investigative** 49:*21*
**investigator** 48:*1, 3, 4, 10, 14, 16, 18* 56:*7*
**investigators** 47:*21* 51:*16*
**investigator's** 13:*3*
**involves** 10:*10*
**Isaiah** 8:*11* 51:*20* 62:*10* 63:*1*
**Isaiah's** 30:*13*

**< J >**
**Jefferson** 6:*23*
**Johnston** 2:*21*
**jurisdiction** 50:*2*
**jury** 5:*7* 8:*19* 9:*8, 10* 11:*20* 12:*23* 13:*6, 14, 22* 14:*8* 15:*18* 17:*12* 20:*11, 16* 21:*1* 22:*13* 23:*4* 24:*3, 7* 26:*22* 29:*17* 32:*17, 25* 36:*2* 50:*5* 57:*10*

**< K >**
**kept** 61:*7*
**kidney** 37:*2*
**kidneys** 6:*5*
**killing** 53:*3*
**kind** 15:*5* 20:*20* 22:*2* 25:*7, 8*

27:*1, 12, 20* 28:*7* 30:*6, 10* 43:*6* 50:*7* 51:*7* 52:*2*
**kindergarten** 5:*16*
**knee** 38:*23, 24* 44:*25* 45:*14, 14*
**kneeling** 25:*3* 59:*17*
**know** 5:*2* 8:*1, 1* 23:*21* 25:*16* 34:*9* 35:*10, 23* 40:*19* 41:*22* 46:*14* 47:*17* 55:*8* 64:*9, 10*
**knowing** 64:*1*

**< L >**
**labeled** 12:*7* 45:*18*
**large** 8:*5* 16:*22* 21:*22* 37:*19* 47:*10, 18* 53:*19*
**larger** 34:*5*
**largest** 21:*24, 24*
**larynx** 14:*17, 20*
**lateral** 27:*4* 28:*12, 22* 31:*6, 9, 18* 35:*8* 41:*6, 7* 44:*18* 52:*1, 2, 4*
**law** 48:*12*
**lawful** 4:*2*
**lead** 45:*3*
**left** 11:*23* 13:*8, 13* 16:*5, 11* 20:*14, 19* 21:*14, 15, 15, 16* 26:*18* 27:*4, 5* 28:*3, 21* 29:*19* 31:*9, 18* 33:*4* 35:*8, 9, 11, 22* 36:*1, 24* 37:*2, 8* 42:*6* 43:*5, 14* 44:*12, 17, 24* 45:*14* 46:*21, 21* 52:*1, 3* 54:*25* 55:*1, 4* 56:*9* 57:*3* 58:*2, 17, 20, 21, 24* 59:*1*
**leftward** 26:*14* 31:*23* 32:*1*

Case: 4:19-cv-01525-DDN   Doc. #:  109-3   Filed: 06/02/20   Page: 78 of 82 PageID #: 1238

Deposition of Erin E. Ely, M.D.                                        Gina Torres, et al. v. City of St. Louis, et al.

35:22  39:19
40:7  54:8, 12
**leg**  38:24
**Legal**  2:21
**lethal**  12:2, 4, 5,
6, 9, 10, 12, 13
21:4  29:23
30:2  37:22, 24
42:2  53:2, 5
**lethality**  12:19
**leukemias**  6:7
**level**  15:12  19:4
24:15  64:8
**light**  20:20
**likelihood**  30:8
**line**  68:13  69:3
70:3
**list**  38:18  68:12
**listed**  11:4, 5, 9
38:3
**Litigation**  2:22
68:17
**little**  5:7  11:11
15:23  20:21
28:23  33:17, 18
34:3, 4  35:9
36:23  41:14
**liver**  6:5  37:17,
19, 19
**living**  56:9, 11
58:9, 11
**lobe**  21:15, 16
22:7, 8
**lobes**  21:16  22:8
**located**  5:21
6:10  12:24
13:8  15:2
20:18  22:24
27:1  31:2
32:18  35:12
36:3, 24  37:11
38:19  39:16, 24
40:20, 21  44:19,
25  45:24  47:10
55:5  56:6
57:18  58:21
**location**  29:24
34:10  39:2
56:15  58:15

