IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GINA TORRES, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-CV-1525 |
| | ) | |
| CITY OF ST. LOUIS, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Lance Coats, Glennon P. Frigerio, Joshua D. Becherer, Nicholas J. Manasco, Ronald Allen Jr., John C. Jones, Mark S. Seper, Jon B. Long, Tim Boyce and Benjamin Lacy (collectively "Defendant Officers") and the City of St. Louis ("City") (collectively "Defendants"), by and through their attorney, Julian Bush, City Counselor for the City of St. Louis, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for their Reply in Support of their Motion for Summary Judgment state as follows:

Plaintiffs' Response, which is replete with outlandish claims, asks this Court to submit this case to a jury and deny the Defendant officers qualified immunity based on Plaintiffs' unsupported theory that, on the day in question, the Defendants officers decided to enter 5414 S. Kingshighway without announcing themselves and, for no discernable reason at all, blindly unleashed a barrage of automatic weapons fire through a wall and door in the house, with no knowledge of who or what was inside, in an execution style assault designed to kill every innocent person in the room. Then, Plaintiffs apparently ask this Court to submit to a jury their impossible theory that,

1

somehow, in a manner defying all logic, the officers managed to (in a matter of seconds before they exited the home), stage the scene by planting an AK-47 style rifle owned and registered to Hammett near his body, planting multiple AK-47 caliber expended bullets throughout the house, and planting in Hammett's bedroom shell casings *fired in Hammett's weapon* that the officers inexplicably obtained in advance and brought with them. No rational fact finder could, on this record, reasonably accept this unsupported account.

In the end, Plaintiff's Response fails to proffer evidence sufficient to demonstrate a genuine issue of material fact and permit a rational fact finder to find in their favor. Instead, Plaintiffs rely on mere speculation, conjecture, and unsupported generalized assertions in an apparent effort to raise metaphysical doubt regarding the material facts in this case. This is insufficient. *See King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 983 (7th Cir. 2020) (holding a plaintiff's "planted weapon" theory insufficient on summary judgment where it relied on "speculation or conjecture" that raised only "metaphysical doubt" which required "logical leaps rather than reasonable inferences" (citing *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010)).

For example, Plaintiffs rely on their assertion that "photographs of the scene and Plaintiff's expert's ballistics examination show no bullet holes or other ballistics evidence behind where the officers were purportedly positioned." (Doc. 108-1 at 1). But, Plaintiffs ignore the Defendant officers' uncontroverted testimony that Hammett moved to his right as he fired to evade the officers' line of fire and ignore photographs of the scene showing where Hammett's diagonal fire went through the bedroom wall and impacted the south wall of the house next to where the officers had been positioned. (Ex. T; Ex. S; Ex F.,

Manasco Dep., p. 53 ("He was -- you know, he was shooting through his bedroom door initially... And then he began strafing that wall...So as we're moving left, he's moving right"; Ex. G, Becherer Dep., p. 68 ("the rounds I saw that were clearly strikes from [Hammett] were along this wall right here, which would be the south wall of the living room")).

Plaintiffs assert that Hammett had no gun when he was shot. (Doc. 108-1 at 2). But, Plaintiffs' ignore Plaintiff Dennis Torres' *own testimony* that a photograph showing Hammett's rifle lying next to his body fairly and accurately depicts the scene as Torres saw it when he passed Hammett's body just after the shooting on his way out of the house. (Ex. R-1; Ex. R, Torres Dep., p. 41). Torres cannot avoid the result his own testimony, which confirms that Hammett was armed, nor can he create an issue of material fact by contradicting his own testimony.[1]

Plaintiffs assert that "[n]o AK-47 bullets were recovered from the scene..." (Doc. 108-1 at 2). But, Plaintiffs ignore that multiple 7.62 caliber bullets consistent with having been fired from an AK-47 style rifle were recovered from the scene. (Ex. O, p. 130-137). Specifically, qualified firearms examiner Julie Davis examined eight identifiable 7.62 caliber expended projectiles recovered from the scene and compared them to test shots from Hammett's AK-47 style rifle. *Id.*[2] While Ms. Davis could not definitively match these 7.62 caliber bullets to Hammett's weapon due to damage common to expended projectiles, Ms. Davis nevertheless concluded that these eight 7.62 caliber expended

---

[1] And, of course, Torres testified that he did not see Hammett get shot. (Ex. R, Torres Dep., p. 33). It necessarily follows that Torres cannot controvert the officers' testimony that, at the time he was shot, Hammett was holding a gun.

