**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

GINA TORRES, ET AL.,       )
      )
Plaintiffs,       )
      )
vs.       )       Case No. 4:19-CV-1525
      )
CITY OF ST. LOUIS, ET AL.,       )
      )
Defendants.       )
      )

## DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

COME NOW Defendants Lance Coats, Glennon P. Frigerio, Joshua D. Becherer, Nicholas J. Manasco, Ronald Allen Jr., John C. Jones, Mark S. Seper, Jon B. Long, Tim Boyce and Benjamin Lacy (collectively "Defendant Officers") and the City of St. Louis ("City"), by and through their attorney, Julian Bush, City Counselor for the City of St. Louis, and pursuant to Rule 56(c)(1) of the Federal Rules of Civil Procedure and Local Rule 7-4.01(E), and hereby respond to Plaintiffs' Statement of Material Facts for purposes of their Motion for Summary Judgment only:

1.     On June 7, 2017, Dennis Torres was asleep in his room when he was woken up by loud noises. Defendants' Ex. R, Dennis Torres Depo., p. 50 The first thing Dennis Torres heard was a lot of shots fired. *Id.*, p. 114. Dennis did not hear any yelling until after the shooting. *Id.*, pp. 50-51.

**RESPONSE**: **Admit.**

2.     The next thing that happened was that Isaiah Hammett came out of his room to Dennis, picked him up and put him on the floor. Defs Ex. R, Dennis Torres

Depo., p. 114.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertion that "[t]he next thing that happened was that Isaiah Hammett came out of his room to Dennis, picked him up and put him on the floor." Without waiving that objection, Defendants admit that after Dennis Torres heard a lot of shots fired, Hammett came into Dennis Torres' room and put him on the floor.**

3. Dennis asked him, "Who's shooting?" Isaiah stated "I don't know, Grandpa. Stay down. I love you." Then his grandson went to the dining room. Defs Ex. R, Dennis Torres Depo., p. 115.

**RESPONSE**: **Defendants admit only that Dennis Torres said "Who's shooting." Defendants object to the remainder of paragraph 3 pursuant to Rule 56(c)(2) on the grounds that what Hammett said or did not say is inadmissible hearsay and cannot be presented in a form that would be admissible in evidence.**

4. When Isaiah Hammett went into the dining room, he did not have anything in his hands. Defs Ex. R, Dennis Torres Depo. p. 116.

**RESPONSE**: **Defendants deny that Hammett's hands were empty when he went into the dining room. Rather, Hammett entered the dining room carrying an AK-47 type rifle at his shoulder. Defs.' Ex. H, Seper, p. 35, ln. 5- p. 36, ln. 3 (Ex. Defs.' H-1, Diagram); p. 64, ln. 22- p. 65, ln. 25; Defs.' Ex. I, Coats, p. 43, ln. 18 - p. 47, ln. 14; p. 48, ln. 22- p. 50, ln. 14; p. 74, ln. 8-13; Defs.' Ex. F, Manasco, p. 35, ln. 6- p. 36, ln. 6; p. 38, ln. 2-6; Defs.' Ex. G, Becherer, p. 42, ln. 12- p 45, ln. 1. (Defs.' Ex. G-1); Defs.' Ex. D, Long Affidavit, ¶¶ 29; Defs.' Ex. R-1 depicts the AK-47 type**

**rifle next to Hammett after he collapsed onto the ground. Torres testified that Exhibit R-1 fairly and accurately depicts the scene as Torres saw it when he passed Hammett's body just after the shooting on his way out of the house. (Ex. R-1; Ex. R, Torres Dep., p. 41).**

5. Dennis Torres passed the vision test for his driver's license. If Isaiah Hammett had something in his hands the size of an AK-47, he would have been able to see it. Defs Ex. R, Dennis Torres Depo., p. 116.

**RESPONSE**: Defendants admit only that, at some point in his life, Dennis Torres passed a vision test for his driver's license. Defendants object to the remainder of paragraph 5 pursuant to Rule 56(c)(2) on the grounds that what Dennis Torres "would have been able to see" is inadmissible speculation and, moreover, there is no foundation regarding *when* Dennis Torres "would have been able to see… something in [Hammett's] hands the size of an AK-47" and no foundation for Dennis Torres to testify regarding what was in Hammett's hands when he was shot because he did not see Hammett get shot. Ex. R, Torres, p. 33, ln. 6-9.

6. Isaiah got about twelve feet into the dining room. At this point Dennis could see just his left side. Exhibit R, Dennis Torres Depo., p. 118

**RESPONSE**: Denied. From the position on the floor under the bed where Dennis Torres' head was throughout the shooting at issue in this case with the dogs lying next to him, he could not have seen into the dining room. Ex. R, Torres, p. 31, ln.18-22; p. 83, ln. 16-22.

7. Isaiah said "Please don't shoot" and then Dennis heard more shots. Ex. R,

Dennis Torres Depo. p. 119.

**RESPONSE**: **Defendants admit only that Dennis Torres heard more shots. Defendants object to the remainder of paragraph 7 pursuant to Rule 56(c)(2) on the grounds that what Hammett said or did not say is inadmissible hearsay and cannot be presented in a form that would be admissible in evidence.**

8.     Dennis was trying to get up into his wheelchair and he yelled "Isaiah." Two more shots went off right by his head. If he would have gotten up any sooner, he would have gotten hit in the head. Defs Ex. R, Dennis Torres Depo., p. 119. Those two bullets ended up in the wall. The holes are still there. Dennis Torres Depo., p. 120.

**RESPONSE**: **Objection. Pursuant to Rule 56(c)(2), paragraph 8 cannot be presented in a form that would be admissible in evidence because there is no foundation for Mr. Torres to testify in that, at the time of these alleged incidents, in his mind, he was in Vietnam. Defs.' Ex. R, Dennis Torres Depo., p. 76.**

9.     Dennis then heard more shots. He thought they were shooting at him but there weren't any more bullets coming into his room. He thought they were meant for him because Isaiah was already down on the floor. Defs Ex. R, Dennis Torres Depo., p. 120. He stayed down until he heard nothing. Defs Ex. R, Dennis Torres Depo., p. 121.

**RESPONSE**: **Defendants admit that Dennis Torres stayed down with his head under the bed throughout the shooting at issue in this case, until he heard nothing. Defendants object to the remainder of paragraph 9 pursuant to Rule 56(c)(2) on the grounds that there is no foundation for Mr. Torres to testify in that, at the time of these alleged incidents, in his mind, he was in Vietnam. Defs.' Ex. R, Dennis Torres Depo., p. 76. Moreover, from the position on the floor under the bed**

4

**where Dennis Torres' head was throughout the shooting at issue in this case with the dogs lying next to him, he could not have seen into the living room. Ex. R, Torres, p. 31, ln.18-22; p. 83, ln. 16-21. Without waiving that objection, the remainder of paragraph 9 is denied. Ex. F, Manasco, p. 38, 12-14; Seper, p. 38, ln. 16-25; Ex. I, Coats, p. 49, ln. 24- p. 50, ln.3.**

10.     Dennis called 911 and informed them that someone was shooting up his house. They asked if he knew who, and he said he did not know who it was. Defs.' Ex. R, Dennis Torres Depo., p. 121. Dennis does not know exactly when he called 911. Ex. R, Dennis Torres Depo., p. 147.

**RESPONSE**: **Denied. Defs.' Ex. DD, Torres 911 Call; Defs.' Ex. R, Dennis Torres Depo., p. 137 (Hammett left Torres' room, then Torres called 911, and then after he got off the phone with 911 Hammett went into the dining room).**

11.     Dennis' 911 call was recorded by the Police and is also referenced in an "Event Information" document produced by Defendants, which indicates that the officers did not properly announce their presence, as Dennis was not aware that the shooters were police officers: "CALLER SAYS HIS HOME IS GETTING SHOT UP. CALLER DIDN'T SEE ANYONE." Plaintiffs' Exhibit 2, Event Information.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertion in paragraph 11. Without waiving that objection, denied. Defs.' Ex. DD, Torres 911 Call; Defs.' Ex. R, Dennis Torres Depo., p. 50.**

12.     Everything stopped. Dennis crawled up into the wheelchair. He went to the dining room and Isaiah's head was laying with his mouth kind of open and blood was

behind his head. He appeared to be deceased. Defs.' Ex. R, Dennis Torres Depo., p. 121. There was no gun next to Isaiah. Dennis Torres Depo., pp. 121-122.

