IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


GINA TORRES, et al,          )
                             )
          Plaintiffs,        )
                             )
vs.                          )  No. 4:19-CV-1525-DDN
                             )
CITY OF ST. LOUIS, et        )
al,                          )
                             )
          Defendants.        )


Volume II
Zoom Videoconference Video Deposition of
L. SAMUEL ANDREWS
taken on behalf of the Defendants
September 8, 2020


INDEX

Questions By:                          Page:

MS. MCGOWAN                          283, 373
MR. DOWD                                 372


Reporter:  Sara Alice Masuga, CSR, CCR
IL CSR No. 084-002993  MO CCR No. 1012


MASUGA REPORTING SERVICE
2033 HIAWATHA AVENUE
ST. LOUIS, MO  63143-1215


Page 279

EX Z

Page 280

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF MISSOURI
 2                     EASTERN DIVISION
 3
   GINA TORRES, et al,           )
 4                               )
                 Plaintiffs,     )
 5   vs.                         )   No. 4:19-CV-1525-DDN
 6   CITY OF ST. LOUIS, et       )
   al,                           )
 7                               )
 8              Defendants.      )
 9
10 APPEARANCES:
11
   On Behalf of the Plaintiffs:
12
13          Dowd & Dowd, PC
            By Richard K. Dowd, Esq.
14          211 North Broadway
            Suite 4050
15          St. Louis, MO  63102
            (Via Zoom)
16
17 On Behalf of the Defendants:
18
            City Counselor's Office
19          By Erin K. McGowan, Esq.
            Andrew D. Wheaton, Esq.
20          1200 Market Street
            City Hall Room 314
21          St. Louis, MO  63103
            (Via Zoom)
22
23 Videographer:  Lou Stemmler, CLVS
24
25
```

Page 282

```
 1                    EXHIBIT INDEX
        Exhibit:                   Page:
 2
 3 Defendants' Exhibit B...............................315
   (Affidavit of Samuel Andrews)
 4
 5 Defendants' Exhibit C...............................327
   (L. Samuel Andrews' Report and Opinions)
 6
 7 Defendants' Exhibit I...............................329
   (Physical Evidence List)
 8
 9 Defendants' Exhibit J...............................329
   (Laboratory Report - Firearm Comparison)
10
11 Defendants' Exhibit K-2.............................290
   (Photo)
12
13 Defendants' Exhibit K-2-4...........................288
   (Screenshot taken during Vol. I of the deposition)
14
15 Defendants' Exhibit K-2-5...........................288
   (Screenshot taken during Vol. I of the deposition)
16
17 Defendants' Exhibit K-3.............................306
   (Photo)
18
19 Defendants' Exhibit N...............................284
   (Judgment of Modification)
20
21 Defendants' Exhibit P...............................293
   (32 Color Copies of Photos)
22
23 (Exhibits attached.)
24
25
```

Page 281

```
 1      IT IS STIPULATED AND AGREED by and between
 2 counsel for Plaintiffs and counsel for Defendants that
 3 Volume II of the Zoom videoconference video deposition of
 4 L. SAMUEL ANDREWS may be taken pursuant to the Federal
 5 Rules of Civil Procedure, by and on behalf of the
 6 Defendants on September 8, 2020, originating at the
 7 offices of Masuga Reporting Service, 2033 Hiawatha
 8 Avenue, St. Louis, Missouri, before me,
 9 Sara Alice Masuga, Certified Court Reporter and Certified
10 Shorthand Reporter; that the issuance of notice is waived
11 and that this deposition may be taken with the same force
12 and effect as if all Federal Rules had been complied
13 with.
14      IT IS FURTHER STIPULATED AND AGREED that the
15 signature of the deponent is reserved pending completion.
16
17
18
19
20
21
22
23
24
25
```

Page 283

```
 1           VIDEOGRAPHER:  We are on the record.  This
 2 begins File Number 1 in Volume II of the deposition
 3 of L. Samuel Andrews in the matter of Gina Torres,
 4 et al v. City of St. Louis, et al, which is Case
 5 Number 4:19-CV-1525-DDN pending in the United States
 6 District Court, the Eastern District of Missouri,
 7 the Eastern Division.  Today is September 8 of 2020.
 8 The time is now approximately 4:07 p.m. Central
 9 Daylight Time.  This meeting is being held by
10 videoconference with the attendees appearing from
11 different locations.
12           May I ask counsel present to identify
13 themselves for the record, please.
14           MS. MCGOWAN:  Erin McGowan for the Defendants.
15           MR. DOWD:  Richard Dowd for Plaintiffs.
16
17      L. SAMUEL ANDREWS produced via Zoom
18 videoconference, sworn, and examined as a witness on
19 behalf of the Defendants testified as follows:
20
21           CONTINUED DIRECT EXAMINATION
22 BY MS. MCGOWAN:
23
24      Q.  Good afternoon, Mr. Andrews.  We're back for
25 the second day of your deposition.  We last spoke to you
```

2 (Pages 280 to 283)

Page 284

1 on August 11, 2020. And I wanted to begin by asking,
2 have you provided Mr. Dowd with an updated report or a
3 updated affidavit since we spoke on August 11, 2020?
4     A. No, I don't think so.
5     Q. And before we dive back into things, sir, I
6 wanted to ask, have you ever been diagnosed with any type
7 of mental disorder?
8     A. No. I'm married to a psychologist, though.
9 You could always consult her.
10     Q. Have you ever been found by a medical
11 professional to suffer from narcisistic personality
12 disorder?
13     A. Not one I find credible, that's for sure.
14     Q. Okay. I'm going to pull up an exhibit, bear
15 with me.
16     MS. MCGOWAN: Can everyone see a document
17 titled, "In The Family Court of St. Louis County,
18 State of Missouri"?
19     THE REPORTER: (Nodding.)
20     MS. MCGOWAN: Has that shown up yet?
21     THE REPORTER: (Nodding.)
22     MS. MCGOWAN: Okay.
23         (Questions by Ms. McGowan)
24     Q. Sir, do you --
25     THE WITNESS: I see it.

Page 285

1     Q. -- have you seen this document before today?
2     MR. DOWD: I'm going to --I'm going to --
3     A. I've seen --
4     MR. DOWD: I'm going to --
5     A. I've seen --
6     MR. DOWD: -- object. Wait a minute. I'm
7 going to object and move to strike any questions
8 along this line. The purpose of this, us agreeing
9 to give you two more hours, was for you to finally
10 get around to asking him about his opinions and
11 his -- and his investigation, not for you to go
12 digging around in his background and come up with
13 new documents.
14     MS. MCGOWAN: Oh --
15     MR. DOWD: You could've --
16     MS. MCGOWAN: -- I had this document prepared
17 prior to August 11 and Sara would have had a copy
18 before then, so --
19     MR. DOWD: You could have --
20     MS. MCGOWAN: -- this was --
21     MR. DOWD: -- had --
22     MS. MCGOWAN: -- planned prior.
23     MR. DOWD: You could have had this back before
24 that deposition.
25         (Questions by Ms. McGowan)

Page 286

1     Q. All right, sir --
2     MR. DOWD: My motion to strike.
3     Q. Sir, do you recognize this document?
4     A. I sure do.
5     Q. Okay, what is it?
6     A. It looks like a document from a bogus attempt
7 of my ex-wife to gain custody of our children.
8     Q. All right. And is it true that you are
9 referred to throughout this document as the father?
10     A. Yes, I think so.
11     Q. And true you were examined by
12 Dr. Sharon Lightfoot in connection with these divorce and
13 child custody proceedings; correct?
14     A. I was given a test. I wouldn't say gi- -- I
15 wouldn't say examined by any stretch of the imagination.
16     MR. DOWD: Say that again?
17     THE WITNESS: I said I was given a couple of
18 tests, but I wasn't examined by her.
19     MR. DOWD: Okay.
20     THE WITNESS: I --
21     Q. All right.
22     THE WITNESS: -- took an MMPI-2 and I took a
23 Rorschach test.
24     Q. Okay, sir, would you agree that
25 Dr. Sharon Lightfoot diagnosed you as suffering from

Page 287

1 narcissistic personality disorder?
2     A. No, as a matter of fact, I wouldn't agree with
3 that and any professional in the industry would tell you
4 that you can't diagnose someone from an MMPI or a
5 Rorschach test and she -- she did that, she -- she made
6 some claims in court, but they weren't valid.
7     Remember, I'm married to a psychologist. I
8 actually know the process for diagnosing someone.
9     MR. DOWD: Mr. Andrews, please just limit your
10 answers to the questions so we can get through these
11 two hours quickly and get to --
12     THE WITNESS: Roger that.
13     MR. DOWD: -- get to the pertinent --
14 pertinent information.
15     Q. Okay. All right. Now, turning to I'm going
16 to pull up a screenshot that we previously looked at.
17 Okay.
18     MS. MCGOWAN: Can everyone see a shot of the
19 door and the bedroom wall?
20     THE WITNESS: Yes.
21         (Questions by Ms. McGowan)
22     Q. Okay. All right, sir, on August 11, 2020, do
23 you recall taking a look at this screenshot?
24     A. I do.
25     Q. All right. And directing your attention to

3 (Pages 284 to 287)

Page 288

1  the area circled in red, was it your testimony that this
2  was a exit hole or an entry hole?
3      A.  Well, I think I tried to originally determine
4  by looking at the photograph which was which, but I think
5  I came back to you and said that I think it's impossible
6  from the photographs to definitively say one way or the
7  other.
8      MS. MCGOWAN:  And let's go ahead and mark this
9  Exhibit -- looks like I've got this Exhibit K-2-5.
10      (At this point, Defendants' Exhibit K-2-5 was
11  marked for identification.)
12      MS. MCGOWAN:  And moving on.  And is everyone
13  able to view now a different screenshot depicting
14  the same area?
15      THE WITNESS:  I have the same original one
16  that you posted.
17      MS. MCGOWAN:  Okay.  All right.  Is that
18  appearing a new photo?
19      THE WITNESS:  I see a new photo now.
20      MS. MCGOWAN:  Okay.  Let's go ahead and label
21  this Exhibit K-2-4.
22      (At this point, Defendants' Exhibit K-2-4 was
23  marked for identification.)
24      (Questions by Ms. McGowan)
25      Q.  And, Mr. Andrews, I believe your testimony was

Page 289

1  on August 11, 2020, that this was a exit hole?
2      A.  I don't recall and, once again, I don't think
3  from these -- the poor quality of what you're showing me
4  on the screen that there's any way to be definitive.  I
5  think we'd have to be on site with a laser and be able to
6  look at both sides of the wall.
7      Q.  All right, so, you're not able to say as you
8  sit here today whether the hole depicted in Exhibit K-2-4
9  is an exit or an entry?
10      A.  Not from the photograph here.  I could if I
11  was standing next to the wall and looking on both sides.
12      Q.  And it's true that you don't have any
13  documentation that would tell you whether or not you
14  determined this to be an exit or an entry?
15      A.  I didn't mark any of the holes as exit and
16  entry.
17      Q.  You don't have any documentation that would
18  tell you that; correct?
19      A.  Yeah, I didn't record any exit and entry holes
20  by location or by number.
21      MS. MCGOWAN:  And I have to do a little
22  housekeeping.  I've neglected to give the last
23  document we looked at an exhibit label.  Let's mark
24  the document we looked at first, the one titled
25  Judgment of Modification, as Exhibit N.

Page 290

1      (At this point, Defendants' Exhibit N was
2  marked for identification.)
3      (Questions by Ms. McGowan)
4      Q.  All right.  And, sir, I believe you testified
5  when we last spoke that you believed there to be
6  approximately 15 exit holes on the bedroom door when
7  viewed from the front living room; is that true?
8      A.  I recall a number around 14, 14 exit holes, I
9  think.
10      Q.  And you recall approximately 12 on the living
11  room wall to the left of the bedroom door; is that
12  accurate?
13      A.  I don't know that they're exit holes.  I
14  wouldn't say that.  There's holes there, but I don't
15  think you can determine from the photographs if they're
16  entry or exit without being physically at the location.
17      MS. MCGOWAN:  I'm going to pull up another
18  exhibit here.  Please bear with me.  This may be...
19      THE WITNESS:  We're getting some lightning
20  here, so if something blinks, it's probably the
21  storm where I'm at.
22      (Questions by Ms. McGowan)
23      Q.  All right.  Sir, directing your attention to
24  Exhibit K-2, which we viewed back on August 11, I believe
25  it was your testimony that day that you observed 12 exit

Page 291

1  holes on the wall next to the door.  Is that incorrect?
2      A.  I don't think -- You said on the wall or the
3  door?
4      Q.  Oh, I apologize.  On the wall next to the
5  door.  Let me get over here.
6      A.  You just asked me that question.  That's --
7  That's been asked and answered.
8      Q.  And your answer for the wall was 14?
9      A.  No, for the door.
10      Q.  Okay.  And the wall, how many exit holes --
11      A.  Well, like I say --
12      Q.  -- is it in your opinion coming through the
13  wall?
14      MR. DOWD:  Let me -- Let me object.  It's
15  evidence -- It's facts that are not in evidence in
16  terms of exit holes on that wall.
17      Q.  Sir, do you want me to reask the question?
18      A.  No, you've asked the question now and I've
19  told you from the pictures that you're showing me,
20  it's -- it's not likely to accurately be able to
21  determine if they're entry or exit holes without
22  physically being at the location and being able to see
23  both sides of the wall.
24      Q.  And, so, you're unable to testify today as to
25  which holes are exit and entries?

Page 292

1      A.  I'm unable to testify about this picture.
2      Q.  What information would you need aside --
3      A.  I just --
4      Q.  -- from being physically present at the
5  location to tell us whether or not these are exit --
6      A.  You --
7      Q.  -- or entry holes?
8      A.  You'd have to see the path with a laser and
9  you'd have to determine -- the exit holes are generally
10  larger than the entrance holes, particularly through
11  plaster like this, so you'd want to know the path of the
12  bullet and then be able to measure both sides of the
13  wall.
14      Q.  Did you use a laser in rendering your opinions
15  in this case?
16      A.  I did use -- I did use a laser.
17      Q.  On what date did you use a laser?
18      A.  The first day I was there, the day after the
19  shooting.
20      Q.  And you don't have any notes documenting your
21  inspection on that day; correct?
22      A.  I don't think so.  I -- I -- I did write some
23  things down, but I'm not sure.  It's been two and a half
24  years.  I just -- Maybe longer.  I just don't remember
25  where they are or what I wrote down.  It's been too long.

Page 293

1      Q.  Did you take any photographs on the date of
2  your first visit documenting --
3      A.  Well --
4      Q.  -- your inspection?
5      A.  -- there was a -- there was a photographer
6  there that took many, many, many photographs as I walked
7  around and inspected.
8      Q.  And you don't have custody of those
9  photographs; correct?
10      A.  I -- I don't have custody of them.  I may have
11  some copies of them.
12      Q.  Did you rely on those photographs in rendering
13  any of your opinions in this case?
14      A.  No, I relied on my physical inspection while I
15  was there.
16      MS. MCGOWAN:  Moving to another exhibit.
17  Please bear with me.  It's going to be a bit
18  document-heavy.
19      (Questions by Ms. McGowan)
20      Q.  All right, sir, I'm showing you now a group of
21  photographs.
22      MS. MCGOWAN:  Let's go ahead and label this as
23  exhibits Defendants' Group Exhibit P.  It's a group
24  of 32 photographs.  And I want to start with
25  photograph number 17 out of that batch.

Page 294

1      (At this point, Defendants' Group Exhibit P
2      was marked for identification.)
3      (Questions by Ms. McGowan)
4      Q.  Do you recognize this photo?
5      A.  I do.
6      Q.  Okay.  What is it?
7      A.  It's a picture of my right hand holding a
8  digital caliper measuring a 9 millimeter bullet hole in a
9  wall.
10      Q.  All right.  And next photo, do you recognize
11  that?
12      A.  Yes.
13      Q.  Okay.  What is it?
14      A.  It's a picture of a caliper that I was holding
15  measuring a 9 millimeter bullet hole in the wall.
16      Q.  All right.  Do you know what date these
17  photographs were taken?
18      A.  I don't know, but I think it was the second
19  time that I visited the residence with Mr. Dowd.
20      Q.  And who took these photos?
21      A.  I suspect Mr. Dowd did with his camera.
22      Q.  All right.  I'm going to flip through a few
23  more.  Do you recognize the photos that we're looking at
24  in Exhibit P?
25      A.  I sure do.

Page 295

1      Q.  All right.  Did you take any of these
2  photographs?
3      A.  No, I was the one holding the caliper doing
4  the measuring.
5      Q.  How long were you on the scene that day?
6      A.  Probably four hours.
7      Q.  How many photos did Mr. Dowd take?
8      A.  You'd have to ask him, I'm sorry.
9      Q.  Did you create any kind of inventory of the
10  photographs taken?
11      A.  No.
12      Q.  Why not?
13      A.  Well, I was more interested in the evidence
14  than inventories and lists.
15      Q.  So, you have no documentation that would show
16  what photographs were taken that day?
17      A.  Well, I'm -- I -- I believe that the Dowd law
18  firm e-mailed me or threw some type of electronic file to
19  my e-mail where I could get into a cloud and look at
20  these.  I believe I've had access to the photos through
21  the cloud or through a share -- file sharing software.
22      Q.  How many photos were you provided access to by
23  Dowd & Dowd?
24      A.  In -- Taken by Dowd or -- or in total?
25      Q.  In total, how many were --

5 (Pages 292 to 295)

Page 296

1      A.  Well, I was gi- --
2      Q.  -- you given access to?
3      A.  I was given hundreds of photos taken by
4   St. Louis City PD and given I would say more than 20
5   photos, 15 or 20 taken that I recognize as being taken by
6   the Dowd law firm or Richard in this case.
7      Q.  Did you ensure that all the proper photographs
8   were taken that day to substantiate your conclusions?
9      A.  What I did was I asked Mr. Dowd to photograph
10  evidence that I thought was significant to the type of
11  fire and the direction of fire and the calibers fired on
12  that day in that house.
13     Q.  Have you ever received proper training on
14  generating a chain of custody on evidence?
15     A.  Proper chain of custody?  Specifically, I
16  understand you don't want to contaminate a field, you
17  don't want to contaminate an area, but the chain of
18  custody was so poorly done in this -- in this scene that
19  I'm not sure that -- that anybody was trained in how all
20  this stuff was handled.
21        MS. MCGOWAN:  I want to move to strike as
22     nonresponsive.
23        (Questions by Ms. McGowan)
24     Q.  Sir, have you, yourself, taken any training on
25  generating a chain of custody?

Page 297

1      A.  Yeah, I believe in college I had a little bit
2   of training on forensics.
3      Q.  In what context?
4      A.  It was -- It was a science -- It was like in
5   the science program, part of the curriculum.  It was just
6   a week or so, but I definitely understand the principles
7   of chain of custody from my quality engineering
8   experience at Mark Andy and I believe I had some training
9   in that respect as well.
10     Q.  How many holes did you count at the scene,
11  bul- -- and by "holes," I mean bullet holes -- regardless
12  of them being exit or entries?
13     A.  Well, I could say just in general.  I don't
14  have a specific number, but I could say there was --
15  there was over I want to say 70 or 80 holes.
16        MR. DOWD:  I'll object.  It calls for
17     speculation.
18     A.  Yeah, I just don't know for sure.  I can't --
19     Q.  Sir --
20     A.  -- give you a good number.
21     Q.  Sir, as you sit here today, you're not able to
22  tell me how many holes there were that appeared to be
23  ballistics damage at the scene?
24     A.  Not exactly, but there were more than 50.
25     Q.  And just to be sure, you don't have any

Page 298

1   documentation where you recorded the number of bullet
2   holes at the scene?
3      A.  No, I do not.
4      Q.  By 2019, you had formally been retained by the
5   Dowd & Dowd law firm; correct?
6      A.  I'm not sure when the date was.  I would
7   imagine it was early 2019.
8      Q.  And I'm correct in that you did not take
9   measurements of every hole you deemed to be an entry
10  hole; is that right?
11     A.  I think initially, on my first visit, I had a
12  set of calipers, a light, a laser.  I think I did measure
13  every single hole I could find looking for -- I was
14  looking for a .311 hole to exonerate the SWAT team.
15     Q.  And you don't have any documentation that you
16  can refer to that will tell you the measurement of every
17  entry hole you identified?
18     A.  No, I just kept finding .223 and -- and -- and
19  9 millimeter holes and kept moving onto the next hole
20  looking for a .311 hole.
21     Q.  So, you're not in any position to tell us each
22  measurement for each hole?
23     A.  Not unless you want to go back to the scene
24  and have me remeasure them.
25     Q.  And true that you did not make trajectory

Page 299

1   determinations for each hole, right?
2      A.  No, that's not true.  My original visit I did
3   check the trajectory of every hole I could find.
4      Q.  Every hole?
5      A.  Every single hole, including the ones in the
6   floor in the living room.
7      Q.  And did you document those findings?
8      A.  You asking in writing, did I write down the
9   findings?
10     Q.  Yes.
11     A.  No, no.
12     Q.  Okay.  Did you document them in any other way,
13  via photograph, video --
14     A.  Yeah, I had --
15     Q.  -- recording?
16     A.  -- I had -- I had a -- a person following me
17  around named Sid, who was a photographer, photographing
18  every single hole that I looked at, every piece of brass
19  that I picked up.
20     Q.  Did you --
21     A.  She followed me most of the day.  He or she.
22     Q.  And you do not have those photographs in your
23  possession, right?
24        MR. DOWD:  Object --
25     A.  I might have --

MASUGA REPORTING SERVICE
314/680-2424

Page 300

1          MR. DOWD:  Object to --
2     A.  I might have them.
3          MR. DOWD:  -- vague.  Objection.  Vague as to
4     "possession."
5     Q.  Do you have those photographs within your --
6     A.  I may --
7     Q.  -- control?
8     A.  I may have copies of the photographs on a --
9     on a -- on a drive somewhere.  I haven't looked.
10    Q.  Did you review those photographs in offering
11    your opinions in this case?
12    A.  No, you asked me that question.  My opinions
13    are based on what I physically saw in three inspections
14    of the home in person.
15    Q.  And you're relying on your memory in giving
16    your testimony here today; true?
17    A.  I think most of us do.
18    Q.  Okay.  And you'd agree that memories can be
19    imperfect; correct?
20    A.  Of course.
21    Q.  Now, turning back to Exhibit P --
22         MS. MCGOWAN:  Sara, is it possible to give
23    Mr. Andrews control of the document?
24         (At this point, an off-the-record discussion
25         was had.)

Page 301

1          (Questions by Ms. McGowan)
2     Q.  Sir, I'm going to go ahead and flip through
3     Pages 17 and 32, let you take a look at these.
4          Okay.  Sir, would you agree that Pages 17
5     through 32 of Exhibit P document your measurements of
6     only four distinct bullet holes?
7     A.  It's hard to tell.  I would -- I would say
8     there's definitely a 9 millimeter hole being measured and
9     there's several .22 caliber holes being measured.
10    Q.  All right.  Can you tell me the trajectory of
11    the bullet hole depicted in Exhibit P, Page 17?
12    A.  Not from a photograph.
13    Q.  All right.  Moving on to Page 20, Exhibit P,
14    are you able to tell us the trajectory of the bullet hole
15    depicted in Exhibit P, Page 20?
16    A.  You know, this is one that I remember quite
17    clearly because it came through the bedroom door from
18    inside the bed from the back of the house, through the
19    bedroom, through the door, and then hit this wall.  I
20    know exactly where this -- this photograph is and I
21    remember measuring this mark because it was so clearly
22    cut through the wallpaper and --
23    Q.  Where is --
24    A.  Someone fired a .22 caliber rifle from the
25    back of the house or from the bedroom out towards the

Page 302

1     front through the bedroom door and this mark clearly
2     shows that and it matches up with a hole in the door.
3     Q.  So, it's your testimony that the bullet hole
4     depicted in Page 20 of Exhibit P traveled through the
5     bedroom door?
6     A.  Yes, ma'am.
7     Q.  With -- All right, turning to Page 23, this is
8     a different bullet hole; correct, sir?
9     A.  Yes, ma'am.
10    Q.  All right.  Do you know the trajectory of this
11    bullet hole?
12    A.  This is another .22 that came through the door
13    and hit the wall towards the front of the house.
14    Q.  Okay.  And where is this located?
15    A.  It's on the wall.  As you walk in the front
16    door of the home, it's on the wall to the right.  It's on
17    the -- It's -- It's the exterior wall of the home, but
18    the inside of that wall to the right of the front door
19    before you get to the bedroom door of the deceased.
20    Q.  Okay, turning to Page 27 of Exhibit P, this is
21    a fourth bullet hole; correct?
22    A.  It's different than the previous two .22
23    caliber holes, yes.
24    Q.  And can you tell me the trajectory of the
25    bullet in this image?

Page 303

1     A.  Yeah, this -- this bullet was similar to the
2     previous two as it came from the back of the house
3     through the bedroom door and then hit this wall at an
4     angle between the -- the front bedroom door and the front
5     door of the home.
6     Q.  Okay.  So, it's your testimony that this
7     bullet traveled through the front door?
8     A.  No, it's my testimony --
9     Q.  Or the -- Or the -- the front --
10    A.  -- that --
11    Q.  -- the -- the bedroom door, excuse me, the
12    bedroom door?
13    A.  Yeah, the bedroom door closest to the front of
14    the home.
15    Q.  All right, sir, did you reach a conclusion --
16    it may seem obvious at this point, but did you reach a
17    conclusion as to whether there was a gun fired from
18    inside the bedroom?
19    A.  I found no evidence of an AK shooting bullets
20    of a .311 diameter being fired from the bedroom.  I found
21    evidence of 14 rounds of .223 being fired from the back
22    of the house traveling through airspace in the bedroom,
23    penetrating the bedroom door closest to the front door
24    and then fragmenting on the wall where you saw those
25    previous photos.

7 (Pages 300 to 303)

Page 304

