**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| GINA TORRES, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-CV-1525-DDN |
| | ) | |
| CITY OF ST. LOUIS, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF L. SAMUEL ANDREWS**

COME NOW Defendants Lance Coats, Glennon P. Frigerio, Joshua D. Becherer, Nicholas J. Manasco, Ronald Allen Jr., John C. Jones, Mark S. Seper, Jon B. Long, Tim Boyce and Benjamin Lacy (collectively "Defendant Officers") and the City of St. Louis ("City"), by and through counsel, and for their Memorandum in Support of Their Motion to Strike the Affidavit of and Exclude the Testimony of Samuel Andrews, state as follows:

**BACKGROUND**

Plaintiff has designated L. Samuel Andrews ("Andrews") to provide expert testimony in this matter[1]. Andrews states that he was "asked to conduct a ballistics analysis of the shooting" and he seeks to provide testimony in this case on a variety of topics. Exhibit B, Affidavit of Andrews ("Affidavit"),¶ 6. First, Andrews purports to conduct a forensic analysis of bullet holes in the walls of Decedent Isaiah Hammett's ("Decedent") home based primarily upon

---

[1] In their Response to Defendants' Motion for Summary Judgment, Plaintiffs attached to their Additional Statement of Uncontroverted Material Facts the affidavit from Andrews. See Doc. 109-7. Plaintiffs have also since provided Andrews' report. Exhibit C.

measurements he made using a caliper. Second, he claims that based upon his review of photographs taken of shell casings at the scene that it is impossible that the bullets were fired from the Decedent's AK-47 on the day of the shooting. Third, Andrews claims that based upon the sounds in a cellphone video recorded across an intersection from the Decedent's house, he can, by sound alone, identify the style of firearms being fired.

Andrews is precisely the type of so-called "expert" that Federal Rule of Evidence 702 is designed to protect against. His sloppy methodologies lack any semblance of reliability and are incapable of being tested or replicated. He is not a certified crime scene investigator, certified crime scene analyst, or certified crime scene reconstructionist. Ex. A, Andrews' Curriculum Vitae; Ex. D, Deposition of Andrews, Vol. I, pp. 69-70. He is not a trained forensic sound engineer. Ex. E, Deposition of Andrews Vol. II, p. 371. Andrews' profession is managing a shooting range in Lebanon, Missouri, where sniper courses are also taught. Ex. D, pp. 41-43. At that same location, he also manufactures and sells barrels for "sniper weapon systems." *Id.* at p. 62. Andrews has no training or education on how to conduct crime scene examinations or forensic ballistics analyses. Ex. A; Ex. D, p. 29. He holds no board certifications[2] in crime scene reconstruction, tool mark identification or criminalistics. Ex. A; Ex. D, p. 70. He is not a scientist and possesses no relevant scientific or technical degrees. Ex. A; Ex. D, pp. 82, 148. He has never served as a law enforcement officer, a police detective, or crime scene investigator with a law enforcement agency. Ex. A; Ex. D, p. 84. Apart from work he has performed for Plaintiffs' counsel, Mr. Dowd, Andrews has never been paid to investigate a shooting. Ex. D, pp. 149-150.

---

[2] Certifications relevant to the field of forensic ballistics and crime scene reconstruction are offered by the American Board of Criminalistics, the International Association for Identification's (IAI) Crime Scene Certification Board, and the Association of Firearm and Tool Mark Examiners (AFTE). Andrews possesses no certifications from these entities. Ex. D, pp. 69-70.

Andrews' lack of expertise in the field of forensic ballistics is further evidenced by the flawed and unreliable methodologies he relies upon to reach his opinions in this matter. Incredibly, Andrews retained no notes and took no photographs or created no other media documenting his inspection of the shooting scene. Ex. D, p. 297-98. Instead, Andrews purports to rely *on his memory alone* in offering his opinions regarding reconstruction of a complex shooting scene that involved more 100 pieces of ballistics evidence – a methodology no qualified crime scene reconstructionist would employ.

As will be shown, the opinions Andrews renders in his Affidavit and Report are not based upon sufficient facts or data and are not grounded in any reliable scientific principles or methodology. For example, prior to rendering his opinion that "the alleged AK-47 shell casings taken immediately after the shooting do not show signs of having been recently fired," (Ex. B, ¶ 13) Andrews had not even inspected the shell casings. Ex. D, pp. 259-60.

Moreover, Andrews' opinions based upon his review of a cell phone video recording of the search warrant execution should be struck because Andrews is no better suited than a juror to interpret what can and cannot be heard in this video. In order to render his opinion that he cannot hear the sound of an AK-47 being fired on a cellphone video recording of the incident, he merely listened to the audio, without any enhancements, using unidentified software on his home computer. Ex. E, pp. 320-24, 360.

As will be shown, Andrews does not possess any scientific, technical, or other specialized knowledge that will assist the jury. This Court should therefore, pursuant to FRE 702, exclude Andrews' testimony, report, and affidavit in their entirety.

**Opinions of Samuel Andrews**

According to Andrews, the day after the Decedent's shooting he was called to the Torres' home and conducted an "extensive inspection of the ballistics evidence left behind after the police turned control of the premises back over to the home owner." Ex. B, Affidavit, ¶ 6. Andrews also reviewed the "Kevin Broccard video/audio of the shooting." ¶ 7. This references a recording made by a citizen who stopped in his car and used his personal cell phone to record the SWAT team as they approached the Decedents' residence to execute the search warrant. ¶ 7. Based on his review of this cell phone recording, Andrews states that, in his opinion, "it is clear there was no announcement by the police before the breach, flash band and shots being fired as claimed by the police in their post shooting interviews and depositions." *Id.*

Next, Andrews renders the opinion that there are "no bullet hole entries in the home that match a 7.62 caliber gun." ¶ 12. In support of that conclusion Andrews simply states that "[t]he width of the entry holes made are either much too small or much too large to have come from and [sic] AK-47 model rifle." ¶ 12. Based on this purported finding, Andrews states that he "can testify beyond any question that the damage done to the walls of the Torres home shown in the Departments' photographs were not done with an AK-47 cal. gun." *Id.* at ¶ 12.

