IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| GINA TORRES and | ) | |
| DENNIS L. TORRES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:19-cv-01525-DDN |
| vs. | ) | |
| | ) | |
| CITY OF ST. LOUIS, LANCE COATS, | ) | |
| GLENNON P. FRIGERIO, JOSHUA D. | ) | |
| BECHERER, NICHOLAS J. MANASCO, | ) | |
| RONALD ALLEN JR., JOHN C. JONES, | ) | |
| MARK S. SEPER, JON B. LONG, | ) | |
| TIMOTHY BOYCE and BENJAMIN R. LACY, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF L. SAMUEL ANDREWS

COME NOW Plaintiffs Gina Torres and Dennis L. Torres, and for their Memorandum in Opposition to Defendants' Motion to Exclude Testimony of L. Samuel Andrews, and state as follows:

Defendants have filed a motion to exclude and strike the testimony of Plaintiff's expert L. Samuel Andrews. Mr. Andrews has over three decades of extensive experience and training with firearms and was clearly qualified to evaluate the ballistics evidence left behind at 5414 S. Kingshighway after Defendant officers shot Isaiah Hammett over twenty times, killing him. At issue in this case is whether Isaiah Hammett ever shot at police officers with a 7.62 Sporter Rifle, whether Isaiah Hammett ever possessed the 7.62 Sporter Rifle on the date of his death, and whether Isaiah Hammett was unarmed and already on the dining room floor when he was repeatedly shot and killed by the St. Louis Metropolitan Police Department SWAT team.

1

## APPLICABLE LAW.

Admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703. The screening requirement of Rule 702 has been boiled down to a three-part test: First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *See Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (8th Cir. (Minn.) 2014).

When evaluating the methodology that an expert witness applies, it may be important to consider "(1) whether the theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error'; and (4) whether the theory has been generally accepted." *Shuck v. CNH America, LLC*, 498 F.3d 868, 874 (8th Cir. (Neb.) 2007), citing *Peitzmeier v. Hennessy Indus., Inc.,* 97 F.3d 293, 297 (8th Cir.1996). These factors are not exclusive, however, and they need not be considered in every case because, "[o]f course, the *Daubert* reliability factors should only be relied upon to the extent that they are relevant and **the district court must customize its inquiry to fit the facts of each particular case.**" *Id.,* quoting *Jaurequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1083 (8th Cir.1999). The *Daubert* inquiry is a "flexible, case-specific inquiry" in which "The trial court ha[s] to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *American Auto. Ins. Co. v. Omega Flex, Inc.*, 783 F.3d 720, 722 (8th Cir. (Mo.) 2015).

The Eighth Circuit has stated that Daubert "call[s] for the liberal admission of expert testimony." *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. (Minn.) 2014). *See also Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir.2001) (Rule 702 "clearly is one of admissibility rather than exclusion" (internal quotation omitted)); *Wood v. Minn. Mining & Mfg. Co.,* 112 F.3d 306, 309 (8th Cir.1997) (holding that exclusion of expert's opinion is proper "only if it is so fundamentally unsupported that it can offer no assistance to the jury" (internal quotation omitted)). Further, district courts are admonished not to weigh or assess the correctness of competing expert opinions. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. (Minn.) 2014), citing *Wyeth,* 686 F.3d at 625. As long as the expert's testimony rests upon "good grounds, based on what is known" it should be tested by the adversary process with competing expert testimony and cross–examination, rather than excluded by the court at the outset. *Id.,* citing *Daubert,* 509 U.S. at 590, 596, 113 S.Ct. 2786.

## ARGUMENT

I. **L. SAMUEL ANDREWS IS QUALIFIED TO RENDER THE OPINIONS HE HAS EXPRESSED IN THIS CASE.**

"[A] court should consider a proposed expert's **full range of practical experience** as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *McGuire v. Davidson Mfg. Corp.*, 238 F.Supp.2d 1096, 1101 (N.D.Iowa 2003), citing *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). [Emphasis supplied.] Here, Mr. Andrews qualifications, which were sufficient for Defendant City of St. Louis to hire him as an expert to train their own SWAT officers on numerous occasions and to purchase SWAT rifles and equipment manufactured by Mr. Andrews based upon his 35 years of experience in the field of ballistics, are more than sufficient to render the opinions he has given in this case.

In addition to the extensive qualifications Mr. Andrews provided in his Curriculum Vitae and Affidavit (*See* Defs. Exs. A and B), Mr. Andrews expounded further on why he is an expert in the field of ballistics during his depositions, including the following:

His firearms training began in 1986 doing contract work for the federal government, and again after 9/11 and in 2002 when he received training in specific weapons systems on behalf of a government contracting company. He is also a National Rifle Association certified instructor since the late 1980s. *See* Defs. Ex. D, pp. 17, 21.