59:6
**locations**  56:19
**long**  61:1, 6
**look**  10:11, 12
13:19  33:14
48:25  56:13
**looked**  28:16
33:19, 20
**looking**  7:9
10:11  15:15
41:11  63:23
64:7
**lot**  7:18  15:23
47:13, 14  59:18
**LOUIS**  1:11, 20
2:7, 16, 24  4:8, 9,
12  5:25  6:10, 13,
14, 16, 18, 22, 23
8:2, 5  23:20
45:7  66:13
67:11  68:4, 8, 23
**low**  36:10
**lower**  20:2, 4
21:14, 16  24:16,
16  31:1  32:20
36:23  37:16
**lumpers**  37:9
**lung**  21:15, 16,
17  22:7, 8, 9
**lying**  57:5, 21,
24  58:3, 4
**lymphomas**  6:7

**< M >**
**M.D**  1:17  4:1
71:1, 12
**mail**  68:15
**main**  68:23
**maintained**
47:14  61:2
**major**  37:13
**majority**  52:6
54:7  55:1
**Manchester**  2:23
68:22
**mandible**  15:1, 3
20:1
**manner**  7:4, 14,
25  9:13  48:8
55:15, 16

**marijuana**  63:17,
21
**mark**  13:22
22:13  27:6
28:14  32:15
61:25  65:7
**Market**  2:14
**marking**  12:22
**matter**  68:11
**maxilla**  15:1, 4
20:1
**McGowan**  2:12
3:3  4:16, 16
19:12  24:23
25:13, 21  42:19
46:13  47:8
50:8  51:23
52:10, 15  53:24
56:22  57:1, 14,
17  58:12  59:11
60:12, 14  61:25
62:3  64:16
**McGowanE@stlo
uis-mo.gov**  2:18
**MD**  68:3, 5
**mean**  19:5  25:7
41:8  42:12
47:9  50:10, 12
52:21, 23  53:25
54:2, 11  58:8
63:22
**meaning**  32:20
33:21
**means**  25:25
41:7, 7
**measure**  47:22
**measurements**
38:19
**medial**  41:6
**Medical**  1:19
4:8  5:13, 20, 23
6:11, 13, 15, 22
7:1, 3, 16, 22
14:19  38:11
47:25  48:6
49:10, 18  50:2
60:7  64:13
66:12  68:3
**Medicine**  5:21

**medicolegal**  48:4
**mentioned**  71:6
**Merit**  1:23
**metabolite**  63:21
**meth**  63:19
**middle**  5:18
22:7, 8  37:18
**midline**  22:5
**mind**  66:16
**minimal**  64:3
**misrepresent**
58:8
**missing**  8:21  9:4
**MISSOURI**  1:2,
20  2:7, 16, 24
4:9  66:4, 9, 13
67:11  68:4
**Mm-hmm**  10:25
20:8  27:8  38:6
**MO**  68:23
**morning**  5:3
60:13
**mouth**  52:17
**move**  30:25
62:24
**moved**  48:2
**movement**  63:4
**multiple**  15:7
22:6, 11, 22
23:17
**muzzle**  60:16
63:13

**< N >**
**naked**  50:15
51:3
**name**  4:23  5:1
60:13
**nation**  7:8, 10
**natural**  10:12,
17, 19
**nature**  15:17
16:21  17:5
18:7  23:8, 14
29:14  53:13
**necessarily**
12:13  34:16
53:25  59:14, 21
64:5

**neck**  11:23  13:8,
13  14:18, 20, 21,
22  15:8  17:21
22:17  24:4
37:24  53:6, 7, 8,
15  55:21
**need**  9:17  19:8
22:15  50:1
**Nods**  14:11
**North**  2:6
**notary**  68:13
71:23
**notice**  66:7
**number**  20:9, 13,
18  61:17  68:13
**numbered**  10:6

**< O >**
**Oath**  4:20
**oaths**  66:6
**Objection**  19:12
24:23  25:13, 21
42:19  46:13
47:8  50:8
51:23  52:10, 15
53:24  56:22
57:14, 17  58:12
59:11
**objections**  67:1
**obliterated**  21:17
**obviously**  23:7
30:7
**occur**  6:20
**occurred**  44:17
46:1  57:9
**Office**  1:18
2:13  4:8  6:11
7:1, 12  29:11
47:25  48:17, 19
66:11  68:3, 15
**Office@360litigati
onservices.com**
68:24
**officers**  23:23
54:16  56:10, 16,
18
**Ohio**  5:10, 15, 22
**once**  10:14
13:18