[2] These eight identifiable 7.62 caliber bullets recovered from the scene are referred to in Ms. Davis' Lab Report and Notes as Items 9-11, 9-12, 9-13, 9-14, 9-15, 9-16, 9-17, and 26-01. (Ex. O, pp. 6-7). The test shots fired from Hammett's AK-47 style rifle are referred to as Item 28-03. *Id*. The officers' weapons are referred to as Items 27, 31, 32, 33, 34, 35, 36, and 37. *Id*. Ms. Davis' Report is admissible as a business record. (Ex. O, ¶¶ 5-6).

projectiles recovered from the scene "could have been fired from several different models of AK and SKS type manufactured firearms." *Id.*[3] Critically, Ms. Davis further concluded that these recovered 7.62 caliber bullets could not have been fired in the officers' weapons. *Id*. On the record before the Court, these eight recovered 7.62 caliber bullets could only have been fired by Hammett.[4] Plaintiffs offer no explanation for this irrefutable physical evidence and, instead, choose to mislead the Court by baselessly asserting that "[n]o AK-47 bullets were recovered from the scene." In fact, consistent with the officers' account, multiple 7.62 caliber bullets were recovered from the scene which could not have been fired by the officers and which, on this record, could only have been fired by Hammett.

Plaintiffs assert that "the police 'recovered' only a handful of old shell casing which plainly had not been fired that day." (Doc. 108-1 at 2). But, this unsupported red herring ignores entirely the undisputed evidence that shell casings recovered from the scene *were fired in Hammett's nearly brand-new AK-47 style rifle*. (Ex. O). Instead of addressing this critical material fact, Plaintiffs rely on their contention that the casings could not have been fired in Hammett's AK-47 on the day in question and appear to suggest they were fired long before because, they contend, the casings "show oxidation." But, Plaintiffs ignore the undisputed fact that Hammett himself purchased the AK-47 style rife on May 16, 2017, just 22 days before the officer-involved shooting at issue in this case – undercutting their baseless assertion regarding "oxidation." (Ex. A). Neither

---

[3] The diameter of these eight recovered bullets is .313 inches which, according to Plaintiffs' putative expert, matches the diameter of the bullets fired by Hammett's 7.62 x 39 caliber AK-47 style rifle. (Ex. Y, Andrews Dep., Vol I, p. 241).

[4] Multiple other steel jacketed expended projectiles (as opposed to copper jacketed projectiles as used by the officers' rifles) that could have been fired by Hammett were likewise recovered from the scene, but were too damaged to be suitable for comparison. (See *e.g.*, Ex. O, pp. 149, 150, 151, 152, 153).

do Plaintiffs offer any admissible evidence sufficient to establish that ammunition with oxidized casings could not have been fired in Hammett's weapon. Notably, Plaintiff's purported expert conceded during his deposition that it is not impossible for a bullet showing signs of oxidation to be fired from a gun. Ex. Y, p. 260, ln. 5-8.

Plaintiffs then conclude, without support, that because their unqualified "expert" cannot see small extraction marks on unidentified photos of the casings on the floor taken at a distance, that the casings cannot have been fired by Hammett's gun.[5] But, Plaintiffs ignore entirely photographs in the record taken by qualified firearms examiner Julie Andrews of the matching firing pins and breech face impressions on the cartridges recovered at the scene next to test cartridges fired in Hammett's gun. (Ex. O at 97-98). Plaintiffs' obfuscation fails to controvert the undisputed material fact that that nine 7.62 caliber cartridge cases recovered from the scene were fired in Hammett's Inter Ordnance Inc. make, Sporter model, 7.62x 39mm caliber semi-automatic rifle. (UMF #87).[6]

Plaintiffs assert, in reliance on their putative expert's affidavit, that the bullet holes in the house "are either much too small or much too large to have come from and [sic] AK-47 model rifle." (Doc. 108-1 at 7). Even if this Court were to find Andrew's opinions and affidavit admissible, which it should not, Plaintiffs ignore the undisputed evidence that, because the Defendant Officers' ammunition could not penetrate walls, the officers shot rounds "through the holes that [Hammett] was making when he was

---

[5] For the reasons set forth in Defendants' forthcoming Motion to Strike, Andrews' affidavit and his opinions must be excluded and cannot be considered on summary judgment. Defendants will not here reiterate their arguments in this regard, but incorporate them by reference.

[6] In fact, the physical evidence in this case is so consistent with the Defendant Officers' account that even Plaintiffs' so-called "expert" testified that someone shot from the bedroom, through the bedroom door, and towards the front door where the officers entered the residence. (Ex. Y, Andrews Dep., Vol I, pp. 244-245).

shooting." (Ex J, Frigerio Depo, p. 41). Thus, the undisputed record shows that the officers shots back through and enlarged preexisting bullet holes made by Hammett's 7.62 caliber ammunition. Therefore, even crediting Andrews' unqualified opinions, the Defendant Officers' testimony remains uncontroverted.