**RESPONSE**: **Defendants admit that Torres crawled into his wheelchair, admit he went into the dining room, and admit that Hammett's head was lying with his mouth open. Defendants deny the remainder of paragraph 12. Defs.' Ex. R, Dennis Torres Depo., p. 41; Defs.' Ex. R-1, Dennis Torres Depo Ex. F (depicting the gun lying next to Hammett).**

13. The officers yelled "come out with your hands up" and he did. Ex. R, Dennis Torres Depo., p. 51. That was the only yelling he heard. Id.

**RESPONSE: Admit.**

14. Dennis Torres is a decorated combat veteran who served his country in Vietnam for three years and estimates that in that time he was in approximately 20 firefights. Defs Ex. R, Dennis Torres Depo., p. 97.

**RESPONSE: Admit.**

15. Dennis received a total of 15 medals and citations for his service, including unit citations, three Purple Hearts, the Bronze Star with a Cloverleaf, Vietnam medals, good conduct medals and the infantry badge. Defs Ex. R, Dennis Torres Depo., p. 106.

**RESPONSE: Admit.**

16. After the shooting and Dennis was told to wheel out of the house the police were inside the home and Dennis was not allowed inside for six hours. Defs Ex. R, Dennis Torres Depo., p. 110.

**RESPONSE: Admit.**

17.     After the shooting, Dennis' medals were taken off the wall and thrown in a dumpster with all of his Vietnam stuff. Defs Ex. R, Dennis Torres Depo., p. 107.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertion in paragraph 17. Moreover, pursuant to Federal Rule 56(c)(2), paragraph 17 cannot be presented in a form that would be admissible in evidence because there is no foundation for Torres to testify regarding what happened to his medals in that he did not see them removed from the house and did not testify that he himself found them in a dumpster. To the extent Torres relies on what he heard from someone else, that is inadmissible hearsay that cannot be considered on summary judgment.**

18.     Dennis heard an AK-47 being fired thousands of times in Vietnam. Dennis testified that "If you were in combat in Vietnam, it's a sound you will hear until the day you die.… You will never forget that sound." Defs Ex. R, Dennis Torres Depo., p. 99.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(2), paragraph 18 cannot be presented in a form that would be admissible in evidence because there is no foundation and nothing other than speculation for Torres to testify regarding what particular type of firearm he heard in Vietnam or on June 7, 2019. Without waiving that objection, admit that Torres heard what he believed were AK-47's fired thousands of time in Vietnam and admit only that Torres so testified.**

19.     If Dennis had heard an AK-47 he would have been able to identify it on June 7, 2017 he did not at any time hear an AK-47 being fired. Defs Ex. R, Dennis Torres Depo., p. 100.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(2), paragraph 19**

**cannot be presented in a form that would be admissible in evidence because there is no foundation and nothing other than speculation for Torres to testify regarding what particular types of firearms he heard fired on June 7, 2019. Moreover, Torres is not qualified to offer such an opinion. Without waiving that objection, denied. Ex. I, Coats, pp. 63 – 64.**

20.    The Defendant Officers agree that the sound of shots being fired from a 9mm handgun, a .223 caliber rifle and an AK-47 are all distinctive sounds that can be differentiated. See Defs Ex. E, Timothy Boyce Depo. p. 30, 39; Defs Ex. I, Lance Coats Depo. p. 64; Defs Ex. J, Glennon Frigerio Depo. p. 26, 28; Defs Ex. G, Joshua Becherer Depo. p. 66; Defs Ex. K, Ronald Allen Depo. p. 32-33; and Defs Ex. H, Mark Seper Depo. pp. 51-52.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertion in paragraph 20. Otherwise, denied. Ex. E, Boyce, pp. 30, 39; Ex. I, Coats, p. 64; Ex. J, Frigerio. pp. 26, 28; Ex. G, Becherer. p. 66; Ex. K, Allen. pp. 32-33; and Ex. H, Seper. pp. 51-52.**

21.    Dennis was wounded five times in Vietnam. He lost many friends. Defs Ex. R, Dennis Torres Depo., p. 99. When Dennis returned from Vietnam he was in the hospital for awhile because he had been shot in the back and it damaged the nerves in his back. Id., p. 101. He still has pain from that. Id., p. 102. Dennis was diagnosed with PTSD as a result of his service in Vietnam. Id., p. 74.

**RESPONSE**: **Admit.**

22.    When Dennis woke up, to the flashbang and shooting he thought he was back in Vietnam. It brought the fighting in Vietnam back to him as he was there in his

house on June 7, 2017. Defs Ex. R, Dennis Torres Depo., p. 74.

**RESPONSE**: **Admit.**

23.    In his dreams Dennis use to see men from his battalion who had died who were under him because he was the platoon leader. That finally went away, but now he sees Isaiah in his room standing over him with tears in his eyes. He saw Isaiah at his door when he was in ICU intensive care at Barnes. Sometimes Dennis thinks that Isaiah tells him it's time to join him and Dennis' wife, who is also deceased. Defs Ex. R, Dennis Torres Depo., p. 75.

**RESPONSE**: **Admit.**

24.    After 1980, Dennis did not have nightmares and stuff like that. He thought he was doing good until this happened. Defs Ex. R, Dennis Torres Depo., p. 79. In the five years prior to June 7, 2017, Dennis had not sought any treatment for any mental health condition. Defs Ex. R, Dennis Torres Depo., p. 77.

**RESPONSE**: **Admit.**

25.    Before the shooting Dennis was just in groups with other veterans where they talked. Now he is seeing a psychiatrist. Dennis started seeing the psychiatrist a week after his grandson was killed. Defs Ex. R, Dennis Torres Depo., pp. 76-77. Dennis is still in treatement [sic] at the VA. Defs Ex. R, Dennis Torres Depo., p. 76.

**RESPONSE**: **Admit.**

26.    Dennis had no knowledge of Isaiah having any drugs in his room. Dennis would not have allowed it. Defs Ex. R, Dennis Torres Depo., pp. 70-71.

**RESPONSE**: **Admit.**

27.    There was no blood on the "AK-47" model gun recovered from the scene.

Plaintiffs' Ex. 1, Photographs of AK-47. Ms. Sommer, the evidence technician, testified

that she documented in her reports that there were "areas of apparent blood on the floor

inside the dining room directly west of the victim. A larger area of apparent blood was

located on the floor inside the dining room following investigation completed by the

medical examiner. I observed an area of apparent blood on the south door frame of the

east doorway of the dining room." Defs Ex. M, Sommer Depo., p. 33. Despite the

copious amount of blood documented as a result of Isaiah being shot at least 24 times,

Sommer did not document any blood on the "AK-47" model gun, and there is no blood

on the weapon in the photographs taken by the police. Defs Ex. M, Sommer Depo., pp.

33-37. Photographs of Isaiah taken by the police also shows blood splattered on his

stomach. The gun was turned over to Officer Skaggs for conveyance back to police

headquarters. Officer Skaggs similarly testified that, based on the photographs taken, he

did not see any blood on either side of the weapon. Defs Ex. N, Officer Skaggs Depo.,

pp. 24-25. Dr. Ely also did not see any blood on the gun as depicted in Defendants'

photographs of the AK-47. Plaintiffs' Exhibit 3, Dr. Ely Depo. pp. 49-50.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material
cited by Plaintiffs does not support the assertion in paragraph 27 that there was no
blood on the "AK-47" model gun. Rather, the material cited by Plaintiffs supports
only the assertion that the deponents did not see any blood in the particular
photographs they were shown at their depositions.**

**Further answering, Defendants deny that Sommer did not document any
blood on the "AK-47" model gun and deny there is no blood on the weapon in the
photographs taken by the police. To the contrary, blood is visible on the bottom of**

the receiver of the rifle as depicted in Defs.' Ex. X, one of the evidence photographs taken by Sommer on June 7, 2017. Ex. M, Deposition of Summer, pp. 32-33. Further, a visual and presumptive serological examination performed by Police Department Criminalist Erica Mpoy, yielded positive results for apparent blood on the bottom of the receiver (see Defs.' Ex. CC-1 and Defs.' Ex. X) and also near the safety lever of the rifle (Ex. CC-2). Ex. CC, Affidavit Erika Mpoy, ¶¶ 6-10.