```
1        Q.   And aside from the ballistics evidence we've
2    already discussed in this case, what did you base that
3    on?
4        A.   Well, I found brass in the back of the house,
5    .223 brass that wasn't documented by St. Louis' evidence
6    technicians, and I found .223 holes in the bedroom door,
7    entry holes on the inside and exit holes on the side
8    closest to the front door and with a laser traced them to
9    the wallpaper and then I measured a .223 bullet impact on
10   the wallpaper, so there's several pieces of evidence that
11   all point the same direction, literally.
12       Q.   Bear with me for one moment.
13            Sir, did you perform roadmapping of this death
14   investigation?
15       A.   Can you repeat the question, please?  You --
16   Something rattled and I didn't hear the question.
17       Q.   Did you perform what's known as roadmapping of
18   this death investigation?
19       A.   What's the word before investigation?
20       Q.   Roadmapping.
21       A.   No, I heard roadmapping.  Between roadmapping
22   and the word right before you said investigation.
23       Q.   Death investigation.
24       A.   Death investigation?  No, I didn't perform any
25   roadmapping.
```

Page 305

```
1        Q.   Have you ever performed it before?
2        A.   Sure.
3        Q.   What is it?
4        A.   Roadmapping is where you document, trace the
5    path of a bullet as it proceeds through the air through
6    media like doors and walls and people, things like that.
7            You're basically mapping trajectories on
8    documentation and a lot of people do it with 3D software,
9    some people do it in 2D, but it's more effective in 3D.
10       Q.   Sir, what was your methodology for determining
11   the trajectory of the holes?
12       A.   Using a laser.
13       Q.   And can you take me through step by step how
14   you did that?
15       A.   Well, I like to get as far away from the hole
16   as I can and I want -- as the physics of the surrounding
17   area allow and I like to shine a laser through the hole.
18   And when I get the largest, roundest imprint on the
19   surface on the opposite side of the hole, I have achieved
20   my ma- -- my maximum precision in alignment of the laser.
21   And then we, in this case, we were going through doors
22   and going through walls looking at the laser finishing on
23   a window frame.  We were going through the door looking
24   at it finishing on the side walls.  The laser would
25   terminate at the bullet impact on the wall.
```

Page 306

```
1        Q.   Anything else?
2        A.   No, that does a pretty good job of it.
3        Q.   And it's your testimony that you performed
4    that process on your first trip out to the site?
5        A.   Yes.
6        Q.   And did you perform that process for each and
7    every bullet hole?
8        A.   Every one I could find.
9        Q.   And, of course, the door was not present when
10   you were there on June 8; correct?
11       A.   No, the door -- the door wasn't there.  They
12   had taken the door.  They had ta- -- Actually, they had
13   taken the -- the front door.  The back door to the
14   bedroom was still there.
15       Q.   And did you make use of any ballistic
16   trajectory equations in making your trajectory
17   determinations?
18       A.   At -- At such short distances, there's no
19   reason for trajectory equations.  The bullet drop is
20   almost unmeasurable at these close distances.
21       Q.   Bear with me again while I pull up another
22   image.
23            Okay.  Now, Mr. Andrews, I'm showing you
24   what's been previously marked as Exhibit K-3.  And you
25   recognize this photo; correct?
```

Page 307

```
1        A.   Yes, ma'am.
2        Q.   Okay.  As you sit here today, are you able to
3    provide us your trajectory determination for any of the
4    bullet holes visible in this exhibit?
5        A.   I don't understand what you mean by provide
6    you trajectory.  What did you say exactly?
7        Q.   Your determinations of the trajectory of the
8    bullets.
9        A.   From this photograph, there's no way to
10   establish an exact trajectory, but if you rehung the door
11   and closed the door, we could surely do that.
12       Q.   Okay.  Have -- Have you done that?
13       A.   No, I haven't rehung the door.  What I did do
14   is I shined a laser through some of the holes on the
15   wall, actually all of the holes on the wall, and some of
16   the larger 9 mil. holes that you can see the window to
17   the right of the doorknob, so the far edge of the frame
18   some of the 9 mil. holes trace back to an impact on the
19   frame just a few inches above the lower far corner of the
20   window frame.  I do recall those from memory.
21       Q.   Did you make any attempt to determine whether
22   the shooter was -- where the shooter was located when
23   the bullets were fired from the bedroom?
24       A.   I never saw clear evidence of bullets being
25   fired from the bedroom.
```

8 (Pages 304 to 307)

Page 308

1    Q.  What do you mean by that?  Would -- And I can
2  rephrase.  Strike that.
3         What would you have expected to find if
4  bullets were fired from the bedroom?
5    A.  I would have expected to find powder residue
6  if the bullets were close to the wall.  I would have
7  expected to find brass.  I found brass everywhere that
8  St. Louis City didn't find and bullets and holes that
9  weren't marked and I -- I would have suspected they would
10  have missed something because the bedroom was quite
11  messy.
12    Q.  Sir --
13    A.  And --
14    Q.  -- did you find any shell casings within the
15  living room?
16    A.  I found -- I found four outside and one back
17  by the kitchen.
18    Q.  Sir, did you find any shell casings in the
19  living room?
20    A.  Not that I recall.
21    Q.  Sir, did you find any shell casings in the
22  bedroom?
23    A.  Not that I recall.
24    Q.  And I'm not sure if you answered my question.
25  Did you make any attempt to determine whether the

Page 309

1  shooter -- where the shooter was located in the bedroom?
2    A.  Well, I didn't find any evidence of someone
3  shooting from the bedroom.  I looked for it.  I just
4  couldn't find any.
5    Q.  And correct me if I'm wrong, but you testified
6  earlier that shots were fired through the door into the
7  wall to the immediate right when you entered the front
8  door; did I understand that correctly?
9    A.  Yes, ma'am.
10    Q.  Okay.  How is it that shots were fired through
11  the bedroom door, but there was no -- you have no
12  evidence or found no evidence of a shooter firing from
13  within the bedroom?
14    A.  Because the bullet impacts on the wall trace
15  back to the center of the door in the rear of the bedroom
16  and, so, it's entirely possible that that door was open
17  and the shooter was significantly out of the bedroom when
18  they were pulling the trigger.
19    Q.  So, it is your testimony that the shooter was
20  on the other side of the bedroom towards the back of the
21  house?
22    A.  If you -- You see the picture you have up
23  right now?
24    Q.  Yes.
25    A.  You see the door?  So --

Page 310

1    Q.  Of course, yes.
2    A.  -- if you were to walk through that door
3  straight from where this picture was taken, on a left
4  diagonal on the rear wall of the bedroom is another door
5  that -- that opens to the hallway in the home and the
6  bullets were on a line to be consistent with that door as
7  well.  All of these bullet impacts on the right side on
8  the wall between the front door and the bedroom door are
9  consistent with a line that leads to the back door of the
10  bedroom.
11    Q.  Did you find any ballistics damage on the back
12  door of the bedroom?
13    A.  No, ma'am.
14    Q.  Is it your opinion that there was a shooter
15  located in or near the back bedroom door that caused the
16  damage visible on the --
17    A.  It's my opinion that someone fired multiple
18  .223 rounds from the diagonal line through the back door
19  of the bedroom from the back of the house through the --
20  through the front door of the bedroom that hit the wall
21  on the right that we can see in this picture.  It's clear
22  as day.
23    Q.  Did you include that opinion in your report?
24    A.  I don't -- I don't believe so.
25    Q.  Did you include that opinion in your

Page 311

1  Affidavit?
2    A.  I don't believe so.
3        MR. DOWD:  Do you have your report there?
4        THE WITNESS:  I don't have it here.  I'd have
5  to go through it again.  It's been so long since
6  I've looked at any of that that I honestly don't
7  recall what's in the report exactly.
8    Q.  Sir, if I represented to you that that opinion
9  was not included in your report, would you disagree with
10  me?
11    A.  No, because I tried to stick to the things
12  that were significant like the fact that they're .223 in
13  diameter.  To me that's more -- much more significant
14  than the placement of the shooter's feet when he fired
15  the shots.  I tried to keep the report concise and
16  readable, include what was significant and I thought --
17    Q.  Well --
18    A.  -- the fact that they're .223 is highly
19  significant.
20    Q.  Let me ask you this:  Were you able to
21  determine a viable shooting solution in terms of the
22  number of rounds that were fired, the number of spent
23  casings, the number of projectiles recovered at the
24  scene?
25    A.  Well, you have to remember I came after the

9  (Pages 308 to 311)

1  scene was cleaned up, so what I had to look at were
2  permanent fixtures, walls, windows, window frames, doors,
3  sofas.  You know, I had fixtures to look at.  I didn't
4  have placards and brass laying everywhere.  I didn't get
5  to look at the maga-- -- the 9 mil. magazine under the
6  sofa or --
7      Q.  Sir, I don't think you're answering my
8  question.  Were you able to determine a viable shooting
9  solution in terms of the number of rounds fired, spent
10  shell casings, number of projectiles?  I'm just looking
11  for a "yes" or "no" here.
12      A.  In general, yes.  Specifically to the round
13  count with a perfect number, no.  There were a lot of
14  rounds fired.
15      Q.  Did you include that information in your
16  report?
17          MR. DOWD:  Objection.  His report is -- is the
18  best evidence of what's in it.
19      Q.  What was the viable shooting solution you
20  determined?
21      A.  Are you asking me to provide you a solution of
22  what happened with all the rounds being fired?  Would
23  you --
24      Q.  Yes.
25      A.  -- like to hear my take on that?

1      Q.  Yes.
2      A.  I think there's two possible scenarios.  One
3  is that a police officer fired and triggered sympathetic
4  firing from a lot of other officers.  Someone obviously
5  fired 14 or 15 rounds with a .223 based on the video
6  evidence and I believe that those are the doors that came
7  through the wall -- through the bedroom door and hit the
8  wall that's in this picture and they were fired from the
9  back of the house.  I found a .223 shell back there on
10  the floor.  And no evidence was shown by St. Louis City
11  PD of anything being fired from the back of the house or
12  anything being fired from outside, yet I found brass that
13  matches the brass on the inside of the home on the
14  outside of the home and, so, someone shot through the
15  window from the outside of the home through the bedroom
16  window that you can see here, someone shot from the back
17  of the house with a 5.56 weapon system, the evidence is
18  crystal clear to that effect, and either all these shots
19  were fired because of sympathetic reactions or a much
20  worse scenario where the -- where the -- the scenario was
21  staged by officers.  And with the box being taken out the
22  back and thrown away and with blood being wiped up, I'm
23  leaning towards the fact that they staged this scene.
24      Q.  Okay.  So, it's your opinion in this matter
25  that the officers staged the scene?

1      A.  I believe they manipulated evidence
2  significantly.
3      Q.  Okay.  And, again, what are you basing that
4  on?
5      A.  Rounds coming from the back of the house that
6  are .223 in caliber.  Rounds coming from outside the
7  house into the house that are .223, okay?  The fact that
8  they claimed so many rounds were fired from this AK and
9  yet they only had ten casings all dif- -- of different
10  headstamps and every other weapon found on the scene had
11  boxed ammo that was all made by the same manufacturer,
12  but yet just for the AK they had rounds -- he had rounds
13  of different headstamps and that the round count that
14  they claim he fired doesn't match the ballistic evidence
15  that they presented in a number of shell casings and
16  there's no .311 holes anywhere and there's no holes on
17  the wall behind where the officers said the wall that was
18  behind them as .311 bullets were supposedly whizzing past
19  them.  I mean, these are all huge problems.  And, so, as
20  I look at the -- the -- the totality of all this and the
21  fact that there was no blood on the gun at all and
22  looking at the box that the gun was in, I believe the
23  evidence was dramatically manipulated.
24      Q.  Now, sir, we'll come back to this.  Right now
25  I want to ask you some questions about your opinions that

1  are based on the cell phone video in this case.  Let me
2  go ahead and pull up your Affidavit.
3          Okay.  Sir, are you able to see Exhibit B on
4  your screen?
5      A.  I can see my Affidavit.
6      Q.  All right.  So, in your Affidavit on Page 11,
7  I believe, you state that you cannot hear the police --
8  Well, let me back up.  Did you review a cell phone video
9  recording taken by a passerby in rendering your opinions
10  in this case?
11      A.  Yes, ma'am.
12      Q.  Did you refer to that cell phone video in your
13  Affidavit as the Broccard video?
14      A.  I do.
15      Q.  Okay.  You state in Paragraph 11, "In
16  listening to the Broccard video you would clearly
17  hear" -- Well, let me back up.  In Paragraph 11, you
18  state, "The officers in their reports contradict who
19  announced police search warrant."
20      A.  Yes, I did.
21      Q.  "When an officer 'yells police search warrant'
22  it is established that they are five time's normal
23  volume.  In listening to the Broccard video you would
24  clearly hear that if they announced it while they were
25  outside the house as they claim because you can clearly

Page 316

1  hear it at the (sic) 3:50-3:58 time frame of the video
2  after all of the shooting has stopped."  So, you seem to
3  say in your Affidavit that you cannot hear the police
4  announce themselves as police prior to breaching the
5  door.  Is that your opinion?
6      A.  I'm saying they did not announce.  It's not on
7  the video --
8      Q.  What is your --
9      A.  -- until after the shooting.
10     Q.  What's your basis for that opinion, is that
11  based solely on your review of the video?
12     A.  Well, no, it's based on the fact that the
13  officers contradicted each other on who announced and the
14  fact that you could hear gates rattle and other small,
15  quiet sounds, but you couldn't hear a whole team yell,
16  "Police, search warrant," it's just not credible.
17     Q.  Okay.
18     A.  And --
19     Q.  You're ba- -- You're basing that upon your
20  review of video when you say that you cannot -- you
21  cannot hear the officers announce themselves?
22         MR. DOWD:  Objection.  Vague.  Time frame.
23     Q.  When you state you cannot hear officers
24  announce themselves before the deployment of the flash
25  bang, you are basing that upon your review of the video,

Page 317

1  right?
2      A.  I said I based it on the review of the video
3  and the fact that they contradicted themselves on who
4  announced and when.
5      Q.  Okay.  But certainly you aren't drawing
6  opinions from the officers' deposition testimony about
7  what you can and can't hear, that's based upon your
8  review of the cell phone video, right?
9      A.  Well, I'm basing it on what was and was not
10  said --
11     Q.  Right.
12     A.  -- not just what can be heard on the video.
13     Q.  But, sir, you understand that there's no --
14  And I guess I'm confused.  I mean, certainly your -- your
15  testimony is that --
16     A.  Well, don't be confused.  I raised two sons.
17  When -- When they tell me different stories, I know at
18  least one of them is lying.
19     Q.  When you watch the cell phone video, it's your
20  testimony that you cannot hear the officers announce
21  themselves before the flash bang is deployed, right?
22         MR. DOWD:  I object again.  Are you talking
23  about before the shooting or after the shooting?
24         MS. MCGOWAN:  I said before the flash bang.  I
25  limited it in time.

Page 318

1      A.  Yes, yeah, they -- they did not announce
2  before the -- before the flash bang.
3         (Questions by Ms. McGowan)
4      Q.  Okay.  And the video itself is your only basis
5  for that opinion; correct?
6      A.  No, it's also their testimony in deposition.
7      Q.  Okay.  Well, some of the -- the officers
8  testified pretty uniformly that they did announce
9  themselves prior to the flash bang, so I'm just a --
10     A.  No, they di- --
11     Q.  -- little confused --
12     A.  -- they did not testify --
13     Q.  -- who --
14     A.  -- uniformly.  I don't agree with that
15  statement at all.
16     Q.  Are you relying on any other evidence aside
17  from the deposition testimony and the cell phone video
18  for your opinion that you cannot hear the officers
19  announcing themselves prior to deploying the flash bang?
20     A.  No, those are the two main things that I rely
21  upon to draw that conclusion.
22     Q.  What equipment did you use to watch the cell
23  phone video?
24     A.  I have a very expensive Bose sound system --
25     Q.  And --

Page 319

1      A.  -- that -- that allows me to listen to things
2  in real high fidelity and I can turn the volume up to the
3  point where it's uncomfortable for the human ear but
4  crystal clear.  I'm --
5      Q.  And --
6      A.  -- ac- -- Go ahead.
7      Q.  -- what is the -- the make and model of your
8  Bose sound system?
9      A.  Well, Bose is the make, okay?  And I also
10  have -- I also have some JBL monitors.  I can walk in the
11  other room and give you the make and model if you like.
12  They're called -- They're called monitors.  They're for
13  sound studios to analyze sound and they're extremely high
14  quality devices.  They -- They are made specifically to
15  accurately replicate sound.  I can get you the mo- --
16  name and model number if you give me two minutes to drop
17  my headphones.
18     Q.  No, I've got a -- I've got a few more
19  questions.  Let's do these first.  So, is that a -- when
20  you say "monitor," what kind of equipment is that?
21     A.  It's -- It's called a studio monitor.
22     Q.  Okay.
23     A.  It's what professionals use to analyze sound
24  when they're mixing music or they're analyzing evidence.
25  They're made specifically to accurately reproduce the

11  (Pages 316 to 319)

Page 320

1  frequencies that are on a recording.
2      Q.  Go ahead and show them to us.
3      A.  You want me to grab one?
4      Q.  Yes, please.
5      A.  Hold on just a second.  I'll grab one.
6          (At this point, there was a brief pause in the
7          proceedings.)
8      A.  Okay, let me see if I can get this.  So, we
9  use a pair of these when we analyze sound signatures.
10  There's the front.
11     Q.  I can't -- Can you read that to me?
12     A.  It says JBL.  I'll show you the back that
13  gives you the model number.  It's an LSR308.  Can you see
14  that now?
15         MR. DOWD:  Yep.
16     Q.  I do see that.  So, what you're holding is a
17  speaker; correct?
18     A.  Not -- Not a -- Not a stereo speaker.  It's --
19  It's a sound monitor for recording.  It's what you use in
20  a studio to analyze sound.
21     Q.  And, so --
22     A.  It's --
23     Q.  -- how -- how did you play the cell phone
24  video when you analyzed it, how was that played?
25     A.  Well, it's played through some sound software.

Page 321

1      Q.  On what device?
2      A.  On my computer.  On a --
3      Q.  So --
4      A.  On a Windows computer.
5      Q.  So, you were playing --
6          MR. DOWD:  Object to questions as being vague.
7      Q.  So, you were playing the cell phone video
8  on -- on your computer.  What -- What kind of computer?
9          MR. DOWD:  Objection.  Relevance.
10     A.  It's a Dell Inspiron.
11     Q.  All right.  And then the sound is emitted from
12  what, is it emitted from your computer speakers?
13     A.  From the monitor that I just showed you.
14     Q.  And the monitor is hooked up to then what
15  equipment?
16     A.  The monitor is hooked up to the computer.
17     Q.  Will you hold that up one more time?
18     A.  Yeah.
19     Q.  And will you flip it around?
20     A.  (Witness complying with counsel's request.)
21     Q.  Okay.  So, describe how this process works.
22  You play the cell phone video on your Dell computer and
23  the sound is emitted through that; correct?
24     A.  Yes.
25     Q.  Do you use any other equipment?  Did you --

Page 322

1      A.  Yes.
2      Q.  -- use any other equipment to analyze --
3      A.  Do I need --
4      Q.  -- the cell phone video?
5      A.  Do I need -- Do I need to take my whole sound
6  room apart?
7          MR. DOWD:  No.
8      A.  You know what I might --
9          MR. DOWD:  No, just let -- let her ask the
10  questions.
11         THE WITNESS:  I'm sorry.
12     Q.  So, we've covered all of the equipment that
13  you used to analyze the cell phone video recording?
14     A.  Yeah, I listened to them through JBL monitors.
15  I also have headphones that I use.
16     Q.  What kind of headphones do you use?
17     A.  I've been using these lately.  I have
18  Logitechs; I have Bose.  Would you like to see my -- my
19  good set of headphones?
20     Q.  What headphones are you currently using?
21     A.  I'm using the Logitechs.  This is what I do
22  radio shows with.
23     Q.  Okay, and what model are they?
24     A.  I don't know.
25     Q.  Okay.  And going back to the JBL monitor, what

Page 323

1  is the difference between a monitor and a speaker?
2      A.  Well, they're both -- they're both speakers.
3  Technically, they both use magnets and cones and
4  electrical signals to reproduce sound.  The difference
5  between a monitor and a speaker is a high quality stereo
6  speaker is made to enhance the sound of the music, so
7  it's a three-way speaker that splits the signal into
8  three bands and runs the signals to various cones made to
9  enhance and give the listener the ability to tune the
10  sound, raise the treble, lower the midrange, increase the
11  bass, whatever they want.  A studio monitor is made for
12  one purpose and one purpose only; to reproduce the
13  recording exactly the way it is with all its flaws, with
14  all its good and bad points and to not shade the color or
15  sound in any way.  And, so, they're designed differently
16  and they're used for different purposes.  One's used for
17  listening pleasure, the other is used for analyzing
18  sound.
19     Q.  Do you make any use of audio software in your
20  review of the cell phone video?
21     A.  I do.
22     Q.  And what is that?
23     A.  You know, I don't -- I'll have to -- I'd have
24  to get my computer and software out and look at it.  I've
25  been using it for so long, I don't even remember the

1   name.  But I have the ability to look and analyze
2   frequencies and look at the timing, the length of sound
3   signals, that type of thing.  It even lets, if I want to,
4   I can tune the pitch.  I can change the pitch.  Like
5   let's say you were singing and you sang 5 cents flat.  I
6   can click on the sound signal, move the curve of the
7   sound wave and make it in perfect tune.
8       Q.   How long would it take you to look at what
9   software you are using?
10      A.   Probably about five, six minutes.
11      Q.   Okay, why don't we do that when we go on --
12      A.   On a break?
13      Q.   -- break.
14      A.   Okay.
15      Q.   In your review of the cell phone video, did
16  you hear the officers say anything before the flash bang
17  is deployed?
18      A.   You could hear -- You could hear voices and
19  you could hear -- I think you heard some footsteps, I
20  think you heard a chain -- a chain link fence rattle.
21  You could hear some things, but, you know, everything was
22  kind of quiet as they walked up to the house.  They
23  weren't trying to make a lot of noise.  They typically
24  don't when they're about to make entry.  You want to be
25  discreet.

1       Q.   Would you agree that there is a car radio
2   playing at the beginning of the cell phone video?
3       A.   Certainly -- It certainly could be.
4       Q.   Okay.  As you sit here today, you wouldn't
5   agree or disagree that --
6       A.   I don't -- I don't recall.  I mean, we --
7   we've got the file.  We can just listen to it if you
8   like.
9       Q.   So, where exactly where -- where exactly was
10  the cell phone video recorded?
11      A.   It looked to me like -- You mean the person
12  doing the recording, where were they standing; is that
13  your question?
14      Q.   Yes.
15      A.   It looked to me like they were right across
16  the street in a car or next to a car.  I recall -- I
17  think I recall seeing a window frame from a vehicle, so
18  they were probably -- they may have been in their vehicle
19  with the window open.
20      Q.   Would the location of the person recording the
21  video matter in your analysis?
22      A.   It would if they were too far away to pick up
23  the sound.  But if you can hear -- if you can hear chain
24  link fences rattle, I mean quiet sounds from fences being
25  moved and footsteps, it's -- it's picking up a lot.

1       Q.   How many feet away from the Torres/Hammett
2   residence was the person who was recording the cell phone
3   recording?
4       A.   I would guess 30 feet across the street minus
5   the width of the car plus the depth of the front yard, so
6   probably 80.  Seventy-five to a hundred feet, somewhere
7   in that range.
8       Q.   Was there any movement of the cell phone
9   during the shooting event?
10      A.   Of course.  Nobody can hold a cell phone
11  perfectly still.
12      Q.   Can you recall, based on your observation,
13  what were the officers' voices saying before the flash
14  bang went off?
15      A.   I'd have to review the video.
16      Q.   So, you agree that the officers can be heard
17  saying something at --
18      A.   I'm not -- I'm not going to agree to anything
19  unless we review the video here.  I mean, we've got the
20  video; let's play it.
21      Q.   Sir, when is the last time you reviewed the
22  video?
23      A.   When I was prepping for the deposition.  It
24  was supposed to happen months ago.
25      Q.   Sir, have you had any hearing test performed

1   in the last three years?
2       A.   No, but I'm a musician and I hear quite well.
3       Q.   What do you play?
4       A.   I play the piano and I play the guitar.
5       Q.   Do you suffer from any hearing loss?
6       A.   I don't.
7       Q.   How do you know that?
8       A.   Well, I operate my instruments through a very
9   broad range of frequencies and I hear every pitch.  There
10  isn't a note on the piano I can't hear and it covers a
11  range.  I also have a -- I also have bass guitars that
12  play quite low and I hear them quite well, so I really
13  don't think I have any hearing loss.
14      Q.   All right.  I now want to turn back to your
15  report.
16      A.   Can you give me a moment to set this monitor
17  down?
18      Q.   Yes.
19           MR. DOWD:  You're fine.
20           (At this point, there was a brief pause in the
21  proceedings.)
22      Q.   All right, sir, on Page 11 of your report,
23  which we previously marked Exhibit C, you state, "The
24  Sporter Semi-Automatic 7.62 caliber rifle that was
25  legally owned by Mr. Hammett was never tested to

MASUGA REPORTING SERVICE
314/680-2424

1  determine if it had been recently fired that day." Is it
2  your opinion that the Inter Ordnance rifle was never
3  tested?
4      A.  No, I can't -- I can't testify to a negative.
5  I mean, the -- the rifle was taken in and out of evidence
6  like six or seven times, so obviously somebody did some
7  things with it.
8      Q.  What tests would you expect to have been
9  performed to that rifle to determine if it had been fired
10  that day?
11      A.  Well, I would have liked -- I would have liked
12  to have seen a gunpowder residue test on the stock.  I
13  would have liked to have seen rifling marks analyzed on
14  the bullets that were supposedly recovered.  Most of them
15  were destroyed to the point where they couldn't been
16  analyzed.  Now, that's a whole nother issue, but.  I
17  would have at least expected to see the gun when I
18  inspected it to be in a fired condition, which it wasn't.
19      Q.  What do you -- I'm sorry to interrupt you.
20  What do you mean by that?
21      A.  The gun was cleaned and lubricated by a
22  professional.  It was the slickest AK I'd ever had in my
23  hands.
24      Q.  Are you aware whether any test shots were
25  fired from the Inter Ordnance Sporter rifle?

1      A.  I would assume in a situation like this they
2  would fire test shots, but I can't say one way or the
3  other if they did or not.  I didn't see any evidence of
4  the test shots.
5      Q.  And bear with me, I'm just pulling up other
6  documents.
7          Sir, have you seen this document before today?
8      A.  I've seen something similar to that.  It may
9  have been this document.
10      MS. MCGOWAN:  Let's go ahead and mark this as
11  Defendants' Exhibit I.
12      (At this point, Defendants' Exhibit I was
13          marked for identification.)
14      Q.  Did you rely upon this document in forming any
15  of your opinions in this case?
16      A.  I don't think so.
17      Q.  And, sir, can I direct your attention to this
18  Laboratory Report.
19      MS. MCGOWAN:  Let's mark this as Defendants'
20  Exhibit J.
21      (At this point, Defendants' Exhibit J was
22          marked for identification.)
23          (Questions by Ms. McGowan)
24      Q.  Sir, have you reviewed Exhibit J prior to
25  today?

1      A.  I think so.
2      Q.  What is it?
3      A.  Looks like a lab report from test -- they're
4  claiming they fired some test shots and it also lists
5  some of the evidence that was supposedly collected at the
6  scene.
7      Q.  Okay.
8      MR. DOWD:  Can you let him take a look at it?
9  There you go.
10      MS. MCGOWAN:  Sure.
11      MR. DOWD:  Okay.
12      THE WITNESS:  I read pretty fast.  I got it.
13      MR. DOWD:  Okay.
14      (Questions by Ms. McGowan)
15      Q.  Okay.  Are you familiar with the findings in
16  this report?
17      A.  You mean the conclusions?
18      Q.  Yes.
19      A.  You could show me the conclusions.  I don't
20  recall.  This looked like a list of activity.  I didn't
21  see any conclusions.  Do you see conclusions on this
22  report?
23      Q.  I'm not under oath today, sir.
24      A.  Well, where would the conclusions be?  I don't
25  see any conclusions on this report.

1      Q.  Sir, this document is 180 pages.  Do you
2  need -- Have you reviewed this report prior to today?
3      A.  I think I have.  I think I read through it
4  months ago.
5      Q.  Okay.  What is it?
6      MR. DOWD:  Objection.  Asked and answered.
7      A.  It looks like firing pin analysis.  It looks
8  like some ballistic projectile analysis.  It looks like
9  various things trying to match a weapon to some of the
10  things that were entered into evidence.
11      Q.  Do you believe that this report has any
12  bearing on your opinion that the Inter Ordnance Sporter
13  model was never fired that day?
14      MR. DOWD:  Objection.  Overly broad and vague.
15      A.  I don't understand that question.  Could you
16  rephrase, please?
17      Q.  Did you review this report prior to rendering
18  your opinions in this matter?
19      A.  I think I did review this report.  I recall
20  some of the pictures.
21      Q.  Do you think the findings in this report have
22  any bearing on your opinion that the Inter Ordnance
23  Sporter model was never -- rifle was never fired on
24  June 7, 2017?
25      MR. DOWD:  Object.  Overly -- Object to the

Page 332