Andrews also opines that "the alleged AK-47 shell casings taken immediately after the shooting do not show signs of having been recently fired" because, according to Andrews' inspection of *photographs* of the shell casings, he does not observe "any of the normal markings of a recently fired shell." ¶ 13.

According to Andrews, "[w]hen the round of an AK-47 is ejected to allow the next round to enter the chamber it causes scratches on the casings as it is ejected causing 'extraction marks.'" ¶ 14. Based upon his view of photographs of the casings on the floor of the Torres

home, the casings "do not have these shiny markings because the casings in the photographs show oxidation." Based upon this, he concludes that "AK-47 casings had not been fired on June 7, 2017." ¶ 14.

Andrew's Affidavit also makes impermissible credibility determinations by calling into question the Defendant Officers' account of events. First, Andrews claims that, based upon his review of the cell phone recording of this incident, "it is clear there was no announcement by the police before the breach, flash bang and shots being fired as claimed by the police in their post shooting interviews and depositions." ¶ 8. Andrews claims this is so because based upon his own personal review of the audio of the cellphone video he can hear the announcement at the 3:50 mark, but he says, he does not hear an announcement at the beginning of the video. *Id*.

Next, Andrews provides the opinion that "the Officers were using an alleged 'compromise' to turn the knock and announce [search warrant] into a battering ram breach flash bang assault." ¶ 9. Although the point Andrews is making is difficult to discern, it appears that he is arguing that the Defendant Officers lied about the need to call a "compromise" in order to later justify their use of a battering ram to breach the door and the deployment of a flash bang. In his Affidavit, Andrews states that "[t]he Officers then claim to have called a 'compromise', which is a no knock battering ram breach with a flash bang and approximately 93 shots fired." ¶ 9. "However, the Officers thereafter claim that they knocked and announced which is directly conflicting evidence." *Id*.

This Court should find that, first, Andrews is unqualified to provide opinions concerning the ballistics evidence at the scene, and second Andrews is unqualified to provide opinions relating to his interpretation of the cell phone video recording. This Court should further find that

Andrews' opinions are premised upon a lack of facts and data and rely upon scientifically unreliable methodologies.

## **LEGAL STANDARD**

The admission of expert testimony is governed by FRE 702; *Wagner v. Hesston Corp*., 450 F.3d 756, 758 (8th Cir. 2006). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *McKnight ex rel. Ludwig v. Johnson Controls, Inc*., 36 F.3d 1396, 1408 (8th Cir. 1994). The party seeking admission of expert testimony has the burden of establishing admissibility. *Lauzon v. Senco Products, Inc*., 270 F.3d 681, 686 (8th Cir. 2001). The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Lauzon v. Senco Prods., Inc*., 270 F.3d. 681, 686 (8th Cir. 2001).

FRE 702 requires a trial judge to act as a "gatekeeper." *Russell v. Whirlpool Corp*., 702 F.3d 450, 456 (8th Cir. 2012) quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). As "gatekeeper," a trial court must determine at the outset whether a proffer of expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 597 (1993). The trial judge should admit expert testimony only if it is both relevant and reliable. *Id*. To demonstrate the expert testimony is relevant, "'the proponent must show that the expert's reasoning . . . was applied properly to the facts at issue.'" *Khoury v.*

*Philips Med. Sys.*, 614 F.3d 888, 892 (8th Cir. 2010) quoting *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010).

Further, opinions that "merely tell the jury what result to reach" are not admissible. *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010); Advisory committee's note Fed. R. Evid. 704; *Hale County A & M Transp., LLC v. City of Kansas City, Missouri*, 998 F. Supp. 2d 838, 845 (E.D. Mo. Feb. 5, 2014). Although expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the trier of fact, "[a] trial court may, however, exclude opinion testimony if it is so couched in legal conclusions that it supplies the fact finder with no information other than what the witness believes the verdict should be." *Williams v. Wal-Mart Stores, In*c., 922 F.2d 1357, 1360 (8th Cir. 1990) citing Fed. R. Evid. 704(a); *Hogan v. AT&T*, 812 F.2d 409, 411 (8th Cir. 1987).

In addition, it is "plain error to admit testimony that is a thinly veiled comment on a witness' credibility." *United States v. Benedict,* 815 F.3d 377, 382 (8th Cir. 2016) citing *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 884 (8th Cir. 1998). "It is the exclusive province of the jury to determine the believability of the witness. . . An expert is not permitted to offer an opinion as to the believability or truthfulness of a [witness's] story." *Bachman v. Leapley*, 953 F.2d 440, 441 (8th Cir. 1992). See also *DiCarlo v. Keller Ladders, Inc*., 211 F.3d 465, 468 (8th Cir. 2000) (citation omitted) (determining the credibility of a witness is the jury's province, whether the witness is lay or expert).

## ARGUMENT

I. **This Court should strike Andrews' Affidavit and bar him from testifying because Plaintiffs have not carried their burden of showing that Andrews is qualified as an expert in the field of forensic ballistics or crime scene reconstruction or that he is qualified to conduct a forensic audio analysis.**

Andrews is unqualified to render opinions on crime scene reconstruction and forensics ballistics within a reasonable degree of scientific certainty. First, Andrews has no experience, professional or otherwise, analyzing ballistics evidence at shooting scenes or conducting crime scene investigations[3]. Ex. A, Ex. D, pp. 149-150. He possesses no certifications in the fields of crime scene investigation, forensic ballistics, crime scene reconstructionist, or tool mark identification. Ex. A; Ex. D, p. 70. He is not a scientist and possesses no relevant scientific degrees in engineering, physics, or math. Ex. A; Ex. D, pp. 82, 148. He has never served as a law enforcement officer, a police detective, or otherwise worked in law enforcement.[4] Ex. A; Ex. D, p. 84. He has never worked in a law enforcement crime laboratory analyzing evidence collected from crime scenes. Ex. A, Ex. D, p. 146. He has never published articles or given presentations on crime scene investigations. Ex. AA. He has never been recognized by a Court as an expert in any field. Ex. D, p. 145. Decedent's death is the first and only fatal shooting he has investigated, period. Ex. D, pp. 149-150.