In the mid 1990's Mr. Andrews received extensive training from Gunsite Academy Training Center in Paulden, Arizona in handguns and numerous weapons systems, as well as classroom training in ballistics as a subsection of sniper training and Close Quarters Combat. Defs. Ex. D, p. 22. He was trained by Instructor Neil Terry, a 20 year veteran SWAT Officer for the Albuquerque Police Department. Defs. Ex. D, p. 31. He received training from Mr. Terry in crime scene investigation including both external and terminal ballistics, lines of fire, trajectory angles, places to target a threat, the various types of projectiles, bonded hollow point, soft point, penetration of walls, windows, human flesh, and body armor. Defs. Ex. D, pp. 30, 32. Mr. Andrews in turn provided that training to individual members of the St. Louis Metropolitan Police Department SWAT team and hundreds of others. Defs. Ex. D, p. 39; Defs. Ex. B. pp. 1-2; Defs. Ex. D. p. 139.

He also received training at Gunsite Academy relative to threat risk, threat assessment and proper firing sequences in threat situations, i.e. when it's appropriate to shoot based on time, distance, cover and risk. Defs. Ex. D, p. 32. The training involved assessing the threat, immediate action to the threat and whether you have a legal foundation to respond with lethal force. Defs. Ex. D, p. 34.

Mr. Andrews received instructor level training and range officer training at the Benchrest Rifle club in Wright City, MO in approximately 1997 and 1999. Defs. Ex. D, p. 22. He also received training at the Direct Action Resource Center (DARC) in North Little Rock, Arkansas where Navy Seals and Army Special Forces train. Defs. Ex. D, p. 23. He has received comprehensive weapons training at Camp Peary in Williamsburg, VA, where the federal government trains many of its direct action intelligence assets and ambassadors and their staff. Defs. Ex. D, p. 25. These trainings were conducted by law enforcement agencies and military officers and provided to Mr. Andrews. Defs. Ex. D, p. 26. Mr. Andrews also received extensive sniper training at the Small Arms Training Academy in Gillette, Wyoming. Defs. Ex. D, p. 22-23.

In the late 1990s and early 2000s, Mr. Andrews performed contract engineering work for Powell River Laboratories in Oakridge, Tennessee, developing projectiles and weapons systems for the Secret Service and Navy SEAL Teams, for approximately 5 to 7 years. Defs. Ex. D, p. 70. Notably, he was involved in research and development for external and terminal ballistics and firearm barrel development. Defs. Ex. D, p. 70. He worked with all kinds of ammunition, including .223 and 7.62 mm caliber which are at issue in this case. Defs. Ex. D, p. 72-73. The research performed at Powell was external and terminal testing, looking at accuracy, trajectory and terminal ballistics. Defs. Ex. D, pp. 72, 74.

External ballistics refers to the motion of projectiles leaving the muzzle of a firearm, namely trajectory, velocity, and range penetration whereas terminal ballistics refers to the effects of the projectile on impact on a target. As Mr. Andrews explained these areas of ballistics: "External ballistics is how the bullet flies, what trajectory it flies on, how it interacts with the atmosphere, what its spin stability is, gyroscopic stability is. terminal [ballistics] has to do with how it interacts when it impacts media like human flesh or walls or trees or ground or steel from

vehicles or glass[.]" Defs. Ex. D, p. 73. Mr. Andrews then went on to explain in great detail the different types of tests and research they performed at different sites when he was a contractor with Powell River Laboratories. *See* Defs. Ex. D. pp. 73-76.

Since 2003 Mr. Andrews has managed multiple firearms manufacturing, training and consulting companies. Defs. Ex. B. p. 2. He is the managing member of Freedom Center USA, LLC, a thousand-yard rifle range and training center providing specialized training in firearms to military, SWAT, police personnel and civilians. Defs. Ex. D, pp. 41-42, 44. The training courses Freedom Center provides are long range precision rifle, advanced long range precision rifle, hard target interdiction precision rifle, basic hand gun, enhanced hand gun, advanced combat hand gun, basic carbine, enhanced carbine, advanced urban vehicle tactical carbine, advanced carbine two, advanced carbine three and advanced night combat, field craft training, first aid training, conceal carry training, and ammunition manufacture training. Defs. Ex. D, p. 44. Specific parts of these courses directly overlap with shooting scenes inspections based upon bullet trajectories and terminal ballistics. Defs. Ex. D, p. 46. He has classroom facilities and firing ranges where he and his contract instructors conduct classroom, live fire and training exercises. Defs. Ex. D, p. 45.