Deposition of Erin E. Ely, M.D.                                    Gina Torres, et al. v. City of St. Louis, et al.

one-dimensional
35:*11*
ones  29:*8*  52:*3,
5*  53:*13*
one's  43:*6*
one-year  6:*9*
open  10:*14*
13:*18, 19*
opening  10:*10*
14:*4*
opinion  29:*11*
33:*1*
opinions  60:*6*
64:*11*
opioids  63:*19*
opportunity
48:*22*  49:*8*
opposed  52:*21*
opposite  50:*19,
24*
oral  4:*5*
order  53:*17, 18*
organs  6:*3*
10:*11, 13*
orientation  60:*23*
oriented  60:*16*
Original  3:*18*
outer  32:*21*
44:*13*
outline  11:*10*
outside  9:*24*
oversee  6:*19*

< P >
P.C  2:*5*
PAGE  3:*1, 5*
8:*21*  9:*4*  10:*24*
11:*19*  62:*5*
68:*12, 12, 13, 15*
69:*3*  70:*3*
pages  8:*22*  10:*3*
66:*23*
palms  15:*25*
61:*12*
pancreas  37:*13*
paper  25:*8*  40:*1*
papers  21:*7*
paragraphs  10:*6,
21*

Part  7:*23*  14:*17*
37:*18*  38:*9, 10,
11, 20*  40:*8, 16,
19, 21*  55:*12*
particular  61:*22*
parts  27:*14*
part-time  6:*21*
path  10:*16*
60:*20*  63:*15*
Pathologic  10:*24*
11:*3, 14, 20*
pathologists  7:*5*
pathology  5:*24,
25*  6:*10, 17*
10:*12, 18, 19*
pelvic  37:*10, 16*
pelvis  37:*8*
pen  20:*16*
people  7:*8*
15:*23*  37:*9*
61:*11*  63:*2*
percent  49:*14*
perform  62:*13*
performed  8:*8,
11*  9:*20*
pericardial  21:*18*
phonetic  34:*2*
photo  13:*4*
15:*21*  54:*25*
photograph  3:*7,
8, 9, 10, 11*  12:*24*
13:*1, 7*  22:*15*
47:*6*  49:*20, 21*
51:*13, 14, 15*
photographs
48:*11, 20, 21, 23*
49:*9*  51:*5, 8, 11*
photos  13:*3, 3*
49:*15*
phrase  38:*21*
picture  50:*5, 14*
54:*18, 18*
pictures  49:*3*
pieces  15:*8*
place  59:*3*
plaintiff  1:*18*
Plaintiffs  1:*7*
2:*3*  4:*15*
PLAINTIFF'S
3:*5*  8:*18*  49:*7*

50:*17*  54:*19*
56:*4*
plan  3:*12*  54:*21*
55:*12*
plane  17:*13*
18:*10*  19:*10*
24:*10*
plate  22:*5, 5*
please  4:*14, 19,
24*  5:*12*  8:*19*
12:*23*  13:*6, 11*
23:*1*  26:*22*
27:*7, 10*  28:*11,
14, 20*  29:*17*
30:*3, 25*  31:*8, 12*
32:*17, 25*  35:*25*
36:*2, 14*  38:*2*
39:*13, 22*  43:*4*
56:*13*  61:*25*
68:*12, 13*
point  13:*5, 10*
15:*19*  20:*16*
26:*21*  43:*1*  50:*6*
pointed  46:*18*
57:*11*
Police  23:*20*
45:*7*  49:*20*
55:*11*  59:*17*
portion  37:*16*
39:*15*  40:*6*
41:*5*  53:*9*
portions  33:*23*
position  15:*22*
16:*3, 4*  24:*20, 25*
25:*12*  30:*13, 18*
31:*21*  39:*10, 12*
42:*15, 23, 24*
44:*4*  47:*12*
55:*4, 6, 8*  57:*7*
58:*18*  59:*4*
61:*12, 23*  62:*24*
63:*1*
positioned  18:*15*
24:*15, 17*  25:*4,
23*  26:*7*  43:*11*
44:*16, 21*  46:*11*
54:*6, 9*
positions  61:*18*
positive  62:*11*