Next, Plaintiffs assert that Hammett's wounds "tracked upwards, backward, and rightward," and therefore presume that Hammett must have been shot while he was lying on the floor – absurdly positing that "[b]ecause the officers were not lying on the floor shooting up at Isaiah, the only reasonable inference is that their positions were reversed: Isaiah was lying on the floor while the officers shot down into his body. (Doc. 108-1 at 11-12). But, Plaintiffs' speculative presumption ignores the spatial relationship in the record between the officers' weapons and Hammett's body that is consistent with the officers' account – that Hammett was falling backwards with the gun in his hand as he was shot, causing the bullet trajectories to appear to track upwards through his body. (Ex. H, Seper Dep., p. 38 ("A: I delivered rounds towards his direction and, I mean, he ended up dropping… falling to the ground… Q: Falling backwards? A: uh-huh… yes"); Ex. I, Coats Dep, pp. 49-50; Ex. G, Becherer Dep., p. 45 ("He fell on his back"); Ex. F, Manasco Dep., p. 39). Plaintiff's claim that "Isaiah was lying on the floor while the officers shot down into his body" is completely undercut by the testimony of Medical Examiner Dr. Erin Ely, who testified that that bullet wound trajectory simply reflects the orientation of the firearm relative to the body and any number of body positions and circumstances can be consistent with Decedent's gunshot wounds. Plaintiffs' Ex. 3, pp. 60-61.

Plaintiffs assert that the Defendant officers did not announce themselves because

Torres did not hear them do so. (Doc. 108-1 at 5). Then, in the next sentence, Plaintiffs acknowledge that Torres was asleep when the police announced themselves and did not wake up until he heard gun shots. *Id*. Regardless, that Torres did not hear the police announce themselves fails to controvert that they did. *See Malone v. Hinman*, 847 F.3d 949 n.3 (8th Cir. 2017) (holding that plaintiff's testimony that he did not *hear* the officer's warnings failed to present a question of material fact regarding whether warnings were given). And, of course, there is a video of the Defendant officers' announcing their presence before entering 5414 S. Kingshighway. Defs.' Ex. C-1. Even if the Court finds the wording of the announcement indiscernible based on the video alone, it is clear that the officers yelled before entering, the officers testified that they yelled "police search warrant," and that testimony is uncontroverted.[7]

Finally, Plaintiffs make much of their assertion that there was no blood on the AK-47. (Doc. 108-1 at 9). But, as an initial matter, no evidence is no evidence, and no inference may be drawn at all from the purported lack of blood. *See King*, 954 F.3d at 983 (holding, in an analogous excessive force face, that the plaintiff could make anything of the lack of fingerprint evidence because "no evidence is no evidence," and a lack of evidence "is not affirmative evidence that contradicts the officers' testimony") (citing *United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005)). Notwithstanding, on August 25, 2020 Criminalist Erica Mpoy performed an examination and testing of the Inter Ordnance Sporter rifle that did indicate the presence of blood on the rifle. Ex. CC,

---

[7] Likewise, Torres' statements during his 911 call do nothing to controvert that the officers announced themselves before entry. And, even if this Court credits Plaintiffs' assertion that Hammett did not initially know the police were present, it remains uncontroverted that, before Hammett came out with his rifle and was shot, he had a direct line of sight to and saw Officer Seper wearing a marked police uniform. Hammett then, after certainly knowing the police were present, came towards the officers with his rifle raised in their direction. (UMF #56).

Affidavit of Erica Mpoy, ¶¶ 6-10. A visual examination and phenolphthalein test yielded positive results for apparent blood on the bottom of the receiver (Ex. CC-1 and Defs.' Ex. X (photograph of Hammett's weapon taken shortly after the shooting by Jennifer Sommer showing apparent blood)) and near the safety lever of the rifle (Ex. CC-2). *Id*. at 7-9. The commonly found false positives for this test are horseradish and other food items, which generally do not visually resemble blood. *Id*. at 10.

Plaintiff's unabashedly assert that a "mountain of evidence" supports their position, but Plaintiff's imagined "mountain of evidence" collapses upon the application of logic and a review of this record. In the end, there is no controverted material fact and Plaintiffs fails to proffer evidence sufficient to demonstrate a genuine issue of material fact and permit a rational fact finder to find in their favor.