Defendants admit only that Officer Skaggs and Dr. Ely testified that they were unable to see blood on the gun in the selected photographs shown to them during their depositions by Plaintiffs' counsel. Further, Dr. Ely qualified her response, stating that although she could not see any blood in the photos she had been shown "that doesn't mean there is not any blood on it." Plaintiff's Ex. 3, Dr. Ely Depo, pp. 49-50 (Plaintiffs' Ex 3. and Ex. 4).

28.     Plaintiffs' deceased hands were bagged at the scene for the purpose of preserving "trace evidence" including any evidence of gunshot residue. See Defs Ex. M, Sommer Depo., pp. 52, 65-66. It was up to the police department to elect to perform a gunshot residue test, yet evidently no gunshot residue test was performed on Isaiah's hands. See Defs Ex. M, Sommer Depo., p. 52; Ex. 3, Ely Depo., p. 62.

**RESPONSE:** **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertion in paragraph 28 that "it was up to the police department to perform a gunshot residue test."**

**Without waiving that objection, admit that Hammett's hands were bagged at the scene and that no gunshot residue test was performed on Decedent's hands.**

29.     On the morning of June 8, 2017, Dr. Erin Ely, assistant medical examiner,

performed a post-mortem examination on Isaiah Hammett. Plaintiffs' Ex. 4, Medical Examiner's Report, p. 1. Dr. Ely determined the cause of death was gunshot wounds to the neck and chest. Plaintiffs' Ex. 3, Dr. Ely Depo. p. 53.

**RESPONSE**: **Admit that Dr. Ely performed a post-mortem examination on Hammett and admit that she testified that the gunshot wounds to the neck and chest were "the most lethal injuries." Ex. 3, p. 54.**

30.     Dr. Ely has a lot of experience examining gunshot wounds. Ex.3, Dr. Ely Depo. p. 8. In four years as an assistant medical examiner she has performed autopsies in over 400 homicide cases, almost all of which were caused by gunshot wounds. Ex. 3, Dr. Ely Depo. p. 8.

**RESPONSE**: **Admit.**

31.     Dr. Ely can determine the track or trajectory of a bullet by examining external wounds together with the internal injuries caused by a bullet and with the use of x-rays. Ex. 3, Dr. Ely Depo. p. 10. The description of a bullet's track or trajectory is always given from the decedent's anatomic position. Id., p. 15. Anatomic position means the body is positioned as if standing with hands at the side and palms facing up. Id., p. 15.

**RESPONSE**: **Admit.**

32.     Dr. Ely analyzed thirty-one gunshot wounds during her examination of Isaiah. Plaintiffs' Ex. 4, Medical Examiner's Report. pp. 2-8.

**RESPONSE**: **Deny that Dr. Ely analyzed thirty-one distinct gunshot wounds. Rather, Dr. Ely analyzed twenty-four (24) gunshot wounds, and other injuries, during her examination of Isaiah. Plaintiff's Ex. 4, pp. 11-14.**

33.     The gunshot wound to the left side of his neck was lethal. Ex. 3, Dr. Ely

Depo. p. 12. The lethal wound to the neck tracked upward, backward, and rightward. Ex. 3, Dr. Ely Depo. p. 13. The gun had to be positioned below the wound. Ex. 3, Dr. Ely Depo. p. 18. The bullet passed through Isaiah's larynx, fractured his C2 vertebrae, and transected the spinal cord, fracturing the mandible and maxilla. Ex. 4, Medical Examiner's Report, p. 3.

**RESPONSE**: **Denies that the gun that fired the shot that caused the wound on the left side of the neck "had to be positioned below the wound." Rather, Dr. Ely testified that all she can say is that the gun "has to be positioned . . . in a way such that . . . the bullet could go through the body, upwards, backwards, and rightwards" Ex. 3, p. 18. Dr. Ely further testified that bullet wound trajectory simply reflects the orientation of the firearm relative to the body and any number of body positions and circumstances can be consistent with Decedent's gunshot wounds. Ex. 3, pp. 60-61. Based upon her examination of Decedent's gunshot wounds Dr. Ely cannot determine what particular position Hammett was in at the time of the shooting. Ex. 3, Dr. Ely Deposition Transcript, p. 61.**

**Defendants admit that the gunshot wound to the left side of his neck was "more lethal" than some of the other wounds, and the lethal wound to the neck tracked upward, backward, and rightward. Ex. 3, p. 12-13. Defendants admit the bullet injured the larynx, C2 vertebrae, the spinal cord, mandible and maxilla.**

34. Dr. Ely determined that the second gunshot wound described in her report to the left side of the chest was also lethal. Ex. 3, Dr. Ely Depo. p. 21. The lethal chest wound had the same trajectory as the neck wound: upward, backward and rightward. Dr. Ely Depo. p. 24. The barrel of the gun had to be positioned lower than, or below, the

wound at the time Isaiah was shot. Ex. 3, Dr. Ely Depo. pp. 24-25. That bullet fractured Isaiah's left fourth rib, disrupted the lower lobe of the left lung, obliterated the pericardial sac, damaged all four chambers of the heart and the aorta, fractured his sternum, disrupted the middle lobe of the right lung and fractured the fourth and sixth right ribs. Ex. 4, Medical Examiner's Report, p. 3.

**RESPONSE**: **Defendants admit that Dr. Ely determined the gunshot wound to the left side of the chest was lethal. Defendants admit that the gunshot wound to the chest had an upward, backward and rightward trajectory. Defendants deny that the "barrel of the gun had to be positioned lower than, or below, the wound" at the time Decedent was shot. Dr. Ely specifically testified that the wound was caused by the gun being "positioned such that it can go upward, backward, and rightward." Doc.109-3, Ex. 3, Deposition of Dr. Ely, p. 25. However, Dr. Ely could not say what the position the Decedent was in at the time of the shooting.** *Id.* **at pp. 23-26. Rather, Dr. Ely testified the body "just has to be positioned such that the bullet can go through the body at that angle."** *Id.* **at p. 26. Dr. Ely further testified that bullet wound trajectory simply reflects the orientation of the firearm relative to the body and any number of body positions and circumstances can be consistent with Decedent's gunshot wounds.** *Id.* **at pp. 60-61. Based upon her examination of Decedent's gunshot wounds Dr. Ely cannot determine what particular position Hammett was in at the time of the shooting.** *Id.* **at p. 61. Defendants admit that the bullet injured the left fourth rib, the lower lobe of the left lung, the pericardial sac, the heart and the aorta, the sternum, the middle lobe of the right lung and fractured the fourth and sixth right ribs.**

35.     Dr. Ely determined a wound to the left pelvis and lower abdomen also could have been lethal. Plaintiffs' Ex. 3, Dr. Ely Depo. p. 37. The pelvis wound also tracked upward, backward, and rightward, like the other lethal wounds. Ex. 3, Dr. Ely Depo. p. 37. The bullet transected the pancreas, disrupted the inferior vena cava and disrupted the liver. Ex. 4, Medical Examiner's Report, pp. 5-6.

**RESPONSE**: **Admit.**

36.     Most of the wounds tracked upward, backward, and rightward. Ex. 3, Dr. Ely Depo. p. 46. There were no gunshot wounds that tracked straight into Isaiah's body. All of the wounds, except a graze wound to the back, tracked upward or downward into his body. Ex. 3, Dr. Ely Depo. pp. 46-47.