```
 1    form.  Overly broad and vague.
 2       Q.  Sir, did -- I'm sorry, did you want me to
 3    repeat the question?
 4       A.  Sure.
 5       Q.  Okay.
 6       A.  Kind of lost -- Kind of lost my train of
 7    thought when Mr. Dowd objected.
 8       Q.  Do you believe that the findings in this
 9    report have any bearing on your opinion that the Inter
10    Ordnance Sporter model rifle was never fired that day?
11          MR. DOWD:  Same objections.
12       A.  If they were trustworthy, if this lab had any
13    credibility, I would think that they would, but
14    considering what I've seen so far in the last several
15    years, I'm not sure I give this lab a whole lot of
16    credibility.
17       Q.  Are you -- You aren't familiar with the
18    findings in this report, are you, sir?
19       A.  I see -- I see some of the findings.  I mean,
20    I recall it.  I mean, we can go over them if you'd like
21    to.  Specifically point out what finding you're talking
22    about 'cause there's a --
23       Q.  Okay.
24       A.  -- lot of information in this report.  It's
25    180 pages.
```

Page 333

```
 1       Q.  Right, and did you review the 180 pages prior
 2    to rendering your opinions in this case?
 3       A.  I'm sure I reviewed this, this report, months
 4    ago.  I answered that question about five minutes ago.
 5       Q.  Okay.  And as you sit here today, can you
 6    describe what the findings are in this report?
 7          MR. DOWD:  Same objections.
 8       A.  There's so many different pieces of
 9    information in this report.  Can you be more specific?
10       Q.  Okay.
11       A.  Do you want me to pick one of the 400
12    findings?  I mean, I don't understand.
13       Q.  Did you, yourself, ever examine the 7.62 by 39
14    millimeter cartridge cases that were recovered from the
15    case --
16       A.  I did.
17       Q.  -- under a microscope?
18       A.  I did.  Not under a microscope, but I did.  I
19    took a look at them.  You have pictures of me analyzing
20    them.
21       Q.  Why -- Why not, why didn't you conduct that
22    examination?
23          MR. DOWD:  Why didn't he what?
24       A.  Why didn't I conduct the -- analyze the -- the
25    ballistic evidence under a microscope?
```

Page 334

```
 1       Q.  Correct.
 2       A.  Because, to me, having the gun checked out of
 3    evidence seven times means that that evidence could have
 4    been created in the lab and fired.  Those -- Those cases
 5    that they match up could have been fired in the lab.  You
 6    know, it's just, I mean, when you have five to seven
 7    people checking a rifle out of evidence and doing various
 8    things with it, there's no -- I mean, the chain of
 9    evidence is so corrupted, how could anything in this
10    report be consistent, reliable, or -- or credible?
11       Q.  Sir, what is your basis for saying the chain
12    of custody was corrupted?
13       A.  Well, how many people get to handle a rifle
14    and take it and shoot it before you say, okay, we've now
15    can no longer analyze the rifle in the state that it was
16    in when they -- when he supposedly used it to shoot at
17    the place.  We can -- We can no longer analyze the
18    statement of the grandfather saying that the rifle was
19    jammed and wouldn't function.  I mean --
20       Q.  Sir --
21       A.  -- when -- when you have --
22       Q.  -- is it --
23       A.  -- multiple -- And I'm still answering your
24    question.  When you have multiple people taking a rifle
25    out and shooting it and sticking it back into evidence
```

Page 335