Despite his lack of training and qualifications, Andrews claims that his knowledge of the "laws of physics[5]" equips him to perform crime scene investigations[6]. However, Andrews cannot point to any training, education or instruction qualifying him to competently and reliably apply the "laws of physics" in the context of a crime scene investigation. He possesses no degrees or certifications in the fields of science, technology, engineering or math. Ex. A; Ex. D, pp. 82, 148. His undergraduate degree, earned in 1985, is in business administration. Ex. A; Ex. D, p. 15.

---

[3] Andrews testified that he has previously been shown evidence from shooting scenes by former City police officers, but he had never previously to conducted a shooting scene investigation. Ex. D, p. 149.

[4] Andrews claims that he, in the past, has provided sniper and SWAT team training sessions to officers who were employed by the St. Louis Metropolitan Police Department, however, it is unclear how this experience qualifies him to conduct a crime scene investigation. Moreover, Andrews admits that he holds no Missouri's Peace Officer Standards and Training Program (POST) licensing or accreditation.

[5] Ex D, p. 265

[6] For example, when asked to explain his basis for his opinion that an "oxidized" bullet increases in dimension, Andrews merely replied, "[t]hat's a physical law, ma'am." Ex. D, p. 256, ln. 23-25.

Although he claims to have taken science coursework while studying as an undergrad, having taken an undergraduate physics course nearly 40 years ago does not qualify Andrews to reliably examine and analyze ballistics evidence at a shooting scene in 2017.

In *Bird v. Jefferson County Sheriff's Dep't*, 2009 U.S. Dist. LEXIS 24945 (E.D. Mo. March 25, 2009), this court struck the testimony of a purported expert witness who sought to provide opinions regarding the propriety of defendants' use of deadly force and the alleged lack of proper training. *Id*. at *10. The Court barred the witness from testifying, finding "little or nothing in [the witness'] resume that demonstrates a particularized knowledge of crime scene investigation." *Id*. at *6.

In *Bird*, the plaintiff filed a § 1983 action alleging that the decedent's constitutional rights were violated when he was shot and killed by police officers during the alleged commission of a crime. *Id*. at *1. The purported expert had worked for thirteen years as a private investigator. *Id*. at *6. In that role, he had investigated mainly allegedly fraudulent insurance claims and conducted background investigations. *Id*. at *6-*7. He also had worked 25 years as a police officer, serving as a patrol officer and as a detective. Id. at *7. He also served for a year and a half as the officer assigned to investigating police misconduct. *Id*.

The court noted, however, that his resume did not indicate that as a police officer he was trained as a crime scene investigator or in the field of crime scene reenactment. *Id*. at 7. In fact, the court noted the purported expert had "never investigated a single incident involving an officer-related shooting." *Id*. at 7. Moreover, the purported expert had not been recognized by a court as an expert in any area of law enforcement. *Id*. at *8. The Court further found "nothing in his report or deposition that provides an explanation or any link between his past experiences as a police officer and insurance fraud investigator and/or background investigator with the

speculations and conclusions he reaches as to what occurred" on the date of the incident. *Id*. at *8-*9. Likewise, the Court found "nothing in his resume or deposition that provides any educational or field training to support his speculations and conclusions." *Id*. at *9. The Court therefore concluded that the purported expert "lacks the credentials and training to provide expert testimony regarding crime scene evaluation, expert testimony as to the use of deadly force by law enforcement officials, and/or the lack of training in the use of deadly force by law enforcement officials." *Id*. at *9.

In *White v. United States*, 2018 U.S. Dist. LEXIS 82334 at *23-*26 (E.D. Mo. May 16, 2018, this Court found that plaintiffs' purported experts, mechanical engineers who were accident scene reconstructionists but not experts on the issues of ballistics, bullet trajectory analysis, or shooting reconstruction, were not qualified to give their opinions regarding defendant's location at the time of decedent's shooting because "the question of where a shooter was standing requires a different kind of expertise" than accident scene reconstruction. *Id*. at *23-*26.

In that case plaintiffs designated two mechanical engineers to offer opinions about the defendant's location relative to the decedent's vehicle and whether defendant was in danger of being hit by the vehicle at the time he fired shots, killing the decedent. *Id*. at *21. The Court found the two engineers typically performed accident reconstruction for cases involving car accidents or claims of product malfunctions and noted that the expert's previous "work as an expert witness has been within the realm of accident reconstruction where the injury at issue was caused by the accident itself." *Id*. at 24. By contrast in *White*, the Court noted, the experts had "tried to determine where [the defendant] was located when he shot into the suspects' vehicle based upon bullet trajectories and estimated speed and location of the car." *Id*. at *24. The Court

concluded that although the engineers "may be accomplished accident reconstructionists, and they appear to be qualified to opine as to the trajectory of the suspects' vehicle when it collided with the bucket truck, the question of where a shooter was standing requires a different kind of expertise." *Id*. at 26. Accordingly, the Court found the engineers unqualified to testify as ballistics experts given that they had "no experience, training, or education in bullet trajectory analysis." *Id*. at *24.

Here, for all the same reasons identified by the Court in *Bird and White*, this Court should conclude that Andrews is unqualified to provide opinions relating to forensic ballistics and crime scene investigation or reconstruction. Plaintiffs have not carried their burden to show that Andrews is an expert in bullet trajectory analysis or crime scene reconstruction. Andrews has never been employed as a crime scene investigator or forensic ballistics analyst. No court has recognized Andrews as an expert in ballistics, crime scene investigation or in any field whatsoever. Ex. D, p. 145. He cannot point to any educational or field training relating to forensic ballistics or crime scene investigation. He possesses no certifications in these fields and has not earned any degrees in a relevant field of science. Although Andrews teaches people how to shoot at his shooting range and manufactures component firearms parts, "none of this is any indication of a special expertise in crime scene investigation, reenactment or reconstruction." *Bird,* 2018 U.S. Dist. LEXIS 82334 at *8. An expert cannot "'render an opinion on an entirely different field or discipline.'" *Wheeler v. John Deere Co*., 935 F.2d 1090, 1100 (10th Cir. 1991).