The sniper trainings conducted by Mr. Andrews company include teaching trajectory, bore line, sight line, and how bullets interact with different mediums and change directions. Defs. Ex. D, p. 111. These aspects of external and terminal ballistics were included in his sniper trainings because it is critical for law enforcement to understand how to control their projectiles for the safety of themselves and others. Defs. Ex. D, p. 111. Mr. Andrews also described how his terminal ballistics teachings applied more in his close range trainings Defs. Ex. D, p. 111 He relies more on the terminal ballistics instruction and less on trajectory instruction because bullets are very

"straight-line" inside 30 yards. Gravity doesn't have much time or distance to affect them, so we don't spend a lot of time on trajectory, but much more on the terminal side. Defs. Ex. D, p. 112.

Mr. Andrews has also performed terminal ballistic training wherein he taught SWAT team members on how to use a caliper to measure bullet holes. Defs. Ex. D, pp. 108-109. He taught the officers how to read and operate a caliper which includes zeroing the instrument properly so that you have a proper baseline for the instrument measuring and how to use a temperature ground piece of metal called a gauge, to make sure it is measuring properly, and how to properly measure the bullet hole and how to hold things so you don't increase the temperature of the area you're measuring, because even your body heat can make even a piece of metal grow, which is taught by Mr. Andrews as the coefficient of thermal expansion. The training goes through the basic fundamental procedures for calipers and even more accurate micrometers. Defs. Ex. D, pp. 109-110. Mr. Andrews is trained and has trained others to perform caliper measurements on many different surfaces, because bullets interact with materials differently when they impact. Defs. Ex. D, p. 111.

Through Mr. Andrews extensive experience with firearms and ammunition he has become an expert in metallurgy in general. In the past he has assisted St. Louis County Police Department with drug interdiction investigations, where he has used his expertise in metallurgy to assist them in locating hidden contraband in metal pontoons, because the welding seams did not show oxidation and therefore had been recently done. Defs. Ex. D, p. 84-85.

As Mr. Andrews testified, much of the training and consulting he provides to law enforcement is because they seek out his expertise in evaluating and improving tactical operations and ammunition, because he is an expert in external and terminal ballistics. Defs. Ex. D, p. 133.

**Importantly Mr. Andrews has been repeatedly hired by the St. Louis Metropolitan Police Department to train its officers with regard to other ballistics issues, including terminal ballistics**. See generally Defs. Ex. D, p. 39; Defs. Ex. B. pp. 1-2; Defs. Ex. D. p. 139. Mr. Andrews owned and operated A.R. Tactical, which provided POST certified sniper training to six members of the St. Louis Metropolitan SWAT Team in the early 2000s. Defs. Ex. D, p. 51, 57. He currently owns and operate Tier One Weapons Systems that manufactures rifles, ammunition and optics. Defs. Ex. D, p. 59. Tier One has been manufacturing rifles since 2011 and has made sniper weapons systems for the St. Louis Metropolitan Police Department. Defs. Ex. D. p. 61. He was also hired by the St. Louis Metropolitan Police Department to provide multiple private training sessions for the department's SWAT team members between 2004 and 2012, including as to the critical issue in this case of terminal ballistics. Defs. Ex. B. pp. 1.

Mr. Andrews is very familiar with the performance of the ammunition in this case because from 2010 to 2012 Mr. Andrews conducted terminal ballistics test with St. Louis Metropolitan Police Department, shooting predominantly .556/.223, 7.62, and 9mm ammunition through SLMPD weapons into calibrated ballistic gelatin to gather terminal ballistic performance data and look for under and over penetration data to be analyzed and used for S.W.A.T. ammunition purchase decisions. Defs. Ex. B. pp. 1-2.

Based on that ballistics testing he recommended to Seargent Jerome Klipfel of SLMPD that the SWAT team move to a Hornady frangible ammunition, which the department subsequently did. Defs. Ex. D. p. 131. He also did terminal ballistics testing with Sgt. Klipfel between 2005 and 2008, wherein they shot into different surfaces such as dry wall and doors. Defs. Ex. D. p. 139.

Defendants rely on *Bird v. Jefferson County Sheriff's Dep't*, 2009 U.S. Dist. LEXIS 24945 (E.D. Mo. March 25, 2009), however that case is easily distinguished on its facts. In *Bird* the expert

had primarily worked as a private investigator investigating fraudulent insurance claims, and had served as an officer with duties unrelated to ballistics. *See Id.* at *6-7. Mr. Andrews' qualifications, as set forth above, are vastly different and clearly qualify him to render the opinions he has offered in this case. Defendants also rely on *White v. United States*, 2018 U.S. Dist. LEXIS 82334 at *23-*26 (E.D. Mo. May 16, 2018) which involved vehicle accident reconstruction experts who did not have applicable firearms experience but who were attempting to give an opinion regarding a shooter's position which required knowledge of ballistics. Again, Mr. Andrews' qualifications regarding the use of firearms is vastly different and superior to the experts in those cases.