possible  23:*22*
29:*8, 13*  56:*20*
58:*22*  61:*8*
possibly  28:*22*
59:*7*
posterior  31:*21*
44:*14*
postmortem  9:*9,
11*  62:*6*
Post-Mortem
3:*6, 16*
potentially  7:*13*
25:*1, 16*  26:*3*
29:*23*  34:*19*
37:*22*  51:*13*
53:*12*  61:*15*
prefer  38:*7, 12*
64:*23*
PRESENT  2:*20*
pretty  32:*9*  52:*9*
previously  23:*14*
29:*22*  33:*17*
49:*12*
primarily  7:*3*
8:*6*
primary  5:*17*
prior  9:*15*
49:*10, 17*
problem  54:*25*
procedures  49:*21*
process  44:*9*
processing  68:*15*
product  63:*23*
Production  68:*22*
profession  6:*25*
48:*6*
Professional  1:*22*
professor  6:*16*
projectile  13:*20*
22:*10*  60:*17*
projectiles  16:*22*
17:*3, 7*  23:*15*
33:*13, 22*  34:*11,
17*  45:*25*  46:*3*
47:*13*
promoted  48:*17*
prompt  68:*15*
propounded  4:*5*
67:*1, 4*

provided  48:*13*
pseudo  33:*21*
pseudostippling
33:*12, 20*
Public  71:*23*
pump  21:*21*
pursuant  14:*3*
66:*7*
put  11:*24*  25:*19*
52:*17*
putting  11:*10*

< Q >
qualified  66:*5*
quick  55:*23*
quite  43:*25*
quote  6:*3*

< R >
radius  44:*8*
raised  5:*8, 9*
range  33:*25*
59:*22*
ranging  34:*6*
rate  8:*3*
rdowd@dowdlaw.
net  2:*9*
read  11:*16*
64:*20, 23*  68:*8,
12*  71:*2*
readable  11:*11*
really  26:*24*
reason  11:*24*
reasonable  60:*7*
64:*12*
recall  51:*4, 13*
receive  56:*20*
received  5:*19*
48:*25*  57:*6*
recess  31:*15*
35:*2*  55:*25*
record  4:*6, 14,
24*  31:*13, 16*
35:*1, 3*  53:*24*
56:*1*  65:*5*
recover  9:*17*
recovered  15:*8*
16:*22, 23*  17:*3*
20:*2*  36:*20*

Deposition of Erin E. Ely, M.D.                                    Gina Torres, et al. v. City of St. Louis, et al.

37:5, *20*  39:*9*, *21*
45:2, *9*, *13*
**red**  22:*13*
**refer**  9:2  21:*14*
33:*11*
**referenced**  68:*11*
**reflecting**  20:*21*
**reflects**  60:*23*
**regard**  7:*17*, *19*
9:9  12:*11*  14:4
17:*11*  20:*9*, *15*
21:*1*  24:*10*, *12*
26:*20*  28:*10*
35:6  46:4  47:3
49:*19*  51:*19*
63:*16*
**region**  14:*19*
28:7  31:*19*, *24*
34:6  35:*14*, *24*
37:*10*, *11*, *16*
**regions**  34:*5*
**Registered**  1:*22*,
*23*
**regular**  68:*15*
**related**  7:*20*
22:*22*  23:2  67:*9*
**relationship**
61:*1*, *6*, *7*  63:*10*
**relative**  60:*24*
**reliably**  44:*15*,
*19*  61:*14*
**remarks**  67:*1*
**remember**  38:*21*
41:*15*, *22*  43:*20*
44:4, *13*
**removed**  47:*23*
49:*10*, *17*
**repeat**  5:*5*  21:*8*
**reply**  4:*4*
**report**  3:*6*, *16*
8:*15*, *20*  9:*5*
10:*4*, *24*
**reported**  66:*22*
**Reporter**  1:*22*,
*23*, *23*  4:*19*  66:*3*
**reports**  12:*1*
**represent**  62:*6*
**representing**
60:*15*