With regard to Plaintiff's § 1983 conspiracy claim, because the application of the intracorporate conspiracy doctrine has not been addressed authoritatively in §1983 cases in this Circuit, this Court must, at is has recently done, apply qualified immunity here and grant summary judgment in favor of Defendant officers. Defendants' argument concerning qualified immunity to plaintiffs' conspiracy claim is quite simple: Because the application of the intracorporate conspiracy doctrine has not been addressed authoritatively in §1983 cases in this Circuit, this Court must apply qualified immunity here. This conclusion follows from *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017), where the Supreme Court held that officials were entitled to qualified immunity on §1985 conspiracy claims because the lower courts were divided on the applicability of the intracorporate conspiracy doctrine in a § 1985 case. *Ziglar v. Abbasi*, 137 S.Ct. 1843, (2017).

In that case, the Supreme Court declared that the government officers involved in alleged intentional constitutional violations were entitled to qualified immunity, observing that close and frequent consultations to facilitate the adoption and implementation of policies are essential to the orderly conduct of governmental affairs, and if those discussions, and the resulting policies, were to be the basis for private suits seeking damages against the officials as individuals, "the result would be to chill the interchange and discourse that is necessary for the adoption and implementation of governmental policies" 137 S.Ct. at 1868-69. To be sure, *Ziglar* was decided under §1985(3), but the principles of qualified immunity applied in *Ziglar* are identical to immunity principles applied in claims under §1983. *E.g., Ashcroft v. al-Kidd*, 563 U.S. 731 (2011); *Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014); *Hanson v. Best*, 915 F.3d 543 (8th Cir. 2019).

In light of the above, on August 4, 2020, Chief Judge Rodney Sippel of this Court granted judgment on the pleadings on qualified immunity grounds in favor of defendant police officers on analogous § 1983 conspiracy claims. *Baude v. City of St. Louis*, No. 4:18-CV-1564-RWS, 2020 U.S. Dist. LEXIS 139770, at *26 (E.D. Mo. Aug. 4, 2020). In *Baude*, the Court held that the defendant police officers were entitled to qualified immunity from analogous § 1983 conspiracy claims because "it cannot be said that the law regarding the application of the intracorporate conspiracy doctrine in § 1983 cases is clearly established." *Id*. at 28. Accordingly, the Court held that, "[g]iven the uncertainty regarding the applicability of the intracorporate conspiracy doctrine in § 1983 cases, the officers could not have reasonably known their actions would open them up to liability for a conspiracy." *Id*. at 28.

Here, like in *Baude*, because the intracorporate conspiracy doctrine has not been addressed authoritatively in §1983 cases in this Circuit, Defendants could not have reasonably known that their alleged actions would open them up to liability for a conspiracy. Thus, the Defendant Officers are entitled to qualified immunity to Plaintiffs' § 1983 conspiracy claims and summary judgment must be entered in favor of the Defendant Officers.

With regard to Plaintiffs' § 1983 claim for municipal liability, their Response devotes a mere five sentences to attempting to support it and relies entirely on published statistics regarding internal affairs complaints. (Doc. 108-1 at 19). Plaintiff argues that over a period of 10 years, 5% of complaints regarding use of force investigated by the Police Division were sustained and concludes, without support, that "[t]he fact that 19 out of 20 officers facing complaints of abuse and excessive suffered no consequences shows that the Department permitted this custom to exist and did nothing to remedy it." *Id*. But, Plaintiff does nothing to establish that these complaints were in fact instances in which excessive force was used, does nothing to establish the facts underlying any of these incidents, and does nothing that would establish the Defendant officers used force in this case *because* of a widespread custom of excessive force. This is insufficient. Neither do the statistics alone help her. *See White v. City of St. Louis*, No. 4:18-cv-00518-SRC, 2019 U.S. Dist. LEXIS 197190, at *22-23 (E.D. Mo. Nov. 14, 2019) (dismissing similar conclusory assertions regarding the alleged number of excessive force incidents over a six-year period for failure to state a claim). Accordingly, Plaintiff's § 1983 claim for municipal liability must fail.

For all of the reasons set forth above, this Court should enter summary judgment

in favor of Defendants and against Plaintiffs.

WHEREFORE, for all of the reasons set forth above, Defendants respectfully requests that this honorable Court grant summary judgment in favor of Defendants and against Plaintiffs.

Respectfully submitted,

JULIAN BUSH
CITY COUNSELOR

/s/ Andrew D. Wheaton
Andrew D. Wheaton   #65269 MO
Associate City Counselor
Attorney for Defendants
City Hall, Room 314,
St. Louis, MO  63103
314.622.3361
FAX: 314.622.4956
wheatona@stlouis-mo.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2020, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system.

/s/ Andrew D. Wheaton