**RESPONSE**:   **Defendants deny that there "were no gunshot wounds that tracked straight into Isaiah's body." Dr. Ely testified that the graze wound of the right back is "going either right to left or left to right." Plaintiff's Ex. 3, Dr. Ely Depo, p. 46. Defendants admit that some of the wounds tracked upward, backward, and rightward and that all of the wounds, except a graze wound to the back, tracked upward or downward into his body.**

37.     Dr. Ely testified that there is no question that Isaiah's body was oriented to the trajectory of the bullets that she described in her deposition. The muzzle of the gun had to be at an angle such that the bullets could travel through the body at the "paths she described. Ex. 3, Dr. Ely Depo. p. 63.

**RESPONSE**: **Defendants deny that Dr. Ely testified that "there is no question that Isaiah's body was oriented to the trajectory of the bullets that she described in her deposition," and further, object to that statement as vague and nonsensical.**

**Defendants admit only that the orientation of the muzzle of the gun to the body dictates the angles the projectile enters the body. Ex. 3, Dr. Ely Deposition, p. 60. Defendants admit that bullet wound trajectory simply reflects the orientation of the firearm relative to the body and any number of body positions and circumstances can be consistent with Decedent's gunshot wounds. Ex. 3, pp. 60-61. Based upon her examination of Decedent's gunshot wounds Dr. Ely cannot determine what particular position Hammett was in at the time of the shooting. Ex. 3, Dr. Ely Deposition Transcript, p. 61.**

38.     Plaintiffs have also attached the Affidavit of their weapons and ballistics expert Samuel Andrews. Mr. Andrews is highly qualified to opine in this matter, including because he has previously trained the SLMPD SWAT Team. See Plaintiffs' Exhibit 7, Andrews Affidavit, paras. 1-5, setting forth qualifications and experience.

**RESPONSE: Objection. Plaintiffs have not carried their burden of showing that Andrews is qualified to render opinions on ballistics evidence within a reasonable degree of scientific certainty, and therefore, this Court should find that Andrews is unqualified to provide the opinions set forth in paragraph 45. First, Andrews has no education or experience, professional or otherwise, analyzing ballistics evidence at a fatal shooting scene or conducting crime scene investigations. Ex. AA, Resume of Andrews; Ex. Y, 29. He has not been recognized as an expert in any field by any Federal Court. Ex. Y, p. 145. He is not a certified crime scene investigator, certified crime scene analysist, or certified crime scene reconstructionist. Ex. AA, Resume of Andrews; Ex. Y, pp. 69-70. He has never served as a law enforcement officer, a police detective, or crime scene investigator**

**with a law enforcement agency. Ex. AA.; Ex. Y, p. 84. Has not participated in any classroom training for crime scene investigation. Ex. Y, p. 29. Andrews has no experience conducting forensic ballistics in a laboratory setting. Ex Y, p. 147. Andrews possess no degrees in engineering, technology, physics, or biology. Ex. Y, pp. 82, 148. Thus, this Court should find that Andrews is unqualified to provide the opinions set forth in paragraph 45 because he is unqualified to render opinions on ballistics evidence within a reasonable degree of scientific certainty.**

**Andrews' purported instruction to the SLMPD SWAT Team does not qualify him as a criminalist, forensic ballistics expert, crime scene investigator, or crime scene reconstructionist. None of Andrews' instruction of members of the St. Louis Metropolitan Police Department SWAT team involved forensic crime scene investigations. *Id*. at p. 99.**

**For all of these reasons, Defendants deny the assertions in paragraph 38.**

39.     Mr. Andrews was contacted on the day of the shooting of Plaintiffs' decedent, and asked to conduct a ballistics analysis of the shooting. The next morning he travelled from his home in Lebanon, Missouri to 5414 S. Kingshighway and did an extensive inspection of the ballistics evidence left behind after the police turned control of the premises back over to the home owner. Mr. Andrews states that the photographs provided by the St. Louis Police Department accurately depict what he saw at the time of his ballistics analysis. See Ex. 7, Andrews Affidavit, para. 6.

**<u>RESPONSE</u>: Defendants admit that Andrews was contacted on the day of the shooting and asked to conduct a ballistics analysis of the shooting and that the next morning he travelled from his home in Lebanon, Missouri to 5414 S.**

**Kingshighway.**

**Deny that Andrews did an "extensive inspection of the ballistics evidence left behind" because the majority of ballistics evidence, including 95 cartridge cases, bullets, bullet fragments and the wooden door to Hammett's bedroom, had already been seized by the Police Department on June 7, 2017. Defs.' Ex. M, Deposition of Sommer, pp. 26, 49, 51. Defendant further denies that Andrews did an "extensive inspection" because he failed to take notes or in any way document his findings. Ex. Y, p. 174. Defendants deny any remaining assertions in paragraph 39. *Id.***

40.     In addition to the personal inspection the day following the shooting, Mr. Andrews viewed and reviewed the Kevin Broccard video/audio of the shooting. From that video/audio he concluded that the initial shots have a .13 "split", or seconds between shots which is impossible with an AK-47 model rifle because of the length of the trigger pull, the length of the recoil recovery time and the length of the "trigger reset". In addition, he opines that the timing and "signature" or sounds of the shooting are as follows, based on the Broccard recording:

Time of Event: Event:

:08 seconds Flash Bang;

:12 – :14 secs. 4 shots from a 9 mm cal hand gun from inside the house;

:14 – :19 Barrage of over 25 shots from .223 caliber assault rifles;

:19 – 20 Frantic 3 syllable scream possibly ending with the " f "

word;

:21 – :22 4 shots from .223 caliber assault rifles;

:26 – :28 6 shots from .223 caliber assault rifles;

:32 – :35 2 bursts of 6 and 7 shots from .223 caliber assault rifles;

:37 – :39 2 bursts of 3 shots each from .223 caliber assault rifles;

:43 – :44 Someone yelling "back up" twice;

1:13 –1:19 2 shots followed by approximately 23 shots from multiple

.223 caliber assault rifles;

1:30 – 1:35 12 to 16 shots fired from .223 caliber assault rifles;

3:50 – 3:58 "Police we have a search warrant" yelled outside the house;

4:06 – 4:13 Yelling at house next door;

4:24 – 4:26 "Come to me, come out of the house".

See Ex. 7, Andrews Affidavit, para. 7.

**RESPONSE**: **Objection. Defendants object to Paragraph 40 on the basis that Andrews is not qualified to conduct a forensic analysis of an audio recording of gunshots. Andrews lacks any education or training that qualifies him to conduct audio forensics of gunshot acoustics. Ex AA, Resume of Andrews; Ex. Z, Deposition of Andrews Vol. II, p. 371. Moreover, Andrews did not make any enhancements to the recording, aside from playing it in slow motion, prior to observing the recording and rendering his opinions. Ex. Z, p. 320-324. Plaintiffs have not established that Andrews used a reliable methodology to render his opinions about the cell phone audio. In fact, Andrews could not recall the name of the software he used to play the cellphone recording. *Id.* at p. 320-23, 360.**

**Moreover, Andrews' interpretation of the audio recording is not based on sufficient facts and data because Andrews lacks basic information about how the**

recording was made. Andrews, for example, did not determine how far the cellphone was located from the house during the shooting or what type of microphone (or phone) recorded it. Ex. Z, pp. 326, 357-58. He did not know for certain whether the person making the recording was located inside or outside of a car. *Id.* at 325.

For these reasons, Plaintiffs have not carried their burden of showing that Andrews is an expert in the field of forensic acoustics whose testimony is based on sufficient facts and data and is the product of reliable methods, and this Court should find that Andrews is unqualified to provide the opinions set forth in paragraph 40.

Without waiving that objection, Defendants admit only that Andrews "concluded" and "opined" as set forth in paragraph 40, but deny his conclusions and opinions are accurate. Ex. F, Manasco, p. 13, ln. 16- p. 15, ln. 18 (Ex. F-1, Diagram), p. 28, ln. 3-22; p. 52, ln. 18-22; Ex. I, Coats, p. 33, ln. 22- p. 43, ln. 11; Ex. D, Long Affidavit, ¶¶ 18-20.