```
 1    and cleaning it and doing various other things with it,
 2    how can you trust anything that shows up three years
 3    later?
 4       Q.  Sir, is it your opinion that it is not
 5    standard to perform test -- to fire test shots from a gun
 6    recovered from a crime scene?
 7       A.  It is absolutely standard for an -- for a lab
 8    technician to check a rifle out of evidence and fire some
 9    test shots.  It's not standard to have five, seven
10    different people handle that weapon.
11       Q.  What is your basis for saying that five to
12    seven people handled this weapon?
13       A.  Well, if you're familiar with the evidence
14    procedures at St. Louis City PD, you'll notice that if
15    the evidence box is cut open, it's then sealed with a
16    different color of tape.  Look at how many different
17    colors of tape are on the evidence box with the AK-47.
18    Look at the chain of custody, all of the different people
19    that are in the record checking this rifle out and doing
20    something with it and there's no accounting as to what
21    they did with the rifle.  It just got taken out of
22    evidence, it got put back in evidence.  And there's a
23    couple of things where, okay, we fired some test rounds
24    where a couple of people said we did this or that, but
25    there's no record, complete record of what was done every
```

15 (Pages 332 to 335)

Page 336

1  time this rifle was taken out of evidence.
2      Q.  What people checked the rifle out of evidence?
3      A.  It's right in the report.
4      Q.  Okay.  Sitting here today, do you know who
5  checked the rifle out of evidence?
6      A.  I think we'd have to go through the report and
7  start listing the names.  There's -- I don't know these
8  people personally.  It was just a lot of people.  As I
9  reviewed the report, I was aghast at how many people had
10 handled this rifle after it was put in evidence.
11     Q.  How many based on the reports?  You have --
12 So, sir, is your testimony that you believe multiple
13 people handled the rifle based on --
14     A.  Yes.
15     Q.  -- tape on the box?
16     A.  Yes.  Well, no, based on -- on the report
17 itself and the tape on the box.
18     Q.  What reports are you referring to?
19     A.  The -- The laboratory.  Here's the lab report.
20 There's a chain of custody report as well.  Mr. Dowd
21 would have to dig that up for you, but there's a chain of
22 custody report on this rifle as well.
23     Q.  And it's your opinion that the individuals who
24 took the rifle out did so improperly?
25     A.  No, I didn't -- I didn't say they took them

Page 337

1  out improperly.  I said there's no accounting as to why
2  so many people handled this piece of evidence.  And
3  that's a question for St. Louis City PD, not for me.
4      Q.  So, I guess you seem to be suggesting that the
5  chain of custody of the rifle was corrupted and you seem
6  to be saying that it's due to the number of people who --
7  who handled the rifle.  What is your basis for concluding
8  that different lab personnel or personnel with the PD
9  corrupted the chain of custody?
10         MR. DOWD:  Objection.  Misstates his prior
11     testimony.  You can answer if you understand.
12     A.  Could you rephrase the question?  I'm not sure
13 I understand what you're getting at.
14     Q.  Sure.  Sir, I understand your testimony to be
15 that you believe that the rifle was compromised because
16 there was a problem with the chain of custody.  Am I
17 understanding you correctly?
18     A.  I believe way too many people handled this
19 evidence.
20     Q.  Who were those people?
21     A.  You just asked me that.  I told you I don't
22 know them by name.
23     Q.  Or can you say based on --
24     A.  It's in --
25     Q.  -- your review of the documents --

Page 338

1      A.  It's -- It's --
2      Q.  -- whether --
3      A.  -- in the --
4      Q.  -- they were -- Sir --
5      A.  It's in --
6      Q.  -- let me finish my question.  Sir, can you
7  say whether or not they were employees or agents of the
8  City Police Department?
9      A.  I would assume they were employees of the
10 Police Department based on --
11     Q.  And --
12     A.  -- the report.
13     Q.  What is your basis for concluding that any of
14 the handling of the rifle was improper?
15     A.  Well, normally on -- on the chain of evidence
16 with a -- with a weapon system, you're going to perform
17 two tests.  You're going to fire the weapon to get
18 projectiles to analyze and to look at case markings and
19 firing pin markings and the imprint of the bolt on the
20 back of the brass.  That takes one guy, okay?  The other
21 thing you're going to do is you may do a gunpowder
22 residue test on the gun.  That may be another technician.
23 That's two people; that's not five to seven people.
24     Q.  Sir, if I represented to you that Exhibit J
25 indicates that nine 7.62 by 39 millimeter caliber

Page 339

1  cartridges recovered from the scene had firing pin and
2  breech face impressions matching the test shots fired
3  from the Inter Ordnance model rifle recovered, would you
4  have any basis for refuting that?
5      A.  I sure would.
6      Q.  What is it?
7      A.  I don't -- I don't believe -- I don't believe
8  those cases were fired on the day that the police claim
9  they were.
10     Q.  What is your --
11     A.  I believe that --
12     Q.  -- basis for that?
13     A.  Well, they're all mixed headstamps, yet the
14 projectiles all look like they're constructed exactly the
15 same.
16     Q.  What is -- Why is it not possible that mixed
17 headstamps were recovered from the scene?
18     A.  It's possible.  It's just highly unlikely.
19 And it's almost impossible that four different headstamps
20 would be shooting identical projectiles as if
21 manufacturers all used exactly the same bullet, four
22 manufacturers.  I mean, it just doesn't match up.  It
23 doesn't make sense.
24     Q.  Is it possible that you were looking at the
25 test shots?

16  (Pages 336 to 339)

Page 340

1          MR. DOWD:  Looking at the what?
2          MS. MCGOWAN:  Test shots.
3     A.   Would the evidence team mix test shots with
4 evidence collected at the scene?  'Cause they were all
5 pulled out of the same envelope.  I doubt it.  I can't
6 imagine that happening.
7          (Questions by Ms. McGowan)
8     Q.   You'd agree that there were 7.62 caliber
9 bullets recovered from the scene, right?
10    A.   I would say that I would agree there were
11 heavier bullets than 5.56 recovered from the scene.  I
12 can't verify that they were 7.62 because they were so
13 distorted when I looked at them.
14    Q.   Did you use any equipment to view the bullets
15 recovered from the scene?
16    A.   I had calipers with me and I had a phone that
17 would -- that would give me a magnified look at things,
18 but --
19    Q.   Your -- Your telephone?
20    A.   -- I didn't -- I don't think -- I don't think
21 I used the phone, but that's what I had on me.
22    Q.   So, you did not view those bullets
23 microscopically; true?
24    A.   Yeah, I couldn't determine anything from them
25 microscopically.  The evidence wasn't labeled

Page 341

1 specifically enough that I could make any conclusions, so
2 it didn't make sense to waste time doing that.
3          MR. DOWD:  You had a magnifying glass.
4     A.   I did have a magnifying glass.
5          MS. MCGOWAN:  I could ask --
6     A.   That's true.
7          MS. MCGOWAN:  -- Mr. Dowd to refrain from
8 testifying during the deposition.
9          MR. DOWD:  Well, you did -- you did --
10    A.   Well --
11         MR. DOWD:  -- that last deposition.
12         MS. MCGOWAN:  Sir, please don't -- Richard,
13 please don't coach the witness.
14         MR. DOWD:  He remembered it last time in his
15 deposition, and if we didn't have to come back, that
16 wouldn't be an issue, so --
17    A.   I did --
18         MR. DOWD:  -- I don't feel bad.
19    A.   I did have a magnifying glass, that is true.
20 I'm sorry, I forgot.
21         (Questions by Ms. McGowan)
22    Q.   All right.  Sir, another opinion that you've
23 given in this matter is that Hammett was shot and killed
24 while lying on the floor; is that true?
25    A.   Yes, ma'am.  Well, I -- he was shot while

Page 342

1 lying on the floor.  I can't testify whether he was dead
2 already or not.
3     Q.   And you've previously testified that you've
4 located bullet holes in the hardwood floor of the dining
5 room; is that correct?
6     A.   Bullet impacts.  I wouldn't call them holes.
7 I would call them scallops similar to what's on the hard
8 wall by the front door.  There's bullet -- There's five
9 bullet impacts that were fired from the same gun in the
10 same position.
11    Q.   Bear with me, I'm pulling up another document
12 slowly.
13         Sir, do you recognize the photograph depicted
14 on your screen?
15    A.   Yes, that's a bullet impact.
16    Q.   Where is that lo- -- First of all, back up.
17 Where -- Do you know what date this photograph was taken?
18    A.   It was the same date as the other photographs
19 we looked at when I was with Mr. Dowd.  Mr. Dowd took the
20 photograph.
21    Q.   And as you sit here today, you're not able to
22 tell me the date; correct?
23    A.   It would have -- It would have been I think
24 sometime in 2019, but I can't tell you the exact day.
25 I'm sure it's on the photograph.

Page 343

1     Q.   Okay.
2     A.   You can look at the detail --
3     Q.   Is --
4     A.   -- on the photograph, it'll tell you the date
5 it was taken.
6     Q.   Is this photograph one of the defects you were
7 referring to a few minutes ago?
8     A.   One of the impacts from a .223 bullet on the
9 dining room floor, yes.
10    Q.   Is that the same impact?
11    A.   Go back and forth for me once.
12    Q.   (Counsel complying with witness' request.)
13    A.   Go back to one.
14    Q.   Do you see that?
15    A.   Yep, I see it.  Now let's go back to two.
16    Q.   (Counsel complying with witness' request.)
17    A.   Yeah, that's the same impact.
18    Q.   Did you make a trajectory determination for
19 this impact?
20    A.   I know it was fired at a 35 degree down angle.
21    Q.   How do you know that?
22    A.   There's a machine thing called a parallel that
23 I laid in the center of the slot sort of where the jaws
24 are that shows the original entry path into the wood.
25    Q.   Okay.  Is that a tool commonly used by crime

17 (Pages 340 to 343)

1 scene investigators to determine trajectory of bullet
2 holes?
3      A.  Yeah, it's a form of a straight edge.  Most
4 crime scene investigators use straight edges and lasers
5 and -- and tape measures and that type of thing.  It's a
6 common tool.
7      Q.  How do you know that?
8      A.  How do I know that?
9      Q.  Correct, yes.
10      A.  Because that's the only way you could
11 determine the path on a -- on a bullet mark like that.
12 You'd have to have a very thin straight edge.  A laser
13 won't work on this type of impact.  Laser works when you
14 have holes through double walls.  In this type of impact,
15 you need a straight edge.
16      Q.  Moving on.  And, again, for the record, we're
17 on Defendants' Exhibit P.  We were looking at Page 1 and
18 2 and now I want to direct your attention to Page 3.  Is
19 that the same defect?
20      A.  No, that's a different impact.
21      Q.  Okay, did you make a trajectory determination
22 for this impact?
23      A.  Yeah, same angle and originated from the same
24 gun in the same position.
25      Q.  And what was your methodology, the same as

1 before?
2      A.  Yeah, straight edge and tape measure, that
3 type of thing.
4      Q.  Okay.  Can you take me through that step by
5 step?
6      A.  Okay.  So, you remember the Pythagorean
7 theorem from high school?
8      Q.  No.
9      A.  The whole triangle thing?  Hypotenuse squared
10 equals A squared plus B squared, that's the triangle
11 rule.  It's a mathematical formula.  And, so, you lay the
12 straight edge in there and you get a determination on the
13 direction and then you can approximate the height that
14 the bullet was fired from because it was fired from a
15 SWAT operator who was obviously standing.  Based on this
16 trajectory into the room and the size of the room is a --
17 is a boundary layer for your -- for your lines.  And then
18 if you have multiple marks of these and they all
19 intersect in the same spot at the same height
20 approximately four feet off the ground, it's pretty
21 likely that they were fired by the same operator from the
22 same weapon system at probably fairly close in time
23 because it's --
24      Q.  Have you --
25      A.  -- hard -- it's hard to approximate that level

1 of precision if you're moving around.
2      Q.  Have you described every step that you took to
3 make your trajectory determination?
4      A.  Well, we lay the straight edge in the slot, we
5 extend the lines until they cross from multiple impacts,
6 and we draw the triangle and use the Pythagorean theorem
7 and then we know what distance it -- it is shot from
8 because it is the hypotenuse of the triangle.
9      Q.  Do you have any photographs of you performing
10 that process here?
11      A.  No, I don't think.  Just -- Just measuring the
12 impacts to make sure they were .22 caliber.
13      Q.  Did you take any notes documenting that
14 process?
15      A.  No.
16      Q.  How do you know as you sit here today that it
17 was a 35 degree angle?
18      A.  Because that's the angle that the straight
19 edge laid in the slot.
20      Q.  You're relying on your memory?
21      A.  In this case, I am relying on my memory
22 because I -- because I remember the angle and the
23 distance, you know, and it came out to be about seven to
24 eight feet and 35 degrees.
25      Q.  What is your basis for saying that Hammett was

1 shot while lying on the dining room floor?
2      A.  Well, if someone is a threat, a SWAT team
3 member is trained to shoot at the threat and disable them
4 with an accelerated pair, so that's two shots.
5      Q.  Sir, that's not answering my question.  What
6 is your basis for your opinion that he was shot while
7 lying on the dining room floor?
8          MR. DOWD:  Objection.  He's trying to answer
9      that.
10      A.  I'm trying to answer the question.  Sometimes
11 an answer to your question, ma'am, is more than a
12 sentence.  It takes two or three sentences.  So, in a
13 normal threat scenario with a guy standing with an AK,
14 your shots would be almost parallel to the ground.  They
15 would never be at a 35 degree angle as these impacts
16 were.  And, so, in a threat situation or when you're
17 trying to fire and shoot someone, you're going to aim at
18 the person you're shooting at and your bullet would never
19 hit the ground from this short distance.  It would run
20 parallel and hit a wall.
21      Q.  Is it your opinion that the defect depicted in
22 Page 3 occurred as a result of a bullet passing through
23 Hammett and hitting the floor?
24      A.  No.  No, I -- I -- I think that some of these
25 impacts were before, that hit before where the body was

1 found to be located.  So, unless the body was moved, I
2 don't see that happening.
3      Q.   So, again, what is your basis for saying that
4 he was shot while lying on the dining room floor, what
5 are you relying on?
6      A.   Okay, so, these impacts are all clear evidence
7 of an operator pointing his gun down at the floor, okay,
8 and also the testimony by the medical technician and one
9 of the evidence technicians that trace the path of the
10 bullets through the body.  When you have a bullet that
11 enters the torso low on the left side and exits up here,
12 if someone's across the room from you, that's impossible
13 to do that with a rifle.  Okay, they have to be laying on
14 the ground or the operator has to be laying on the ground
15 and shooting up at them from a distance of about six
16 inches.  And there were no powder burn marks, there were
17 no evidence indicating that possibility, so obviously he
18 had to be on a horizontal plane and the rifles were
19 aiming down towards him and this corroborates the
20 physical paths of the bullets through the body.
21      Q.   So, I guess I'm confused.  How do these
22 particular defects provide support for the assertion that
23 he was shot while lying on the ground?
24      A.   Because SWAT officers are extremely accurate
25 with their rifles.  They don't shoot at things on the

1 ground unless there's something on the ground.  There's
2 no tactical reason to just fire bullets into the floor.
3      Q.   So, I guess I'm confused because you testified
4 a few minutes ago that these defects that we're looking
5 at in Exhibit E -- No, I'm sorry.  I apologize -- Exhibit
6 P, the defects we're looking at in Exhibit P did not
7 necessarily enter Hammett's body; did I understand you
8 correctly?
9      A.   I don't think we can determine -- I don't
10 believe they entered Hammett's body because the bullets
11 will fragment.  The type of ammunition that they were
12 shooting will often fragment.  The problem, it's -- it's
13 a cloudy thing to analyze, though, because there was
14 evidence of them using full metal jacket bullets and also
15 using the Hornady frangible round and they were
16 interwoven in the magazines and they were in -- that's
17 clear in evidence and the shells entered and, so, I
18 believe if you see the narrow trace right at the jaws of
19 the caliper, if you can see that, if a bullet had entered
20 and exit his body, it would not have left a .22 caliber
21 signature; it would have fragmented and been in pieces.
22 And, so, I don't believe that this bullet necessarily hit
23 his body first and then went into the floor.
24      Q.   And just to be clear, is that your opinion
25 with regard to the defect shown in Page 2 of Exhibit P?

1      A.   Well, I need to see the position 'cause
2 there's five of these marks on the floor and I can't tell
3 from the pictures which of the five that is.  I need a
4 broader picture from a -- from a further distance.
5      Q.   Okay.  And you don't have any notes or
6 memoranda that you can refer to to tell you where each
7 defect depicted in Group P is located --
8      A.   Well --
9      Q.   -- on the dining room --
10      A.   -- there is --
11      Q.   -- floor?
12      A.   There is a picture -- There is a picture of
13 all of the marks in evidence somewhere.  I remember
14 reviewing it.  It's just these pictures show a closeup.
15 They're designed to show the width of -- of the area of
16 the floor that the bullet destroyed, so you can see that
17 it was a .22 caliber weapon system that made that mark.
18 That's what this picture is designed to do.  Trying to
19 draw other conclusions from this picture wouldn't be
20 appropriate.
21      Q.   And, sir, you don't have any experience
22 conducting medical examinations; correct?
23      A.   Ma'am, you asked me that previously so many
24 times in the previous deposition.
25      Q.   I don't --

1      A.   That's --
2      Q.   -- recall answering you -- answering -- or
3 asking you that.  Can you humor me and answer?
4      A.   Yeah, phrase the question again and I'll give
5 you my best shot.
6      Q.   Sure, sure.  I don't recall asking you that.
7 Can you humor me again and give me an answer?
8      A.   Can you ask the question again so I know what
9 question I'm answering?  Reask --
10      Q.   Do you have --
11      A.   -- the question, please.
12      Q.   Do you have any experience conducting medical
13 examinations?
14      A.   Well, the Navy did a live tissue test that I
15 participated in, which I don't want to get into, and, so,
16 yes, I do have experience doing that and it is
17 specifically revolves around wound statistics.
18      Q.   Now, you didn't personally map out the
19 injuries on Hammett's body; correct?
20      A.   No, I -- I listened to the deposition and
21 testimony of the medical examiner and your ETU, your
22 evidence technician person very --
23      Q.   Do you know how --
24      A.   -- carefully.
25      Q.   Do you know how tall decedent was?

1    MR. DOWD:  How -- How tall?
2    MS. MCGOWAN:  How tall Hammett was.
3    A.  Well, I didn't know him when he was alive, so
4  I have no -- not even a guess.
5        (Questions by Ms. McGowan)
6    Q.  Do you know the height of any of the officers
7  who fired shots that day?
8    A.  Not exactly.
9    Q.  Is it possible that any of the officers were
10  firing while they were bent over to assume a lower
11  tactical position while moving through the house?
12    A.  Well, officers are always in a -- in a low
13  position trying to reduce their signature if they're
14  well-trained.  It's not only possible, it's highly
15  likely, and that would have made it less likely for this
16  severe an angle entry into the floor.
17    Q.  Did you do an independent verification of the
18  trajectories that the medical examiner determined?
19    A.  In the body?
20    Q.  Yes.
21    A.  No, I was not allowed to view the body.
22    Q.  Did you make a request?
23    A.  I did not.
24    Q.  Are you aware whether Mr. Dowd made the
25  request -- made a request to view the body?

1    A.  I am not aware either way.  I trust the
2  medical technician to be accurate.
3    Q.  So, if the trajectories of the bullet wounds
4  in the body were different than those that are stated in
5  the medical examiner's report, would that change your
6  opinion?
7    A.  It would definitely change my opinion about
8  certain things.  It wouldn't change my opinion about the
9  marks on this floor, though.  These -- These marks are
10  what they are.
11    Q.  All right.  Skipping back to Page 4 of your
12  Affidavit.  Pull that up.
13    A.  While you're doing that, I'm going to grab
14  some water.  I'll be back in 20 seconds.
15        (At this point, there was a brief pause in the
16        proceedings.)
17    Q.  Okay, sir, if you're ready, I'll --
18    A.  Yes.
19    Q.  -- go ahead and ask you the next question.  In
20  Paragraph 10 of your Affidavit, which we've previously
21  marked as Exhibit B, you talk about knowing the sound
22  signature of an AK-47 because you've heard it fired tens
23  of thousands of times under many different circumstances?
24    A.  Yes.
25    Q.  Okay.  And you claim the diameter of the

1  cartridge which holds the gun powder causes the guns to