By contrast, in *United States v. Shipp*, 422 F. Supp. 3d 762, 769 (E.D. N.Y. Nov. 26, 2019), the district court found a detective qualified to provide testimony in the field of ballistics, precisely what weapon was used in a shooting incident. There, the district court noted that, "[i]n the course of his work, he has "analyzed and tested the operability of over 1500 firearms" and

"microscopically examined thousands of pieces of ballistics evidence." *Id*. at 769. "He has completed multiple trainings in the area of toolmark analysis, including the two-and-a-half-year NYPD Firearms Examiner Training Program, and he now trains others in the proper procedures around conducting ballistics examinations." Accordingly**,** the court found the detective competent to testify regarding firearms toolmark analysis. *Id*. at 784.

Here, unlike *Shipp*, Plaintiffs are unable to carry their burden to show that Andrews' experience firing weapons and manufacturing barrels qualifies him to perform a forensic analysis of a complex shooting scene like the one at issue in this case. Andrews lacks the requisite qualifications required by FRE 702, and his Affidavit should be struck and he should be barred from providing any testimony in this case concerning forensic ballistics or shooting scene reconstruction.

Moreover, Andrews has no training, education or experience that qualifies him to perform a forensic analysis of gunshot acoustics or sound recordings. Ex. A. Andrews purports to provide opinions relating to what he believes he does or does not hear in the cellphone video recording. However, Andrews has not been trained in how to conduct forensic audio analysis. Ex. E, p. 371. Aside from slowing down the audio recording, he made no enhancements to the digital file prior to listening to it. Ex. E, p. 320-324. Moreover, there is no indication that he relied upon professional-grade audio equipment in his review of the audio recording. *Id*. at p. 320-23, 360.

Andrews lacks the qualifications to render opinions on these topics within a reasonable degree of scientific or engineering certainty. Andrew's Affidavit should be struck and he should not be permitted to testify in this matter.

**II.    This Court should further strike Andrews' Affidavit and bar his testimony that there was no AK-47 fired because that opinion is not based on sufficient facts or data.**

This Court should find that Andrews' opinion that no AK-47 was fired is based on insufficient facts and data because Andrews failed to consider the results of laboratory tests of physical evidence seized from the house following the shooting that establishes that the Decedenet's Inter Ordnance Sporter AK-47 type rifle was indeed fired.

Following this incident, a City of St. Louis Police Department evidence technician recovered multiple expended 7.62 caliber bullets and 10 Barnaul stamped 7.62x39mm caliber cartridge cases from the residence. Testing was performed on the recovered ballistics evidence by Julie Davis ("Davis"), a qualified firearms examiner employed by the St. Louis Police Department, who completed an 11-month training program at the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives National Firearms Examiner Academy. Ex. F, Affidavit of Julie Davis, ¶¶ 2, 4.

Through testing, Davis concluded, to a reasonable degree of scientific certainty, that 9 of 10 Barnaul stamped 7.62x39mm caliber cartridge cases recovered from the scene had been fired in the Inter Ordnance Inc. make, Sporter model, 7.62x 39mm caliber semi-automatic rifle seized from the scene. *Id.* at ¶¶10-11. Further testing performed by Davis showed that the expended 7.62 caliber bullets recovered from the scene were consistent with having been fired from an AK-47 style rifle. *Id.* at pp. 130-137. Davis' findings and supporting documentation and photographs are contained in Laboratory Report #9 (Ex. F, pp. 5-185).

At his deposition Andrews was unable to speak to the findings in Laboratory Report #9 (Deposition Exhibit J) and could not say one way or another whether those findings had any bearing on his opinion that no AK-47 type rifle was fired during the incident. Ex. E, p. 329-333. Instead, when questioned about the findings contained in Laboratory Report #9, Andrews resorted to attacking the credibility and integrity of the City Police laboratory (see Ex. E, page

332-334: "if this lab had any credibility, . . . I'm not sure I give this lab a whole lot of credibility"). From there, Andrews insinuated that the laboratory had fabricated evidence, speculating without any basis that "that evidence could have been created in the lab." Ex. E, p. 334.

It is clear that Andrews completely failed to consider Davis' findings, contained in Laboratory Report #9, prior to arriving at his opinion that no AK-47 was fired in the residence that day. To be sure, neither his Affidavit nor Report addresses Davis' finding that the 7.62 caliber bullets recovered from the scene were consistent with having been fired from an AK-47 style rifle, and Andrews ignores that 9 of the 10 Barnaul stamped, 7.62x39mm caliber cartridges cases recovered from the scene bear firing pin and breech face impressions that match test shots fired from Hammett's Inter Ordnance Sporter Model rifle. When questioned about the existence of this ballistics evidence and the findings contained in Laboratory Report #9, Andrews could not provide a reasonable explanation for why that information should be discounted and instead resorted to wild speculation that the laboratory "could have" "created" the evidence. Ex. E, p. 334. This Court should find that Andrews' opinion that no AK-47 was fired is not based upon sufficient facts and data.

Further, Andrews' opinion that "[t]here are no bullet hole entries in the home that match a 7.62 caliber gun" is likewise unreliable because it is based on insufficient facts and data. At his deposition Andrews was unable to provide basic information about the ballistics damage he observed at the home. Andrews was not able to say how many total bullet holes he observed at the scene and could only testify that he believes "there were more than 50." Ex. E, pp. 297-98. Andrews was, and is, unable to state how many bullet holes he identified during his visit because, quite incredibly, he has no notes from his visit. *Id*. at 297-98. Although Andrews claims

he measured each entry bullet hole during his first visit to the house, he is unable to provide the
measurements because he did not create any documentation:

> Q. And you don't have any documentation that you can refer to
>
> that will tell you the measurement of every entry hole you
>
> identified?
>
> A. No, I just kept finding .223 and -- and – and 9 millimeter holes
>
> and kept moving onto the next hole looking for a .311 hole.
>
> Q. So, you're not in any position to tell us each measurement for
>
> each hole?
>
> A. Not unless you want to go back to the scene and have me
>
> remeasure them.

Ex. E, p. 298.

Andrews initially claimed that he thinks he "may have" taken notes while doing the
inspection but admitted that he did not rely upon them in rendering his opinions and currently
has no documents memorializing the measurements he took that day. Ex. D, p. 174. Even
viewing photographs of the ballistics damage did not refresh Andrews' memory:

> I don't think that I can go hole by hole and tell you from looking at
>
> the picture exactly what the diameter is or even if it's an entry or
>
> exit hole from the photograph. I kind of have to see the other side of
>
> the wall and see the path through to really be able to do that
>
> accurately and scientifically . . .