In conclusion, Defendants' claims that Mr. Andrews is not qualified because he does not hold degrees or certifications in crime scene investigation and forensic ballistics is an obvious attempt to distract the Court from Mr. Andrews' extensive and impressive experience and qualifications. Mr. Andrews is clearly qualified based on his specialized knowledge, skill and experience with regard to firearms and ballistics. The case law cited by Defendants does *not* hold that a ballistics expert is required to be academically trained instead of qualified by specialized knowledge and experience. And the law is to the contrary. *See Fletcher v. Beightler*, 2011 WL 741294, at *7 (N.D.Ohio February 24, 2011) (police officer offered as ballistics expert on bullet trajectories and other ballistics evidence was properly qualified as an expert given his experience with firearms over his long career as a law enforcement officer).

Furthermore, as indicated above, Defendant City has itself contracted, hired and consulted with Mr. Andrews in the past to provide expert analysis and training, including on "**terminal ballistics**." Defs. Ex. B, pp. 1-2. Mr. Andrews has simply applied his years of practical experience in ballistics to properly analyze and opine on the extensive evidence he has personally viewed and reviewed in this case.

## II.    L. SAMUEL ANDREWS' OPINION THAT THE SPORTER RIFLE WAS NOT FIRED ON THE DAY OF THE SHOOTING IS BASED ON SUFFICIENT FACTS AND DATA AND SHOULD NOT BE EXCLUDED.

Mr. Andrews testified that the AK-47/Sporter Rifle was not fired during the incident in this case based on the following facts and analysis:

He testified he looked at every bullet hole, looking for a .311 hole made by a 7.62 caliber weapon in the walls of the home in order to exonerate the SWAT team from wrong doing as they were returning fire, however only found bullet holes made by .223 and 9 mm weapons. Defs. Ex. E, p. 298; Defs. Ex. D. p. 211; Ex. B, p. 5; Defs. Ex. C, pp. 7-8, 12.

Defendants argue that this opinion should be stricken as insufficient because (1) Mr. Andrews did not address the opinion of Julie Davis regarding her examination of "tool mark" evidence (Mr. Andrews addressed the tool mark evidence in his report that the cartridge casings had tool marks showing oxidation because they had not been recently fired. Defs. Ex. C, p. 11); and (2) Mr. Andrews purportedly did not sufficiently "document" his analysis regarding bullet hole and shell casing evidence. Defendants separately argue that Mr. Andrews' Affidavit offered in opposition to Defendants' Motion for Summary Judgment should be stricken because he purportedly did not review sufficient physical evidence prior to offering that affidavit.

### A.  MR ANDREWS WAS NOT REQUIRED TO RESPOND TO THE IMPROPER AND INADMISSIBLE OPINION OF MS. DAVIS.

Defendants contend that Mr. Andrews did not sufficiently consider the opinions of Defendants' employee and agent Julie Davis, which purports to conclusively identify heavily-oxidized shells claimed to have been found at the scene as having been fired from the subject weapon.

First, The Eighth Circuit has "consistently ruled that experts are not required to rule out all possible causes" when performing a differential analysis. *See Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 563 (8th Cir. (Minn.) 2014). "A differential expert opinion can be reliable even with less than full information" and such considerations go to the weight to be given the testimony by the factfinder, not its admissibility. *Id. at 564*. Defendants' contention that Mr. Andrews' opinions and findings are inconsistent with the findings of its own employee therefore go to weight, rather than admissibility.

Furthermore, Davis' opinion and conclusion is itself improper and inadmissible. Davis apparently claims to be able to *conclusively* identify the shells relied on by Defendants as coming from the weapon at issue. Courts have repeatedly held that this is improper and inadmissible given the limitations and state of the art of "tool mark" evidence. *See U.S. v. Green*, 405 F.Supp.2d 104. (D.Mass. 2005). The "field" of tool mark analysis "consists entirely of individuals who work for law enforcement agencies." *Id.* at 110 note 7. Furthermore the examination by the purported tool mark expert is entirely subjective, with numerous complicating factors, none of which have been subject to proper scientific methodology. *See Id.* (summarizing problems with tool mark methodology and subjective nature of the analysis). Most importantly, Davis' opinion conclusively claiming to have linked shell casings to an exact weapon to a degree of "scientific certainty" is an opinion that has been routinely excluded by courts. See *U.S. v. Green*, 405 F.Supp.2d 104, 124 (D.Mass. 2005) (tool mark expert barred from testifying that he had excluded "all other guns" as the source of the shell casings); *U.S. v. Willock*, 696 F.Supp.2d 536, 549 (D.Md. 2010) (tool mark expert barred from testifying that it was a "practical impossibility" for a firearm to have fired the cartridges other than the firearm at issue); *U.S. v. Ashburn*, 88 F.Supp.3d 239, 249 (E.D.N.Y. 2015) (precluding expert from testifying that he was "certain" or "100%" sure of his tool mark matches);

*U.S. v. Glynn*, 578 F.Supp.2d 567, 569 (S.D.N.Y. 2008) (ballistics expert could only offer opinion as to whether match was "more likely than not").