**residency**  5:*24*
**residue**  62:*14*
**respects**  67:*2*
**result**  8:*14*
**retained**  3:*18*
**return**  68:*13*
**review**  48:*23*
49:*1*  50:4  51:*12*
**reviewed**  29:*10*
51:*5*
**rib**  21:*14*
**ribs**  22:5, *6*, *9*
**Richard**  2:*4*
4:*15*  5:*1*
**Rick**  48:*16*
**right,**  16:7
**rightward**  13:*21*
16:*14*, *20*  18:*17*
24:5, *9*, *19*  25:*10*,
*24*  26:*15*, *19*
27:*12*, *20*  28:*17*,
*25*  29:*21*  30:6
31:3, 7  36:5, *25*
37:*12*  39:6
41:*13*, *17*  42:8, *9*,
*24*  43:7, *10*, *12*,
*23*  44:3, 6  45:*12*
46:6, *9*  54:*11*, *14*
56:*17*
**RMR**  67:*16*
68:*17*
**Road**  2:*23*
68:*22*
**rolled**  47:*17*, *20*
**Room**  2:*15*
56:6, *9*, *11*, *11*, *16*
58:*9*
**rotated**  61:*3*, 7
**rotating**  61:*15*
62:*23*
**roughly**  25:*6*
40:*21*  41:*10*
42:7  43:*16*, *17*
44:*12*
**rounds**  19:2
**RPR**  67:*16*
68:*17*
**rub**  11:7

**< S >**
**sac**  21:*17*, *18*
**safety**  47:*22*
**Saint**  5:*25*  6:*14*,
*18*
**saw**  51:*12*
**saying**  18:7
25:*14*, *18*  46:*14*,
*17*  54:*3*  57:*24*
62:*22*, *23*  64:*3*
**scars**  10:*1*
**scenario**  48:*13*
61:*2*, *16*
**scenarios**  61:*9*
**scene**  12:*25*
13:2  47:*17*, *24*
48:*10*, *21*  49:*11*,
*18*, *25*  50:*3*
**school**  5:*13*, *13*,
*15*, *18*, *18*, *20*, *21*
**schools**  5:*17*
**scientific**  60:7
64:*13*
**scrape**  11:6
34:*12*
**se**  31:7
**second**  14:*21*, *24*
17:*21*  29:*18*
56:5
**secure**  49:*25*
**see**  8:*23*  18:*13*
19:*17*  23:4
34:2, *18*  38:*17*
40:3, *15*  42:*20*
47:7  49:*19*
50:6, *9*, *12*, *15*, *23*
51:3, *19*  54:3, *18*
56:9
**seeing**  51:*4*
**seen**  13:*1*  49:*11*
**send**  48:*10*
**sends**  47:*25*
**serial**  64:*9*
**Services**  2:*22*
6:*18*  68:*17*
**set**  66:*24*
**setting**  56:*8*
**seven**  14:*23*
34:*10*

**sever**  17:*22*
**severe**  17:*9*
**severed**  14:*9*, *25*
**Shallow**  1:*21*
66:3  67:*16*
68:*17*
**sheet**  62:7
**sheets**  68:*12*, *13*,
*13*
**shirtless**  46:*1*
**shoot**  59:*19*
**shooting**  48:*15*
54:*16*  58:4, *6*, *15*,
*17*
**shorthand**  66:*22*
**shot**  23:*24*
30:*14*  42:*17*
46:*12*, *25*  47:*4*
58:*23*  63:7
**shots**  47:7  53:*3*,
*17*, *18*, *19*, *21*
**shoulder**  27:*22*
28:7  38:*22*, *25*
42:6, *7*, *11*  43:6
**show**  16:*15*
24:7  27:*23*
31:*25*  40:*16*
50:*5*
**shown**  66:*20*
**shows**  56:*5*
**side**  13:*8*, *13*
15:*25*  18:*1*, 3, *4*,
*8*  20:*19*  26:*18*
27:5, *5*  28:5, *13*
36:*12*, *24*  39:*15*
42:*18*  50:*18*, *19*,
*24*  57:3  58:*3*, *17*,
*20*, *21*, *24*  59:*1*
**sides**  63:*3*
**sign**  64:*24*  68:*8*,
*13*
**signature**  64:*22*
67:5  68:*12*, *13*,
*15*  71:*4*
**signed**  65:*10*
**significant**  40:*17*,
*18*
**similar**  13:*4*
28:*17*, *22*, *24*