41. Based upon the fact that you can hear the Police announce "Police we have a search warrant" at the 3:50 mark of the recording but at no other time during the video it is clear there was no announcement by the police before the breach, flash bang and shots being fired as claimed by the police in their post shooting interviews and depositions. See Ex. 7, Andrews Affidavit, para. 8.

**RESPONSE**: Defendants deny that the cellphone video recording does not depict the announcement "Police! Search Warrant" prior to the breach and flash bang. Exhibit C-1 depicts Defendant Frigerio yelling "Search Warrant!" between

the 0:05 and 0:06 second marks and "Police! Search Warrant" between the 0:08 and 0:09 second marks. See Ex. C-1 (Cell phone video recording); Ex. C, Frigerio Affidavit, ¶¶ 5-11; Ex. P, Lacy Affidavit, ¶¶ 8-10, 21-22; Ex. J, Frigerio, p. 33, ln. 14-21; Ex. K, Allen, p. 17, ln. 24 – p. 18, ln. 2; Ex. G, Becherer, p. 26, ln. 8- p. 17; p. 65, ln. 15-23; Ex. F, Manasco, p. 26, ln. 17-p. 27, ln. 5; p. 48, ln. 3-10; Ex. H, Seper, p. 29, ln. 6-11; Ex. I, Coats, p. 30, ln. 14- 24; p. 71, ln. 21 – p. 72, ln. 1; Ex. L, Sgt. Jones Affidavit, ¶ 9; Ex. D, Long Affidavit, ¶ 14.

Further, Andrews is not qualified as an expert in the field of forensic acoustics. Ex AA, Resume of Andrews; Ex. Z, Deposition of Andrews Vol. II, p. 371. Andrews employed no specialized knowledge, training or experience relating to the analysis or enhancement of digital video and audio recordings, and he did not provide any enhancements to the recording, aside from playing it in slow motion. Ex. Z, p. 220-323. This Court should find that Andrews is unqualified to provide the opinions set forth in paragraph 41 because absent some specialized skill or knowledge, an expert's opinion regarding his observation of the events depicted in video recording do not assist the trier of fact. FRE 702; *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010).

42.     Mr. Andrews opines that, if the officers were planning on a knock and announce search as they claim there would be no reason or any concern about being "compromised" by the camera on the front of the house because they intended to identify themselves from the beginning. The Officers then claim to have called a "compromise" which is a no knock battering ram breach with a flash bang and approximately 93 shots fired. However, the Officers thereafter claim that they knocked and announced which is

directly conflicting evidence. This demonstrates that the Officers were using an alleged "compromise" to turn the knock and announce into a battering ram breach flash bang assault. This has been a known approach since the Supreme Court of Missouri required officers to knock and announce. A no knock raid is much higher risk that shots will be fired because of the surprise element heightening everyone's fear and adrenaline levels. See Ex. 7, Andrews Affidavit, para. 9.

**RESPONSE**: Objection. Andrews' opinions set forth in paragraph 42 construct a factual narrative of what Andrews believes happened and the Defendant Officers' motivations for providing certain testimony. These opinions are based exclusively upon his review of the cell phone video recording and the Defendant Officers' testimony. He relies upon no specialized skill or knowledge in reaching this opinion, which is nothing more than an impermissible credibility determination. It is "plain error to admit testimony that is a thinly veiled comment on a witness' credibility." *United States v. Benedict*, 815 F.3d 377, 382 (8th Cir. 2016) citing *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 884 (8th Cir. 1998). "It is the exclusive province of the jury to determine the believability of the witness. . . An expert is not permitted to offer an opinion as to the believability or truthfulness of a [witness's] story." *Bachman v. Leapley*, 953 F.2d 440, 441 (8th Cir. 1992). See also *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000) (citation omitted) (determining the credibility of a witness is the jury's province, whether the witness is lay or expert).

The Court should therefore strike Andrews' opinion that the Defendant Officers called a "compromise" in order to justify the use of the battering ram and

**flash bang because that opinion is premised upon improper credibility determinations and invades the province of the jury.**

**Without waiving that objection, denied. Ex. J, Frigerio, p. 31, ln. 22 – p. 32, ln. 4; Ex. K, Allen, p. 16, ln. 2-6; Ex. G, Becherer, p. 25, ln. 16-p. 26, ln. 3; Ex. E, Boyce, p. 18, ln. 18- p. 20, ln. 1; Ex. F, Manasco, p.19, ln. 9-13; Ex. H, Seper, p. 24, ln. 24- p.25, ln. 2; Ex. I, Coats, p. 23, ln. 23-24; Ex. L, Declaration of Jones, ¶¶ 6-7.**

43.     Mr. Andrews states that he has heard AK-47 model rifles fired tens of thousands of times under many different circumstances and as a result is very familiar with that sound signature because the diameter of the AK-47 bullet is .311 inches (7.62 mm). He has heard .223 inches (5.56 mm) assault rifles fired tens of thousands of times. He has heard 9mm handguns fired tens of thousands of times. The diameter of the cartridge which holds the gun powder causes that gun to make a distinctive sound to him and the officers from the SWAT team who have testified in this case that they can tell the difference. In addition, Dennis Torres, testified that based on his extensive service in the Vietnam War he can tell that difference. They have repeatedly listened to the Broccard video/audio and at no time do they hear an AK-47 fired. Based upon his comparisons of firearm "signatures" of the 5414 Kingshighway shooting recorded in the Broccard video there can be no doubt or dispute that there was never an AK-47 fired at the time of this raid. The first shots fired are 4 rounds of a 9mm handgun followed by approximately 90 .223 assault rifle shots being fired. See Ex. 7, Andrews Affidavit, para. 10.

**RESPONSE: Deny that there "was never an AK-47 fired" during the execution of the search warrant and that the "first shots fired are 4 rounds of a 9mm handgun." Ex. J, Frigerio, p. 31, ln. 22 – p. 32, ln. 4; Ex. K, Allen, p. 16, ln. 2-**

6; Ex. G, Becherer, p. 25, ln. 16-p. 26, ln. 3; Ex. E, Boyce, p. 18, ln. 18- p. 20, ln. 1; Ex. F, Manasco, p.19, ln. 9-13; Ex. H, Seper, p. 24, ln. 24- p.25, ln. 2; Ex. I, Coats, p. 23, ln. 23-24; Ex. L, Declaration of Jones, ¶¶ 6-7.

Multiple expended 7.62 caliber bullets recovered from the scene were consistent with having been fired from an AK-47 style rifle. Ex. O, p. 130-137. Specifically, qualified firearms examiner Julie Davis examined eight identifiable 7.62 caliber expended projectiles recovered from the scene and compared them to test shots from Hammett's AK-47 style rifle. *Id*. These eight identifiable 7.62 caliber bullets recovered from the scene are referred to in Ms. Davis' Lab Report and Notes as Items 9-11, 9-12, 9-13, 9-14, 9-15, 9-16, 9-17, and 26-01. (Ex. O, pp. 6-7). The test shots fired from Hammett's AK-47 style rifle are referred to as Item 28-03. *Id*. The officers' weapons are referred to as Items 27, 31, 32, 33, 34, 35, 36, and 37. *Id*.  Ms. Davis' Report is admissible as a business record. (Ex. O, ¶¶ 5-6). While Ms. Davis could not definitively match these 7.62 caliber bullets to Hammett's weapon due to damage common to expended projectiles, Ms. Davis nevertheless concluded that these eight 7.62 caliber expended projectiles recovered from the scene "could have been fired from several different models of AK and SKS type manufactured firearms." *Id*.[1] Critically, Ms. Davis further concluded that these recovered 7.62 caliber bullets could not have been fired in the officers' weapons. *Id*. On the record before the Court, these eight recovered 7.62 caliber bullets could only have been fired by Hammett.