2  make distinctive sounds; is that correct?
3    A.  Well, the pitch of the -- just like a pipe
4  organ, the diameter of the barrel affects the pitch.  The
5  volume of the cartridge affects -- and the pressure of
6  the cartridge affects the volume.
7    Q.  And you also claim that you know the sound
8  signature with regard to .223 rounds and 9 millimeter
9  rounds; correct?
10    A.  Yes.  Yes, ma'am.
11    Q.  Is a gunshot sound, is that a single loud
12  sound or a single event?
13    A.  Well, not typically.  I mean, I live at a
14  range.  I train people every week.  And, so, part of our
15  training program is to teach police officers and
16  operators how to recognize various weapon systems by
17  their sound signature.  So, depending on the type of
18  round and the type of caliber, you get dramatically
19  different sound signatures that are easily recognizable
20  and that's part of the basic training class in tactical
21  weapons.
22    Q.  So, is a gunshot sound made up of a single
23  loud sound or a single event?
24    A.  No, the -- it depends.  If it's a subsonic
25  round, yes, you will hear the muzzle blast.  If it's a

1  supersonic round, you will hear the supersonic crack of
2  the bullet in flight and then the muzzle blast, so
3  there'll be two distinct sound signatures from a
4  supersonic round that's fired.  From a subsonic round,
5  it's generally just the muzzle blast that you hear --
6    Q.  Okay.
7    A.  -- unless a bullet is tumbling or whizzes by
8  close to your ear, then you may hear a buzzing sound
9  or -- or some other air disturbance sound, but it depends
10  on the type of round that's being fired and it depends on
11  whether that projectile is supersonic or subsonic in its
12  velocity and what the sound device is capable of
13  capturing.
14    Q.  Are the sound waves of a shooting event
15  dependent on the source or size of the cartridge?
16    A.  Oh, the -- you'll get a different sound
17  signature from a different size cartridge for sure or a
18  different pressure cartridge.
19    Q.  So, different ammunition types and weights
20  affect the sound?
21    A.  They can slightly, but within a caliber,
22  they're very similar.
23    Q.  Okay, so, the weight of a bullet affects the
24  sound a bullet makes --
25    A.  No.

Page 356

1      Q.  -- is that true?
2      A.  No.  Indirectly, because a heavier bullet is
3  generally flying at a lower velocity than a -- than a
4  lighter bullet, so it's you're into a very technical area
5  where there's a lot more to that.  There's a matrix to
6  that.  It's not just one factoid that can answer that.
7      Q.  So, would the manufacture of the same caliber
8  firearm make a difference in the sound produced?
9      A.  It can make a small difference.  Are you
10  talking within the same caliber?
11      Q.  Yes.
12      A.  So, for example, if you had a 9 millimeter
13  round being fired, you could fire 147 grain projectile
14  subsonic and you would use a slower burning powder, so
15  that would affect the sound signature slightly, but not
16  enough that you wouldn't recognize it as a 9 mil.  You
17  could also use a 90 grain bullet and fire it supersonic,
18  you would get a supersonic crack from the bullet, you
19  would have a faster burning powder, and you would have a
20  slight change in pitch, but not enough to not recognize
21  it as a 9 mil.
22      Q.  Now, as far as the cell phone that recorded
23  the cell phone video in this case, forgive me if I asked
24  you this, do you know what type of device that was
25  recorded on?

Page 357

1      A.  I would suspect it was an iPhone based on the
2  sound quality, which was really good.
3      Q.  So, you don't know as I sit here today?
4      A.  I don't know -- I don't know for sure, but it
5  sure sounds like an iPhone recording.
6      Q.  And earlier you testified that you believe the
7  cell phone that recorded this video was about 30 feet
8  across the street?
9          MR. DOWD:  Objection.
10      A.  No, I think --
11          MR. DOWD:  Objection.  Misstates his
12  testimony.
13      A.  No, that's not what I testified to.  You asked
14  me the questioned how far did I think the cell phone was
15  from -- from the people knocking -- supposedly knocking
16  and announcing.
17      Q.  Sure.
18      A.  And I -- And I said you had the width of the
19  street minus the width of the car plus the length of the
20  front yard.  So, I guess between -- I would approximate
21  between 75 and a hundred feet, but that's just
22  speculation.
23      Q.  Did you actually measure the distance?
24      A.  I didn't.
25      Q.  Do you know what kind of micro- -- Well,

Page 358

1  you're not certain about what type of --
2      A.  Yeah.
3      Q.  -- cell phone was used that day?
4      A.  Yeah, I can't speculate on what -- what the
5  cell phone was.
6      Q.  So, it follows that you're not sure what type
7  of microphone was used to record that recording?
8      A.  True.
9      Q.  Do you know what kind of car the person was
10  inside who was filming the --
11      A.  No.
12      Q.  -- video recording?
13      A.  No, ma'am, I don't.  I don't even know that
14  they were in the car.  I got the feeling from the video
15  they were in or around a car.
16      Q.  Does it matter whether they were inside the
17  car when they were recording that audio?
18      A.  It would change the sound signature if they
19  had the windows up.  It wouldn't dramatically change the
20  sound signature if they held the phone by the window and
21  the window was down.
22      Q.  And it's your testimony that you believe the
23  window was down in this case?
24      A.  If they were in the car, it was obviously
25  down.  They wouldn't have gotten such a clear sound

Page 359

1  recording if they had been in the car with the window up.
2  That would have been impossible.
3      Q.  Does the location of the person holding this
4  cell phone recording, does that matter?
5          MR. DOWD:  Asked and answered.
6      A.  I -- I answered that, ma'am.
7      Q.  And your answer was no?
8      A.  No, my answer was it -- it matters
9  significantly if the person's too far away to pick up the
10  sounds.  Every microphone has its limits of what dB
11  pressure level the cone will move at and, so, if they're
12  too far away to pick up a sound, then it would matter.
13  Generally, if they're close enough to pick up quiet
14  sounds, then it won't be significant on anything louder
15  than something quiet.
16      Q.  So, it's your belief that the location of the
17  mic in relationship to the gunfire is irrelevant so long
18  as the mic picks up on the gunfire?
19      A.  No, I believe that the location is irrelevant
20  as long as the microphone is close enough to pick up the
21  quieter sounds in the scene because if it will handle the
22  lower pressure levels, it will definitely pick up the
23  stronger pressure levels.  Sound is a pressure wave.
24  And, so, as long as the microphone operates properly at
25  the lower pressure levels on the quieter sounds, it will

21 (Pages 356 to 359)

Page 360

1 be effective for the louder sounds until it's
2 overmodulated.
3 Q. So, did you slow down the cell phone video
4 recording to do your analysis?
5 A. I did play it -- I did -- I did play it in
6 slow motion, I believe.
7 Q. And can you recall what software you used to
8 examine the cell phone --
9 A. No.
10 Q. -- phone recording?
11 A. -- we were -- we were going to -- we were
12 going to do that at the break, but we're kind of past the
13 whole break thing at this point, so what I did was I -- I
14 used a PACT timer to measure the -- the timing between
15 shots.
16 Q. What's a PACT timer?
17 A. It's a device that we use on the range for
18 training and it measures shots to a hundredth of a second
19 and, so, when you get a sound that's a pressure level
20 above a normal speaking voice, I don't know what the
21 exact threshold is, but it triggers the computer to start
22 tracking shots and then it measures the split times
23 between the shots so you can tell what the distance is
24 and then it gives you a total time of all the shots.
25 Q. Are you familiar with SPL?

Page 361

1 A. Sound pressure levels, yeah.
2 Q. Okay. Did you determine SPL in order to form
3 your opinions regarding the cell phone recording?
4 A. Well, without knowing the exact distance, you
5 couldn't. You don't have enough in the equation to use
6 sound pressure levels.
7 Q. So, let me -- let me move on. I know we're
8 limited on time here. So, would a shot sound any
9 different if it was recorded from 50 feet away or if it
10 was recorded from behind the shooter within ten feet?
11 A. Shots have a sound signature that is affected
12 by everything in the environment, okay? So, the question
13 is to what degree and is it a significant degree. And
14 without a more detailed question, you know, the answer is
15 categorically yes, it can, but without a specific
16 question, there's no way to give you an exact answer.
17 Q. In your report, you state that you've heard --
18 Let me stop this. In your report, you state that you
19 heard the Sporter model semi-automatic rifle model fire
20 tens of thousands of times.
21 A. I stated that I've heard the AK round fire
22 tens of thousands of times. I work at a range, ma'am.
23 Q. All right.
24 A. It's a very popular weapon system.
25 Q. Let's pull up Page 10 of your report.

Page 362

1 All right. Are you able to see --
2 A. Yes, ma'am.
3 Q. -- see that? Okay. I'm back on Exhibit C,
4 which is your report. You state, I have heard
5 SporterModel Semi-AutomaticRifles fired tens of thousands
6 of times under many different circumstances [...]." Is
7 that a true statement?
8 A. Absolutely true.
9 Q. And have you had occasion to shoot an Inter
10 Ordnance Sporter rifle like the one recovered in this
11 case?
12 A. I have shot many rifles like the one recovered
13 in this case.
14 Q. When you say like this rifle --
15 A. Yeah.
16 Q. -- the rifle from this case?
17 A. 7.62 barrels down to 12 inches, barrels up to
18 20 inches.
19 Q. And you've heard this particular model fired
20 in person?
21 A. Well, the model doesn't affect the sound. The
22 barrels are all made to a spec so they control pressure.
23 The -- The only thing that affects the sound is the
24 muzzle attachment, whether it's a flash hider or brake,
25 and it can have a small effect on the sound signature

Page 363

1 based on your physical position.
2 Q. Have you ever heard the Inter Ordnance Sporter
3 rifle fired in an urban environment?
4 A. The round or the rifle?
5 Q. The rifle.
6 A. Not an Inter Ordnance, but it doesn't matter.
7 It's a 7.62 by 39. No one can tell the difference
8 between an Inter Ordnance or a different brand because
9 it's shooting the same cartridge. If the barrel length's
10 the same and the muzzle attachment is the same, the brand
11 does not matter. It doesn't affect the sound.
12 Q. Have you heard a similar Sporter model
13 semi-automatic fired in an urban environment?
14 A. Many times.
15 Q. When?
16 A. Well, the St. Louis City Police used to have a
17 range that was in an urban environment off of Highway 55.
18 We used --
19 Q. Have --
20 A. -- to fire all kinds of -- Bob Cooney and I
21 used to fire all kinds of stuff at that range from AKs to
22 MP5s, to MP5SDs, to .308s, to handguns --
23 Q. Well --
24 A. -- and that's an urban environment.
25 Q. -- have you ever heard a Sporter model

22 (Pages 360 to 363)

Page 364

1  semi-automatic rifle fired from within a house in an
2  urban environment?
3      A.  A shoot house.  Inside a shoot house, yeah.
4      Q.  You've heard --
5      A.  And also --
6      Q.  -- a --
7      A.  And ars- -- also at -- in the shoot towns at
8  Fort Leonard Wood and also at Fort Polk at the
9  Shughart-Gordon Live Fire Center.  Many, many times is
10  the answer.
11      Q.  In conducting your analysis of the sounds
12  depicted in the cell phone recording, did you take
13  reverberation into account?
14      A.  Well, there wasn't a lot of reverb, so I
15  didn't really consider it significant.  You get reverb
16  when you have really tall buildings, but the reverb in
17  that environment with just single story, you know, or one
18  and a half story houses is not really going to be a
19  significant part of the sound signature.  So, I
20  considered it, but I just didn't find it significant.
21      Q.  Now I want to direct your attention to Exhibit
22  C, Page 11.  Would you agree that on Page 11 of your
23  report you provide a timeline of your interpretation of
24  the cell phone video recording?
25      A.  Yeah, that looks like something -- something

Page 365

1  that I did.
2      Q.  Okay.  And I want to direct your attention to
3  the 14 to 19 second mark.  You write --
4      A.  Yes.
5      Q.  -- that there's a barrage of over 25 shots
6  from a .223 caliber assault rifle or rifles plural.  By
7  that you mean there are many overlapping shots; correct?
8      A.  No, what I'm saying there is that I can
9  determine at least 25 distinct shots.
10      Q.  So, do you agree or disagree that the shots
11  fired during that time frame are overlapping?
12      A.  Well, there -- there could have been shots
13  that overlapped.  It's possible.
14      Q.  Can you say whether -- as you sit here today
15  whether or not there were overlapping shots during that
16  time period?
17      A.  I can say that it's possible.  I can't testify
18  that it's certain.
19      Q.  Did you consider that in your analysis of the
20  cell phone video recording?
21      A.  Of course.  As a matter of fact, I would say
22  that -- that it's likely that there was some overlap
23  because I think I counted distinct shots in the 70 range
24  and the evidence technicians that missed brass and missed
25  evidence showed over 80 or 90 shots fired, so, I mean,

Page 366

1  obviously there was some overlap based on my count from
2  the video.
3      Q.  All right, on Page 10 of your report, you
4  state that -- One second.  I'm getting there -- you state
5  in Paragraph 3 that you concluded that the initial shots
6  have a .13 split or seconds between shots which is not
7  possible with this particular Sporter model
8  semi-automatic rifle because of the length of the trigger
9  pull, the length of the recoil recovery time, and the
10  length of the trigger reset.
11      A.  Roger that.
12      Q.  How did you determine that there was a .13
13  second split?
14      A.  We talked about that.  That's the PACT timer.
15      Q.  And take me through your methodology on using
16  the PACT timer.
17      A.  So, you reset the PACT timer to zero.  You
18  start the sound recording.  The PACT timer picks up the
19  shots and automatically determines the split times
20  between shots and it displays it out in a list.  Shot 1,
21  shot 2, shot 3, shot 4.
22      Q.  So, would, if the audio recording depicted
23  overlapping shots being fired, would that prohibit you
24  from determining the round types that are fired?
25      A.  Not in this situation because the first four

Page 367

1  shots there were no overlapping shots.  It was all the
2  same weapon and it was a ni- --
3      Q.  So, the --
4      A.  -- and it was a 9 millimeter.
5      Q.  Aside from those four shots that you're
6  describing, if overlapping shots were being fired, would
7  that prevent you from being able to determine what rounds
8  were being fired?
9      A.  Yeah, overlapping shots could confuse a PACT
10  timer, that's true.
11      Q.  What is the length of the trigger pull of this
12  type of rifle?
13      A.  It's over a quarter of an inch.  It's
14  extremely long.
15      Q.  What is the length of the recoil recovery
16  time?
17      A.  Well, the recoil recovery time is determined
18  by the shooter, not the rifle.  The -- The recoil from
19  the rifle is much more significant than a handgun, so
20  it's extremely difficult to be fast with something like a
21  7.62, particularly if it has a long trigger pull and a
22  long reset.  Even a professional can't fire at that
23  speed.  SWAT guys shoot that fast, not kids that are 19
24  years old and have no training.
25      Q.  Okay.  So, I think we're getting into your

23 (Pages 364 to 367)

Page 368

1  statement on Page 10 (sic).  You say, "In addition, the
2  timing and 'signature' or sounds of the initial shots do
3  not match a 7.62x39 fired by an untrained shooter."
4      A.  Yes, ma'am.
5      Q.  What -- What is your basis for saying that,
6  what are you relying on?
7      A.  Well, I've been training people for 40 years
8  and I've had a PACT timer in my hand for 30 years, so I
9  have an incredible sample of new shooters, slightly
10  trained shooters, advanced shooters, and then
11  professionals like SWAT team members and so, we keep
12  records of that.  We -- We do this thing called an
13  El Presidente and we look at split times and we look at
14  total times and we analyze that and give feedback to our
15  students.  It's something that we're very, very familiar
16  with and is very common.  It's also done in competition
17  shooting.  So, it's not an -- it's not a -- it's not a
18  unique thing to our range or our training facility.
19      Q.  So, it's not impossible for a person to fire
20  shots with a .13 split?
21      A.  No, guys like Ronnie Fowlkes, who used to be
22  on the SWAT team, when he had an AR-15 with a Maxx
23  trigger, he could fire with a .11 split, which is
24  two-hundredths faster than .13, but that's the best
25  shooter with the best trigger with a very light recoiling

Page 369

1  rifle.  I mean, that's the best of the best of the best
2  scenarios.  There's -- There's no way that someone with
3  an AK Sporter with this horrifically bad trigger could
4  pull the trigger that fast.  It's impossible.
5      MR. DOWD:  Erin, we've been going two hours
6  here.
7      MS. MCGOWAN:  I think we've got a few more
8  minutes.  Give me -- Give me a couple more
9  questions.
10      (Questions by Ms. McGowan)
11      Q.  Sir, you provide the opinion that the officers
12  were using alleged compromise to turn the
13  knock-and-announce search warrant into a battering ram
14  breech flash bang assault you write.  What do -- What do
15  you mean by that?
16      A.  Well, there's a history of problems with SWAT
17  teams when a judge refuses to give a no-knock warrant on
18  a dangerous entry and the SWAT team feels like they're
19  being compromised by not being given a no-knock warrant
20  and, so, they developed a workaround and it's a very
21  common technique used by SWAT teams all over the country
22  when a judge doesn't give them a no-knock, they find a
23  reason to claim compromise as they approach the -- the
24  dwelling and then they no-knock, they don't announce.
25  They just bang -- you know, ram the door and bang the

Page 370

1  room and enter and that's -- that's a result of judges
2  and SWAT teams not agreeing on whether or not it's a safe
3  enough situation to knock and announce.  And that's been
4  going on for decades.  That's not just my opinion.
5  That's the way it works.  And SWAT teams want to go home
6  to their wife and kids at night and don't want to be
7  exposed to unnecessary danger --
8      MR. DOWD:  I'm going to --
9      A.  -- and judges don't want to give no-knock
10  warrants every time they're asked.
11      MR. DOWD:  I'm going to object.
12      Q.  Sir, do you have any training in audiology or
13  sound engineering?
14      MR. DOWD:  I object.  Let me -- I -- I'm
15  interposing an objection.  I object.  It's
16  non-responsive.  Move to strike.
17      MS. MCGOWAN:  Oh.
18      MR. DOWD:  You can -- You can go ahead.
19      (Questions by Ms. McGowan)
20      Q.  Sir, do you have any training as a sound
21  engineer?
22      A.  I actually do have some training as a sound
23  engineer.  I've worked extensively with sound engineers
24  and -- and worked extensively with sound as a musician
25  and setting up stages and being part of bands and playing

Page 371

1  music and recording my own music and editing my own
2  music, so I do have some experience with sound
3  engineering.
4      Q.  Any experience conducting forensic audio
5  analyses?
6      A.  Did I go to a school to take audio analysis
7  for forensic, no, ma'am.
8      MS. MCGOWAN:  And if you wouldn't mind, I'm
9  just going to review my notes very quickly.  I
10  realize we're running up against the two hour mark.
11      MR. DOWD:  Are you talking to me?
12      MS. MCGOWAN:  Yes.
13      MR. DOWD:  What was the question?
14      MS. MCGOWAN:  I'm just reviewing my notes very
15  quickly.  I said I realize we're running up against
16  the --
17      MR. DOWD:  Yeah.
18      MS. MCGOWAN:  -- the two hour mark.
19      MR. DOWD:  You are there.
20      MS. MCGOWAN:  I think that may be it for today
21  at least.  I just want to note that we still have a
22  motion for an additional three hours of deposition
23  pending before the judge, so we may be back for a
24  third day.
25      MR. DOWD:  Okay, I just have a couple

24 (Pages 368 to 371)

Page 372

1     questions.
2
3           E X A M I N A T I O N
4   BY MR. DOWD:
5
6       Q.  Mr. Andrews, who -- who hired this doctor
7   that -- that Erin was asking you about right off the bat
8   in your deposition?
9       A.  (No response.)
10      Q.  You remember that?
11      Q.  Who hired this doctor?
12      Q.  Yeah, the one -- the one with the report
13  with --
14      A.  Oh, the -- Oh, on the bogus custody trial that
15  didn't work out for her?  The -- My ex-wife's attorney
16  hired -- hired that person.
17      Q.  And did -- did -- was it successful in getting
18  your children taken from you?
19      A.  It -- The decision from Judge Hood, who was
20  basically removed --
21      Q.  Okay.  That's okay.
22      A.  -- and sanctioned, it wasn't successful
23  ultimately.  It -- It lasted about three months and then
24  my daughter came to live with me full time and my wife
25  went and married four other men, so, you know, it just --

Page 373

1   it wasn't successful, but she tried.
2       Q.  Not a problem, okay.  I -- I shouldn't have --
3   didn't need to bring that up, but --
4       A.  That's all right.
5           MR. DOWD:  You have the right to ha- -- to
6   read your deposition and be sure that it was taken
7   down as spoken both of the -- on both of the these
8   occasions.  We do appreciate your time a lot.  We