Ex. D, p. 216, ln. 12-18. Andrews admitted he had nothing to which he could refer to for that
information. Ex. D, p. 216, ln. 7-9. At a second day of , Andrews testified that he was merely

relying upon his memory of his visits to the home to provide his testimony. Ex. E, p. 300. In light of Andrews' failure to take notes and contemporaneously document his observations, it appears Andrews relied solely upon his memory to form his opinions in this case. Ex. E, p. 300, ln. 15-20. Andrews conceded that memory is imperfect. *Id*.

Moreover, notably, prior to authoring his Affidavit, Andrews had not personally inspected the shell casings recovered by the Police Department[7]. Rather, Andrews viewed (unidentified) photographs taken of the casings[8] and concluded they "do not have any of the normal markings of a recently fired shell." ¶ 13. Andrews further states that the "pictures of the casings lying on the floor of the Torres home" do not have "extraction marks" "because the casings in the photographs show oxidation." ¶ 14. Andrews, however, did not examine the shell casings microscopically, much less *in person*, prior to providing the opinion that they do not have "extraction marks." Ex. E, p. 333. In rendering his opinion, he is relying solely upon his review of a group of *photographs* of the cartridges taken at the scene. The photographs reviewed by Andrews were taken by an evidence technician solely for the purpose of marking and documenting the location of the cartridges at the scene of the shooting. Ex. G, Deposition of Jennifer Sommer, pp. 17, 27. It is quite clear that these photographs were never intended to be used for the purpose of toolmark identification.

Unlike the analysis performed by qualified firearms examiner Davis, Andrews did not view the shell casings microscopically. Andrews does not refer to or rely upon any sort of standard or protocol that would espouse the reliability of identifying markings on cartridges just

---

[7] Andrews also had not personally inspected the wooden door to Hammett's room prior to rendering the opinions he included in his Affidavit. Ex. D, p. 230

[8] Andrews was also unable to identify the photographs he viewed to form his opinion that the shell casings showed oxidation: "Ma'am, I looked at 700 photos. There's about five photos of the 7.62 by 39 brass. Just pick one." Ex. D, p. 258, ln. 8-15.

by looking at evidentiary photos taken on the scene. Andrews admitted, in any event, it is not impossible for a bullet showing signs of "oxidation" to be fired from a gun. Ex. D, p. 260, ln. 5-8.

Andrews' failure to document his observations and his admission that memory is imperfect beg the question: "what data and facts did he actually rely upon in drafting his Affidavit and Report?" This Court should find that Andrews' opinion that the AK-47 shells photographed immediately after the shooting "had not come from a cartridge that was recently fired" is based on insufficient facts and data and fails the requirements of FRE 702. Accordingly, this Court should bar Andrews from testifying that no AK-47 was fired the day of the shooting.

<blockquote>

a. **Andrews' Affidavit should further be excluded in its entirety because his opinions are not based on sufficient facts or data because he had not inspected sufficient physical evidence prior to rendering those opinions.**
</blockquote>

In his Affidavit, Andrews opines that that no bullet hole entries in the home match a 7.62 caliber gun and that photographs taken after the shooting of the AK-47 shell casings were not recently fired "because they do not have any of the normal markings of a recently fired shell." Ex. B, ¶¶ 12, 13. He also asserts vaguely that "the Department's photographs of the alleged AK-47 shell casings do not match up with the ballistics evidence of the scene." *Id*. at ¶ 14.

This Court should strike Andrews' affidavit in its entirety because the date on which he authored the Affidavit, Andrews had not inspected any of the physical evidence seized by the police on the day of the shooting. Ex. B, p. 6; Ex. D, p. 178.

Following the shooting on June 7, 2020, Evidence Technician Jennifer Sommer documented and seized physical evidence, including bullet casings, bullets, and the door to Decedent's bedroom. Doc. G, p. 17, 18, 26, 49-50, 51. The AK-47 type rifle located next to Decedent was seized by Detective Robert Skaggs. *Id*. at p. 37.

Prior to May 28, 2020, the date on which he signed his Affidavit, Andrews had not viewed or inspected the 95 cartridge cases, which included ten 7.62 cartridge cases bullets, the bullets and the bedroom door seized by police. Ex. D, pp. 176-177; Ex. G, pp. 26, 49, 51. Andrews' inspection of that evidence did not occur until a month later on June 23, 2020. Ex. D, pp. 176-177.

Thus, prior to rendering his opinion that "[t]here are no bullet hole entries in the home that match a 7.62 caliber gun," Andrews had failed to inspect the wooden door to Hammett's room, which had sustained significant ballistics damage. Ex. H. Prior to rendering his opinion that the AK-47 shell casings "were not recently fired," he had failed to inspect the shell casings. What this means is that prior to opining that no AK-47 had been fired in the residence, Andrews had only inspected and considered a fraction of the physical evidence.

Given that Andrews had failed to inspect any of the physical evidence recovered by the City Police Department, including 95 cartridge cases and the bedroom door, it is clear that the opinions he proffers in the Affidavit are without sufficient foundation. This Court should find that the opinions in Andrews' Affidavit are not based upon sufficient facts or data and strike his Affidavit in its entirety because this testimony fails to meet the requirements of FRE 702.

### III. Andrews' Affidavit should be struck and he should be barred from testifying in this case because his opinions are not the product of reliable principles and methods.

#### a. Andrews' opinion that there is no evidence that a Sporter 7.62x39 Semi-Automatic Rifle was fired at 4241 S. Kingshighway is not the product of reliable principles and methods.

FRE 702 requires that an expert's testimony be the product of reliable principles and methods and that the expert has reliably applied the principles and methods to the facts of the case. The Supreme Court has identified four *Daubert* factors to guide courts in evaluating the

reliability of expert testimony: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) whether the potential error rate is known; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *First Union Nat'l Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005) citing *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 593-94 (1993).