Furthermore, Davis' opinions themselves do not address Mr. Andrews' opinions that the cartridges in question were heavily oxidized and had clearly not been fired on the date in question. See Defs. Ex. F.

Furthermore, as set forth in Plaintiff's Motion to Defer or Deny without Prejudice Defendants' Motion to Exclude the Testimony of L. Samuel Andrews Until the Close of Expert Discovery, filed herewith, Julie Davis' opinions have not been disclosed in a proper expert report and she has not been subject to a deposition regarding her expert opinions and their basis. As set forth above, there are ample grounds to challenge the validity of those opinions, which will be greatly bolstered if Davis is actually subject to deposition regarding those opinions. Her opinion testimony may also be subject to rebuttal expert opinions as anticipated by the Court's Case Management Order. Plaintiff should not be required to litigate these issues absent her being properly disclosed as an expert and Plaintiffs given an opportunity to depose her in accordance with Rule 26(a)(2).

## B. MR. ANDREWS SUFFICIENTLY DOCUMENTED THE BASIS FOR HIS OPINIONS AND DEFENDANTS' COMPLAINTS GO TO WEIGHT, NOT ADMISSIBILITY.

This claim that Mr. Andrews did not sufficiently document his analysis goes to the weight the jury may choose to give his testimony, not the admissibility of his testimony, when he is clearly qualified and has employed reliable methods, based on sufficient facts or data.

Mr. Andrews is not required to document every measurement he took during his inspections of the scene of the shooting in order for his testimony and findings to be admissible.

Plaintiffs have produced photographs of Mr. Andrews using the caliper at the scene. Defs. Ex. D. p. 174. Mr. Andrews testified that videos and photographs were taken the day after the shooting, when he conducted his first inspection at the residence and those photos and video have been provided to Defendants. Defs. Ex. D. p. 163, 202. For example, there are photographs showing the ballistics damage to the floor in the dining room, which was created by a .22 caliber weapon. See Def. Ex. E. p. 350. Furthermore, Mr. Andrews' methods and the information he relied on have been fully explained to Defendants and his measurements at the scene could easily have been replicated by Defendants, as explained in Section II(C) below.

## C. MR. ANDREWS' AFFIDAVIT IN OPPOSITION TO SUMMARY JUDGMENT SHOULD NOT BE STRICKEN.

To the extent that Defendants suggest that Mr. Andrews failed to review sufficient evidence prior to offering his Affidavit in opposition to Defendants' Motion for Summary Judgment, this is simply incorrect. In fact, Mr. Andrews at that time had reviewed the physical evidence at the scene, together with almost all of the discovery he reviewed in preparation of his report with the exception of the inspection of physical evidence on June 23, 2020. See Defs. Ex. C, pp. 1-5.

There is no requirement that an affidavit submitted in support of **Plaintiff's Opposition to Defendant's Motion for Summary Judgment** must include a complete list of everything reviewed, but instead was intended to guide the court in demonstrating that disputes of material fact exist in the case and to alert the Court to Mr. Andrews' opinions. Mr. Andrews complied with all requirements of Rule 26 in listing all of the evidence he relied on in drawing his conclusions in his report. Defendants ask the Court to simply ignore Mr. Andrews' report, which has fundamentally the same opinions as his affidavit.

Defendants complain that Mr. Andrews relied on photographs instead of direct inspection of physical evidence for his initial opinions in his Affidavit, however they fail to show how this is relevant to his opinions. For example, photographs of oxidized cartridge casings taken near the time they were purportedly "fired" are obviously superior to reviewing the shells at a later time as they reflect the condition of the shells at the relevant time.

Defendants' attempt to distinguish between the opinions offered in Mr. Andrews' Affidavit and in his report and deposition has no weight whatsoever because in their argument on this point Defendants do not point to any relevant *differences* between the opinions offered in his affidavit versus his report or deposition. Mr. Andrews' review of additional evidence after the submission of his affidavit has not negated any of those opinions in any way. To the contrary, those opinions have been reinforced, as explained in Mr. Andrews' report and deposition testimony. Therefore Defendants' attack on his affidavit is nothing more than a distraction.