29:*20*  43:*8*, *10*
52:*3*
**simply**  60:*23*
**Sincerely**  68:*17*
**sit**  21:*9*
**sits**  15:*12*
**sixth**  22:*9*
**size**  34:7, *8*
**sizes**  11:*13*, *15*
**skin**  11:7  32:*21*
33:*13*, *16*, *18*, *19*,
*23*, *24*  34:*12*, *14*
46:*2*
**skull**  14:*24*
15:*10*, *12*, *14*, *15*
17:*1*, *4*, *9*  19:*18*,
*20*  53:*7*
**slightly**  35:*22*
**small**  34:*4*
37:*14*  39:*21*
48:*25*
**soft**  15:*9*  20:*2*
31:5  39:9  41:*1*
45:*13*
**solid**  6:*3*
**somebody**  48:*8*
63:*24*
**Sommers**  56:7
**sorry**  18:6
19:*15*  20:*23*
21:7  22:7
27:*16*, *23*  36:*15*
39:*17*  40:2, 2, *2*,
3, *4*  41:*13*  45:*14*
52:*22*  53:*8*
54:*12*
**sound**  66:*16*
**sounds**  51:*21*
**spatter**  51:*16*, *17*,
*18*
**Specialist**  2:*21*
**specialized**  7:*15*
**specific**  24:*11*
**specifically**  53:*4*
**Specified**  10:7
**spinal**  14:*10*, *25*
17:*22*
**splitters**  37:*9*
**spoken**  64:*21*

Deposition of Erin E. Ely, M.D.                                                    Gina Torres, et al. v. City of St. Louis, et al.

**ST**  1:*11*, *20*  2:*7*, *16*, *24*  4:*8*, *9*, *12*  6:*10*, *13*, *16*, *22*, *23*, *24*  8:*2*, *5*  23:*20*  45:*7*  66:*13*  67:*11*  68:*4*, *8*, *23*
**stance**  16:*1*
**stand**  61:*11*  63:*2*
**standing**  15:*24*  16:*1*, *3*  25:*2*, *17*  46:*12*  56:*20*  57:*7*, *16*  59:*4*, *9*  63:*1*
**start**  9:*22*  12:*2*, *19*  16:*16*
**started**  12:*8*, *9*, *11*  42:*11*
**Starting**  14:*23*
**starts**  9:*13*
**state**  1:*20*  4:*23*  5:*20*  66:*4*, *13*
**statement**  10:*8*  20:*7*  53:*23*  55:*19*  64:*7*
**STATES**  1:*1*  66:*8*
**statistics**  7:*7*
**steep**  19:*5*, *14*  20:*4*
**sternum**  22:*4*
**Steve**  2:*21*
**stick**  56:*6*
**stippling**  33:*15*, *15*, *20*  34:*4*
**stomach**  36:*16*, *21*
**straight**  17:*25*  18:*2*, *4*  52:*8*  59:*12*
**Street**  2:*14*
**strickling**  34:*2*
**striking**  23:*11*
**struck**  15:*20*  25:*20*
**study**  5:*25*
**subcuticular**  32:*21*

**Subscribed**  71:*16*
**subsequent**  14:*3*
**suddenly**  7:*11*
**suggest**  59:*4*
**suggests**  59:*2*
**suit**  67:*8*
**Suite**  2:*6*, *23*  68:*22*
**supposed**  41:*16*
**Sure**  5:*9*, *14*  13:*2*, *12*  20:*13*  21:*9*  31:*1*, *13*  32:*16*  38:*3*, *18*  47:*22*  62:*21*
**surface**  17:*24*  31:*24*  32:*21*  39:*1*  41:*4*, *9*, *10*, *12*, *16*, *23*  43:*15*, *17*, *18*, *19*, *21*  44:*2*, *2*, *6*, *7*, *14*  50:*12*
**swear**  4:*19*
**sworn**  4:*2*  66:*18*  71:*16*

**< T >**
**take**  15:*13*, *13*  17:*23*  31:*11*  32:*12*  34:*25*  48:*11*, *21*  51:*14*  55:*23*  56:*13*
**taken**  1:*18*  4:*11*  48:*20*  64:*20*  71:*3*
**talk**  48:*11*, *12*
**talked**  33:*17*  38:*5*  61:*10*
**talking**  16:*8*
**Tara**  48:*16*  51:*14*
**tattoos**  10:*2*
**technically**  26:*2*  37:*8*
**teeth**  15:*2*, *3*, *3*
**tells**  7:*8*
**tend**  12:*19*  15:*6*, *7*
**tenths**  34:*9*, *10*