---

[1] The diameter of these eight recovered bullets is .313 inches which, according to Plaintiffs' putative expert, matches the diameter of the bullets fired by Hammett's 7.62 x 39 caliber AK-47 style rifle. (Ex. Y, Andrews Dep., Vol I, p. 241).

In addition, Firearms Examiner Julie Davis performed a microscopic examination of 10 Barnaul stamped, 7.62x39mm caliber cartridges cases recovered from the scene ("Items 009-01 (A through I) and 009-02") and found firing pin and breech face impressions on 9 of them. Defs' Ex. O, Affidavit of Julie Davis, ¶ 9. Further, through testing, Julie Davis concluded, to a reasonable degree of scientific certainty, that 9 of the Barnaul stamped 7.62x39mm caliber cartridge cases recovered from the scene of the incident by Sommers were fired in the Inter Ordnance Inc. make, Sporter model, 7.62x 39mm caliber semi-automatic rifle Detective Skaggs seized from the scene. *Id*. at ¶¶10-11. Davis fired 4 test shots, including cartridge cases and bullets, from the Inter Ordnance Inc. make Sporter model, 7.62 x 39 mm caliber semi-automatic rifle seized by Detective Skaggs and then conducted a microscopic comparison between test cartridge cases #1 through #4 and the 10 Barnaul stamped, 7.62 x 39 mm caliber cartridge cases recovered from the scene. Id. at ¶ 9. Based on her comparison, she determined that 9 Barnaul stamped ("Items 009-01 (A through I"), 7.62 x 39mm cartridge cases recovered from the scene were fired in the semi-automatic rifle sized by Detective Skaggs from the scene. Id. at ¶ 10.

Defendants further object to Andrews' opinions that are premised upon his review of the cellphone video recording. Defendant objects to Paragraph 40 on the basis that Andrews is not qualified to conduct a forensic analysis of an audio recording of gunshots. Andrews lacks any education or training that qualifies him to conduct audio forensics of gunshot acoustics. Ex AA, Resume of Andrews; Ex. Z, Deposition of Andrews Vol. II, p. 371. Moreover, Andrews did not make any

**enhancements to the recording, aside from playing it in slow motion, prior to observing the recording and rendering his opinions. Ex. Z, p. 320-324. Plaintiffs have not established that Andrews used a reliable methodology or technique to render his opinions about the cell phone audio. In fact, Andrews could not recall the name of the software he used to play the cellphone recording.** *Id.* **at p. 320-23, 360.**

**Moreover, Andrews' interpretation of the audio recording is not based on sufficient facts and data because Andrews lacks basic information about how the recording was made. Andrews, for example, did not determine how far the cellphone was located from the house during the shooting or what type of microphone (or phone) recorded it. Ex. Z, pp. 326, 357-58. He did not know for certain whether the person making the recording was located inside or outside of a car.** *Id.* **at 325. For these reasons, Plaintiffs have not carried their burden of showing that Andrews is an expert in the field of forensic acoustics, and this Court should find that Andrews is unqualified to provide opinions concerning his observations of the cellphone audio set forth in paragraph 43.**

44.     Mr. Andrews' affidavit notes that the officers in their reports contradict who purportedly announced "police search warrant." When an officer "yells police search warrant" it is established that they are five times normal volume. In listening to the Broccard video you would clearly hear that if they announced it while they were outside the house as they claim because you can clearly hear it at 3:50-3:58 time frame of the video after all of the shooting has stopped. In his opinion the police did this so the neighborhood witnesses would be able to say they heard "police search warrant" when interviewed after the officer involved shooting as required by standard operating

procedure after Officer involved shootings. See Ex. 7, Andrews Affidavit, para. 11.

**RESPONSE**: **Defendants deny Andrews' assertion that the officers' testimony contradicts who announced "police search warrant" and deny the assertion that officers did not announce themselves while they were outside the house. Ex. P, Lacy Affidavit, ¶¶ 8-10, 21-22; Ex. J, Frigerio, p. 33, ln. 14-21; Ex. K, Allen, p. 17, ln. 24 – p. 18, ln. 2; Ex. G, Becherer, p. 26, ln. 8- p. 17; p. 65, ln. 15-23; Ex. F, Manasco, p. 26, ln. 17-p. 27, ln. 5; p. 48, ln. 3-10; Ex. H, Seper, p. 29, ln. 6-11; Ex. I, Coats, p. 30, ln. 14- 24; p. 71, ln. 21 – p. 72, ln. 1; Ex. L, Sgt. Jones Affidavit, ¶ 9; Ex. D, Long Affidavit, ¶ 14. Moreover, the cell phone recording depicted in Exhibit C-1 establishes that at least one officer, Defendant Frigerio, yelled "Search Warrant!" between the 0:05 and 0:06 second marks and "Police! Search Warrant" between the 0:08 and 0:09 second marks. See Ex. C-1 (Cell phone video recording); Ex. C, Frigerio Affidavit, ¶¶ 5-11.**

**Further, pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertion in paragraph 44 that the officers announced themselves at the 3:50 – 3:58 mark after the shooting stopped only "so the neighborhood witnesses would be able to say they heard 'police search warrant' when interviewed." Andrews "cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). Further, an expert cannot provide testimony about what they perceive in a video recording using "simple observation" because that opinion is not the product of specialized knowledge, skill, experience, or training. See *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010) (holding that the opinion of an expert who used "simple observation" to**

**interpret the contents of video images captured by a surveillance video were inadmissible because that opinion would not have assisted the jury).**

45.     Based on Mr. Andrews' review of the scene, there are no bullet hole entries in the home that match a 7.62 caliber gun. There are many bullet hole entries that match the diameter of a .223. He searched extensively for a 7.62 entry hole as he expected to find, because it would have justified the officers "returning" fire and exonerated them of wrong doing. Having measured the entry of all bullet holes throughout the home with a caliper Mr. Andrews can testify beyond any question that the damage done to the walls of the Torres home shown in the Department's photographs were not done with an AK-47 caliber gun. The width of the entry holes made are either much too small or much to large to have come from and AK-47 model rifle. They are the width of a .223 bullet or a 9 mm handgun bullet. It is also his understanding that Dennis Torres served in the military in Vietnam, used a .223 caliber assault rifle and heard AK-47s being shot hundreds if not thousands of times and has testified that at no time did he hear and AK-47 fired on June 7, 2017. See Ex. 7, Andrews Affidavit, para. 12.

**RESPONSE**: Objection. Plaintiffs have not carried their burden of showing that Andrews is qualified to render opinions on ballistics evidence within a reasonable degree of scientific certainty, and therefore, this Court should find that Andrews is unqualified to provide the opinions set forth in paragraph 45. First, Andrews has no education or experience, professional or otherwise, analyzing ballistics evidence at a fatal shooting scene or conducting crime scene investigations. Ex. AA, Resume of Andrews; Ex. Y, 29. He has not been recognized as an expert in

any field by any Federal Court. Ex. Y, p. 145. He is not a certified crime scene investigator, certified crime scene analysist, or certified crime scene reconstructionist. Ex. AA; Ex. Y, pp. 69-70. He has never been employed as a law enforcement officer, a police detective, or crime scene investigator with a law enforcement agency. Ex. AA; Ex. Y, p. 84. Andrews has no experience conducting forensic ballistics in a laboratory setting. Ex Y, p. 147. Andrews possess no degrees in engineering, physics, or biology. *Id*. at pp. 82, 148. Thus, this Court should find that Andrews is unqualified to provide the opinions set forth in paragraph 45 because he is unqualified to render opinions on ballistics evidence within a reasonable degree of scientific certainty.