9   know how busy you are.  Do you want to read it?
10          THE WITNESS:  Yeah, I would like a copy to
11  read.  Can you send me electronic copy?
12          MR. DOWD:  Yes, sir.
13          THE WITNESS:  That would be wonderful.
14          MR. DOWD:  I'll get it to you if you will send
15  it on to me, Sara.
16          MS. MCGOWAN:  And may I ask one more question
17  while we're -- we're on the topic?  I apologize,
18  just one more follow-up to Mr. Dowd's questioning.
19
20          FURTHER EXAMINATION
21  BY MS. MCGOWAN:
22
23      Q.  Sir, I'm pulling up Exhibit N and I want to
24  direct your attention to Paragraph 6; do you see that?
25  And this document states:  "The Court further ordered the

Page 374

1   appointment of Sharon Lightfoot, Ph.D. to conduct a
2   mental examination of each party."  Would you agree that
3   the Court ordered the appointment of Dr. Lightfoot to
4   conduct your mental examination?
5       A.  Well, I think Dale Hood appointed the
6   psychologist that the attorney on the other side wanted
7   appointed, that's what happened.
8       Q.  Okay.  So, you agree that the Court appointed
9   Dr. Lightfoot?
10      A.  The most corrupt judge in St. Louis City -- or
11  St. Louis County history, sure.
12          MS. MCGOWAN:  Thank you.  I don't have any
13  further questions today, for today, pending the
14  pending motion for additional time.
15          MR. DOWD:  Thank you, everybody.
16          MS. MCGOWAN:  Thank you, sir.
17          MR. DOWD:  Thank you.
18          MS. MCGOWAN:  Thank you, everyone, goodnight.
19          THE WITNESS:  Thank you, guys.
20          VIDEOGRAPHER:  At 6:13 Central Daylight Time,
21  that concludes Volume II of the deposition of
22  L. Samuel Andrews.  We are going off the video
23  record.
24          (Deposition concluded pending motion for
25          additional time at 6:13 p.m.)

Page 375

1           (SIGNATURE RESERVED PENDING COMPLETION)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MASUGA REPORTING SERVICE
314/680-2424

Page 376

1  STATE OF            )
                       ) SS
2  COUNTY OF           )
3
4      I, L. SAMUEL ANDREWS, do hereby state that the
5  foregoing statements are true and correct to the best of
6  my knowledge and belief.
7
8
9
10
11      _____
            L. SAMUEL ANDREWS
12
13
14
15      Subscribed and sworn to before me this _____ day
16  of _____, 2020.
17
18
19
20
        _____
21          NOTARY PUBLIC
22
   My Commission Expires:
23
24
25

Page 378

1          C E R T I F I C A T E
2
3      I, Sara Alice Masuga, Certified Shorthand
4  Reporter and Certified Court Reporter within and for the
5  States of Illinois and Missouri, DO HEREBY CERTIFY that
6  pursuant to agreement between counsel that on
7  September 8, 2020, originating at the offices of Masuga
8  Reporting Service, 2033 Hiawatha Avenue, St. Louis,
9  Missouri, there appeared before me via Zoom
10  videoconference the aforementioned witness, and having
11  been duly sworn to tell the whole truth, was examined,
12  and the examination was taken down in shorthand by me and
13  afterwards transcribed upon the computer, and said
14  transcription is herewith returned.
15      IN WITNESS WHEREOF, I have hereunto subscribed my
16  name this 17th day of September, 2020.
17
18
19
20
21
        _____
22      Sara Alice Masuga, CSR, CCR
            IL CSR No. 084-002993
23          MO CCR No. 1012
24
25

Page 377

1          DEPOSITION CORRECTION SHEET
       VOLUME II OF THE DEPOSITION OF L. SAMUEL ANDREWS
2
   In Re:  GINA TORRES, et al vs. CITY OF ST. LOUIS,
3      et al, No. 4:19-1525-DDN
4
   Page:  Line:    Should Read:
5    Reason:
6  Page:  Line:    Should Read:
       Reason:
7
   Page:  Line:    Should Read:
8    Reason:
9  Page:  Line:    Should Read:
       Reason:
10
   Page:  Line:    Should Read:
11   Reason:
12  Page:  Line:    Should Read:
       Reason:
13
   Page:  Line:    Should Read:
14   Reason:
15  Page:  Line:    Should Read:
       Reason:
16
   Page:  Line:    Should Read:
17   Reason:
18  Page:  Line:    Should Read:
       Reason:
19
20
        _____
21      SIGNATURE OF DEPONENT
22
23
24
25

Page 379

MASUGA REPORTING SERVICE
2033 Hiawatha Avenue
St. Louis, MO  63143-1215
(314)680-2424

September 17, 2020

Dowd & Dowd, PC
Attn:  Richard K. Dowd, Esq.
211 North Broadway
Suite 4050
St. Louis, MO  63102

SENT VIA E-MAIL:  Rdowd@dowdlaw.net

In Re:  GINA TORRES, et al vs. CITY OF ST. LOUIS, et al
No. 4:19-CV-1525-DDN

Dear Mr. Dowd:

Enclosed herewith, please find your copy of Volume II of
the Zoom videoconference video deposition transcript of
L. SAMUEL ANDREWS taken in the above-styled matter along
with the original signature page of same.
Please have the deponent read your copy of the
transcript, note any corrections to be made, sign the
original signature page, have the deponent's signature
notarized where indicated, and return the signed
signature page and correction sheets to Ms. McGowan for
proper filing of the original transcript with the Court.

Thank you for your attention to this matter.

Sincerely,

MASUGA REPORTING SERVICE

Sara Alice Masuga, CSR, CCR

cc:  Ms. McGowan

26  (Pages 376 to 379)

**A**

**ability** 323:9
324:1
**able** 288:13
289:5,7 291:20
291:22 292:12
297:21 301:14
307:2 311:20
312:8 315:3
342:21 362:1
367:7
**above-styled**
379:14
**absolutely** 335:7
362:8
**ac-** 319:6
**accelerated**
347:4
**access** 295:20,22
296:2
**account** 364:13
**accounting**
335:20 337:1
**accurate** 290:12
348:24 353:2
**accurately**
291:20 319:15
319:25
**achieved** 305:19
**activity** 330:20
**addition** 368:1
**additional**
371:22 374:14
374:25
**advanced**
368:10
**affect** 355:20
356:15 362:21
363:11
**affidavit** 282:3
284:3 311:1
315:2,5,6,13
316:3 353:12
353:20
**aforementioned**
378:10

**afternoon**
283:24
**agents** 338:7
**aghast** 336:9
**ago** 326:24
331:4 333:4,4
343:7 349:4
**agree** 286:24
287:2 300:18
301:4 318:14
325:1,5 326:16
326:18 340:8
340:10 364:22
365:10 374:2,8
**AGREED** 281:1
281:14
**agreeing** 285:8
370:2
**agreement** 378:6
**ahead** 288:8,20
293:22 301:2
315:2 319:6
320:2 329:10
353:19 370:18
**aim** 347:17
**aiming** 348:19
**air** 305:5 355:9
**airspace** 303:22
**AK** 303:19
314:8,12
328:22 347:13
361:21 369:3
**AK-47** 335:17
353:22
**AKs** 363:21
**al** 279:3,7 280:3
280:7 283:4,4
377:2,3 379:11
379:11
**Alice** 279:20
281:9 378:3,22
379:23
**alignment**
305:20
**alive** 352:3
**alleged** 369:12

**allow** 305:17
**allowed** 352:21
**allows** 319:1
**ammo** 314:11
**ammunition**
349:11 355:19
**analyses** 371:5
**analysis** 325:21
331:7,8 360:4
364:11 365:19
371:6
**analyze** 319:13
319:23 320:9
320:20 322:2
322:13 324:1
333:24 334:15
334:17 338:18
349:13 368:14
**analyzed** 320:24
328:13,16
**analyzing**
319:24 323:17
333:19
**Andrew** 280:19
**Andrews** 279:11
281:4 282:3
283:3,17,24
287:9 288:25
300:23 306:23
372:6 374:22
376:4,11 377:1
379:14
**Andrews'** 282:5
**Andy** 297:8
**angle** 303:4
343:20 344:23
346:17,18,22
347:15 352:16
**announce** 316:4
316:6,21,24
317:20 318:1,8
369:24 370:3
**announced**
315:19,24
316:13 317:4
**announcing**

318:19 357:16
**answer** 291:8
337:11 347:8
347:10,11
351:3,7 356:6
359:7,8 361:14
361:16 364:10
**answered** 291:7
308:24 331:6
333:4 359:5,6
**answering** 312:7
334:23 347:5
351:2,2,9
**answers** 287:10
**anybody** 296:19
**apart** 322:6
**apologize** 291:4
349:5 373:17
**APPEARANC...**
280:10
**appeared** 297:22
378:9
**appearing**
283:10 288:18
**appointed** 374:5
374:7,8
**appointment**
374:1,3
**appreciate** 373:8
**approach**
369:23
**appropriate**
350:20
**approximate**
345:13,25
357:20
**approximately**
283:8 290:6,10
345:20
**AR-15** 368:22
**area** 288:1,14
296:17 305:17
350:15 356:4
**ars-** 364:7
**aside** 292:2
304:1 318:16

**367:5
**asked** 291:6,7,18
296:9 300:12
331:6 337:21
350:23 356:23
357:13 359:5
370:10
**asking** 284:1
285:10 299:8
312:21 351:3,6
372:7
**assault** 365:6
369:14
**assertion** 348:22
**assume** 329:1
338:9 352:10
**attached** 282:23
**attachment**
362:24 363:10
**attempt** 286:6
307:21 308:25
**attendees** 283:10
**attention** 287:25
290:23 329:17
344:18 364:21
365:2 373:24
379:19
**Attn** 379:6
**attorney** 372:15
374:6
**audio** 323:19
358:17 366:22
371:4,6
**audiology**
370:12
**August** 284:1,3
285:17 287:22
289:1 290:24
**automatically**
366:19
**Avenue** 279:24
281:8 378:8
379:1
**aware** 328:24
352:24 353:1

**B**

**B** 282:3 315:3
345:10 353:21
**ba-** 316:19
**back** 283:24
284:5 285:23
288:5 290:24
298:23 300:21
301:18,25
303:2,21 304:4
306:13 307:18
308:16 309:15
309:20 310:9
310:11,15,18
310:19 313:9,9
313:11,16,22
314:5,24 315:8
315:17 320:12
322:25 327:14
334:25 335:22
338:20 341:15
342:16 343:11
343:13,15
353:11,14
362:3 371:23
**background**
285:12
**bad** 323:14
341:18 369:3
**ballistic** 306:15
314:14 331:8
333:25
**ballistics** 297:23
304:1 310:11
**bands** 323:8
370:25
**bang** 316:25
317:21,24
318:2,9,19
324:16 326:14
369:14,25,25
**barrage** 365:5
**barrel** 354:4
363:9
**barrels** 362:17
362:17,22
**base** 304:2

**based** 300:13
313:5 315:1
316:11,12
317:2,7 326:12
336:11,13,16
337:23 338:10
345:15 357:1
363:1 366:1
**basic** 354:20
**basically** 305:7
372:20
**basing** 314:3
316:19,25
317:9
**basis** 316:10
318:4 334:11
335:11 337:7
338:13 339:4
339:12 346:25
347:6 348:3
368:5
**bass** 323:11
327:11
**bat** 372:7
**batch** 293:25
**battering** 369:13
**bear** 284:14
290:18 293:17
304:12 306:21
329:5 342:11
**bearing** 331:12
331:22 332:9
**bed** 301:18
**bedroom** 287:19
290:6,11
301:17,19,25
302:1,5,19
303:3,4,11,12
303:13,18,20
303:22,23
304:6 306:14
307:23,25
308:4,10,22
309:1,3,11,13
309:15,17,20
310:4,8,10,12

310:15,19,20
313:7,15
**beginning** 325:2
**begins** 283:2
**behalf** 279:11
280:11,17
281:5 283:19
**belief** 359:16
376:6
**believe** 288:25
290:4,24
295:17,20
297:1,8 310:24
311:2 313:6
314:1,22 315:7
331:11 332:8
336:12 337:15
337:18 339:7,7
339:11 349:10
349:18,22
357:6 358:22
359:19 360:6
**believed** 290:5
**bent** 352:10
**best** 312:18
351:5 368:24
368:25 369:1,1
369:1 376:5
**bit** 293:17 297:1
**blast** 354:25
355:2,5
**blinks** 290:20
**blood** 313:22
314:21
**Bob** 363:20
**body** 347:25
348:1,10,20
349:7,10,20,23
351:19 352:19
352:21,25
353:4
**bogus** 286:6
372:14
**bolt** 338:19
**Bose** 318:24
319:8,9 322:18

**boundary**
345:17
**box** 313:21
314:22 335:15
335:17 336:15
336:17
**boxed** 314:11
**brake** 362:24
**brand** 363:8,10
**brass** 299:18
304:4,5 308:7
308:7 312:4
313:12,13
338:20 365:24
**breaching** 316:4
**break** 324:12,13
360:12,13
**breech** 339:2
369:14
**brief** 320:6
327:20 353:15
**bring** 373:3
**broad** 327:9
331:14 332:1
**broader** 350:4
**Broadway**
280:14 379:7
**Broccard** 315:13
315:16,23
**buildings** 364:16
**bul-** 297:11
**bullet** 292:12
294:8,15
297:11 298:1
301:6,11,14
302:3,8,11,21
302:25 303:1,7
304:9 305:5,25
306:7,19 307:4
309:14 310:7
339:21 342:4,6
342:8,9,15
343:8 344:1,11
345:14 347:18
347:22 348:10
349:19,22

350:16 353:3
355:2,7,23,24
356:2,4,17,18
**bullets** 303:19
307:8,23,24
308:4,6,8
310:6 314:18
328:14 340:9
340:11,14,22
348:10,20
349:2,10,14
**burn** 348:16
**burning** 356:14
356:19
**busy** 373:9
**buzzing** 355:8

**C**

**C** 282:5 327:23
362:3 364:22
378:1,1
**caliber** 301:9,24
302:23 314:6
327:24 338:25
340:8 346:12
349:20 350:17
354:18 355:21
356:7,10 365:6
**calibers** 296:11
**caliper** 294:8,14
295:3 349:19
**calipers** 298:12
340:16
**call** 342:6,7
**called** 319:12,12
319:21 343:22
368:12
**calls** 297:16
**camera** 294:21
**capable** 355:12
**capturing**
355:13
**car** 325:1,16,16
326:5 357:19
358:9,14,15,17
358:24 359:1
**carefully** 351:24

cartridge 333:14
354:1,5,6
355:15,17,18
363:9
cartridges 339:1
case 283:4
292:15 293:13
296:6 300:11
304:2 305:21
315:1,10
329:15 333:2
333:15 338:18
346:21 356:23
358:23 362:11
362:13,16
cases 333:14
334:4 339:8
casings 308:14
308:18,21
311:23 312:10
314:9,15
categorically
361:15
cause 332:22
340:4 350:1
caused 310:15
causes 354:1
cc 379:25
CCR 279:20,20
378:22,23
379:23
cell 315:1,8,12
317:8,19
318:17,22
320:23 321:7
321:22 322:4
322:13 323:20
324:15 325:2
325:10 326:2,8
326:10 356:22
356:23 357:7
357:14 358:3,5
359:4 360:3,8
361:3 364:12
364:24 365:20
center 309:15

343:23 364:9
Central 283:8
374:20
cents 324:5
certain 353:8
358:1 365:18
certainly 317:5
317:14 325:3,3
Certified 281:9
281:9 378:3,4
CERTIFY 378:5
chain 296:14,15
296:17,25
297:7 324:20
324:20 325:23
334:8,11
335:18 336:20
336:21 337:5,9
337:16 338:15
change 324:4
353:5,7,8
356:20 358:18
358:19
check 299:3
335:8
checked 334:2
336:2,5
checking 334:7
335:19
child 286:13
children 286:7
372:18
circled 288:1
circumstances
353:23 362:6
City 279:6 280:6
280:18,20
283:4 296:4
308:8 313:10
335:14 337:3
338:8 363:16
374:10 377:2
379:11
Civil 281:5
claim 314:14
315:25 339:8

353:25 354:7
369:23
claimed 314:8
claiming 330:4
claims 287:6
class 354:20
cleaned 312:1
328:21
cleaning 335:1
clear 307:24
310:21 313:18
319:4 348:6
349:17,24
358:25
clearly 301:17
301:21 302:1
315:16,24,25
click 324:6
close 306:20
308:6 345:22
355:8 359:13
359:20
closed 307:11
closest 303:13
303:23 304:8
closeup 350:14
cloud 295:19,21
cloudy 349:13
CLVS 280:23
coach 341:13
collected 330:5
340:4
college 297:1
color 282:21
323:14 335:16
colors 335:17
come 285:12
314:24 341:15
coming 291:12
314:5,6
Commission
376:22
common 344:6
368:16 369:21
commonly
343:25

Comparison
282:9
competition
368:16
complete 335:25
completion
281:15 375:1
complied 281:12
complying
321:20 343:12
343:16
compromise
369:12,23
compromised
337:15 369:19
computer 321:2
321:4,8,8,12
321:16,22
323:24 360:21
378:13
concise 311:15
concluded 366:5
374:24
concludes
374:21
concluding
337:7 338:13
conclusion
303:15,17
318:21
conclusions
296:8 330:17
330:19,21,21
330:24,25
341:1 350:19
condition
328:18
conduct 333:21
333:24 374:1,4
conducting
350:22 351:12
364:11 371:4
cone 359:11
cones 323:3,8
confuse 367:9
confused 317:14

317:16 318:11
348:21 349:3
connection
286:12
consider 364:15
365:19
considered
364:20
considering
332:14
consistent 310:6
310:9 334:10
constructed
339:14
consult 284:9
contaminate
296:16,17
context 297:3
CONTINUED
283:21
contradict
315:18
contradicted
316:13 317:3
control 300:7,23
362:22
Cooney 363:20
copies 282:21
293:11 300:8
copy 285:17
373:10,11
379:13,16
corner 307:19
correct 286:13
289:18 292:21
293:9 298:5,8
300:19 302:8
302:21 306:10
306:25 309:5
318:5 320:17
321:23 334:1
342:5,22 344:9
350:22 351:19
354:2,9 365:7
376:5
correction 377:1

379:18
**corrections**
379:16
**correctly** 309:8
337:17 349:8
**corroborates**
348:19
**corrupt** 374:10
**corrupted** 334:9
334:12 337:5,9
**could've** 285:15
**counsel** 281:2,2
283:12 343:12
343:16 378:6
**counsel's** 321:20
**Counselor's**
280:18
**count** 297:10
312:13 314:13
366:1
**counted** 365:23
**country** 369:21
**County** 284:17
374:11 376:2
**couple** 286:17
335:23,24
369:8 371:25
**course** 300:20
306:9 310:1
326:10 365:21
**court** 279:1
280:1 281:9
283:6 284:17
287:6 373:25
374:3,8 378:4
379:18
**covered** 322:12
**covers** 327:10
**crack** 355:1
356:18
**create** 295:9
**created** 334:4
**credibility**
332:13,16
**credible** 284:13
316:16 334:10

**crime** 335:6
343:25 344:4
**cross** 346:5
**crystal** 313:18
319:4
**CSR** 279:20,20
378:22,22
379:23
**currently** 322:20
**curriculum**
297:5
**curve** 324:6
**custody** 286:7
286:13 293:8
293:10 296:14
296:15,18,25
297:7 334:12
335:18 336:20
336:22 337:5,9
337:16 372:14
**cut** 301:22
335:15

---

## D

**D** 280:19
**Dale** 374:5
**damage** 297:23
310:11,16
**danger** 370:7
**dangerous**
369:18
**date** 292:17
293:1 294:16
298:6 342:17
342:18,22
343:4
**daughter** 372:24
**day** 283:25
290:25 292:18
292:18,21
295:5,16 296:8
296:12 299:21
310:22 328:1
328:10 331:13
332:10 339:8
342:24 352:7
358:3 371:24

376:15 378:16
**Daylight** 283:9
374:20
**dB** 359:10
**dead** 342:1
**Dear** 379:12
**death** 304:13,18
304:23,24
**decades** 370:4
**deceased** 302:19
**decedent** 351:25
**decision** 372:19
**deemed** 298:9
**defect** 344:19
347:21 349:25
350:7
**defects** 343:6
348:22 349:4,6
**Defendants**
279:8,11 280:8
280:17 281:2,6
283:14,19
**Defendants'**
282:3,5,7,9,11
282:13,15,17
282:19,21
288:10,22
290:1 293:23
294:1 329:11
329:12,19,21
344:17
**definitely** 297:6
301:8 353:7
359:22
**definitive** 289:4
**definitively**
288:6
**degree** 343:20
346:17 347:15
361:13,13
**degrees** 346:24
**Dell** 321:10,22
**Department**
338:8,10
**dependent**
355:15

**depending**
354:17
**depends** 354:24
355:9,10
**depicted** 289:8
301:11,15
302:4 342:13
347:21 350:7
364:12 366:22
**depicting** 288:13
**deployed** 317:21
324:17
**deploying**
318:19
**deployment**
316:24
**deponent** 281:15
377:21 379:16
**deponent's**
379:17
**deposition**
279:10 281:3
281:11 282:13
282:15 283:2
283:25 285:24
317:6 318:6,17
326:23 341:8
341:11,15
350:24 351:20
371:22 372:8
373:6 374:21
374:24 377:1,1
379:14
**depth** 326:5
**describe** 321:21
333:6
**described** 346:2
**describing** 367:6
**designed** 323:15
350:15,18
**destroyed**
328:15 350:16
**detail** 343:2
**detailed** 361:14
**determination**
307:3 343:18

344:21 345:12
346:3
**determinations**
299:1 306:17
307:7
**determine** 288:3
290:15 291:21
292:9 307:21
308:25 311:21
312:8 328:1,9
340:24 344:1
344:11 349:9
361:2 365:9
366:12 367:7
**determined**
289:14 312:20
352:18 367:17
**determines**
366:19
**determining**
305:10 366:24
**developed**
369:20
**device** 321:1
355:12 356:24
360:17
**devices** 319:14
**di-** 318:10
**diagnose** 287:4
**diagnosed** 284:6
286:25
**diagnosing**
287:8
**diagonal** 310:4
310:18
**diameter** 303:20
311:13 353:25
354:4
**dif-** 314:9
**difference** 323:1
323:4 356:8,9
363:7
**different** 283:11
288:13 302:8
302:22 314:9
314:13 317:17

323:16 333:8
335:10,16,16
335:18 337:8
339:19 344:20
353:4,23
354:19 355:16
355:17,18,19
361:9 362:6
363:8
**differently**
323:15
**difficult** 367:20
**dig** 336:21
**digging** 285:12
**digital** 294:8
**dining** 342:4
343:9 347:1,7
348:4 350:9
**direct** 283:21
329:17 344:18
364:21 365:2
373:24
**directing** 287:25
290:23
**direction** 296:11
304:11 345:13
**disable** 347:3
**disagree** 311:9
325:5 365:10
**discreet** 324:25
**discussed** 304:2
**discussion**
300:24
**disorder** 284:7
284:12 287:1
**displays** 366:20
**distance** 346:7
346:23 347:19
348:15 350:4
357:23 360:23
361:4
**distances** 306:18
306:20
**distinct** 301:6
355:3 365:9,23
**distinctive** 354:2

**distorted** 340:13
**District** 279:1,1
280:1,1 283:6
283:6
**disturbance**
355:9
**dive** 284:5
**Division** 279:2
280:2 283:7
**divorce** 286:12
**doctor** 372:6,11
**document**
284:16 285:1
285:16 286:3,6
286:9 289:23
289:24 299:7
299:12 300:23
301:5 305:4
329:7,9,14
331:1 342:11
**document-hea...**
293:18
**documentation**
289:13,17
295:15 298:1
298:15 305:8
**documented**
304:5
**documenting**
292:20 293:2
346:13
**documents**
285:13 329:6
337:25
**doing** 295:3
325:12 334:7
335:1,19 341:2
351:16 353:13
**door** 287:19
290:6,11 291:1
291:3,5,9
301:17,19
302:1,2,5,12
302:16,18,19
303:3,4,5,7,11

303:12,13,23
303:23 304:6,8
305:23 306:9
306:11,11,12
306:13,13
307:10,11,13
309:6,8,11,15
309:16,25
310:2,4,6,8,8,9
310:12,15,18
310:20 313:7
316:5 342:8
369:25
**doorknob**
307:17
**doors** 305:6,21
312:2 313:6
**double** 344:14
**doubt** 340:5
**Dowd** 279:16
280:13,13,13
283:15,15
284:2 285:2,4
285:6,15,19,21
285:23 286:2
286:16,19
287:9,13
291:14 294:19
294:21 295:7
295:17,23,23
295:24 296:6,9
297:16 298:5,5
299:24 300:1,3
311:3 312:17
316:22 317:22
320:15 321:6,9
322:7,9 327:19
330:8,11,13
331:6,14,25
332:7,11 333:7
333:23 336:20
337:10 340:1
341:3,7,9,11
341:14,18
342:19,19
347:8 352:1,24

357:9,11 359:5
369:5 370:8,11
370:14,18
371:11,13,17
371:19,25
372:4 373:5,12
373:14 374:15
374:17 379:6,6
379:6,12
**Dowd's** 373:18
**Dr** 286:12,25
374:3,9
**dramatically**
314:23 354:18
358:19
**draw** 318:21
346:6 350:19
**drawing** 317:5
**drive** 300:9
**drop** 306:19
319:16
**due** 337:6
**duly** 378:11
**dwelling** 369:24

**E**

**E** 349:5 372:3
378:1,1
**e-mail** 295:19
379:9
**e-mailed** 295:18
**ear** 319:3 355:8
**earlier** 309:6
357:6
**early** 298:7
**easily** 354:19
**Eastern** 279:1,2
280:1,2 283:6
283:7
**edge** 307:17
344:3,12,15
345:2,12 346:4
346:19
**edges** 344:4
**editing** 371:1
**effect** 281:12
313:18 362:25

**effective** 305:9
360:1
**eight** 346:24
**either** 313:18
353:1
**El** 368:13
**electrical** 323:4
**electronic**
295:18 373:11
**emitted** 321:11
321:12,23
**employees** 338:7
338:9
**Enclosed** 379:13
**engineer** 370:21
370:23
**engineering**
297:7 370:13
371:3
**engineers**
370:23
**enhance** 323:6,9
**ensure** 296:7
**enter** 349:7
370:1
**entered** 309:7
331:10 349:10
349:17,19
**enters** 348:11
**entirely** 309:16
**entrance** 292:10
**entries** 291:25
297:12
**entry** 288:2
289:9,14,16,19
290:16 291:21
292:7 298:9,17
304:7 324:24
343:24 352:16
369:18
**envelope** 340:5
**environment**
361:12 363:3
363:13,17,24
364:2,17
**equals** 345:10

Page  384

**equation** 361:5
**equations**
306:16,19
**equipment**
318:22 319:20
321:15,25
322:2,12
340:14
**Erin** 280:19
283:14 369:5
372:7
**Esq** 280:13,19
280:19 379:6
**establish** 307:10
**established**
315:22
**et** 279:3,6 280:3
280:6 283:4,4
377:2,3 379:11
379:11
**ETU** 351:21
**event** 326:9
354:12,23
355:14
**everybody**
374:15
**evidence** 282:7
291:15,15
295:13 296:10
296:14 303:19
303:21 304:1,5
304:10 307:24
309:2,12,12
312:18 313:6
313:10,17
314:1,14,23
318:16 319:24
328:5 329:3
330:5 331:10
333:25 334:3,3
334:7,9,25
335:8,13,15,17
335:22,22
336:1,2,5,10
337:2,19
338:15 340:3,4

340:25 348:6,9
348:17 349:14
349:17 350:13
351:22 365:24
365:25
**ex-wife** 286:7
**ex-wife's** 372:15
**exact** 307:10
342:24 360:21
361:4,16
**exactly** 297:24
301:20 307:6
311:7 323:13
325:9,9 339:14
339:21 352:8
**examination**
283:21 333:22
373:20 374:2,4
378:12
**examinations**
350:22 351:13
**examine** 333:13
360:8
**examined**
283:18 286:11
286:15,18
378:11
**examiner** 351:21
352:18
**examiner's**
353:5
**example** 356:12
**excuse** 303:11
**exhibit** 282:1,1,3
282:5,7,9,11
282:13,15,17
282:19,21
284:14 288:9,9
288:10,21,22
289:8,23,25
290:1,18,24
293:16,23
294:1,24
300:21 301:5
301:11,13,15
302:4,20

306:24 307:4
315:3 327:23
329:11,12,20
329:21,24
338:24 344:17
349:5,5,6,25
353:21 362:3
364:21 373:23
**exhibits** 282:23
293:23
**exit** 288:2 289:1
289:9,14,15,19
290:6,8,13,16
290:25 291:10
291:16,21,25
292:5,9 297:12
304:7 349:20
**exits** 348:11
**exonerate**
298:14
**expect** 328:8
**expected** 308:3,5
308:7 328:17
**expensive**
318:24
**experience**
297:8 350:21
351:12,16
371:2,4
**Expires** 376:22
**exposed** 370:7
**extend** 346:5
**extensively**
370:23,24
**exterior** 302:17
**extremely**
319:13 348:24
367:14,20

**F**

**F** 378:1
**face** 339:2
**facility** 368:18
**fact** 287:2
311:12,18
313:23 314:7