Here, Andrews was unable to identify a reliable methodology that he employed in rendering his opinion that there are "no bullet hole entries in the home that match a 7.62 caliber gun." Ex. B, ¶ 12. Andrews' sole basis for that statement is his conclusion that "[t]he width of the entry holes made are either much too small or much too large to have come from and [sic] AK-47 model rifle." *Id*. at ¶ 12. Andrews' opinion that the bullet holes were either "too small" or "too large" to have come from an AK-47 is based solely upon his visual inspection to identify "entry" holes and then using a caliper to measure the exterior of the hole. Ex. D, p. 155, 225. However, by Andrews' own admission, there are limitations to that approach, and as a result, he is unable to measure every entry hole:

> [T]here are certain holes where you don't have a hole. When the bullet strikes the surface at an acute angle, you have half a hole. And, so, if you've got 180 degree circle, then you've got something to measure. If you don't have 180 degree circle, then it's more difficult to – to get a super accurate measurement."

Ex. D, p. 225.

Given that Andrews' admission that he is unable to "get a super accurate measurement" on a hole if the bullet strikes the surface at an acute angle, his technique for determining the caliber of bullets is clearly prone to error. To further complicate matters, Andrews testified that whether the angle of the bullet as it crosses through a substance affects the size of the hole "depends on the depth of the material." Ex. D, p. 251.

Moreover, there is no evidence that Andrews' technique has been tested; has been subject to peer review and publication; and is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. At his deposition Andrews was unable to identify any particular peer-reviewed paper or scientific literature that he relied upon in rending his opinions. However, according to Andrews, he has "read thousands of scientific articles to learn what [he] knows about ballistics and science and physics and metallurgy and all of the things that allow me to understand what I'm looking at . . ." Andrews claimed he relied upon the "collective knowledge gained from all of those articles." Ex. D, pp. 158-59.

Andrews purports to rely upon his generalized knowledge of ballistics, science and "the laws of physics." (Ex. D, p. 265, ln. 22). However, given Andrews' lack of credentials in the fields of forensic ballistics and crime scene investigation, Plaintiffs cannot carry their burden to show that Andrews reliably applied these highly generalized, complex scientific principles to the specific task of determining the caliber of bullet that passed through a particular substrate.

Further, Andrews methodology is incapable of replication or being tested. See *Daubert*, 509 U.S. at 592 (stating "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.") At his deposition, Andrews claimed that he used a laser during his first visit to the shooting scene on June 8, 2017 to assist with rendering his opinions in this case. Ex. D, pp. 292, 305. In generally describing his methodology for using a laser, Andrews testified that he "likes to get as far away from the hole as [he] can and . . . [he] like[s] to shine a laser through the hole. And when [he] get[s] the largest, roundest imprint on the surface on the opposite side of the hole, [he has] achieved . . . maximum precision in alignment of the laser." *Id*. at p. 305.

Based on this description alone, it is virtually impossible to replicate his work. Andrews admits has no notes documenting this process. *Id*. at 292. As a result, there is no reliable way to replicate it. It is unclear how far Andrews stood from the hole when he shined the laser, and he has nothing documenting his trajectory determinations for each hole he shined the laser through. Curiously, he fails to explain how he, while working alone, stood "as far away from the hole as [he] can" on one side of a wall and was simultaneously in a position to make observations about where the laser was visible on the other side after it passed through the exit hole. Moreover, the wooden door to the bedroom, which sustained extensive ballistics damage, was not even present in the home on June 8, 2017 when he supposedly used this technique. Ex. D, p. 229-30.

Also, significantly, Andrews' testimony concerning key aspects of the case changed from day 1 to day 2 of his deposition. When asked during day 1 of his deposition whether he made any "attempt to determine where the shooter or shooters who fired from the bedroom were located? Andrews answered that, "Well, that's a very difficult thing to do to a precise degree . . . " Ex. D, p. 249. However, on the second date of his deposition, Andrews changed his testimony, instead testifying he had in fact conclusively determined that a shooter had fired from "the back door of the bedroom from the back of the house through the -- through the front door of the bedroom." Ex. E, p. 310. He called this conclusion "clear as day." *Id*.

Andrews further testified that he did not make trajectory determinations for all bullet holes. Ex. D, p. 266. Instead, Andrews testified that he could infer the trajectory of several holes based upon his review of a single hole. Andrews claims he "only really needed to look at the direction of one [hole] carefully to get an idea where all three were. So, I did not look at every single hole and every direction of every hole and document that. I did not do that, but --but I did select holes." Ex. D, p. 243. This methodology, which involves arbitrarily excluding evidence

from consideration and presuming its consistency with limited evidence selected, is inherently unreliable.

Andrews further testified that "[w]hen you look at a tight grouping of holes that were obviously fired from the same weapon from the same position, they all have an identical trajectory. You don't need to look at all of them. You can see with your eye if there's a slight variance and then you would inspect that. But when you've got a grouping of holes -- Two people cannot occupy the same space with two weapons, so a trajectory will generally, if it's the same trajectory on multiple holes, will generally represent one shooter if the holes are close together on their impact marks. *Id*. at p. 244.

Andrews methodology was essentially to look at a grouping of bullet holes with his naked eye and look for "slight variance" in the trajectory. If he did not note a "slight variance" between the holes based upon his visual examination he would then infer that all the bullet holes had an "identical trajectory." This methodology – viewing a grouping of holes to see if there's a "slight variance" – simply cannot be tested for accuracy and precision. This is especially so given that Andrews has no notes or photographs documenting his findings.

FRE 702 requires that an expert's testimony be the product of reliable principles and methods and that the expert has reliably applied the principles and methods to the facts of the case. Here, Andrews claims he simply applied the "laws of physics" and the knowledge he has gleaned from "thousands" of "scientific articles," but never identified any particular principles or techniques widely accepted in field of modern forensic ballistics that he relied upon. Plaintiffs' fail to show that Andrews techniques have been tested and subject to peer review and publication or that these techniques are generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. Accordingly, Plaintiffs have not carried their burden to show that Andrews

employed a scientifically reliable methodology to the facts of this case. See *United States v. Black Hills Power, Inc*., 2006 U.S. Dist. LEXIS 101215 at *122-128 (D. S.D. June 12, 2006) (barring opinion of purported wood preservation expert that lightening did not strike pole where he based his opinion upon visual observation of less than a dozen other power poles that have been struck by lightning and he did not have pictures of the char on the previous poles and could not state that he was aware of any peer-reviewed, scientific literature that would support his theory.)