## III.    MR. ANDREWS HAS SUFFICIENTLY EXPLAINED HIS METHODS, WHICH ARE EASILY REPLICABLE AND RELIABLE.

Mr. Andrews is a ballistics expert, who went to the scene to look at the ballistics damage. He developed expert opinions about what happened during the raid on 5414 S. Kingshighway. Defendants contend that Mr. Andrews' ballistics testimony is not based on replicable or sufficient scientific methods under the *Daubert* analysis. However, the factors are "non-exclusive" and not every factor must be considered in every case because, "[o]f course, the *Daubert* reliability factors should only be relied upon to the extent that they are relevant and the district court must customize its inquiry to fit the facts of each particular case." *Id.,* quoting *Jarequi v. Carter Mfg. Co.,* 173 F.3d 1076, 1083 (8th Cir.1999). "The factors are only guiding factors and an expert must not meet every single element in order to be allowed to testify." *Howerton v. Blitz USA, Inc*., 2007 WL

4615946 (W.D.Mo. December 28, 2007) (expert's failure to identify error rate did not render opinion so unreliable as to be excluded). The *Daubert* inquiry is a "flexible, case-specific inquiry" in which "The trial court ha[s] to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *American Auto. Ins. Co. v. Omega Flex, Inc*., 783 F.3d 720, 722 (8th Cir. (Mo.) 2015).

Here, Mr. Andrews, relying on his extensive 35 years of experience in ballistics, described his methods for measuring the bullet holes with a caliper to determine the diameter of the hole.

"You place a caliper or an inside micrometer, what's called an inside mike that has radius pins on it, you place it in the hole, you expand the micrometer in the hole, and you move the micrometer back and forth as you put a very slight tension on the tool so that it naturally seeks the largest diameter of the hole and then you check to make sure that the tool is square to the -- to the entry of the hole. And when you have all of those things in alignment, then you can get a very, very good measurement on the inside diameter of the hole." Defs. Ex. D, pp 224-225. He further described the process of using a caliper when discussing how he trained SWAT teams in the use of the device, including how to zero the instrument properly, and make sure not to influence the area you are measuring with body heat creating thermal expansion. Defs. Ex. D. pp. 108 – 109.

He also described how he used a laser pointer to determine the trajectory of the bullets that went clear through the walls in the home by pointing it through corresponding entrance and exit holes. Defs. Ex. E, p. 305. Despite Defendants attempts to complicate his explanation, the method of pointing the laser through a bullet hole to determine the trajectory is relatively simple. He further explained in his deposition that there was no need to make complicated trajectory equations in this case because the distances in the house were short enough that any bullet drop would have been almost unmeasurable. Defs. Ex. E, p. 306. Trajectory analysis is not as crucial in close range

shootings, because bullets are very "straight-line" inside of 30 yards. Defs. Ex. D. p. 112. Mr. Andrews also explained that shooters cannot occupy the same space at the same time, and therefore concise "groupings" of holes from one shooter were readily identifiable. Defs. Ex. D., p. 244.

Mr. Andrews also identified ballistics damage to the floor in the dining room at a 30 degree down angle. Defs. Ex. D, p. 139. He used a parallel, a form of a straight edge, to measure the angle of the .223 damage to the dining room floor, which is a tool commonly used by crime scene investigators Def. Ex. E, pp. 343-344.

Defendants assert that "Andrews methodology is incapable of replication or being tested." However this assertion is baseless. As can be seen, Defendant City's ETU could have easily employed these same methods with these tools if they wished to test Mr. Andrews' findings. That Defendants have requested the opportunity to inspect the premises and be able to replicate Mr. Andrews methodology and his principles, but have failed to do so in spite of Plaintiff's request for dates for Defendant's expert to inspect the premises. Obviously Defendants recognize how reliable Mr. Andrews methods and measurements are.

Defendants' arguments, such as on a lack of "testing," focus on irrelevant factors of the *Daubert* test. Opinion evidence based on a well-qualified expert's observations of a scene are entirely appropriate. *See Hickerson v. Pride Mobility Prods. Corp.,* 470 F.3d 1252, 1257 (8th Cir.2006) (holding that a fire causation expert's opinion was admissible where the methodology involved no testing but the application of specialized knowledge to observations of a fire scene).

Moreover, Defendants themselves rely on the Affidavit of Julie Davis, as discussed above. Her opinion is entirely predicated on a subjective comparison of physical evidence regarding shell casings. Therefore Defendants' complaints regarding Mr. Andrews' methods are disingenuous at best. *See Shuck v. CNH America, LLC*, 498 F.3d 868, 874 (8th Ci. (Neb.) 2007) ("When a litigant

clearly believes a certain methodology is acceptable as shown by his or her own expert's reliance on that methodology, it is disingenuous to challenge an opponent's use of that methodology.")