**term**  9:*11*  14:*19*  16:*7*  26:*15*  38:*12*
**terms**  5:*8*  19:*9*  38:*7*
**tested**  62:*10*
**testified**  19:*10*  23:*23*  53:*2*  56:*10*, *19*  60:*2*  63:*5*  66:*20*
**testify**  4:*2*  30:*15*  66:*18*
**testimony**  35:*6*  66:*21*, *24*  71:*5*
**tests**  62:*13*
**Thank**  4:*18*  6:*25*  9:*7*  20:*24*  26:*20*  43:*13*  51:*19*  60:*10*  62:*17*  64:*16*, *18*
**Thanks**  65:*2*
**thereto**  67:*2*
**thigh**  38:*23*  45:*14*
**thing**  43:*8*
**third**  26:*20*
**thoracic**  21:*5*
**three**  8:*23*  15:*16*  22:*8*

**three-dimensional**  60:*20*  61:*5*, *15*  62:*23*
**time**  4:*13*  5:*3*  16:*2*  26:*1*  27:*24*  43:*2*  48:*18*
**times**  30:*13*, *14*
**tip**  34:*8*
**tissue**  15:*9*  20:*2*  23:*16*  31:*5*  32:*22*  39:*9*  41:*1*  45:*13*
**today**  4:*10*  56:*21*  60:*6*  61:*10*  62:*17*  64:*12*, *21*
**Today's**  4:*7*
**toe**  12:*3*, *8*, *20*
**top**  15:*13*

**TORRES**  1:*5*, *5*  4:*11*  68:*7*, *7*
**touched**  49:*22*
**trachea**  14:*19*
**tracked**  16:*13*  24:*4*  31:*3*  39:*18*
**tracks**  22:*1*
**trained**  7:*23*
**training**  7:*15*, *18*
**trajectile**  24:*7*  56:*17*
**trajectory**  10:*15*  13:*15*  14:*5*  15:*19*  19:*9*  27:*9*  29:*7*, *20*, *24*  32:*7*  33:*1*  36:*9*  39:*3*  42:*16*, *22*  58:*22*  60:*19*  63:*10*
**transcribed**  66:*22*
**transcript**  66:*21*  67:*3*  68:*12*  71:*2*, *5*
**travel**  63:*14*
**trial**  66:*10*
**true**  14:*12*  19:*1*  33:*14*  60:*15*  61:*10*, *17*  62:*10*  67:*2*  71:*5*
**truth**  4:*3*, *3*, *3*  66:*18*, *19*, *19*
**trying**  54:*4*
**turn**  11:*19*
**twelfth**  5:*16*
**two**  8:*23*, *25*  10:*3*  20:*9*, *13*, *18*  21:*16*  34:*9*  35:*10*  43:*19*, *19*
**two-dimensional**  17:*17*
**two-minute**  31:*11*
**typewriting**  66:*23*
**typically**  12:*1*  49:*17*  51:*16*  63:*3*

**< U >**
**Uh-huh**  16:*17*
**ulna**  44:*8*
**ultimately**  12:*4*
**unburned**  33:*16*, *18*
**uncommon**  47:*9*
**underneath**  27:*2*  47:*23*
**understand**  5:*4*  11:*18*  17:*18*  18:*6*  42:*21*  56:*24*
**understanding**  14:*9*
**undetermined**  66:*8*
**unexpectedly**  7:*11*
**UNITED**  1:*1*  66:*8*
**University**  5:*19*, *21*, *25*  6:*15*, *18*
**unquote**  6:*3*
**upper**  15:*3*
**upward**  13:*21*  24:*5*, *8*, *17*, *18*  25:*10*, *24*  27:*11*, *19*  28:*16*, *24*  29:*21*  30:*5*  31:*3*, *7*, *23*  32:*1*  35:*15*, *17*  36:*4*, *11*, *12*, *25*  37:*12*  40:*6*  41:*12*, *17*  45:*11*  46:*6*, *8*  52:*12*, *18*, *23*, *25*  54:*1*, *7*, *11*, *14*  56:*16*
**upwards**  16:*4*, *6*, *13*, *19*  18:*17*  28:*5*  52:*1*, *4*, *6*  58:*17*  59:*16*, *19*
**use**  9:*1*  15:*18*, *19*  16:*7*  23:*21*  24:*4*  26:*11*  38:*7*  64:*1*
**uses**  23:*20*
**usually**  34:*4*