In any event, Defendants deny that there are no bullet hole entries in the home that match a 7.62 caliber gun. Multiple expended 7.62 caliber bullets consistent with having been fired from an AK-47 style rifle were recovered from the scene. Ex. O, p. 130-137. Specifically, qualified firearms examiner Julie Davis examined eight identifiable 7.62 caliber expended projectiles recovered from the scene and compared them to test shots from Hammett's AK-47 style rifle. *Id*. These eight identifiable 7.62 caliber bullets recovered from the scene are referred to in Ms. Davis' Lab Report and Notes as Items 9-11, 9-12, 9-13, 9-14, 9-15, 9-16, 9-17, and 26-01. (Ex. O, pp. 6-7). The test shots fired from Hammett's AK-47 style rifle are referred to as Item 28-03. *Id*. The officers' weapons are referred to as Items 27, 31, 32, 33, 34, 35, 36, and 37. *Id*. Ms. Davis' Report is admissible as a business record. (Ex. O, ¶¶ 5-6). While Ms. Davis could not definitively match these 7.62 caliber bullets to Hammett's weapon due to damage common to expended projectiles, Ms.

Davis nevertheless concluded that these eight 7.62 caliber expended projectiles recovered from the scene "could have been fired from several different models of AK and SKS type manufactured firearms." *Id*.[2] Critically, Ms. Davis further concluded that these recovered 7.62 caliber bullets could not have been fired in the officers' weapons. *Id*. On the record before the Court, these eight recovered 7.62 caliber bullets could only have been fired by Hammett.

Further answering, Defendants deny that the "damage done to the walls of the Torres home shown in the Department's photographs were [sic] not done with an AK-47 caliber gun" and that the width of the entry holes made are either much too small or much to [sic] large to have come from and AK-47 model rifle."  At his deposition, Andrews testified that using the methodology he employed he is unable to "get a super accurate measurement" on a hole if the bullet strikes the surface at an acute angle, (Ex Y, p. 225-226). Given this admission, Andrews' opinion that "no bullet hole entries in the home that match a 7.62 caliber gun" is clearly unreliable.

In addition, Officer Frigerio testified that because the SWAT team's ammunition does not penetrate walls he attempted to shoot rounds "through the holes that [Hammett] was making when he was shooting at me." Ex J, Frigerio Depo, p. 41. Thus, the undisputed record shows that, in any event, Frigerio's shots through preexisting bullet holes enlarged preexisting bullet holes made by Hammett's 7.62 caliber ammunition.

46.    In addition, the photographs provided by the department of the alleged

_____

[2] The diameter of these eight recovered bullets is .313 inches which, according to Plaintiffs' putative expert, matches the diameter of the bullets fired by Hammett's 7.62 x 39 caliber AK-47 style rifle. (Ex. Y, Andrews Dep., Vol I, p. 241.

AK-47 shell casings taken immediately after the shooting do not show signs of having been recently fired because they do not have any of the normal markings of a recently fired shell. There is in fact demonstrable evidence that the shells had not come from a cartridge that was recently fired. This is consistent with the Police Department's information that Isaiah Hammett had an AK-47 model rifle that they intended to allege he fired at them. Of importance, if Isaiah Hammett fired as many rounds as the police claim there would have been many more than 10 shell casings. See Ex. 7, Andrews Affidavit, para. 13.

**RESPONSE**: **Deny that the shell casings recovered from the scene "do not show signs of having been recently fired because they do not have any of the normal markings of a recently fired shell" and that "the shell's [sic] had not come form a cartridge that was recently fired."**

**Firearms Examiner Julie Davis performed a microscopic examination of 10 Barnaul stamped, 7.62x39mm caliber cartridges cases recovered from the scene ("Items 009-01 (A through I) and 009-02") and found firing pin and breech face impressions on 9 of them. Defs' Ex. O, Affidavit of Julie Davis, ¶ 9. Further, through testing, Julie Davis concluded, to a reasonable degree of scientific certainty, that 9 of the Barnaul stamped 7.62x39mm caliber cartridge cases recovered from the scene of the incident by Sommers were fired in the Inter Ordnance Inc. make, Sporter model, 7.62x 39mm caliber semi-automatic rifle Detective Skaggs seized from the scene. *Id*. at ¶¶10-11. Davis fired 4 test shots, including cartridge cases and bullets, from the Inter Ordnance Inc. make Sporter model, 7.62 x 39 mm caliber semi-automatic rifle seized by Detective Skaggs and then conducted a microscopic**

comparison between test cartridge cases #1 through #4 and the 10 Barnaul stamped, 7.62 x 39 mm caliber cartridge cases recovered from the scene. *Id.* at ¶ 9. Based on her comparison, she determined that 9 Barnaul stamped ("Items 009-01 (A through I")), 7.62 x 39mm cartridge cases recovered from the scene were fired in the semi-automatic rifle sized by Detective Skaggs from the scene. Id. at ¶ 10.

Defendants admit only that Andrews was unable to see these firing pin and breech face impressions when he reviewed with his naked eye (unidentified) Police Department "photographs of the alleged AK-47 shell casings," (Ex. Y, p. 258) and that Andrews never inspected the shell casings with the aid of a microscope. Ex. Z, Deposition of Andrews, p. 333.


47.     In addition, the Department's photographs of the alleged AK-47 shell casings do not match up with the ballistics evidence of the scene. When the round of an AK-47 is ejected to allow the next round to enter the chamber it causes scratches on the casings as it is ejected causing "extraction marks". The pictures of the casings lying on the floor of the Torres home do not have these shiny markings because the casings in the photographs show oxidation. Therefore, the AK-47 casings had not been fired on June 7, 2017. Therefore the evidence of the scene does not match up with the claims of the SWAT Officers in their post shooting interviews or deposition testimony. See Ex. 7, Andrews Affidavit, para. 14.

**RESPONSE:** Defendants deny that the "the evidence of the scene does not match up with the claims of the SWAT Officers" and that the AK-47 casings had not been fired on June 7, 2017. Defendants further deny that the 7.62x39 mm caliber

casings recovered from the floor of the Torres home do not have extraction marks.

First, Andrews testified that it is not impossible for an oxidized bullet to be fired. Defs.' Ex. Y, Andrews Deposition, pp. 256, 260. Second, Firearms Examiner Julie Davis performed a microscopic examination of 10 Barnaul stamped, 7.62x39mm caliber cartridges cases recovered from the scene ("Items 009-01 (A through I) and 009-02") and found firing pin and breech face impressions on 9 of them. Defs.' Ex. O, Affidavit of Julie Davis, ¶ 9. Further, through testing, Julie Davis concluded, to a reasonable degree of scientific certainty, that 9 of the Barnaul stamped 7.62x39mm caliber cartridge cases recovered from the scene of the incident by Sommers were fired in the Inter Ordnance Inc. make, Sporter model, 7.62x 39mm caliber semi-automatic rifle Detective Skaggs seized from the scene. *Id.* at ¶¶10-11. Davis fired 4 test shots, including cartridge cases and bullets, from the Inter Ordnance Inc. make Sporter model, 7.62 x 39 mm caliber semi-automatic rifle seized by Detective Skaggs and then conducted a microscopic comparison between test cartridge cases #1 through #4 and the 10 Barnaul stamped, 7.62 x 39 mm caliber cartridge cases recovered from the scene. *Id.* at ¶ 9. Based on her comparison, she determined that 9 Barnaul stamped ("Items 009-01 (A through I"), 7.62 x 39mm cartridge cases recovered from the scene were fired in the semi-automatic rifle sized by Detective Skaggs from the scene. *Id.* at ¶ 10.

Defendants admits only that Andrews was unable to see these firing pin and breech face impressions when he reviewed with his naked eye (unidentified) Police Department "photographs of the alleged AK-47 shell casings," (Ex. Y, p. 258) and that Andrews never inspected the shell casings with the aid of a microscope (Ex. Z,

Deposition of Andrews, p. 333), as did Davis during her examination.

Defendants object to the sentence "the Department's photographs of the alleged AK-47 shell casings do not match up with the ballistics evidence of the scene" as vague and nonsensical.

48.     During his ballistics investigation Mr. Andrews did not find any evidence of damage to the front living room wall which would have been there if the AK-47 rounds were fired through the bedroom wall and door as claimed by the Officers in their post-shooting interviews and depositions. See Ex. 7, Andrews Affidavit, para. 15.