314:21 316:12

316:14 317:3
365:21
**factoid** 356:6
**facts** 291:15
**fairly** 345:22
**familiar** 330:15
332:17 335:13
360:25 368:15
**Family** 284:17
**far** 305:15
307:17,19
325:22 332:14
356:22 357:14
359:9,12
**fast** 330:12
367:20,23
369:4
**faster** 356:19
368:24
**father** 286:9
**Federal** 281:4
281:12
**feedback** 368:14
**feel** 341:18
**feeling** 358:14
**feels** 369:18
**feet** 311:14
326:1,4,6
345:20 346:24
357:7,21 361:9
361:10
**fence** 324:20
**fences** 325:24,24
**fidelity** 319:2
**field** 296:16
**file** 283:2 295:18
295:21 325:7
**filing** 379:18
**filming** 358:10
**finally** 285:9
**find** 284:13
298:13 299:3
306:8 308:3,5
308:7,8,14,18
308:21 309:2,4
310:11 364:20

369:22 379:13
**finding** 298:18
332:21
**findings** 299:7,9
330:15 331:21
332:8,18,19
333:6,12
**fine** 327:19
**finish** 338:6
**finishing** 305:22
305:24
**fire** 296:11,11
329:2 335:5,8
338:17 347:17
349:2 356:13
356:17 361:19
361:21 363:20
363:21 364:9
367:22 368:19
368:23
**firearm** 282:9
356:8
**fired** 296:11
301:24 303:17
303:20,21
307:23,25
308:4 309:6,10
310:17 311:14
311:22 312:9
312:14,22
313:3,5,8,11
313:12,19
314:8,14 328:1
328:9,18,25
330:4 331:13
331:23 332:10
334:4,5 335:23
339:2,8 342:9
343:20 345:14
345:14,21
352:7 353:22
355:4,10
356:13 362:5
362:19 363:3
363:13 364:1
365:11,25

366:23,24
367:6,8 368:3
**firing** 309:12
313:4 331:7
338:19 339:1
352:10
**firm** 295:18
296:6 298:5
**first** 289:24
292:18 293:2
298:11 306:4
319:19 342:16
349:23 366:25
**five** 315:22
324:10 333:4
334:6 335:9,11
338:23 342:8
350:2,3
**fixtures** 312:2,3
**flash** 316:24
317:21,24
318:2,9,19
324:16 326:13
362:24 369:14
**flat** 324:5
**flaws** 323:13
**flight** 355:2
**flip** 294:22 301:2
321:19
**floor** 299:6
313:10 341:24
342:1,4 343:9
347:1,7,23
348:4,7 349:2
349:23 350:2
350:11,16
352:16 353:9
**flying** 356:3
**follow-up**
373:18
**followed** 299:21
**following** 299:16
**follows** 283:19
358:6
**footsteps** 324:19
325:25

**force** 281:11
**foregoing** 376:5
**forensic** 371:4,7
**forensics** 297:2
**forgive** 356:23
**forgot** 341:20
**form** 332:1
344:3 361:2
**formally** 298:4
**forming** 329:14
**formula** 345:11
**Fort** 364:8,8
**forth** 343:11
**found** 284:10
303:19,20
304:4,6 308:7
308:16,16
309:12 313:9
313:12 314:10
348:1
**four** 295:6 301:6
308:16 339:19
339:21 345:20
366:25 367:5
372:25
**fourth** 302:21
**Fowlkes** 368:21
**fragment** 349:11
349:12
**fragmented**
349:21
**fragmenting**
303:24
**frame** 305:23
307:17,19,20
316:1,22
325:17 365:11
**frames** 312:2
**frangible** 349:15
**frequencies**
320:1 324:2
327:9
**front** 290:7
302:1,13,15,18
303:4,4,7,9,13
303:23 304:8

306:13 309:7
310:8,20
320:10 326:5
342:8 357:20
**full** 349:14
372:24
**function** 334:19
**further** 281:14
350:4 373:20
373:25 374:13

### G

**gain** 286:7
**gates** 316:14
**general** 297:13
312:12
**generally** 292:9
355:5 356:3
359:13
**generating**
296:14,25
**getting** 290:19
337:13 366:4
367:25 372:17
**gi-** 286:14 296:1
**Gina** 279:3
280:3 283:3
377:2 379:11
**give** 285:9
289:22 297:20
300:22 319:11
319:16 323:9
327:16 332:15
340:17 351:4,7
361:16 368:14
369:8,8,17,22
370:9
**given** 286:14,17
296:2,3,4
341:23 369:19
**gives** 320:13
360:24
**giving** 300:15
**glass** 341:3,4,19
**go** 285:11 288:8
288:20 293:22
298:23 301:2

311:5 315:2
319:6 320:2
324:11 329:10
330:9 332:20
336:6 343:11
343:13,15
353:19 370:5
370:18 371:6
**going** 284:14
285:2,2,4,7
287:15 290:17
293:17 294:22
301:2 305:21
305:22,23
322:25 326:18
338:16,17,21
347:17 353:13
360:11,12
364:18 369:5
370:4,8,11
371:9 374:22
**good** 283:24
297:20 306:2
322:19 323:14
357:2
**goodnight**
374:18
**gotten** 358:25
**grab** 320:3,5
353:13
**grain** 356:13,17
**grandfather**
334:18
**ground** 345:20
347:14,19
348:14,14,23
349:1,1
**group** 293:20,23
293:23 294:1
350:7
**guess** 317:14
326:4 337:4
348:21 349:3
352:4 357:20
**guitar** 327:4
**guitars** 327:11

**gun** 303:17
314:21,22
328:17,21
334:2 335:5
338:22 342:9
344:24 348:7
354:1
**gunfire** 359:17
359:18
**gunpowder**
328:12 338:21
**guns** 354:1
**gunshot** 354:11
354:22
**guy** 338:20
347:13
**guys** 367:23
368:21 374:19

### H

**ha-** 373:5
**half** 292:23
364:18
**Hall** 280:20
**hallway** 310:5
**Hammett**
327:25 341:23
346:25 347:23
352:2
**Hammett's**
349:7,10
351:19
**hand** 294:7
368:8
**handgun** 367:19
**handguns**
363:22
**handle** 334:13
335:10 359:21
**handled** 296:20
335:12 336:10
336:13 337:2,7
337:18
**handling** 338:14
**hands** 328:23
**happen** 326:24
**happened**

312:22 374:7
**happening**
340:6 348:2
**hard** 301:7
342:7 345:25
345:25
**hardwood** 342:4
**headphones**
319:17 322:15
322:16,19,20
**headstamps**
314:10,13
339:13,17,19
**hear** 304:16
312:25 315:7
315:17,24
316:1,3,14,15
316:21,23
317:7,20
318:18 324:16
324:18,18,19
324:21 325:23
325:23 327:2,9
327:10,12
354:25 355:1,5
355:8
**heard** 304:21
317:12 324:19
324:20 326:16
353:22 361:17
361:19,21
362:4,19 363:2
363:12,25
364:4
**hearing** 326:25
327:5,13
**heavier** 340:11
356:2
**height** 345:13,19
352:6
**held** 283:9
358:20
**hereunto** 378:15
**herewith** 378:14
379:13
**Hiawatha**

279:24 281:7
378:8 379:1
**hider** 362:24
**high** 319:2,13
323:5 345:7
**highly** 311:18
339:18 352:14
**Highway** 363:17
**hired** 372:6,11
372:16,16
**history** 369:16
374:11
**hit** 301:19
302:13 303:3
310:20 313:7
347:19,20,25
349:22
**hitting** 347:23
**hold** 320:5
321:17 326:10
**holding** 294:7,14
295:3 320:16
359:3
**holds** 354:1
**hole** 288:2,2
289:1,8 294:8
294:15 298:9
298:10,13,14
298:17,19,20
298:22 299:1,3
299:4,5,18
301:8,11,14
302:2,3,8,11
302:21 305:15
305:17,19
306:7
**holes** 289:15,19
290:6,8,13,14
291:1,10,16,21
291:25 292:7,9
292:10 297:10
297:11,11,15
297:22 298:2
298:19 301:6,9
302:23 304:6,7
304:7 305:11

307:4,14,15,16
307:18 308:8
314:16,16
342:4,6 344:2
344:14
**home** 300:14
302:16,17
303:5,14 310:5
313:13,14,15
370:5
**honestly** 311:6
**Hood** 372:19
374:5
**hooked** 321:14
321:16
**horizontal**
348:18
**Hornady** 349:15
**horrifically**
369:3
**hour** 371:10,18
**hours** 285:9
287:11 295:6
369:5 371:22
**house** 296:12
301:18,25
302:13 303:2
303:22 304:4
309:21 310:19
313:9,11,17
314:5,7,7
315:25 324:22
352:11 364:1,3
364:3
**housekeeping**
289:22
**houses** 364:18
**huge** 314:19
**human** 319:3
**humor** 351:3,7
**hundred** 326:6
357:21
**hundreds** 296:3
**hundredth**
360:18
**hypotenuse**

345:9 346:8

**I**

**identical** 339:20
**identification**
288:11,23
290:2 294:2
329:13,22
**identified**
298:17
**identify** 283:12
**II** 279:10 281:3
283:2 374:21
377:1 379:13
**IL** 279:20
378:22
**Illinois** 378:5
**image** 302:25
306:22
**imagination**
286:15
**imagine** 298:7
340:6
**immediate** 309:7
**impact** 304:9
305:25 307:18
342:15 343:10
343:17,19
344:13,14,20
344:22
**impacts** 309:14
310:7 342:6,9
343:8 346:5,12
347:15,25
348:6
**imperfect**
300:19
**impossible** 288:5
339:19 348:12
359:2 368:19
369:4
**impressions**
339:2
**imprint** 305:18
338:19
**improper**
338:14

**improperly**
336:24 337:1
**inch** 367:13
**inches** 307:19
348:16 362:17
362:18
**include** 310:23
310:25 311:16
312:15
**included** 311:9
**including** 299:5
**incorrect** 291:1
**increase** 323:10
**incredible** 368:9
**independent**
352:17
**INDEX** 279:14
282:1
**indicated** 379:17
**indicates** 338:25
**indicating**
348:17
**Indirectly** 356:2
**individuals**
336:23
**industry** 287:3
**information**
287:14 292:2
312:15 332:24
333:9
**initial** 366:5
368:2
**initially** 298:11
**injuries** 351:19
**inside** 301:18
302:18 303:18
304:7 313:13
358:10,16
364:3
**inspected** 293:7
328:18
**inspection**
292:21 293:4
293:14
**inspections**
300:13

MASUGA REPORTING SERVICE
314/680-2424

instruments
  327:8
**Inter** 328:2,25
  331:12,22
  332:9 339:3
  362:9 363:2,6
  363:8
**interested**
  295:13
**interposing**
  370:15
**interpretation**
  364:23
**interrupt** 328:19
**intersect** 345:19
**interwoven**
  349:16
**inventories**
  295:14
**inventory** 295:9
**investigation**
  285:11 304:14
  304:18,19,22
  304:23,24
**investigators**
  344:1,4
**iPhone** 357:1,5
**irrelevant**
  359:17,19
**issuance** 281:10
**issue** 328:16
  341:16
**it'll** 343:4

**J**

**J** 282:9 329:20
  329:21,24
  338:24
**jacket** 349:14
**jammed** 334:19
**jaws** 343:23
  349:18
**JBL** 319:10
  320:12 322:14
  322:25
**job** 306:2
**judge** 369:17,22

371:23 372:19
  374:10
**judges** 370:1,9
**Judgment**
  282:19 289:25
**June** 306:10
  331:24

**K**

**K** 280:13,19
  379:6
**K-2** 282:11
  290:24
**K-2-4** 282:13
  288:21,22
  289:8
**K-2-5** 282:15
  288:9,10
**K-3** 282:17
  306:24
**keep** 311:15
  368:11
**kept** 298:18,19
**kids** 367:23
  370:6
**killed** 341:23
**kind** 295:9
  319:20 321:8
  322:16 324:22
  332:6,6 357:25
  358:9 360:12
**kinds** 363:20,21
**kitchen** 308:17
**knock** 370:3
**knock-and-an...**
  369:13
**knocking** 357:15
  357:15
**know** 287:8
  290:13 292:11
  294:16,18
  297:18 301:16
  301:20 302:10
  312:3 317:17
  322:8,24
  323:23 324:21
  327:7 334:6

336:4,7 337:22
  342:17 343:20
  343:21 344:7,8
  346:7,16,23
  351:8,23,25
  352:3,6 354:7
  356:24 357:3,4
  357:4,25 358:9
  358:13 360:20
  361:7,14
  364:17 369:25
  372:25 373:9
**knowing** 353:21
  361:4
**knowledge**
  376:6
**known** 304:17

**L**

**L** 279:11 281:4
  282:5 283:3,17
  374:22 376:4
  376:11 377:1
  379:14
**lab** 330:3 332:12
  332:15 334:4,5
  335:7 336:19
  337:8
**label** 288:20
  289:23 293:22
**labeled** 340:25
**laboratory**
  282:9 329:18
  336:19
**laid** 343:23
  346:19
**larger** 292:10
  307:16
**largest** 305:18
**laser** 289:5
  292:8,14,16,17
  298:12 304:8
  305:12,17,20
  305:22,24
  307:14 344:12
  344:13
**lasers** 344:4

**lasted** 372:23
**lately** 322:17
**law** 295:17
  296:6 298:5
**lay** 345:11 346:4
**layer** 345:17
**laying** 312:4
  348:13,14
**leads** 310:9
**leaning** 313:23
**left** 290:11 310:3
  348:11 349:20
**legally** 327:25
**length** 324:2
  357:19 366:8,9
  366:10 367:11
  367:15
**length's** 363:9
**Leonard** 364:8
**let's** 288:8,20
  289:23 293:22
  319:19 324:5
  326:20 329:10
  329:19 343:15
  361:25
**level** 345:25
  359:11 360:19
**levels** 359:22,23
  359:25 361:1,6
**light** 298:12
  368:25
**lighter** 356:4
**Lightfoot**
  286:12,25
  374:1,3,9
**lightning** 290:19
**liked** 328:11,11
  328:13
**limit** 287:9
**limited** 317:25
  361:8
**limits** 359:10
**line** 285:8 310:6
  310:9,18 377:4
  377:6,7,9,10
  377:12,13,15

377:16,18
**lines** 345:17
  346:5
**link** 324:20
  325:24
**list** 282:7 330:20
  366:20
**listen** 319:1
  325:7
**listened** 322:14
  351:20
**listener** 323:9
**listening** 315:16
  315:23 323:17
**listing** 336:7
**lists** 295:14
  330:4
**literally** 304:11
**little** 289:21
  297:1 318:11
**live** 351:14
  354:13 364:9
  372:24
**living** 290:7,10
  299:6 308:15
  308:19
**lo-** 342:16
**located** 302:14
  307:22 309:1
  310:15 342:4
  348:1 350:7
**location** 289:20
  290:16 291:22
  292:5 325:20
  359:3,16,19
**locations** 283:11
**Logitechs**
  322:18,21
**long** 292:25
  295:5 311:5
  323:25 324:8
  359:17,20,24
  367:14,21,22
**longer** 292:24
  334:15,17
**look** 287:23

289:6 295:19
301:3 312:1,3
312:5 314:20
323:24 324:1,2
324:8 330:8
333:19 335:16
335:18 338:18
339:14 340:17
343:2 368:13
368:13
**looked** 287:16
289:23,24
299:18 300:9
309:3 311:6
325:11,15
330:20 340:13
342:19
**looking** 288:4
289:11 294:23
298:13,14,20
305:22,23
312:10 314:22
339:24 340:1
344:17 349:4,6
**looks** 286:6
288:9 330:3
331:7,7,8
364:25
**loss** 327:5,13
**lost** 332:6,6
**lot** 305:8 312:13
313:4 324:23
325:25 332:15
332:24 336:8
356:5 364:14
373:8
**Lou** 280:23
**loud** 354:11,23
**louder** 359:14
360:1
**Louis** 279:6,25
280:6,15,21
281:8 283:4
284:17 296:4
308:8 313:10
335:14 337:3

363:16 374:10
374:11 377:2
378:8 379:2,8
379:11
**Louis'** 304:5
**low** 327:12
348:11 352:12
**lower** 307:19
323:10 352:10
356:3 359:22
359:25
**LSR308** 320:13
**lubricated**
328:21
**lying** 317:18
341:24 342:1
347:1,7 348:4
348:23

___

**M**

**M** 372:3
**ma'am** 302:6,9
307:1 309:9
310:13 315:11
341:25 347:11
350:23 354:10
358:13 359:6
361:22 362:2
368:4 371:7
**ma-** 305:20
**machine** 343:22
**maga-** 312:5
**magazine** 312:5
**magazines**
349:16
**magnets** 323:3
**magnified**
340:17
**magnifying**
341:3,4,19
**main** 318:20
**making** 306:16
**manipulated**
314:1,23
**manufacture**
356:7
**manufacturer**

314:11
**manufacturers**
339:21,22
**map** 351:18
**mapping** 305:7
**mark** 288:8
289:15,23
297:8 301:21
302:1 329:10
329:19 344:11
350:17 365:3
371:10,18
**marked** 288:11
288:23 290:2
294:2 306:24
308:9 327:23
329:13,22
353:21
**Market** 280:20
**markings**
338:18,19
**marks** 328:13
345:18 348:16
350:2,13 353:9
353:9
**married** 284:8
287:7 372:25
**Masuga** 279:20
279:24 281:7,9
378:3,7,22
379:1,21,23
**match** 314:14
331:9 334:5
339:22 368:3
**matches** 302:2
313:13
**matching** 339:2
**mathematical**
345:11
**matrix** 356:5
**matter** 283:3
287:2 313:24
325:21 331:18
341:23 358:16
359:4,12 363:6
363:11 365:21

379:14,19
**matters** 359:8
**maximum**
305:20
**Maxx** 368:22
**McGowan**
279:15 280:19
283:14,14,22
284:16,20,22
284:23 285:14
285:16,20,22
285:25 287:18
287:21 288:8
288:12,17,20
288:24 289:21
290:3,17,22
293:16,19,22
294:3 296:21
296:23 300:22
301:1 317:24
318:3 329:10
329:19,23
330:10,14
340:2,7 341:5
341:7,12,21
352:2,5 369:7
369:10 370:17
370:19 371:8
371:12,14,18
371:20 373:16
373:21 374:12
374:16,18
379:18,25
**mean** 297:11
307:5 308:1
314:19 317:14
325:6,11,24
326:19 328:5
328:20 330:17
332:19,20
333:12 334:6,8
334:19 339:22
354:13 365:7
365:25 369:1
369:15
**means** 334:3

**measure** 292:12
298:12 345:2
357:23 360:14
**measured** 301:8
301:9 304:9
**measurement**
298:16,22
**measurements**
298:9 301:5
**measures** 344:5
360:18,22
**measuring** 294:8
294:15 295:4
301:21 346:11
**media** 305:6
**medical** 284:10
348:8 350:22
351:12,21
352:18 353:2,5
**meeting** 283:9
**member** 347:3
**members** 368:11
**memoranda**
350:6
**memories**
300:18
**memory** 300:15
307:20 346:20
346:21
**men** 372:25
**mental** 284:7
374:2,4
**messy** 308:11
**metal** 349:14
**methodology**
305:10 344:25
366:15
**mic** 359:17,18
**micro-** 357:25
**microphone**
358:7 359:10
359:20,24
**microscope**
333:17,18,25
**microscopically**
340:23,25

midrange
  323:10
mil 307:16,18
  312:5 356:16
  356:21
millimeter 294:8
  294:15 298:19
  301:8 333:14
  338:25 354:8
  356:12 367:4
mind 371:8
minus 326:4
  357:19
minute 285:6
minutes 319:16
  324:10 333:4
  343:7 349:4
  369:8
missed 308:10
  365:24,24
Missouri 279:1
  280:1 281:8
  283:6 284:18
  378:5,9
Misstates 337:10
  357:11
mix 340:3
mixed 339:13,16
mixing 319:24
MMPI 287:4
MMPI-2 286:22
mo- 319:15
MO 279:20,25
  280:15,21
  378:23 379:2,8
model 319:7,11
  319:16 320:13
  322:23 331:13
  331:23 332:10
  339:3 361:19
  361:19 362:19
  362:21 363:12
  363:25 366:7
Modification
  282:19 289:25
moment 304:12

327:16
monitor 319:20
  319:21 320:19
  321:13,14,16
  322:25 323:1,5
  323:11 327:16
monitors 319:10
  319:12 322:14
months 326:24
  331:4 333:3
  372:23
motion 286:2
  360:6 371:22
  374:14,24
move 285:7
  296:21 324:6
  359:11 361:7
  370:16
moved 325:25
  348:1
movement 326:8
moving 288:12
  293:16 298:19
  301:13 344:16
  346:1 352:11
MP5s 363:22
MP5SDs 363:22
multiple 310:17
  334:23,24
  336:12 345:18
  346:5
music 319:24
  323:6 371:1,1
  371:2
musician 327:2
  370:24
muzzle 354:25
  355:2,5 362:24
  363:10

## N

N 282:19 289:25
  290:1 372:3,3
  373:23
name 319:16
  324:1 337:22
  378:16

named 299:17
names 336:7
narcicisstic
  284:11
narcissistic
  287:1
narrow 349:18
Navy 351:14
near 310:15
necessarily
  349:7,22
need 292:2
  322:3,5,5
  331:2 344:15
  350:1,3 373:3
negative 328:4
neglected 289:22
never 307:24
  327:25 328:2
  331:13,23,23
  332:10 347:15
  347:18
new 285:13
  288:18,19
  368:9
ni- 367:2
night 370:6
nine 338:25
no-knock
  369:17,19,22
  369:24 370:9
Nodding 284:19
  284:21
noise 324:23
non-responsive
  370:16
nonresponsive
  296:22
normal 315:22
  347:13 360:20
normally 338:15
North 280:14
  379:7
notarized
  379:17
NOTARY

376:21
note 327:10
  371:21 379:16
notes 292:20
  346:13 350:5
  371:9,14
nother 328:16
notice 281:10
  335:14
number 283:2,5
  289:20 290:8
  293:25 297:14
  297:20 298:1
  311:22,22,23
  312:9,10,13
  314:15 319:16
  320:13 337:6

## O

O 372:3
oath 330:23
object 285:6,7
  291:14 297:16
  299:24 300:1
  317:22 321:6
  331:25,25
  370:11,14,15
objected 332:7
objection 300:3
  312:17 316:22
  321:9 331:6,14
  337:10 347:8
  357:9,11
  370:15
objections
  332:11 333:7
observation
  326:12
observed 290:25
obvious 303:16
obviously 313:4
  328:6 345:15
  348:17 358:24
  366:1
occasion 362:9
occasions 373:8
occurred 347:22

off-the-record
  300:24
offering 300:10
Office 280:18
officer 313:3
  315:21
officers 313:4,21
  313:25 314:17
  315:18 316:13
  316:21,23
  317:20 318:7
  318:18 324:16
  326:16 348:24
  352:6,9,12
  354:15 369:11
officers' 317:6
  326:13
offices 281:7
  378:7
Oh 285:14 291:4
  355:16 370:17
  372:14,14
okay 284:14,22
  286:5,19,24
  287:15,17,22
  288:17,20
  291:10 294:6
  294:13 299:12
  300:18 301:4
  302:14,20
  303:6 306:23
  307:2,12
  309:10 313:24
  314:3,7 315:3
  315:15 316:17
  317:5 318:4,7
  319:9,22 320:8
  321:21 322:23
  322:25 324:11
  324:14 325:4
  330:7,11,13,15
  331:5 332:5,23
  333:5,10
  334:14 335:23
  336:4 338:20
  343:1,25

344:21 345:4,6
348:6,7,13
350:5 353:17
353:25 355:6
355:23 361:2
361:12 362:3
365:2 367:25
371:25 372:21
372:21 373:2
374:8
**old** 367:24
**once** 289:2
343:11
**One's** 323:16
**ones** 299:5
**open** 309:16
325:19 335:15
**opens** 310:5
**operate** 327:8
**operates** 359:24
**operator** 345:15
345:21 348:7
348:14
**operators**
354:16
**opinion** 291:12
310:14,17,23
310:25 311:8
313:24 316:5
316:10 318:5
318:18 328:2
331:12,22
332:9 335:4
336:23 341:22
347:6,21
349:24 353:6,7
353:8 369:11
370:4
**opinions** 282:5
285:10 292:14
293:13 300:11
300:12 314:25
315:9 317:6
329:15 331:18
333:2 361:3
**opposite** 305:19

**order** 361:2
**ordered** 373:25
374:3
**Ordnance** 328:2
328:25 331:12
331:22 332:10
339:3 362:10
363:2,6,8
**organ** 354:4
**original** 288:15
299:2 343:24
379:15,17,18
**originally** 288:3
**originated**
344:23
**originating**
281:6 378:7
**outside** 308:16
313:12,14,15
314:6 315:25
**overlap** 365:22
366:1
**overlapped**
365:13
**overlapping**
365:7,11,15
366:23 367:1,6
367:9
**Overly** 331:14
331:25 332:1
**overmodulated**
360:2
**owned** 327:25

**P**

**P** 282:21 293:23
294:1,24
300:21 301:5
301:11,13,15
302:4,20
344:17 349:6,6
349:25 350:7
**p.m** 283:8
374:25
**PACT** 360:14,16
366:14,16,17
366:18 367:9

368:8
**page** 279:14
282:1 301:11
301:13,15
302:4,7,20
315:6 327:22
344:17,18
347:22 349:25
353:11 361:25
364:22,22
366:3 368:1
377:4,6,7,9,10
377:12,13,15
377:16,18
379:15,17,18
**pages** 301:3,4
331:1 332:25
333:1
**pair** 320:9 347:4
**Paragraph**
315:15,17
353:20 366:5
373:24
**parallel** 343:22
347:14,20
**part** 297:5
354:14,20
364:19 370:25
**participated**
351:15
**particular**
348:22 362:19
366:7
**particularly**
292:10 367:21
**party** 374:2
**passerby** 315:9
**passing** 347:22
**path** 292:8,11
305:5 343:24
344:11 348:9
**paths** 348:20
**pause** 320:6
327:20 353:15
**PC** 280:13 379:6
**PD** 296:4 313:11

335:14 337:3,8
**pending** 281:15
283:5 371:23
374:13,14,24
375:1
**penetrating**
303:23
**people** 305:6,8,9
334:7,13,24
335:10,12,18
335:24 336:2,8
336:8,9,13
337:2,6,18,20
338:23,23
354:14 357:15
368:7
**perfect** 312:13
324:7
**perfectly** 326:11
**perform** 304:13
304:17,24
306:6 335:5
338:16
**performed**
305:1 306:3
326:25 328:9
**performing**
346:9
**period** 365:16
**permanent**
312:2
**person** 299:16
300:14 325:11
325:20 326:2
347:18 351:22
358:9 359:3
362:20 368:19
372:16
**person's** 359:9
**personality**
284:11 287:1
**personally** 336:8
351:18
**personnel** 337:8
337:8
**pertinent** 287:13

287:14
**Ph.D** 374:1
**phone** 315:1,8
315:12 317:8
317:19 318:17
318:23 320:23
321:7,22 322:4
322:13 323:20
324:15 325:2
325:10 326:2,8
326:10 340:16
340:21 356:22
356:23 357:7
357:14 358:3,5
358:20 359:4
360:3,8,10
361:3 364:12
364:24 365:20
**photo** 282:11,17
288:18,19
294:4,10
306:25
**photograph**
288:4 289:10
293:25 296:9
299:13 301:12
301:20 307:9
342:13,17,20
342:25 343:4,6
**photographer**
293:5 299:17
**photographing**
299:17
**photographs**
288:6 290:15
293:1,6,9,12
293:21,24
294:17 295:2
295:10,16
296:7 299:22
300:5,8,10
342:18 346:9
**photos** 282:21
294:20,23
295:7,20,22
296:3,5 303:25

phrase 351:4
physical 282:7
    293:14 348:20
    363:1
physically
    290:16 291:22
    292:4 300:13
physics 305:16
piano 327:4,10
pick 325:22
    333:11 359:9
    359:12,13,20
    359:22
picked 299:19
picking 325:25
picks 359:18
    366:18
picture 292:1
    294:7,14
    309:22 310:3
    310:21 313:8
    350:4,12,12,18
    350:19
pictures 291:19
    331:20 333:19
    350:3,14
piece 299:18
    337:2
pieces 304:10
    333:8 349:21
pin 331:7 338:19
    339:1
pipe 354:3
pitch 324:4,4
    327:9 354:3,4
    356:20
placards 312:4
place 334:17
placement
    311:14
Plaintiffs 279:4
    280:4,11 281:2
    283:15
plane 348:18
planned 285:22
plaster 292:11

play 320:23
    321:22 326:20
    327:3,4,4,12
    360:5,5
played 320:24
    320:25
playing 321:5,7
    325:2 370:25
please 283:13
    287:9 290:18
    293:17 304:15
    320:4 331:16
    341:12,13
    351:11 379:13
    379:16
pleasure 323:17
plural 365:6
plus 326:5
    345:10 357:19
point 288:10,22
    290:1 294:1
    300:24 303:16
    304:11 319:3
    320:6 327:20
    328:15 329:12
    329:21 332:21
    353:15 360:13
pointing 348:7
points 323:14
police 313:3
    315:7,19,21
    316:3,4,16
    338:8,10 339:8
    354:15 363:16
Polk 364:8
poor 289:3
poorly 296:18
popular 361:24
position 298:21
    342:10 344:24
    350:1 352:11
    352:13 363:1
possession
    299:23 300:4
possibility
    348:17

possible 300:22
    309:16 313:2
    339:16,18,24
    352:9,14
    365:13,17
    366:7
posted 288:16
powder 308:5
    348:16 354:1
    356:14,19
precision 305:20
    346:1
prepared 285:16
prepping 326:23
present 283:12
    292:4 306:9
presented
    314:15
Presidente
    368:13
pressure 354:5
    355:18 359:11
    359:22,23,23
    359:25 360:19
    361:1,6 362:22
pretty 306:2
    318:8 330:12
    345:20
prevent 367:7
previous 302:22
    303:2,25
    350:24
previously
    287:16 306:24
    327:23 342:3
    350:23 353:20
principles 297:6
prior 285:17,22
    316:4 318:9,19
    329:24 331:2
    331:17 333:1
    337:10
probably 290:20
    295:6 324:10
    325:18 326:6
    345:22

problem 337:16
    349:12 373:2
problems 314:19
    369:16
Procedure 281:5
procedures
    335:14
proceedings
    286:13 320:7
    327:21 353:16
proceeds 305:5
process 287:8
    306:4,6 321:21
    346:10,14
produced
    283:17 356:8
professional
    284:11 287:3
    328:22 367:22
professionals