> **b. The Court should exclude Andrews' opinion that he cannot hear an AK-47 fired during the cellphone recording because that opinion is not based on any reliable principle or method and he possesses no specialized training, skill or knowledge to conduct a forensic analysis of a sound recording.**

In his Affidavit, Andrews claims he has listened to the cell phone audio recording and "at no time do I hear an AK-47 fired." Ex. B, ¶ 10. He claims that based upon his "comparisons of firearm 'signatures' of the 5414 Kingshighway shooting recorded in the Broccard video there can be no doubt or dispute that there was never an AK-47 fired at the time of this raid." *Id*. at ¶ 10. The Court should strike this opinion not only because Andrews is unqualified to provide it, but also because it is not the product of reliable methods and principles.

First, Andrews lacks any education or training that qualifies him to render opinions on or conduct a forensic analysis of gunshot acoustics. Ex AA, Resume of Andrews; Ex. E, Deposition of Andrews Vol. II, p. 371. Moreover, Andrews did not make any enhancements to the recording, aside from playing it in slow motion, prior to observing the recording and rendering his opinions. Ex. E, p. 320-324. Plaintiffs have not established that Andrews used a reliable methodology to render his opinions about the cell phone audio. In fact, Andrews could not recall

the name of the software he used to play the cellphone recording on his home computer. *Id*. at p. 320-23, 360.

Moreover, Andrews' interpretation of the audio recording is not based on sufficient facts and data. In fact, Andrews lacked knowledge of even the most basic information concerning the conditions in which the recording was made. Andrews, for example, did not determine how far the cellphone was located from the house during the shooting or what type of microphone (or phone) recorded the recording. Ex. E, pp. 326, 357-58. He did not know for certain whether the person making the recording was inside or outside of a car. *Id*. at 325.  Because he could not identify the make and model of cellular phone and its microphone used to record the incident, he could not have taken into consideration the capabilities and limitations of the particular cell phone microphone. His methodology did not account for how the walls and structures within the Decedent's house would affect the travel of the sound waves emitted from a gun. Although Andrews claims that he considered the possibility of some reverberation in the urban environment, he did not factor that into his analysis because he "just didn't find it significant." Ex. E, p. 364.

Pursuant to FRE 702, this Court should bar Andrews from testifying that the cellphone video recording does not depict an AK-47 being fired because he is unqualified to conduct a forensic audio analysis of gunshot acoustics, he lacks sufficient facts and data about the circumstances in which the audio was recorded, and further, Plaintiffs fail to show his opinions are the product of reliable principles and methods.

**IV.    The Court should exclude Andrews' opinion that the officers did not announce themselves prior to breaching the door because that opinion is based solely upon his observation and interpretation of a video recording and Andrews employs no specialized skill or knowledge with regard to the interpretation of digital videos.**

In the Affidavit, Andrews also proffers the opinion that "there was no announcement by the police before the breach, flash bang and shots being fired as claimed by the police in their post shooting interviews and depositions." Ex. B, ¶ 8. Andrews bases this claim exclusively upon his contention that he can hear the police announce "Police we have a search warrant" at the video's 3:50 mark "but at no other time during the video." *Id*. Aside from his review of the cellphone video, he relies upon no other evidence that officers did not yell "Police Search Warrant" prior to breaching the door.

This Court should exclude Andrews' opinion because he is in no better position than the Court or the jurors to review the video and make conclusions about what sounds are or are not perceptible. In rendering his opinion that the officers cannot be heard announcing before the breach, Andrews employed no specialized knowledge, training or experience relating to the analysis of the digital audio files. Rather, as discussed above, his opinion that "there was no announcement by the police before the breach, flash bang and shots being fired" is based solely upon his review of the video, using no enhancements.

"When cases involve review of videotaped events, an expert's opinion should not be permitted when the expert is no better suited than the jury to interpret the video's contents." *Sherrod v. McHugh*, 2018 U.S. Dist. LEXIS 163538 at *104 (D.D.C. Sept. 25, 2018) citing *Estate of Collins v. Wilburn*, 253 F. Supp. 3d 989, 992 (E.D. Ken. 2017); see also *Dunlap v. Hood*, 2009 U.S. Dist. LEXIS 11643, 2009 WL 362292 at * 1 (N.D. Tex. 2009) ("Because [the expert] is no better suited than the jury to interpret the contents of the video [showing an alleged use of excessive force], his supplemental opinion is not the proper subject of expert testimony.").

In *Lee v. Andersen*, the Eighth Circuit held that the opinion of an expert who used "simple observation" to interpret the contents of video images captured by a surveillance video

were inadmissible because that opinion would not have assisted the jury. 616 F.3d 803, 809 (8th Cir. 2010). In *Lee*, the plaintiff sued a police officer and city pursuant to § 1983 arising from the death of the plaintiff's son. The officer testified he shot the decedent during a pursuit after he observed the decedent turn his upper body one-hundred-and-eighty degrees toward the officer while holding a gun in his right hand. *Id*. at 806. Surveillance cameras captured parts of the incident. *Id*. at 807. In that case the plaintiff's designated expert used digital video recording and processing technology to increase the contrast of the video images captured by the surveillance video. *Id*. at 808. The expert "clarified" seven frames and opined in his report that the decedent did not have a firearm in his right hand during the moments before the shooting occurred. *Id*. When asked what methods and principles he used to interpret images, the expert replied that the first method is "simple observation." *Id*. The district court noted the expert's conclusion was "based on his observation of the video – he did not employ any technique or utilize any specialized skill that is unavailable to the jury" and excluded the opinion that decedent did not have a gun in his hand because "the jury does not need assistance in determining whether they can see a gun or any other object in the decedent's hand." *Id*.

The Eighth Circuit affirmed the trial court's decision. *Id*. at 809. It ruled that the expert's opinion that the decedent did not have a gun in his hand was properly excluded under FRE 702 because "the jury was entirely capable of analyzing the images and determining whether [decedent] had anything in his hands." *Id*. According to the Court "[t]he opinion would not have assisted the jury but rather would have told it what result to reach. *Id*.