IV. **ANDREWS' OPINIONS REGARDING THE BROCCARD VIDEO, INCLUDING THAT THE OFFICERS DID NOT PROPERLY ANNOUNCE THEMSELVES PRIOR TO BREACHING THE DOOR, IS BASED ON HIS EXPERIENCE, EXPERTISE, AND EXTENSIVE EXAMINATION OF THAT VIDEO AND SHOULD NOT BE EXCLUDED.**

Defendants contend that Mr. Andrews' testimony regarding the failure of the police to properly announce themselves, based on a video recording of the incident, should be excluded because Mr. Andrews purportedly did "not employ any technique or utilize any specialized skill that is unavailable to the jury," relying on *Lee v. Andersen*, 616 F.3d 803, 809 (8th Cir. 2010)

However, this is untrue and *Lee* is distinguishable. The video expert in *Lee* admitted, as to the stricken opinion, that he was relying entirely on his own observation as opposed to any specialized knowledge. He had performed technical work in enhancing the video, but did not have specialized knowledge regarding what could be seen in the video and therefore was in no better position than a juror to interpret it. *See Id*.

In fact, Mr. Andrews in his analysis of the Broccard video used a studio monitor specifically designed to analyze sound accurately. Defs. Ex. E, p. 320.  In addition, he used different headphones and enhanced the recording, by slowing it down and raising the volume. Andrews can also bring special knowledge to this issue that will aid the jury because he has testified that when an officer yells police search warrant it is established that this should be at five times normal volume. Def. Exhibit B at 4.

Furthermore, with regard to the lack of any gunshots from the Sporter rifle, Mr. Andrews' training programs on tactical weapons teach police officers and firearms operators how to recognize various weapon systems by their sound signature. Defs. Ex. E, p. 347. Mr. Depending on the type of round and the type of caliber, you get dramatically different sound signatures that are easily recognizable. Defs. Ex. E, p. 354. While the sound signature of a weapon may be affected by the source or the size of the cartridge used, it will only affect the signature slightly, and the caliber of the weapon is still identifiable. Defs. Ex. E, p. 355. Mr. Andrews is amply qualified by experience and knowledge to testify on these issues.

## V. ANDREWS' TESTIMONY REGARDING DEFENDANTS' CALL OF A "COMPROMISE" IS NOT AN IMPERMISSIBLE COMMENT ON THE CREDIBILITY OF DEFENDANTS.

Mr. Andrews has testified that the officers' decision to call a "compromise" of the execution of a search warrant in this case, purportedly based on them seeing a surveillance camera which had been in plain view on the front of the house for several years, was used by the officers to justify the use of a battering ram and flash bang. Defendants contend that this is an improper comment on the credibility of the officers. By using this argument, any expert witness' conclusions can be interpreted as an improper "comment" on the credibility of a witness if they are at odds with the opposing party's version of events.

Moreover, as an expert in police and SWAT procedures Andrews' conclusion that the call of the "compromise" was a tactic to create the likelihood that deadly force could be used is further supported by the recent deposition testimony of Detective Lacy, who applied for the search warrant, and who admitted that no-knock search warrants are rarely granted by the courts because deadly force is more likely to result during the execution of no knock search warrants than in knock

and announce search warrants. Clearly there is adequate foundation for Mr. Andrews to express this opinion.

## VI. SAMUEL ANDREWS' REPORT COMPLIES WITH RULE 26(a)(2)(B).

An expert report need not "replicate every word that the expert might say on the stand," but it should "convey the substance of the expert's opinion" so that "'opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses.'" *Wessels v. Biomet Orthopedics, LLC*, 2020 WL 3421478, at *3 (N.D.Iowa 2020) (noting that, while expert "could have elaborated further on the bases for his opinion" exclusion of opinions was not warranted where deposition transcript reflected that opposing counsel had a good enough understanding of [the] opinions to effectively cross-examine him about them.") [Int. cit. omit.] "Rule 26 contemplates that the report will provide notice to opposing counsel of the expert's opinions, but "that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Wessels v. Biomet Orthopedics, LLC*, 2020 WL 3421478, at *3 (N.D.Iowa 2020) quoting *Thompson v. Doane Pet Care Co*., 470 F.3d 1201, 1203 (6th Cir. 2006).

Defendants claim that Mr. Andrews' report fails to comply with Rule 26(a)(2)(B) because he expressed what Defendants characterize as four "opinions" during his deposition that were not included in his report, and therefore his entire report and affidavit must be stricken.

1. "Andrews testified he believed police had wiped up blood at the scene"

2. Andrews "claimed evidence had been removed from the house"

3. "Andrews … testified that he observed bullet holes in the bedroom window closest to the front of the house on the south side that had not been documented by City evidence technicians"

4. "Andrews testified that the evidence technician 'missed bullet casings at three different locations in and around the house, including a casing he claims he found near in the kitchen area." *See Memorandum in Support, p. 29.*

As the Court can see these are not opinions, as Defendants characterize them, but additional facts discussed during counsel's cross-examination of Mr. Andrews. As explained below each of these statements is simply a further discussion of evidence relied on by Mr. Andrews given under defense counsel's cross-examination and additional disclosure during his deposition as allowed by the Federal Rules of Civil Procedure.