**< V >**

**Vague** 52:*10* 56:*23* 58:*13*
**value** 63:*24*
**values** 64:*9*
**vasculature** 37:*18*
**velocity** 15:*6* 19:*2, 2* 23:*14* 24:*1* 45:*5*
**vena** 37:*14, 15*
**ventral** 38:*8, 11, 13* 39:*1, 23* 40:*4* 43:*19*
**ventrolateral** 39:*14*
**versus** 4:*12* 37:*9*
**vertebrae** 14:*9, 21, 23, 23, 25* 17:*21*
**vessel** 21:*24* 37:*13*
**Vibration** 19:*23*
**victim** 26:*1*
**Video** 2:*21* 65:*6*
**VIDEOGRAPHE R** 4:*6, 18* 13:*10* 20:*20, 23* 21:*7, 11* 31:*13, 16* 35:*1, 3* 55:*24* 56:*1* 65:*1, 4*
**VIDEOTAPED** 1:*17*
**view** 47:*21* 49:*8*
**violently** 7:*11*
**Virginia** 5:*19*
**vital** 7:*7*
**vs** 1:*9* 68:*7*

**< W >**
**waist** 53:*22* 54:*1*
**waive** 64:*22* 68:*8*
**waived** 67:*5*
**want** 38:*18* 40:*15* 52:*17* 62:*4*
**way** 16:*14* 18:*15* 20:*23* 27:*12* 30:*10* 33:*6* 36:*6* 39:*6,*

*19* 41:*18* 44:*15, 20* 45:*12* 54:*10* 58:*2, 16, 23, 25* 59:*7*
**Wednesday** 1:*20*
**week** 48:*5*
**weight** 9:*25*
**welcome** 62:*18*
**went** 5:*12, 15* 14:*16, 16, 25* 16:*5, 14* 17:*1* 27:*19* 28:*3, 4, 5, 24* 29:*21* 30:*5, 10* 31:*23* 35:*19, 23* 36:*4, 6, 11, 25* 37:*12, 18* 39:*19* 42:*8, 9* 44:*6* 45:*22* 52:*1, 18* 54:*7, 7* 57:*12* 58:*25, 25*
**whichever** 64:*22*
**wit** 4:*5*
**witness** 4:*19* 65:*11* 66:*14, 16, 25* 67:*4, 6, 11* 71:*1*
**witnesses** 48:*11*
**word** 26:*15* 52:*24, 24*
**words** 26:*11* 52:*17*
**work** 6:*21*
**wound** 11:*21, 22, 22, 25* 12:*4, 4, 6, 10, 11, 16* 13:*6, 7, 16, 20, 24* 14:*6* 15:*17* 16:*16* 19:*22* 20:*9, 13, 14, 18* 21:*2, 3* 22:*13, 18, 20, 23* 23:*3, 10* 24:*2, 4, 16* 26:*12, 21* 28:*8, 10, 12, 15, 17, 21* 29:*17, 19, 23* 30:*3, 4, 23, 24* 31:*18, 23* 32:*9, 14, 19, 24* 35:*8, 25* 36:*1, 4, 14* 37:*7* 38:*2, 3, 4* 39:*6, 22, 23*

40:*16* 41:*3, 15* 42:*5, 5* 43:*4, 5* 44:*11, 14, 17, 18* 45:*3, 4, 11* 46:*20* 52:*12* 53:*7, 9, 11* 60:*19*
**wounds** 7:*21, 24* 10:*15* 11:*2, 6, 8* 12:*2, 5, 8* 13:*19* 23:*2, 9, 18* 35:*6* 38:*17* 42:*1* 44:*23* 45:*16, 16, 20, 23* 46:*5, 10* 51:*20* 52:*6, 7* 53:*8, 14* 55:*1, 20* 56:*21* 61:*9, 13, 19, 22* 62:*25*
**Wright** 5:*20*
**wrist** 38:*23*
**wrong** 10:*23* 16:*25* 28:*16* 44:*3* 50:*18*

**< X >**
**x-rays** 9:*15, 18, 20*

**< Y >**
**year** 48:*5*
**years** 8:*4, 7*
**Yep** 16:*17* 19:*14, 16*