**RESPONSE: Admit that there was no ballistics damage to the front living room wall documented. Deny that there "would have been" damage to the front living room wall "if the AK-47 rounds were fired through the bedroom wall and door." Rather, Defendants' Exhibits S, T, and BB show that bullets fired by Hammett from the AK-47 passed through the bedroom wall and entered the south interior living room wall. Ex. F, Manasco Dep., p. 53 ("He was -- you know, he was shooting through his bedroom door initially… And then he began strafing that wall…So as we're moving left, he's moving right"); See also Defs.' Ex. J, Frigerio, p. 39. Further, because Hammett's bedroom door is located directly across from the front door and the front door was open at the time of the shooting bullets passed from the bedroom door through the front doorway without the front door sustaining any damage. Defs.' Exhibit BB; Ex. F, Manasco, p. 52-53 (stating that Hammett was shooting through his bedroom door initially and "those rounds were -- that door was right in line with the front door.")**

49.     In the ten years between 2006 and 2016, Internal Affairs Statistics

maintained by the St. Louis Police Department record a total of 318 complaints against officers relating to the following categories: Physical Abuse/Use of Force, Violation of Use of Force Policy, and Physical Abuse. The statistics reflect that those charges were sustained only 16 times, or approximately 5% of the time. See Plaintiffs' Ex. 12, Group Exhibit of SLMPD IAD Statistics.

**RESPONSE**: **Denied. Plaintiffs' Ex. 8, Group Exhibit of SLMPD IAD Statistics.**

50.     In a letter dated January 31, 2018, City Counselor, the Honorable Julian Bush provided an explanation to Alderwoman Green of "the City's self insurance fund, 'something called a PFPC,' the funds used for paying settlements, and the liability of the City for paying settlements, particularly those involving police misconduct." Plaintiffs' Ex. 9, Judge Bush Letter.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(2), the cited letter is inadmissible hearsay and an inadmissible legal conclusion that cannot be presented in a form that would be admissible in evidence. Without waiving the objection, denied. Plaintiffs' Ex. 9, Judge Bush Letter.**

51.     The Public Facilities Protection Corporation of the City of St. Louis is a not for profit corporation incorporated on November 20, 1986. Its articles of incorporation state that the purpose of the corporation is "to implement a program which will assure the continuing provision of municipal and governmental services by various public facilities and functions in the St. Louis metropolitan area which facilities are placed in jeopardy by escalating costs and exposures to exceed fiscal abilities." Ex. 9, Judge Bush Letter.

**RESPONSE**: Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertions in paragraph 51. And, pursuant to Federal Rule 56(c)(2), the cited letter is inadmissible hearsay and an inadmissible legal conclusion that cannot be presented in a form that would be admissible in evidence.

52.     On September 16, 1987, the City's Board of Estimate and Apportionment adopted a resolution approving the "City of St. Louis Risk Management Program." Among many other things, the program imposed a duty on the City to annually appropriate funds into a "Risk Trust Fund" to be administered by PFPC, which was made responsible for administering that fund and payment of all claims, given its purpose to "insure the City against all claims." Ex. 9, Judge Bush Letter.

**RESPONSE**: Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertions in paragraph 52. And, pursuant to Federal Rule 56(c)(2), the cited letter is inadmissible hearsay and an inadmissible legal conclusion that cannot be presented in a form that would be admissible in evidence. Without waiving the objection, denied. (Doc. 109-10 at 2).

53.     Judge Bush further states that "It is my understanding that over the years PFPC has, just as the September 16, 1987 plan approved by the Board of Estimate and Apportionment provided, paid claims against the City for damages. In addition to paying claims against the City, it has paid claims against City employees, other public employees, and also claims against other public corporations and not for profit corporations." Ex. 9, Judge Bush Letter.

**RESPONSE**: Objection. Pursuant to Federal Rule 56(c)(2), the cited letter is

**inadmissible hearsay and an inadmissible legal conclusion that cannot be presented in a form that would be admissible in evidence. Without waiving the objection, Defendants admit that paragraph 53 accurately quotes a portion of the letter.**

54.    The City transfers amounts to the PFPC which "uses the sums so transferred to pay judgments against the City and its employees generally, including those arising from the operations of the Division of Police and from the operations of the old Saint Louis Metropolitan Police Department, to the extent that the latter are not paid out of the State Legal Expense Fund." Ex. 9, Judge Bush Letter.

**RESPONSE: Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertions in paragraph 54. And, pursuant to Federal Rule 56(c)(2), the cited letter is inadmissible hearsay and an inadmissible legal conclusion that cannot be presented in a form that would be admissible in evidence. Without waiving the objection, Defendants admit that paragraph 54 accurately quotes a portion of the letter and deny the remainder of paragraph 54. (Ex. 9, Judge Bush Letter).**

55.    Documents obtained in discovery from the City verify the description of the PFPC as the City's insurer as given by Judge Bush in his letter. On September 16, 1987, the Board of Estimate and Approval adopted Resolution No. 88.093 to approve the City of St. Louis Risk Management Approval. See Plaintiffs' Ex. 9, Judge Bush Letter; Plaintiffs' Ex. 14, Board Minutes/Risk Management Program.

**RESPONSE: Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertions in paragraph 55. And, pursuant to Federal Rule 56(c)(2), paragraph 55 is an inadmissible argumentative legal**

**conclusion and the cited letter is inadmissible hearsay that cannot be presented in a form that would be admissible in evidence. Without waiving the objection, denied. Ex. 9, Judge Bush Letter; Ex. 14, Board Minutes/Risk Management Program.**

56. The Risk Management Program provides that it is "designed to protect the City and its related agencies against accidental loss or losses in the most cost effective manner available by applying to risks of accidental loss a risk management process" which includes "financing of risk consistent with the City's financial resources." Ex. 10. The Risk Management Program further provides that the PFPC shall "be responsible for all risk management decisions and administer the Risk Trust Fund. The PFPC shall be responsible for the payment of all claims[.]" Ex. 10. The Program explicitly states that "it is the intent to insure the City against all claims for damages[,]" other than for certain claims relating to damage to City property. See Ex. 10.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertions in paragraph 56. And, pursuant to Federal Rule 56(c)(2), paragraph 56 is an inadmissible argumentative legal conclusion and the cited letter is inadmissible hearsay that cannot be presented in a form that would be admissible in evidence. Without waiving the objection, denied. (Ex. 9, Judge Bush Letter; Ex. 10, "Board Minutes/Risk Management Program").**

57. Agreements entered into between the PFPC and other public entities further demonstrate the intent of the entity to serve as an insurer of the City or a form of self-insurance. For example, a Cooperation Agreement entered with the Public Library of the City of St. Louis on May 1, 2014 (after the City's takeover of the Police Department) provides that "the City has established PFPC as an independent corporation formed for

the purpose of establishing a common fund to provide general liability … protection to the City, its agencies and other public entities operating within the City." Exhibit 11.

**RESPONSE**: **Objection. Pursuant to Federal Rule 56(c)(1)(B), the material cited by Plaintiffs does not support the assertions in paragraph 57. And, pursuant to Federal Rule 56(c)(2), paragraph 57 is an inadmissible argumentative legal conclusion and the cited material is inadmissible hearsay that cannot be presented in a form that would be admissible in evidence. Without waiving the objection, denied. (Ex. 9, Judge Bush Letter; Ex. 14, "Board Minutes/Risk Management Program"; Ex. 10).**

WHEREFORE, Defendants respectfully request that this honorable Court grant summary judgment in favor of Defendants and against Plaintiffs.

Respectfully submitted,

**JULIAN BUSH**
**CITY COUNSELOR**

By: /s/ Erin K. McGowan
    Erin K. McGowan #64020MO
    Andrew Wheaton #65269 MO
    1200 Market Street, Room 314
    City Hall
    St. Louis, Mo 63103
    (314) 622-3361
    (314) 622-4956 fax
    WheatonA@stlouis-mo.gov
    McGowanE@stlouis-mo.gov
    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on **September 21, 2020** the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system..

/s/ Erin K. McGowan