    319:23 368:11
program 297:5
    354:15
prohibit 366:23
projectile 331:8
    355:11 356:13
projectiles
    311:23 312:10
    338:18 339:14
    339:20
proper 296:7,13
    296:15 379:18
properly 359:24
provide 307:3,5
    312:21 348:22
    364:23 369:11
provided 284:2
    295:22
psychologist
    284:8 287:7
    374:6
PUBLIC 376:21
pull 284:14
    287:16 290:17
    306:21 315:2
    353:12 361:25

366:9 367:11
367:21 369:4
pulled 340:5
pulling 309:18
329:5 342:11
373:23
purpose 285:8
323:12,12
purposes 323:16
pursuant 281:4
378:6
put 335:22
336:10
Pythagorean
345:6 346:6

___

## Q

quality 289:3
297:7 319:14
323:5 357:2
quarter 367:13
question 291:6
291:17,18
300:12 304:15
304:16 308:24
312:8 325:13
331:15 332:3
333:4 334:24
337:3,12 338:6
347:5,10,11
351:4,8,9,11
353:19 361:12
361:14,16
371:13 373:16
questioned
357:14
questioning
373:18
questions
279:14 284:23
285:7,25
287:10,21
288:24 290:3
290:22 293:19
294:3 296:23
301:1 314:25
318:3 319:19

321:6 322:10
329:23 330:14
340:7 341:21
352:5 369:9,10
370:19 372:1
374:13
**quickly** 287:11
371:9,15
**quiet** 316:15
324:22 325:24
359:13,15
**quieter** 359:21
359:25
**quite** 301:16
308:10 327:2
327:12,12

**R**

**R** 378:1
**radio** 322:22
325:1
**raise** 323:10
**raised** 317:16
**ram** 369:13,25
**range** 326:7
327:9,11
354:14 360:17
361:22 363:17
363:21 365:23
368:18
**rattle** 316:14
324:20 325:24
**rattled** 304:16
**Rdowd@dow...**
379:9
**reach** 303:15,16
**reactions** 313:19
**read** 320:11
330:12 331:3
373:6,9,11
377:4,6,7,9,10
377:12,13,15
377:16,18
379:16
**readable** 311:16
**ready** 353:17
**real** 319:2

**realize** 371:10
371:15
**really** 327:12
357:2 364:15
364:16,18
**rear** 309:15
310:4
**reask** 291:17
351:9
**reason** 306:19
349:2 369:23
377:5,6,8,9,11
377:12,14,15
377:17,18
**recall** 287:23
289:2 290:8,10
307:20 308:20
308:23 311:7
325:6,16,17
326:12 330:20
331:19 332:20
351:2,6 360:7
**received** 296:13
**recognizable**
354:19
**recognize** 286:3
294:4,10,23
296:5 306:25
342:13 354:16
356:16,20
**recoil** 366:9
367:15,17,18
**recoiling** 368:25
**record** 283:1,13
289:19 335:19
335:25,25
344:16 358:7
374:23
**recorded** 298:1
325:10 356:22
356:25 357:7
361:9,10
**recording**
299:15 315:9
320:1,19
322:13 323:13

325:12,20
326:2,3 357:5
358:7,12,17
359:1,4 360:4
360:10 361:3
364:12,24
365:20 366:18
366:22 371:1
**records** 368:12
**recovered**
311:23 328:14
333:14 335:6
339:1,3,17
340:9,11,15
362:10,12
**recovery** 366:9
367:15,17
**red** 288:1
**reduce** 352:13
**refer** 298:16
315:12 350:6
**referred** 286:9
**referring** 336:18
343:7
**refrain** 341:7
**refuses** 369:17
**refuting** 339:4
**regard** 349:25
354:8
**regarding** 361:3
**regardless**
297:11
**rehung** 307:10
307:13
**relationship**
359:17
**Relevance** 321:9
**reliable** 334:10
**relied** 293:14
**rely** 293:12
318:20 329:14
**relying** 300:15
318:16 346:20
346:21 348:5
368:6
**remeasure**

298:24
**remember** 287:7
292:24 301:16
301:21 311:25
323:25 345:6
346:22 350:13
372:10
**remembered**
341:14
**removed** 372:20
**rendering**
292:14 293:12
315:9 331:17
333:2
**repeat** 304:15
332:3
**rephrase** 308:2
331:16 337:12
**replicate** 319:15
**report** 282:5,9
284:2 310:23
311:3,7,9,15
312:16,17
327:15,22
329:18 330:3
330:16,22,25
331:2,11,17,19
331:21 332:9
332:18,24
333:3,6,9
334:10 336:3,6
336:9,16,19,20
336:22 338:12
353:5 361:17
361:18,25
362:4 364:23
366:3 372:12
**Reporter** 279:20
281:9,10
284:19,21
378:4,4
**Reporting**
279:24 281:7
378:8 379:1,21
**reports** 315:18
336:11,18

**represented**
311:8 338:24
**reproduce**
319:25 323:4
323:12
**request** 321:20
343:12,16
352:22,25,25
**reserved** 281:15
375:1
**reset** 366:10,17
367:22
**residence** 294:19
326:2
**residue** 308:5
328:12 338:22
**respect** 297:9
**response** 372:9
**result** 347:22
370:1
**retained** 298:4
**return** 379:17
**returned** 378:14
**reverb** 364:14
364:15,16
**reverberation**
364:13
**review** 300:10
315:8 316:11
316:20,25
317:2,8 323:20
324:15 326:15
326:19 331:17
331:19 333:1
337:25 371:9
**reviewed** 326:21
329:24 331:2
333:3 336:9
**reviewing**
350:14 371:14
**revolves** 351:17
**Richard** 280:13
283:15 296:6
341:12 379:6
**rifle** 301:24
327:24 328:2,5

Page 393

328:9,25
331:23 332:10
334:7,13,15,18
334:24 335:8
335:19,21
336:1,2,5,10
336:13,22,24
337:5,7,15
338:14 339:3
348:13 361:19
362:10,14,16
363:3,4,5
364:1 365:6
366:8 367:12
367:18,19
369:1
**rifles** 348:18,25
362:12 365:6
**rifling** 328:13
**right** 286:1,8,21
287:15,22,25
288:17 289:7
290:4,23
293:20 294:7
294:10,16,22
295:1 298:10
299:1,23
301:10,13
302:7,10,16,18
303:15 304:22
307:17 309:7
309:23 310:7
310:21 314:24
315:6 317:1,8
317:11,21
321:11 325:15
327:14,22
333:1 336:3
340:9 341:22
349:18 353:11
361:23 362:1
366:3 372:7
373:4,5
**roadmapping**
304:13,17,20
304:21,21,25

305:4
**Roger** 287:12
366:11
**Ronnie** 368:21
**room** 280:20
290:7,11 299:6
308:15,19
319:11 322:6
342:5 343:9
345:16,16
347:1,7 348:4
348:12 350:9
370:1
**Rorschach**
286:23 287:5
**round** 312:12
314:13 349:15
354:18,25
355:1,4,4,10
356:13 361:21
363:4 366:24
**roundest** 305:18
**rounds** 303:21
310:18 311:22
312:9,14,22
313:5 314:5,6
314:8,12,12
335:23 354:8,9
367:7
**rule** 345:11
**Rules** 281:5,12
**run** 347:19
**running** 371:10
371:15
**runs** 323:8

—— S ——
**safe** 370:2
**sample** 368:9
**Samuel** 279:11
281:4 282:3,5
283:3,17
374:22 376:4
376:11 377:1
379:14
**sanctioned**
372:22

**sang** 324:5
**Sara** 279:20
281:9 285:17
300:22 373:15
378:3,22
379:23
**saw** 300:13
303:24 307:24
**saying** 316:6
326:13,17
334:11,18
335:11 337:6
346:25 348:3
365:8 368:5
**says** 320:12
**scallops** 342:7
**scenario** 313:20
313:20 347:13
**scenarios** 313:2
369:2
**scene** 295:5
296:18 297:10
297:23 298:2
298:23 311:24
312:1 313:23
313:25 314:10
330:6 335:6
339:1,17 340:4
340:9,11,15
344:1,4 359:21
**school** 345:7
371:6
**science** 297:4,5
**screen** 289:4
315:4 342:14
**screenshot**
282:13,15
287:16,23
288:13
**sealed** 335:15
**search** 315:19
315:21 316:16
369:13
**second** 283:25
294:18 320:5
360:18 365:3

366:4,13
**seconds** 353:14
366:6
**see** 284:16,25
287:18 288:19
291:22 292:8
307:16 309:22
309:25 310:21
313:16 315:3,5
320:8,13,16
322:18 328:17
329:3 330:21
330:21,25
332:19,19
343:14,15
348:2 349:18
349:19 350:1
350:16 362:1,3
373:24
**seeing** 325:17
**seen** 285:1,3,5
328:12,13
329:7,8 332:14
**semi-automatic**
327:24 361:19
363:13 364:1
366:8
**Semi-Automat...**
362:5
**send** 373:11,14
**sense** 339:23
341:2
**SENT** 379:9
**sentence** 347:12
**sentences** 347:12
**September**
279:12 281:6
283:7 378:7,16
379:4
**Service** 279:24
281:7 378:8
379:1,21
**set** 298:12
322:19 327:16
**setting** 370:25
**seven** 328:6

334:3,6 335:9
335:12 338:23
346:23
**Seventy-five**
326:6
**severe** 352:16
**shade** 323:14
**share** 295:21
**sharing** 295:21
**Sharon** 286:12
286:25 374:1
**SHEET** 377:1
**sheets** 379:18
**shell** 308:14,18
308:21 312:10
313:9 314:15
**shells** 349:17
**shine** 305:17
**shined** 307:14
**shoot** 334:14,16
347:3,17
348:25 362:9
364:3,3,7
367:23
**shooter** 307:22
307:22 309:1,1
309:12,17,19
310:14 361:10
367:18 368:3
368:25
**shooter's** 311:14
**shooters** 368:9
368:10,10
**shooting** 292:19
303:19 309:3
311:21 312:8
312:19 316:2,9
317:23,23
326:9 334:25
339:20 347:18
348:15 349:12
355:14 363:9
368:17
**short** 306:18
347:19
**shorthand**

281:10 378:3
378:12
**shot** 287:18
313:14,16
341:23,25
346:7 347:1,6
348:4,23 351:5
361:8 362:12
366:20,21,21
366:21
**shots** 309:6,10
311:15 313:18
328:24 329:2,4
330:4 335:5,9
339:2,25 340:2
340:3 347:4,14
352:7 360:15
360:18,22,23
360:24 361:11
365:5,7,9,10
365:12,15,23
365:25 366:5,6
366:19,20,23
367:1,1,5,6,9
368:2,20
**show** 295:15
320:2,12
330:19 350:14
350:15
**showed** 321:13
365:25
**showing** 289:3
291:19 293:20
306:23
**shown** 284:20
313:10 349:25
**shows** 302:2
322:22 335:2
343:24
**Shughart-Gor...**
364:9
**sic** 316:1 368:1
**Sid** 299:17
**side** 304:7
305:19,24
309:20 310:7

348:11 374:6
**sides** 289:6,11
291:23 292:12
**sign** 379:16
**signal** 323:7
324:6
**signals** 323:4,8
324:3
**signature** 281:15
349:21 352:13
353:22 354:8
354:17 355:17
356:15 358:18
358:20 361:11
362:25 364:19
375:1 377:21
379:15,17,17
379:18
**signature'** 368:2
**signatures** 320:9
354:19 355:3
**signed** 379:17
**significant**
296:10 311:12
311:13,16,19
359:14 361:13
364:15,19,20
367:19
**significantly**
309:17 314:2
359:9
**similar** 303:1
329:8 342:7
355:22 363:12
**Sincerely** 379:20
**singing** 324:5
**single** 298:13
299:5,18
354:11,12,22
354:23 364:17
**sir** 284:5,24
286:1,3,24
287:22 290:4
290:23 291:17
293:20 296:24
297:19,21

301:2,4 302:8
303:15 304:13
305:10 308:12
308:18,21
311:8 312:7
314:24 315:3
317:13 326:21
326:25 327:22
329:7,17,24
330:23 331:1
332:2,18
334:11,20
335:4 336:12
337:14 338:4,6
338:24 341:12
341:22 342:13
347:5 350:21
353:17 369:11
370:12,20
373:12,23
374:16
**sit** 289:8 297:21
307:2 325:4
333:5 342:21
346:16 357:3
365:14
**site** 289:5 306:4
**Sitting** 336:4
**situation** 329:1
347:16 366:25
370:3
**six** 324:10 328:6
348:15
**size** 345:16
355:15,17
**Skipping** 353:11
**slickest** 328:22
**slight** 356:20
**slightly** 355:21
356:15 368:9
**slot** 343:23
346:4,19
**slow** 360:3,6
**slower** 356:14
**slowly** 342:12
**small** 316:14

356:9 362:25
**sofa** 312:6
**sofas** 312:3
**software** 295:21
305:8 320:25
323:19,24
324:9 360:7
**solely** 316:11
**solution** 311:21
312:9,19,21
**somebody** 328:6
**someone's**
348:12
**sons** 317:16
**sorry** 295:8
322:11 328:19
332:2 341:20
349:5
**sort** 343:23
**sound** 318:24
319:8,13,13,15
319:23 320:9
320:19,20,25
321:11,23
322:5 323:4,6
323:10,15,18
324:2,6,7
325:23 353:21
354:7,11,12,17
354:19,22,23
355:3,8,9,12
355:14,16,20
355:24 356:8
356:15 357:2
358:18,20,25
359:12,23
360:19 361:1,6
361:8,11
362:21,23,25
363:11 364:19
366:18 370:13
370:20,22,23
370:24 371:2
**sounds** 316:15
325:24 354:2
357:5 359:10

359:14,21,25
360:1 364:11
368:2
**source** 355:15
**speaker** 320:17
320:18 323:1,5
323:6,7
**speakers** 321:12
323:2
**speaking** 360:20
**spec** 362:22
**specific** 297:14
333:9 361:15
**specifically**
296:15 312:12
319:14,25
332:21 341:1
351:17
**speculate** 358:4
**speculation**
297:17 357:22
**speed** 367:23
**spent** 311:22
312:9
**SPL** 360:25
361:2
**split** 360:22
366:6,13,19
368:13,20,23
**splits** 323:7
**spoke** 283:25
284:3 290:5
**spoken** 373:7
**Sporter** 327:24
328:25 331:12
331:23 332:10
361:19 362:10
363:2,12,25
366:7 369:3
**SporterModel**
362:5
**spot** 345:19
**squared** 345:9
345:10,10
**SS** 376:1
**St** 279:6,25

Page  395

280:6,15,21
281:8 283:4
284:17 296:4
304:5 308:8
313:10 335:14
337:3 363:16
374:10,11
377:2 378:8
379:2,8,11
**staged** 313:21,23
313:25
**stages** 370:25
**standard** 335:5
335:7,9
**standing** 289:11
325:12 345:15
347:13
**start** 293:24
336:7 360:21
366:18
**state** 284:18
315:7,15,18
316:23 327:23
334:15 361:17
361:18 362:4
366:4,4 376:1
376:4
**stated** 353:4
361:21
**statement**
318:15 334:18
362:7 368:1
**statements**
376:5
**states** 279:1
280:1 283:5
373:25 378:5
**statistics** 351:17
**Stemmler**
280:23
**step** 305:13,13
345:4,5 346:2
**stereo** 320:18
323:5
**stick** 311:11
**sticking** 334:25

**STIPULATED**
281:1,14
**stock** 328:12
**stop** 361:18
**stopped** 316:2
**stories** 317:17
**storm** 290:21
**story** 364:17,18
**straight** 310:3
344:3,4,12,15
345:2,12 346:4
346:18
**street** 280:20
325:16 326:4
357:8,19
**stretch** 286:15
**strike** 285:7
286:2 296:21
308:2 370:16
**stronger** 359:23
**students** 368:15
**studio** 319:21
320:20 323:11
**studios** 319:13
**stuff** 296:20
363:21
**subscribed**
376:15 378:15
**subsonic** 354:24
355:4,11
356:14
**substantiate**
296:8
**successful**
372:17,22
373:1
**suffer** 284:11
327:5
**suffering** 286:25
**suggesting** 337:4
**Suite** 280:14
379:7
**supersonic**
355:1,1,4,11
356:17,18
**support** 348:22

**supposed** 326:24
**supposedly**
314:18 328:14
330:5 334:16
357:15
**sure** 284:13
286:4 292:23
294:25 296:19
297:18,25
298:6 305:2
308:24 330:10
332:4,15 333:3
337:12,14
339:5 342:25
346:12 351:6,6
355:17 357:4,5
357:17 358:6
373:6 374:11
**surely** 307:11
**surface** 305:19
**surrounding**
305:16
**suspect** 294:21
357:1
**suspected** 308:9
**SWAT** 298:14
345:15 347:2
348:24 367:23
368:11,22
369:16,18,21
370:2,5
**sworn** 283:18
376:15 378:11
**sympathetic**
313:3,19
**system** 313:17
318:24 319:8
338:16 345:22
350:17 361:24
**systems** 354:16

-----

**T**

**T** 372:3 378:1,1
**ta-** 306:12
**tactical** 349:2
352:11 354:20
**take** 293:1 295:1

295:7 298:8
301:3 305:13
312:25 322:5
324:8 330:8
334:14 345:4
346:13 364:12
366:15 371:6
**taken** 279:11
281:4,11
282:13,15
294:17 295:10
295:16,24
296:3,5,5,8,24
306:12,13
310:3 313:21
315:9 328:5
335:21 336:1
342:17 343:5
372:18 373:6
378:12 379:14
**takes** 338:20
347:12
**talk** 353:21
**talked** 366:14
**talking** 317:22
332:21 356:10
371:11
**tall** 351:25 352:1
352:2 364:16
**tape** 335:16,17
336:15,17
344:5 345:2
**teach** 354:15
**team** 298:14
316:15 340:3
347:2 368:11
368:22 369:18
**teams** 369:17,21
370:2,5
**technical** 356:4
**Technically**
323:3
**technician** 335:8
338:22 348:8
351:22 353:2
**technicians**

304:6 348:9
365:24
**technique**
369:21
**telephone**
340:19
**tell** 287:3 289:13
289:18 292:5
297:22 298:16
298:21 301:7
301:10,14
302:24 317:17
342:22,24
343:4 350:2,6
360:23 363:7
378:11
**ten** 314:9 361:10
**tens** 353:22
361:20,22
362:5
**terminate**
305:25
**terms** 291:16
311:21 312:9
**test** 286:14,23
287:5 326:25
328:12,24
329:2,4 330:3
330:4 335:5,5
335:9,23
338:22 339:2
339:25 340:2,3
351:14
**tested** 327:25
328:3
**testified** 283:19
290:4 309:5
318:8 342:3
349:3 357:6,13
**testify** 291:24
292:1 318:12
328:4 342:1
365:17
**testifying** 341:8
**testimony** 288:1
288:25 290:25

Page  396

300:16 302:3
303:6,8 306:3
309:19 317:6
317:15,20
318:6,17
336:12 337:11
337:14 348:8
351:21 357:12
358:22
**tests** 286:18
328:8 338:17
**Thank** 374:12
374:15,16,17
374:18,19
379:19
**theorem** 345:7
346:6
**thin** 344:12
**thing** 324:3
338:21 343:22
344:5 345:3,9
349:13 360:13
362:23 368:12
368:18
**things** 284:5
292:23 305:6
311:11 318:20
319:1 324:21
328:7 331:9,10
334:8 335:1,23
340:17 348:25
353:8
**think** 284:4
286:10 288:3,4
288:5 289:2,5
290:9,15 291:2
292:22 294:18
298:11,12
300:17 312:7
313:2 324:19
324:20 325:17
327:13 329:16
330:1 331:3,3
331:19,21
332:13 336:6
340:20,20

342:23 346:11
347:24 349:9
357:10,14
365:23 367:25
369:7 371:20
374:5
**third** 371:24
**thought** 296:10
311:16 332:7
**thousands**
353:23 361:20
361:22 362:5
**threat** 347:2,3
347:13,16
**three** 300:13
323:8 327:1
335:2 347:12
371:22 372:23
**three-way** 323:7
**threshold**
360:21
**threw** 295:18
**thrown** 313:22
**time** 283:8,9
294:19 316:1
316:22 317:25
321:17 326:21
336:1 341:2,14
345:22 360:24
361:8 365:11
365:16 366:9
367:16,17
370:10 372:24
373:8 374:14
374:20,25
**time's** 315:22
**timeline** 364:23
**timer** 360:14,16
366:14,16,17
366:18 367:10
368:8
**times** 328:6
334:3 350:24
353:23 360:22
361:20,22
362:6 363:14

364:9 366:19
368:13,14
**timing** 324:2
360:14 368:2
**tissue** 351:14
**titled** 284:17
289:24
**today** 283:7
285:1 289:8
291:24 297:21
300:16 307:2
325:4 329:7,25
330:23 331:2
333:5 336:4
342:21 346:16
357:3 365:14
371:20 374:13
374:13
**told** 291:19
337:21
**tool** 343:25
344:6
**topic** 373:17
**Torres** 279:3
280:3 283:3
377:2 379:11
**Torres/Hamm...**
326:1
**torso** 348:11
**total** 295:24,25
360:24 368:14
**totality** 314:20
**towns** 364:7
**trace** 305:4
307:18 309:14
348:9 349:18
**traced** 304:8
**tracking** 360:22
**train** 332:6
354:14
**trained** 296:19
347:3 368:10
**training** 296:13
296:24 297:2,8
354:15,20
360:18 367:24

368:7,18
370:12,20,22
**trajectories**
305:7 352:18
353:3
**trajectory**
298:25 299:3
301:10,14
302:10,24
305:11 306:16
306:16,19
307:3,6,7,10
343:18 344:1
344:21 345:16
346:3
**transcribed**
378:13
**transcript**
379:14,16,18
**transcription**
378:14
**traveled** 302:4
303:7
**traveling** 303:22
**treble** 323:10
**trial** 372:14
**triangle** 345:9
345:10 346:6,8
**tried** 288:3
311:11,15
373:1
**trigger** 309:18
366:8,10
367:11,21
368:23,25
369:3,4
**triggered** 313:3
**triggers** 360:21
**trip** 306:4
**true** 286:8,11
289:12 290:7
298:25 299:2
300:16 340:23
341:6,19,24
356:1 358:8
362:7,8 367:10

376:5
**trust** 335:2
353:1
**trustworthy**
332:12
**truth** 378:11
**trying** 324:23
331:9 347:8,10
347:17 350:18
352:13
**tumbling** 355:7
**tune** 323:9 324:4
324:7
**turn** 319:2
327:14 369:12
**turning** 287:15
300:21 302:7
302:20
**two** 285:9
287:11 292:23
302:22 303:2
313:2 317:16
318:20 319:16
338:17,23
343:15 347:4
347:12 355:3
369:5 371:10
371:18
**two-hundredths**
368:24
**type** 284:6
295:18 296:10
324:3 344:5,13
344:14 345:3
349:11 354:17
354:18 355:10
356:24 358:1,6
367:12
**types** 355:19
366:24
**typically** 324:23
354:13

_____
**U**
_____
**ultimately**
372:23
**unable** 291:24

292:1
**uncomfortable**
319:3
**understand**
296:16 297:6
307:5 309:8
317:13 331:15
333:12 337:11
337:13,14
349:7
**understanding**
337:17
**uniformly** 318:8
318:14
**unique** 368:18
**United** 279:1
280:1 283:5
**unmeasurable**
306:20
**unnecessary**
370:7
**untrained** 368:3
**updated** 284:2,3
**urban** 363:3,13
363:17,24
364:2
**use** 292:14,16,16
292:17 306:15
318:22 319:23
320:9,19
321:25 322:2
322:15,16
323:3,19
340:14 344:4
346:6 356:14
356:17 360:17
361:5

**V**
**v** 283:4
**vague** 300:3,3
316:22 321:6
331:14 332:1
**valid** 287:6
**various** 323:8
331:9 334:7
335:1 354:16

**vehicle** 325:17
325:18
**velocity** 355:12
356:3
**verification**
352:17
**verify** 340:12
**viable** 311:21
312:8,19
**video** 279:10
281:3 299:13
313:5 315:1,8
315:12,13,16
315:23 316:1,7
316:11,20,25
317:2,8,12,19
318:4,17,23
320:24 321:7
321:22 322:4
322:13 323:20
324:15 325:2
325:10,21
326:15,19,20
326:22 356:23
357:7 358:12
358:14 360:3
364:24 365:20
366:2 374:22
379:14
**videoconference**
279:10 281:3
283:10,18
378:10 379:14
**Videographer**
280:23 283:1
374:20
**view** 288:13
340:14,22
352:21,25
**viewed** 290:7,24
**visible** 307:4
310:16
**visit** 293:2
298:11 299:2
**visited** 294:19
**voice** 360:20

**voices** 324:18
326:13
**Vol** 282:13,15
**volume** 279:10
281:3 283:2
315:23 319:2
354:5,6 374:21
377:1 379:13
**vs** 279:5 280:5
377:2 379:11

**W**
**Wait** 285:6
**waived** 281:10
**walk** 302:15
310:2 319:10
**walked** 293:6
324:22
**wall** 287:19
289:6,11
290:11 291:1,2
291:4,8,10,13
291:16,23
292:13 294:9
294:15 301:19
302:13,15,16
302:17,18
303:3,24
305:25 307:15
307:15 308:6
309:7,14 310:4
310:8,20 313:7
313:8 314:17
314:17 342:8
347:20
**wallpaper**
301:22 304:9
304:10
**walls** 305:6,22
305:24 312:2
344:14
**want** 291:17
292:11 293:24
296:16,17,21
297:15 298:23
305:16 314:25
320:3 323:11

324:3,24
327:14 332:2
333:11 344:18
351:15 364:21
365:2 370:5,6
370:9 371:21
373:9,23
**wanted** 284:1,6
374:6
**warrant** 315:19
316:16 369:13
369:17,19
**warrant'** 315:21
**warrants** 370:10
**wasn't** 286:18
304:5 306:11
328:18 340:25
364:14 372:22
373:1
**waste** 341:2
**watch** 317:19
318:22
**water** 353:14
**wave** 324:7
359:23
**waves** 355:14
**way** 288:6 289:4
299:12 307:9
323:13,15
329:2 337:18
344:10 353:1
361:16 369:2
370:5
**we'll** 314:24
**we're** 283:24
290:19 294:23
344:16 349:4,6
360:12 361:7
367:25 368:15
371:10,15
373:17,17
**we've** 304:1
322:12 325:7
326:19 334:14
353:20 369:5,7
**weapon** 313:17

314:10 331:9
335:10,12
338:16,17
345:22 350:17
354:16 361:24
367:2
**weapons** 354:21
**week** 297:6
354:14
**weight** 355:23
**weights** 355:19
**well-trained**
352:14
**went** 326:14
349:23 372:25
**weren't** 287:6
308:9 324:23
**Wheaton** 280:19
**WHEREOF**
378:15
**whizzes** 355:7
**whizzing** 314:18
**width** 326:5
350:15 357:18
357:19
**wife** 370:6
372:24
**window** 305:23
307:16,20
312:2 313:15
313:16 325:17
325:19 358:20
358:21,23
359:1
**windows** 312:2
321:4 358:19
**wiped** 313:22
**witness** 283:18
284:25 286:17
286:20,22
287:12,20
288:15,19
290:19 311:4
321:20 322:11
330:12 341:13
373:10,13

Page 398

374:19 378:10
378:15
**witness'** 343:12
343:16
**wonderful**
373:13
**wood** 343:24
364:8
**word** 304:19,22
**work** 344:13
361:22 372:15
**workaround**
369:20
**worked** 370:23
370:24
**works** 321:21
344:13 370:5
**worse** 313:20
**wouldn't** 286:14
286:15 287:2
290:14 325:4
334:19 341:16
342:6 350:19
353:8 356:16
358:19,25
371:8
**wound** 351:17
**wounds** 353:3
**write** 292:22
299:8 365:3
369:14
**writing** 299:8
**wrong** 309:5
**wrote** 292:25

### X

**X** 372:3

### Y

**yard** 326:5
357:20
**yeah** 289:19
297:1,18
299:14 303:1
303:13 318:1
321:18 322:14
340:24 343:17

344:3,23 345:2
351:4 358:2,4
361:1 362:15
364:3,25 367:9
371:17 372:12
373:10
**years** 292:24
327:1 332:15
335:2 367:24
368:7,8
**yell** 316:15
**yells** 315:21
**Yep** 320:15
343:15

### Z

**zero** 366:17
**Zoom** 279:10
280:15,21
281:3 283:17
378:9 379:14

### 0

**084-002993**
279:20 378:22

### 1

**1** 283:2 344:17
366:20
**10** 353:20
361:25 366:3
368:1
**1012** 279:20
378:23
**11** 284:1,3
285:17 287:22
289:1 290:24
315:6,15,17
327:22 364:22
364:22 368:23
**12** 290:10,25
362:17
**1200** 280:20
**13** 366:6,12
368:20,24
**14** 290:8,8 291:8
303:21 313:5

365:3
**147** 356:13
**15** 290:6 296:5
313:5
**17** 293:25 301:3
301:4,11 379:4
**17th** 378:16
**180** 331:1
332:25 333:1
**19** 365:3 367:23

### 2

**2** 344:18 349:25
366:21
**20** 296:4,5
301:13,15
302:4 353:14
362:18
**2017** 331:24
**2019** 298:4,7
342:24
**2020** 279:12
281:6 283:7
284:1,3 287:22
289:1 376:16
378:7,16 379:4
**2033** 279:24
281:7 378:8
379:1
**211** 280:14
379:7
**22** 301:9,24
302:12,22
346:12 349:20
350:17
**223** 298:18
303:21 304:5,6
304:9 310:18
311:12,18
313:5,9 314:6
314:7 343:8
354:8 365:6
**23** 302:7
**25** 365:5,9
**27** 302:20
**283** 279:15
**284** 282:19

**288** 282:13,15
**290** 282:11
**293** 282:21
**2D** 305:9

### 3

**3** 344:18 347:22
366:5,21
**3:50-3:58** 316:1
**30** 326:4 357:7
368:8
**306** 282:17
**308s** 363:22
**311** 298:14,20
303:20 314:16
314:18
**314** 280:20
**314)680-2424**
379:2
**315** 282:3
**32** 282:21
293:24 301:3,5
**327** 282:5
**329** 282:7,9
**35** 343:20
346:17,24
347:15
**372** 279:16
**373** 279:15
**39** 333:13
338:25 363:7
**3D** 305:8,9

### 4

**4** 353:11 366:21
**4:07** 283:8
**4:19-CV-1525...**
279:5 280:5
283:5 377:3
379:11
**40** 368:7
**400** 333:11
**4050** 280:14
379:7

### 5

**5** 324:5

**5.56** 313:17
340:11
**50** 297:24 361:9
**55** 363:17

### 6

**6** 373:24
**6:13** 374:20,25
**63102** 280:15
379:8
**63103** 280:21
**63143-1215**
279:25 379:2

### 7

**7** 331:24
**7.62** 327:24
333:13 338:25
340:8,12
362:17 363:7
367:21
**7.62x39** 368:3
**70** 297:15
365:23
**75** 357:21

### 8

**8** 279:12 281:6
283:7 306:10
378:7
**80** 297:15 326:6
365:25

### 9

**9** 294:8,15
298:19 301:8
307:16,18
312:5 354:8
356:12,16,21
367:4
**90** 356:17
365:25

Page  399