Pursuant to *Lee*, it is proper for the Court to bar Andrews from testifying that "there was no announcement by the police before the breach, flash bang and shots being fired" because Andrews' opinion is premised entirely upon his observations of the cell phone video recording.

Absent some specialized skill or knowledge, Andrew's opinion regarding his observation of the events depicted in a recording do not assist the trier of fact. FRE 702; *Lee*, 616 F.3d at 809. Andrews did not provide any enhancements to the cellphone audio recording, aside from playing it in slow motion, prior to making his observations. Ex. E, p. 220-323. Since Andrews employs no specialized knowledge or skill with regard to the analysis or enhancement of digital audio recordings, he is in no better position than a juror to listen to the cellphone video of this incident.

Moreover, "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. July 19, 2005). Andrews' interpretation of the events depicted in the video recording of this incident is not based upon any technique or a specialized skill. Jurors, and this Court, are fully capable of listening to the cell phone recording of this incident and determining whether the officers announce themselves prior to breaching the door. See also *Wallingford v. Olson*, 592 F.3d 888, 893 (8th Cir. 2010) (rejecting plaintiff's version of facts where video evidence "conspicuously refutes and completely discredits" the plaintiff's version). This Court should exclude Andrews' opinion that the police did not announce themselves prior to breaching the door pursuant to FRE 702 because his observations of the cell phone video recording will not assist the jury.

**V.    The Court should exclude Andrews' opinions concerning the Defendant officers' announcement of a "compromise" because Andrews relies upon no specialized knowledge, skill, experience, training, or education to render that opinion, and moreover, it is an impermissible opinion on Officer Defendants' credibility.**

Andrews also purports to provide the opinion that the Defendant Officers lied when they testified that they called a "compromise." Ex. B, ¶ 9. According to Andrews, that testimony is an after-the-fact justification of the use of a battering ram and flash bang. *Id*. The Court should

strike this opinion because it is an improper credibility determination that comments on the truthfulness of a witness's testimony. Further, this Court should strike this opinion because it is not based upon any specialized knowledge, skill, experience, training or education.

Credibility determinations are the exclusive province of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No expert is permitted to offer an opinion as to the believability or truthfulness of a witness's testimony. *Id.*; *Bachman*, 953 F.2d at 441.

No expert witness is permitted to offer their own opinions as to the truthfulness of a witness's story, but that is exactly what Andrews does here. Andrews attempts to construct a factual narrative of what he believes happened and the Defendant Officers' motivations for providing certain testimony. These opinions are based exclusively upon his review of the cell phone video recording and the Defendant Officers' testimony. He relies upon no specialized skill or knowledge in reaching this opinion, which is nothing more than an impermissible credibility determination.

The Court should therefore strike Andrews' opinion that the Defendant Officers called a "compromise" in order to justify the use of the battering ram and flash bang because that opinion is premised upon improper credibility determinations and invades the province of the jury. See United States v. Benedict, 815 F.3d 377, 382 (8th Cir. 2016) citing *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 884 (8th Cir. 1998) (stating that is "plain error to admit testimony that is a thinly veiled comment on a witness' credibility").

**VI.     Andrews' Report fails to comply with Rule 26(a)(2)(b), and his Report and Affidavit must therefore be stricken**.

Andrews' Report and Affidavit should further be excluded because his Report fails to include a complete statement of all opinions Andrews' will express and his basis and reasons for them as required by Rule 26(a)(2)(B)(i).

With respect to the disclosure of expert witnesses, Rule 26(a)(2)(B) requires that Plaintiffs must provide a written report for any witness retained or specially employed to provide expert testimony, as is the case here. Ex. D, p. 144. The Report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).

Andrews failed to include in his Report a complete statement of all opinions he intends to express and the basis and reasons for them. Numerous times at his deposition it was revealed that Andrews intended to testify about opinions that he failed to include in his Report. For example, Andrews testified he believed police had wiped up blood at the scene. Ex. D, pp. 182-83. This claim was not included in his Report. Ex. C. Andrews also testified that he observed bullet holes in the bedroom window closest to the front of the house on the south side that had not been documented by City evidence technicians. *Id*. at pp. 187-88. Again, he failed to include that opinion in his Report. *Id*. at p. 188; Ex. C. Next, he claimed evidence had been removed from the house, but again, that opinion was absent from his Report. *Id*. at pp. 191, 195; Ex. C. Most significantly, Andrews testified that the evidence technician "missed" bullet casings at three different locations in and around the house, including a casing he claims he found near in the kitchen area. *Id*. at pp. 157, 178, 192. Once again, Andrews failed to include that opinion in his Report. *Id*.; Ex. C.

Clearly, Andrews' failure to include a complete statement of all opinions he intends to express and the basis and reasons for them violates Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 37(c)(1) is clear: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion… unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Here, there

is no justification for Andrews' failure to comply with the clear requirements of Rule 26(a)(2)(B). Andrews' failure to comply with Rule 26(a)(2)(B)'s requirements is certainly not harmless. Defendants are extremely prejudiced by Andrews' failure to include all the opinions he intends to offer at trial and the full and complete basis and reasons for those opinions. This Court should strike his Affidavit and bar him from testifying at trial.

## CONCLUSION

For all the foregoing reasons, L. Samuel Andrews is unqualified to provide expert testimony in the fields the forensic ballistics, shooting scene reconstruction or audio forensics. Further, Plaintiffs have not carried their burden to show that his testimony is based upon sufficient facts or data or that his testimony is the product of reliable scientific principles and methods. Pursuant to FRE 702, his testimony is inadmissible.

WHEREFORE, Defendants respectfully request that this honorable Court strike Andrews' Affidavit (doc. 109-7) submitted in connection with Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and bar him from testifying at trial.

Respectfully submitted,

**JULIAN BUSH**
**CITY COUNSELOR**

By: /s/ Erin K. McGowan
Erin K. McGowan #64020MO
Andrew Wheaton #65269 MO
1200 Market Street, Room 314
City Hall
St. Louis, Mo 63103
(314) 622-3361
(314) 622-4956 fax
WheatonA@stlouis-mo.gov
McGowanE@stlouis-mo.gov
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **September 23, 2020** the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system.

/s/ Erin K. McGowan