Regarding the first two issues, Mr. Andrews testified about believing that some blood may have been wiped up from the scene based upon his comparison of the photographs taken by the department's ETU officer to photos taken after the premises were turned back over to the homeowner. He believed the ETU officer or medical examiner testified to the same effect in their deposition. Defs. Ex. D, p. 182. In addition, Mr. Andrews simply testified that he observed a video taken of the premises that showed a uniformed police officer taking the box that the Sporter Rifle came from up the alley and putting it under other items already in the dumpster. This video has been seen by numerous other individuals who were at 5414 S. Kingshighway following the shooting.

Defendants further argue that Mr. Andrews' entire Affidavit and Report should be stricken because he referenced two additional observations that were not noted in his report, i.e. ballistics damage to the bedroom window closest to the front of the house on the south side that had not been documented by City ETU and some additional bullet casings he noted. Again, these are not new opinions, but simply two additional observations he disclosed under cross-examination in further support of his previously-disclosed opinions. It appears Mr. Andrews was simply mistaken,

as photographs provided by Plaintiffs to the city do in fact show the ballistics damage to the window he referred to.

Even if the two statements about evidence the ETU officer missed were considered to be "opinions" not disclosed in the report, it would not be prejudicial to Defendants. The court may permit untimely disclosure of expert testimony where "the failure was substantially justified or is harmless." *See Sancom, Inc. v. Qwest Communications Corp.*, 683 F.Supp.2d 1043, 1063 (D.S.D. 2010), citing. Fed.R.Civ.P. 37(c)(1). The court should consider four factors in determining whether exclusion is the proper sanction for untimely expert testimony: (1) the importance of the excluded expert testimony; (2) the party's explanation for failure to disclose; (3) the potential prejudice created by permitting use of the expert testimony at trial or on a pending motion; and (4) the ability to cure any prejudice by granting a continuance. *See Transclean Corp. v. Bridgewood Servs., Inc.*, 101 F.Supp.2d 788, 795 (D.Minn. 2000); *see also Citizens Bank of Batesville, Ark. v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir.1994). The trial court has great discretion in determining whether to strike expert testimony that is disclosed in contravention of the court's scheduling orders. *See Sylla–Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 285 (8th Cir.1995).

At best, Defendant's motion to strike the report merely sets forth evidentiary issues that should be taken up in a Motion in Limine, particularly in light of the fact that Defendants have not pointed out any prejudice or other substantive grounds to exclude Mr. Andrews affidavit, report and opinions on the basis of these purported late disclosures. Mr. Andrews' affidavit and opinions should not be excluded from this action on the basis of a few additional observations which were extensively discussed at his depositions and which are substantially harmless, given that Mr. Andrews has been deposed twice and Defendants have now been granted leave to take a third

deposition of Mr. Andrews. Based upon these facts, there can be no grounds to exclude Mr. Andrews' affidavit, report and opinions.

## V.     CONCLUSION.

Expert testimony must only be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1055 (8th Cir.). The court resolves doubts about the usefulness of expert testimony in favor of admissibility. *United States v. Finch,* 630 F.3d 1057, 1062 (8th Cir.2011). Expert testimony should be admitted if it "advances the trier of fact's understanding **to any degree**." *Robinson v. GEICO Gen. Ins. Co.,* 447 F.3d 1096, 1100 (8th Cir. 2006). Mr. Andrews' opinions, based on his impressive experience, will aid the jury in every aspect of its considerations of the ballistics evidence left behind at 5414 S. Kingshighway, confiscated by the police department and memorialized in photographs and videos.

Defendants' complaints are proper for cross-examination, but do not invalidate the conclusions that Mr. Andrews has drawn from his personal examination of the scene and other evidence in this case. Defendants' Motion to Exclude his affidavit, report and opinions should therefore be denied.

WHEREFORE Plaintiffs respectfully request that the Court enter its Order denying Defendants Motion to Exclude Testimony of L. Samuel Andrews.

Respectfully submitted,

DOWD & DOWD, P.C.

By:     /s/ *Richard K. Dowd*
        Richard K. Dowd (33383)
        Alex R. Lumaghi (56569)
        Rachel K. Dowd (69574)
        211 N. Broadway, Suite 4050
        St. Louis, MO 63102

(314) 621-2500
(314) 621-2503 Facsimile
rdowd@dowdlaw.net
alex@dowdlaw.net
racheldowd@dowdlaw.net

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system on all counsel of record this 13th day of October, 2020.

Andrew D. Wheaton
Erin K. McGowan
Brandon Laird
Associate City Counselor
Julian Bush City Counselor
City Hall, Room 314
St. Louis, MO 63103
wheatona@stlouis-mo.gov
mcgowane@stlouis-mo.gov
lairdb@stlouis-mo.gov
*Attorneys for Defendants*

*/s/ Richard K. Dowd*